# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

RUMBLE, INC.,

     Plaintiffs,

v.

NANDINI JAMMI, CLAIRE ATKIN,
AND JOHN DOE NOS. 1-10,

     Defendants.

_____

Case No. 8:23-CV-02718-CEH

**MOTION TO DISMISS
FOR FAILURE TO
STATE A CLAIM**

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants Nandini Jammi and Claire Atkin ("Defendants") move to dismiss the Amended Complaint of Plaintiff Rumble, Inc. ("Rumble") (Dkt. 42, "Am.Compl.") for failure to state a claim.

## PRELIMINARY STATEMENT

This meritless defamation lawsuit seeks to thwart Defendants' mission to bring transparency to complex advertising markets and protect the rights of advertisers to know where their ads appear online. Defendants and their non-profit advertising watchdog organization, Check My Ads, track the billions of dollars that advertisers pay companies like Google to place their advertisements online. And they reveal instances where those advertisers end up paying Google to place ads on third-party platforms featuring objectionable content – despite their expectation that Google will maintain strict content standards. Rumble is an anything-goes video streaming website that Check My Ads has covered extensively because it hosts ads via Google while promoting individuals mainstream advertisers deem "brand unsafe," including Alex Jones, Andrew Tate and Steve Bannon.

Rumble makes no secret of its desire to bring an end to this oversight by destroying Check My Ads. Rumble's CEO described this lawsuit as "thermonuclear" and he linked it to similar "thermonuclear" lawsuits that X (f/k/a Twitter) and other loosely moderated social media platforms have filed against their critics. *See* Dkt , 36-1; Am.Compl. ¶¶ 44-46, 60, 68. Rumble's most prominent content producer and one of its biggest shareholders has even stooped to calling Defendants "child predators" on social media in an outrageous effort to undermine their work. Declaration of John M. Browning dated May 10, 2024 ("Browning Decl."), Ex. B.

Rumble has now sued Defendants for reporting that it depended financially on advertising revenue it received from Google. The first flaw in this claim is that there is nothing defamatory about reporting that Rumble relied heavily on income from the world's most popular online ad broker – particularly since Rumble admits that it was 86% funded by Google Ads until late-2021 and still accepts money from that source. (POINT I.A, *infra*.) Even assuming Defendants' statements could be read to carry some defamatory meaning, they are not defamatory *per se* and Rumble has failed to establish special damages. (POINT I.B, *infra*.) Rumble has additionally failed to plead the necessary element of actual malice because the supposedly exculpatory SEC filing Defendants were referred to as proof of Rumble's financial independence actually confirmed that it received a "material portion" of its income from Google. (POINT I.C, *infra*.) Finally, the defamation by implication claim should be dismissed for all these reasons plus Rumble's failure to plead the literally true facts required to serve as the basis for such a claim. (POINT II, *infra*.)

## FACTUAL BACKGROUND

### A.    The Parties

Rumble is a "proudly content-neutral video platform" that monetizes videos made by individuals who are no longer permitted to post their content on mainstream social media platforms like YouTube – including conspiracy theorist Alex Jones, white nationalist Nick Fuentes, accused sex-trafficker Andrew Tate and political operative Steve Bannon.  Am.Compl. ¶4; Browning Decl. Ex. C, 3.[1]  Rumble's leading content producer and one of its biggest shareholders is Dan Bongino, who *The New York Times* identified as a "superspreader of election misinformation" and was expelled from YouTube "for spreading [COVID] misinformation."  Browning Decl. Ex. D, 2.

Jammi and Atkin are the founders of Check My Ads, "a non-profit digital advertising watchdog" that monitors the billion-dollar markets where advertisers pay ad brokers like Google to place their ads on suitable third-party websites.  Am.Compl. ¶47.  Through its reporting and advocacy, Check My Ads enables advertisers to follow their money and see who is ultimately profiting from hosting their content – which is often unclear due to the complexity and opacity of ad exchanges.  Browning Decl. Ex. E.  Armed with this knowledge, advertisers can pull their funds from platforms they

---

[1] The Court may consider the articles Rumble references and hyperlinks to in the Amended Complaint, which are attached for convenience as Exhibits to the Browning Declaration.  Courts may consider such documents "without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." *Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1316 (M.D. Fla. 2017). The document need not be physically attached to a pleading to be incorporated by reference into it; instead, if the document's contents are alleged in a complaint and no party questions those contents, the court can consider that document. *Id.*  All of those conditions are met here.

do not wish to support and ensure that their speech is not used to endorse or monetize messages they may find abhorrent. *Id*.

**B. Check My Ads' Coverage of Rumble**

Beginning in August 2023, Check My Ads published articles and social media posts about Google's placement of third-party ads on Rumble. Am.Compl. ¶84. Google tells advertisers it only places ads on "a highly vetted network of websites … that pass stringent brand safety standards." Browning Decl. Ex. F, 2. But Check My Ads revealed that Rumble receives ads and payments under the default terms of multiple Google programs. *Id*. at 3. This means that advertisers who place ads through Google, and trust its brand safety guarantees, inadvertently fund "a business that works to monetize content that was banned [from Google's YouTube platform and] elsewhere … for hate, transphobia, and antisemitism." Browning Decl. Ex. C, 1.

Rumble touts its "independence from Big Tech." Am.Compl. ¶65. But, as part of its watchdog activities, Check My Ads has informed advertisers and the general public about Rumble's lucrative partnership with Google. Browning Decl. Exs. C, D, F. This reporting is consistent with multiple SEC forms filed by Rumble (incorporated by reference, Am.Compl. ¶15) affirming that it derived a "significant" or "material portion of its revenue from" Google, "the loss of which could materially harm its results of operations." Browning Decl. Exs. G, H, I. In late 2021, "86% of Rumble's total revenue … was derived from Google Ads." Am.Compl. ¶15. In the first quarter of 2022, "Rumble derived 56% of its total revenue from Google Ads and one other external advertising network." *Id*. By the third quarter of 2022, Rumble reported that

Google Ads still "represented 19% of Rumble's overall revenue." *Id.*[2] Since filing these SEC filings acknowledging its "material" reliance on Google Ads revenue, Rumble claims to have developed its own advertising marketplace and reduced its reliance on Google to 1% of its total income in October 2023 – although Rumble still participates in and earns money from Google Ads programs. Am.Compl. ¶16.[3]

Defendants believe that advertisers who trust Google's brand safety guarantees have a right to know whenever brand-unsafe websites like Rumble "might be getting a chunk of [their] campaign dollars." Browning Decl. Ex. C, 1. To that end, Check My Ads provides advertisers with the information they need "block Rumble from [their] ad campaigns" if they so wish. *Id.* Ex. F. By giving advertisers the ability to make informed choices about who hosts and profits from their ads, Check My Ads advances its mission of making advertising markets transparent. *Id.* Ex. E.

### C. The Amended Complaint

On November 29, 2023, Rumble filed this lawsuit against Defendants alleging defamation and defamation by implication.[4] Rumble concedes that Defendants "are free to disagree with Rumble's policy of content neutrality and the views expressed on the platform by third-party content creators." Am.Compl. ¶19. The Amended Complaint also does not dispute Defendants' characterization of Rumble's platform

---

[2] Rumble alleges that "ad revenue derived solely from Google AdSense in Q3 2022 was only 9%," but this contradicts the SEC filing's clear statement that "approximately 19% … of Rumble's total revenue derived from … Google AdSense." Browning Decl. Ex. I, 65.

[3] Defendants assume the truth of this allegation, like the other allegations in the Amended Complaint, for the sole purpose of this motion to dismiss only.

[4] Defendants filed a motion to dismiss the original Complaint on and, rather than oppose that motion, Rumble amended its pleadings on April 26, 2024.

as "toxic" or that "[o]nce advertisers discover the content Rumble hosts, they don't like what they see." Browning Decl. Ex. C, 3.

Instead, Rumble sued Defendants over the following five statements published between August 16 and October 24, 2023:

1. Rumble is all posturing, all the time. They're not a Google Ads killer or even close to it – they depend on Google for their business. We're talking a house of cards.

2. @rumblevideo is largely monetized through Google Video Partners (GVP), a network of sites that Google forcibly opts YouTube advertisers into.

3. Rumble, the most toxic place on the internet, is 90% funded by @GoogleAds. But the advertisers using Google didn't know! Until now.

4. Without @GoogleAds, Rumble would not be viable.… It's criminal behavior by Google, which has promised brand safety to its clients.

5. Rumble is heavily monetized by Google Ads. Rumble loves to boast about being free from Big Tech. In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner – and advertisers often have no idea their ads are appearing here. Rumble is part of Google Video Partners, which means Google dumps inventory there that many advertisers assume is going to YouTube. And it seems to know brands wouldn't appreciate appearing next to some of Rumble's content: it has taken steps to minimize the risk of advertisers waking up to screenshots of their ads next to Alex Jones' face. Its' two-tier system for ads monetizes the worst videos through Rumble Ads, its in-house platform, while featuring Google Ads on mainstream channels, such as Reuters.

Am.Compl. ¶84 (collectively, the "Statements").[5]  According to Rumble, these Statements "convey … that Rumble's business is largely dependent on Big Tech (*i.e.*, Google Ads)." *Id*. at ¶86. Rumble further alleges that this false because, by the time Defendants published the Statements, Google contributed a "miniscule" share of its

---

[5] The first four Statements appeared in Defendants' social media posts and the fifth is the final paragraph of a longer article that appeared on Check My Ads' website. For the convenience of the Court, copies of the Statements, in their full context, are attached as Exhibits B, C, J, K and L to the accompanying Browning Declaration.

total income. *Id.* at ¶¶61, 87. Rumble also claims that Defendants published the Statements with actual malice because they were aware of SEC filings reporting "that Rumble received less than 20% of its ad revenue from Google." *Id.* at ¶87.

The Court should dismiss Rumble's meritless claims for the following reasons.

## ARGUMENT

## I. THE AMENDED COMPLAINT FAILS TO STATE A DEFAMATION CLAIM

To survive a Rule 12(b)(6) motion to dismiss, the Amended Complaint must allege sufficient facts to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citations omitted). Courts favor early dismissal of defamation claims because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

In order to state a claim for defamation, Rumble must allege and prove the following elements: "(1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official [or figure], or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254,

1262 (11th Cir. 2018) (citing *Jews for Jesus, Inc v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).[6] Rumble fails to plead multiple necessary elements of its defamation claim.

## A. The Statements Are Not Defamatory

Rumble's defamation claim fails, and should be dismissed with prejudice, for the simple reason that it is not defamatory to report that an online "business is largely dependent on Big Tech (*i.e.*, Google Ads)." Am.Compl. ¶86.

"Words are defamatory when they charge a person with an infamous crime or tend to subject one to hatred, distrust, ridicule, contempt or disgrace, or tend to injure one in one's business or profession." *Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305, 1306 (11th Cir. 2001) (citing *Adams v. News-Journal Corp.*, 84 So. 549, 551 (Fla. 1955)). "To injure one in his trade or profession, the statement must … strike at 'professional competence and fitness to engage in a given profession.'" *San Juan Prods. V. River Pools & Spas, Inc.*, 2023 U.S. Dist. LEXIS 25030, at *23 (M.D. Fla. Feb. 14, 2023) (quoting *Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1346 (M.D. Fla. 2003)). Courts have thus found statements accusing companies of unethical, incompetent or fraudulent conduct to be defamatory.[7] It is not defamatory, by contrast, to accuse a

---

[6] While Maryland law would apply to this action in the event of a true conflict of laws, no choice of law analysis is necessary because the laws of Florida and Maryland are substantively identical on each relevant point. *See Gubarev v. BuzzFeed, Inc.*, 2018 U.S. Dist. LEXIS 97246, at *8 (S.D. Fla. June 5, 2018) (noting that choice-of-law analysis required only when "there is a true conflict").

[7] *See, e.g., id.* at *17-18 (noting that it might be defamatory to accuse company of "provid[ing] inaccurate price estimates"); *Techtronic Indus. Co. Ltd. v. Bonilla*, 2023 U.S. Dist. LEXIS 219646, at *20 (M.D. Fla. Dec. 11, 2023) (holding that it was defamatory to accuse a business of "massively persistently manipulated accounting"); *Shapiro v. Massengill*, 105 Md. App. 743, 775 (1995) (finding that it was defamatory to call a lawyer "evasive, secretive, dishonest, dishonorable, and perhaps even a criminal" because it "would disqualify him or render him less fit properly to fulfill the duties incident" to the practice of law); *Leavitt*, 291 F. Supp. 2d at 1345–46 (holding it was defamatory to

company of engaging in activities that are "inherent" in the nature of business and do "not necessarily impute wrongdoing." *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1318 (S.D. Fla. 2020) (dismissing Dan Bongino's libel suit because reporting "that a person was 'fired' from his employment, without more, is not defamatory").

Whether the Statements are "susceptible to defamatory interpretation" is a "question[] of law for the Court." *Turner*, 879 F. 3d at 1263-64 (citing *Keller v. Miami Herald Pub'g Co.*, 778 F.2d 711, 715 (11th Cir. 1985)).[8] "This inquiry turns on the 'gist' of the alleged defamatory statement and the context in which that statement was made." *Bongino*, 477 F. Supp. 3d at 1317 (citing *Jews for Jesus*, 997 So. 2d at 1107-08 & n.12). If a statement "is reasonably susceptible of two meanings, one of which is defamatory, one of which is not, it is for the trier of facts to determine the meaning understood by the average reader." *Rubin,* 271 F.3d at 1306. But "[w]here the court finds that 'a communication could not possibly have had a defamatory or harmful effect, the court is justified in dismissing the complaint for failure to state a [claim].'" *Id.* (quoting *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983)).[9]

There is nothing defamatory about the Statements at issue here, which (at worst) suggest that Rumble faces a "material financial risk" because it is "'largely' or 'heavily'

---

state that a doctor's work quality was poor and his procedures required subsequent corrective work impugned the doctor's professional competence and fitness as a surgeon).

[8] *See also Chesapeake Pub. Corp. v. Williams*, 339 Md. 285, 295 (1995) ("[D]etermining the defamatory quality of a publication…is a question of law for the court").

[9] Courts routinely dismiss libel claims at the pleading stage with prejudice because they are based on non-defamatory statements. *See, e.g., Parekh v. CBS Corp.*, 820 F. App'x 827, 835 (11th Cir. 2020) (affirming dismissal with prejudice where the charged statement was not reasonably capable of defamatory meaning); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993); *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 703 (D. Md. 2000).

monetized by Google." Am.Compl. ¶¶86-87. But advertising is the lifeblood of the online economy and countless website operators depend on Google, the world's largest ad-broker, to provide essential income from advertisers. Saying that Rumble is "heavily monetized by Google Ads" (*id.* ¶76) is not defamatory because it simply conveys that the company benefits from an entirely legal and ubiquitous revenue stream. In an effort to manufacture a defamatory meaning where none exists, Rumble suggests that the Statements are capable of three defamatory interpretations. But none of these interpretations are actionable as a matter of law.

### 1. "Rumble's Business Is Largely Dependent on Big Tech"

Rumble cannot establish a valid defamation claim based on its theory that "any statement that Rumble is largely dependent on Big Tech platforms like Google Ads … damages its brand, particularly with content creators and users who seek out neutral social media platforms." Am.Compl. ¶88. The first problem with this argument is that the standard for defamatory meaning is not whether the Statements are consistent with Rumble's anti-Big-Tech brand. The standard is instead whether the Statements accuse Rumble of committing an infamous crime, expose it to "hatred" or "injure [it] in [its] trade or profession" by "strik[ing] at [its] 'professional competence and fitness to engage'" in its business. *San Juan Prods.*, 2023 U.S. Dist. LEXIS 25030, at *23 ( quoting *Leavitt*, 291 F. Supp. 2d at 1346). Defendants did not cross that line by reporting that Rumble relied on money from Google Ads. And the Statements are not rendered defamatory simply because Rumble and some of its supporters have strong ideological objections to Google. *See, e.g.*, *Tillett v. BJ's Wholesale Club, Inc.*, 2010 U.S.

Dist. LEXIS 79443, at *19 (M.D. Fla. July 30, 2010) (holding that it was not defamatory to report that the plaintiff displayed a Confederate flag even though some readers would perceive this reporting to mean that the plaintiff was racist).

It is also implausible for Rumble to claim that reliance on Google "is incompatible with the proper exercise of [its] business, trade, mission and brand" while simultaneously alleging that its business was, until recently, almost entirely dependent on Google Ads. Am.Compl. ¶65. In the fall of 2021, almost a decade after the company was founded, "86% of Rumble's total revenue … was derived from Google Ads." *Id.* at ¶15. Less than a year before filing this action, Rumble represented to the SEC that "a material portion of [its] revenue" – approximately 19% – still came from Google. Browning Decl. Ex. I, 65. And, while Rumble claims that it now derives only a "minuscule" proportion of its revenue from Google, it is still a Google partner that accepts Google money. Am.Compl. ¶61. Since Rumble admits that depended upon Google until recently and continues to profit from that partnership, it is implausible to allege that Defendants harmed its reputation by making that very point.

## 2. "Heavy Reliance on Google Ads Exposes Rumble to a Material Financial Risk"

It is also not defamatory to report that Rumble faces "a material financial risk" due to its reliance on a particular commercial partner. Am.Compl. ¶86. All businesses face such risks, which are an inherent part of free market economics, and it is not defamatory to report that a company depends on sources of revenue that might be interrupted by forces outside that company's control. Indeed, until recently, Rumble

reported in its own SEC filings that it derived a "significant" or "material portion of its revenue from" Google, "the loss of which could materially harm its results of operations." Browning Decl. Exs. G, H, I.[10]

Nor do the Statements suggest that Rumble engaged in "conduct incompatible with the proper execution of lawful business." Am.Compl. ¶90. The Statements do not state or even suggest that Rumble acted improperly by partnering with Google and accepting its money. To the contrary, when viewed in context, the Statements criticize the business practices of Google (not Rumble) for "promis[ing] brand safety to its clients" while funneling advertising revenue to toxic platforms – which Defendant Jammi colorfully described as "criminal behavior." Am.Compl. ¶84(d).[11]

Rumble also cannot shoehorn the Statements into caselaw finding defamatory meaning where defendants have accused companies of being on the verge of collapse due to their own malfeasance. It could be defamatory, for instance, to falsely report that a company "had ongoing relationships with organized crime, were themselves involved in racketeering activities and were on the verge of financial collapse." *N.J. Steel Corp. v. Lutin*, 297 A.D.2d 557, 557-58 (N.Y. App. Div. 2002). It might also be defamatory to state that a company is "delinquent" on paying its bills or is not creditworthy. *Diplomat Inc. v. Westinghouse Elec. Supply Co.*, 378 F.2d 377, 381 (5th Cir.

---

[10] In addition to being non-defamatory, the Statement that Rumble is "a house of cards" (Am.Compl. ¶84(a)) is not actionable because it is rhetorical hyperbole protected by the First Amendment. *See, e.g.*, *Murray*, 2020 U.S. Dist. LEXIS 213494, at *4.

[11] Rumble does not challenge the Statements' criticism of the "toxic" content it fosters on its platform and, having ceded that point, Rumble cannot establish defamatory meaning based on its alleged role in fostering objectionable material.

2002); Keeton on the Law of Torts § 112, at 791 (5th ed. 1984). But Defendants' Statements – which simply state that Rumble was, like countless other businesses, "heavily dependent" on Google Ads – do not carry the defamatory sting of express or implied malfeasance. Accordingly, the Statements are not actionable.

3.    **"Rumble Has Misled Investors and Other Stakeholders by Reporting False Information about Its Financial Health and Sources of Ad Revenue in Public Securities Filing"**

Finally, the Court should reject the implausible and unreasonable claims that the Statements accuse Rumble of "securities fraud." Am.Compl. ¶90. The law is clear that an allegedly defamatory publication cannot "be construed or taken in [its] mildest or most grievous sense." *Tillett*, 2010 U.S. Dist. LEXIS 79443, at *18-19 (quoting *Loeb v. Geronemus*, 66 So. 2d 241, 245 (Fla. 1953)). The Statements should instead "be considered in [their] natural sense without a forced or strained construction." *Id.* at *19.[12] It is equally well established that the Court may reject Rumble's strained interpretation at the pleading stage. *See, e.g.*, *Murray v. Pronto Installations, Inc.*, 2020 U.S. Dist. LEXIS 213494, at *11 (M.D. Fla. Nov. 16, 2020) (dismissing defamation claim because when statements were "read and understood by the 'common mind,' they do not charge [plaintiff] with … crimes"); *Mercola v. N.Y. Times Co.*, 2024 U.S. Dist. LEXIS 23808, at *10 (M.D. Fla. Feb. 12, 2024) (declining to adopt plaintiff's "unreasonable interpretation [that] invents [defamatory] innuendo").

---

[12] *See also Batson v. Shiflett*, 325 Md. 684, 724 n. 14 (Md. App. 1992) ("The test is whether the words, taken in their common and ordinary meaning, in the sense in which they are generally used, are capable of defamatory construction.").

Nothing in the Statements remotely suggests that Defendants committed securities fraud. There is no mention, for instance, of Rumble's SEC filings or even the fact that Rumble is a public company that must disclose material financial risks relating to its reliance on Google. Nor do the Statements accuse Rumble of fraud or lying to investors or committing any crime whatsoever. Given this reality, Rumble's implausible interpretation of the Statements is hopelessly strained and impermissible. And, by going to such extreme lengths to manufacture accusations of securities fraud, Rumble belies the lack of defamatory meaning based on any plausible interpretation.

**B.     The Statements Are Not Defamatory *Per Se* and Rumble Failed to Plead Special Damages**

Even assuming *arguendo* that the Statements are susceptible to a defamatory interpretation, Rumble's defamation claim still fails for lack of special damages. Defamation may be "established *per se* or *per quod*." *Anderson v. Smith*, 2020 U.S. Dist. LEXIS 256242, at *3 (M.D. Fla. Mar. 24, 2020). A *per se* defamation claim exists only where words "upon their face and without the aid of extrinsic proof were injurious." *Boyles v. Mid-Fla. Television Corp.*, 431 So. 2d 627, 633 (Fla. 5th DCA 1983), *approved*, 467 So. 2d 282 (Fla. 1985) (quotations and citation omitted). "In a *per se* action, consideration is only given to the four corners of the publication." *Daniels v. HSN, Inc.*, 2020 U.S. Dist. LEXIS 19219, at *9 (M.D. Fla. Feb. 3, 2020). "[L]looking outside the four corners of the [publication] … would run afoul the very nature of a *per se* action." *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1259-60 (S.D. Fla. 2021). Accordingly, a publication "rises to the level of libel per se if, *when considered alone and without*

*innuendo*, it (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." *Daniels,* 2020 U.S. Dist. LEXIS 19219, at *9 (quotations and citation omitted) (emphasis added).[13]

Defamation *per quod*, by contrast, requires the defamatory statement to "be put into context so as to demonstrate its defamatory meaning." *Anderson,* 2020 U.S. Dist. LEXIS 256242, at *7 (citation and quotation omitted). "In *per quod* actions, the words used, given their natural and common meaning, are not inherently injurious, but rather are injurious only as a consequence of extrinsic facts." *Flynn v. CNN, Inc.*, 2023 U.S. Dist. LEXIS 165234, at *12 (M.D. Fla. Mar. 17, 2023). Unlike defamation *per se*, *per quod* claims require the plaintiff to "adequately plead[] special damages." *Id.* at *16. "Special damages *are actual, out of pocket losses* which must be proven by specific evidence as to the time, cause and amount." *Id.* (citation omitted) (emphasis in original). "To survive a motion to dismiss, a Plaintiff must 'specifically state[]' the item of special damage claimed." *Id.* (quoting Fed. R. Civ. P. 9(g)).

### 1.   The Statements Are Not Defamatory *Per Se*

The Statements are not defamatory *per se* because they are not defamatory on their face and their allegedly defamatory meanings require extrinsic facts. Rumble first suggests that the Statements are "defamatory per se because they improperly call into question Rumble's financial soundness which tends to injure Rumble in its business."

---

[13] In this context, innuendo "means that facts extrinsic to those published must be known in order to inflict an injury." *IBP, Inc. v. Hady Enterprises, Inc.*, 267 F. Supp. 2d 1148, 1164 (N.D. Fla. 2002).

Am.Compl. ¶89.  But, in order to be defamatory *per se*, a "false statement must do more than merely harm the person or entity in its trade or business – the statements must impute fraud, want of integrity, or actual misconduct."  *San Juan Prods.*, 2023 U.S. Dist. LEXIS 25030, at *23.  *See also Clayton v. Fairnak*, 2018 U.S. Dist. LEXIS 207601, at *6-9 (D. Md. Dec. 10, 2018) (holding that not all "negative … references" in business context are defamatory *per se*).  As discussed above, the Statements' assertion that Rumble relied on revenue from Google Ads does not impute fraud, want of integrity, or actual misconduct.

This is also not a case where the Statements are defamatory *per se* because they accuse Rumble of "committing *specific crimes* punishable by law."  *San Juan*, 2023 U.S. Dist. LEXIS 25030, at *23 (emphasis added).  The Statements never mention securities fraud or any other "specific crime" and, therefore, cannot be defamatory *per se* on that basis.  Or, put another way, the Statements are not "so egregious and reputation shattering that there can be no question that the defamed party's reputation suffered as a result" – and, as such, the Statements are not defamatory *per se*.  *Flynn,* 2023 U.S. Dist. LEXIS 165234, at *15 (quotation omitted).

Rumble's allegedly defamatory readings of the Statements are also "replete with references to extrinsic evidence" – which independently precludes *per se* defamation. *Id.* at * 13.  Rumble alleges, for instance, that the Statements are defamatory because "they falsely [attribute] a material and existential financial risk to the company that Defendants' stated mission to eliminate Rumble's Google Ad revenue will cause Rumble's financial collapse."  Am.Compl. ¶9.  But this interpretation requires facts

from outside the four corners of the Statements, particularly the fact that Rumble's Google Ads revenue is unusually precarious due to the "toxic" content on its platform and the advocacy of groups like Check My Ads. *Id*. at ¶69. The Statements also fail to disclose that Rumble merged with a special purpose acquisition corporation (or "SPAC") to list on the NASDAQ stock exchange and such entities are known to be more volatile than normal publicly traded companies – and more at risk of collapse. *Id*. at ¶¶8, 41. Rumble's interpretation is also dependent on the extrinsic fact that "Rumble's users, shareholders, and investors share Rumble's commitment to independence from Big Tech" and might withdraw from the company if it continues to partner with Google. *Id*. at ¶65.

In a similar vein, extrinsic facts are necessary to understand why the Statements allegedly harm Rumble's brand. Rumble claims that its brand was built on a commitment to independence from Big Tech, but also admits that the company was almost entirely dependent on revenue from Google Ads until very recently. *Id*. at ¶¶15, 65. Rumble explains this apparent contradiction in the Amended Complaint – *i.e.*, it needed time and money to develop the proprietary advertising platform required to wean itself off of revenue from Google Ads. *Id*. at ¶¶4-7. But the Statements mention none of this. The fact that Rumble needs to explain so much about its brand and its historical partnership with Google precludes a finding of defamation *per se*.

Extrinsic facts are also necessary to understand Rumble's claim that the Statements contain hidden references to securities fraud, starting with the fact that Rumble is a publicly traded company that must disclose material reliance on Google

Ads revenue. *See Id*. at ¶¶41, 63, 66. In order to understand that Rumble was "lying to investors" about its reliance on Google, a reader would also need to be aware of at least one public statement from Rumble that it earns little to no money from Google Ads. *Id*. at ¶90. Finally, Rumble's interpretation of the Statements as "misle[ading] investors and other stakeholders about its financial health and sources of ad revenue in public securities filings" can only be understood by reference to those specific documents – including the "public securities filings" repeatedly referenced in the Amended Complaint. *Id*. at ¶52; *see also id*. at ¶¶15, 66, 87, 96.[14] Since the Statements do not refer to these critical extrinsic facts, they are not defamatory *per se*.

## 2.    Rumble Failed to Plead Special Damages

Since the Statements are not defamatory *per se*, Rumble must plead special damages. *Anderson,* 2020 U.S. Dist. LEXIS 256242, at *9-11; *Clayton*, 2018 U.S. Dist. LEXIS 207601, at *5. Rumble asserts three items of special damages (*see* Am.Compl. ¶91) but fails to identify an "actual … or realized loss" capable of supporting its claim. *Flynn*, 2023 U.S. Dist. LEXIS 165234, at * 18-19.

*First*, Rumble alleges that "major advertisers have dropped Rumble" and "putative advertisers have avoided purchasing ads through the Rumble Advertising Center." Am.Compl. ¶80. But "[a]llegations for special damages must be pled in more than 'a conclusory manner.'" *Flynn*, 2023 U.S. Dist. LEXIS 165234, at *18 (quoting

---

[14] One Statement refers to Rumble's claim to be a potential "Google Ads killer" (Am.Compl. ¶84(a)) and another refers to how "Rumble loves to boast about being free from Big Tech" (*Id.* at ¶84(e)), but none of the Statements contain the crucial detail that Rumble misrepresented the amount of revenue it earns from Google.

*Anderson*, 2020 U.S. Dist. LEXIS 256242, at *9). And here, Rumble failed to allege the basic details necessary to support this claim – including the names of "major advertisers" that have "dropped Rumble" or the amount of money allegedly lost. References to putative advertisers, who hypothetically may have purchased ads, are insufficient. It is also implausible to assume that advertisers would stop doing business with Rumble simply because it partnered with Google, the world's biggest online ad broker.[15] Rumble has suggested that its failure to identify lost advertisers is a "curable pleading deficiency" Dkt. 40 at 8. Despite being on notice of this deficiency, Rumble did not even attempt to cure it in its Amended Complaint – which strongly suggests that there is no factual basis for the claim.[16]

*Second*, Rumble alleges that its "stock price … fell nearly 13% in the week following Defendants' publication of their defamatory October 24, 2023 article." Am.Compl. ¶81. But merely alleging that a company's "stock declined in value" does not "reveal any 'realized loss,' that characteristic of 'special damage' that is a crucial element of the cause of action." *Salit v. Ruden, McClosky, Smith, Shuster and Russell, P.A.*, 742 So. 2d 381, 388 (Fla. 4th DCA 1999).[17]

---

[15] To the extent that any advertisers have dropped Rumble as a result of Defendants' activities, Rumble must establish that they did so as a direct result of the Statements that Rumble was heavily reliant on revenue from Google Ads. Rumble cannot state a claim based on advertisers withdrawing their money for other reasons – *e.g.*, because they did not want to support a brand-unsafe platform.

[16] Rumble cannot seriously argue that it needs discovery to identify advertising partners it lost due to the Statements since this information should be squarely within its possession.

[17] This allegation relates only to the fifth Statement and, in addition to being legally insufficient, is also irrelevant to establishing special damages were caused by the other four Statements.

*Third*, Rumble alleges that it "has also incurred special damages trying to mitigate … the harm caused by Defendants defamation" by hiring "outside counsel in connection with its efforts to educate Defendants" and a "public relations consultant." Am.Compl. ¶82. But expenses incurred in paying lawyers and other professionals to remedy allegedly defamatory statements are not cognizable as special damages. *See, e.g.*, *BCRE 230 Riverside LLC v. Fuchs*, 59 A.D.3d 282, 284 (N.Y. App. Div. 2009) ("The allegation that defendant has incurred legal fees does not satisfy [the special damages] requirement."). Rumble also tacitly concedes that fees "spent on this … litigation" are not special damages. Am.Compl. ¶82. Rumble does not – and cannot – plausibly allege that the money it paid an outside law firm to send Defendants pre-action claim letters can be set apart from money it paid the same outside law firm to litigate the case after the pleadings were filed. Neither expense counts as special damages.

## C.    Rumble Failed to Plead Actual Malice

Yet another ground for dismissal is Rumble's failure to plead facts capable of supporting a finding of actual malice. The First Amendment requires Rumble to prove by clear and convincing evidence that Defendants published the Statements with "actual malice" – that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *Turner*, 879 F.3d at 1273 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)). "The test is not an objective one and the beliefs or actions of a reasonable person are irrelevant." *Michel,* 816 F.3d at 702-03. Rather, the law asks whether Defendants "actually entertained serious doubts as to the veracity of the published account, or [were] highly aware that the account was probably false." *Id.*

at 703. The first step in the analysis is "to determine the gist or sting of the report" and then, using "that meaning" as a starting point, determine whether the defendant in fact "entertained serious doubts that the underlying thrust of the [statement] was true." *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1240-41 (11th Cir. 1999). Courts routinely dismiss cases for failing to plead plausible allegations of actual malice because "[f]orcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict" the "breathing space" guaranteed by the actual malice standard. *Michel*, 816 F.3d at 702.[18]

Rumble's primary allegation of actual malice is that Defendants knew the Statements were false at the time of publication because Rumble had previously told them, based on its November 2022 Form-10Q, that Google contributed "less than 20% of [its] revenue." Am.Compl. ¶¶67, 71. The problem with this claim is that the Form 10-Q in question does not contradict the gist of the Statements' reporting that Rumble relied heavily Google Ads revenue, but rather corroborates it. In addition to stating that "approximately 19% … of Rumble's total revenue derived from … Google's Ad Sense," that document characterizes this share as "*a material portion*" of Rumble's revenue "*the loss of which could materially harm its results of operations.*" Browning Decl.

---

[18] *See, e.g.*, *id*. (affirming dismissal for lack of actual malice); *Jacoby v. CNN*, 2021 U.S. App. LEXIS 36594, at *12-15 (11th Cir. Dec. 10, 2021) (same); *Turner*, 879 F.3d at 1262 (same); *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 274 (4th Cir. 2022); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1122 (S.D. Fla. 2021) (granting dismissal for failure to plead actual malice.**);** *Harvey v. Cable News Network, Inc.*, 520 F. Supp. 3d 693, 722 (D. Md. 2021) (same); *Mejia v. Telemundo Mid-Atl. LLC*, 440 F. Supp. 3d 495, 502 (D. Md. 2020) (same).

Ex. I (emphasis added).[19]  Defendants awareness of a document that supports, rather than undermines, the gist of their Statements demonstrates a lack of actual malice.  *See, e.g.*, *Markle v. Markle*, 2024 U.S. Dist. LEXIS 42887, at *61 (M.D. Fla. Mar. 12, 2024) (no actual malice where publication "was supported by" prior reports).[20]

Without their only direct allegation of actual malice, all that remains are a smattering of boilerplate allegations that are each insufficient to state a claim.  Rumble alleges, for instance, that Defendants were "motivated by hostility and ill will toward Rumble."  Am.Compl. ¶93.[21]  But "actual malice is not satisfied 'merely through a showing of ill will or 'malice' in the ordinary sense of the term."  *Reed v. Brandel Eugene Chamblee, TGC, LLC*, 2023 U.S. Dist. LEXIS 172449, at *77 (M.D. Fla. Sept. 27, 2023) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989)).  "Even assuming the alleged 'leftist enmity' is real, the motivations behind Defendants' communications – inspired by political differences or otherwise – do not impact whether defendants acted with actual malice as a matter of law."  *Arpaio v. Zucker*, 414

---

[19] Rumble further alleges that Defendants were following a preconceived "narrative … to take down Rumble," but even assuming the truth of this allegation, it is insufficient to support a finding of actual malice – particularly because the Form 10-Q corroborated the alleged narrative.  *See, e.g.*, *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 692 (S.D.N.Y. 2022).

[20] Since Rumble concedes that the November 2022 Form 10-Q was "the most recent public information about Rumble's advertising revenue" (Am.Compl. ¶71), the Amended Complaint fails to identify any reason for Defendants to suspect that the information contained in that document was out of date.  Even assuming *arguendo* that Defendants were aware of later SEC filings or the Media Matters article referenced in the Amended Complaint, nothing in those documents explicitly contradicts or overrides the November 2022 Form 10-Q's authoritative statement that Google Ads provided a material portion of Rumble's revenue.  Nor does Rumble allege that it directed Defendants' attention to these documents prior to filing this lawsuit, unlike the November 2022 10-Q.

[21] In addition to being legally insufficient, these claims of ill will are ironic given that one Statement replied to a slur from one of Rumble's major shareholders vilifying Defendants as "child predators" – a detail the Amended Complaint conspicuously omits.  Browning Decl. Ex. B.

F. Supp. 3d 84, 92 (D.D.C. 2019). Or, more simply, "[p]ersonal animosity does not establish actual malice." *Dershowitz v. CNN Inc.*, 668 F. Supp. 3d 1278, 1289 (S.D. Fla. 2023) (citing *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 (11th Cir. 1999)).

Equally unavailing is the claim that Defendants had a "financial motive to defame." Am.Compl. ¶73. The Complaint lacks any plausible factual allegation that Defendants profited from the Statements, but even assuming they did, "[p]rofit motive behind publication does not establish actual malice." *Trump v. CNN*, 2023 U.S. Dist. LEXIS 131215, at *10 (S.D. Fla. July 28, 2023) (citing *Harte-Hanks*, 491 U.S. at 666-67). Rumble also claims that "Defendants refused to retract or correct their false and defamatory statements" post-publication. Am.Compl. ¶93.[22] But "refusal to retract … does not qualify as actual malice." *Reed*, 2023 U.S. Dist. LEXIS 172449, at *76 (citing *Dockery v. Fla. Democratic Party*, 799 So. 2d 291, 296 (Fla. 2d DCA 2001)). Finally, Rumble claims "Defendants failed to adhere to journalistic standards in researching, writing, and publishing their October 24, 2023 'news article'" (Am.Compl. ¶93) – but "actual malice requires more than a departure from reasonable journalistic standards." *Michel*, 816 F.3d at 703.[23]

---

[22] Atkin did amend her Statement after reading the retraction letter. Am.Compl. ¶78. Moreover, it was not actual malice for Atkin to repost her Statement that "approximately 90% of Rumble's programmatic display ad revenue comes from @Google Ads" after she received Rumble's retraction letter. First, the 90% figure is not implausible or unprecedented given that "86% of Rumble's total revenue … was derived from Google Ads" in late 2021. *Id.* ¶15. Second, she added the word "programmatic" to clarify that she was referring to "programmatic" ads Rumble receives through ad brokerage programs like Google Ads, as opposed to "direct" ads that advertisers place on Rumble through its proprietary sales portal. Given Google's dominance of programmatic advertising, there is no reason to doubt that Google is the source of 90% of Rumble's programmatic ads.
[23] This allegation is plead exclusively against the fifth Statement, which means that it is irrelevant to the other four Statements.

The cumulation of these circumstantial allegations does not establish actual malice because, even when taken collectively, they cannot establish that Defendants were "highly aware that the [the Statements] were probably false." *Id.* To the contrary, the Amended Complaint alleges that Defendants had knowledge of Rumble's November 2022 Form 10-Q confirming that Google Ads provided a "material portion" of its revenue. Am.Compl. ¶71. Since this document corroborated the gist of Defendants' Statements, there can be no actual malice. And Rumble's accumulated allegations of bad intent and unreasonableness cannot change this fact. *See, e.g.*, *Brimelow v. N.Y. Times Co.*, 2021 U.S. App. LEXIS 31672, at *11 (2d Cir. Oct. 21, 2021) (affirming dismissal because there was "no combination of allegations from which one could plausibly infer that [defendant] was purposely avoiding the truth").

## II. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR IMPLIED DEFAMATION

Rumble's defamation by implication claim should also be dismissed. Whether a statement is defamatory by implication is a question of law. *Turner*, 879 F.3d at 1269. Defamation by implication is "premised not on direct statements but on false suggestions, impressions and implications arising from otherwise *truthful* statements." *Markle*, 2024 U.S. Dist. LEXIS 42887, at *63-64. Accordingly, libel by implication plaintiffs must "identify the literally true facts that would serve as the basis for such a claim." *Id*. at *64. But rather than premising its claim upon "literally true facts," Rumble alleges defamation by implication based on what it calls "a series of false statements of fact." Am.Compl. ¶95. While Rumble claims that "Defendants

juxtaposed [the Statements] to imply" certain allegedly defamatory meanings (*id.*), it cannot have it both ways – by alleging false statements, rather than literally true ones, Rumble has "logically precluded a defamation by implication claim." *Markle*, 2024 U.S. Dist. LEXIS 42887, at *64. *See also Flynn*, 2023 U.S. Dist. LEXIS 165234, at *21.

Rumble's defamation by implication claim also fails because the Statements "on which the defamation claims were based are non-actionable. As the protections of defamation law extend to defamation-by-implication claims, this … necessarily doom[s] these claims as well." *Markle*, 2024 U.S. Dist. LEXIS 42887, at *66.

## CONCLUSION

Defendants respectfully request that this Court dismiss the Amended Complaint with prejudice and award such other relief the Court deems just and proper.

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g)(2), Defendants hereby certify that the parties met and conferred via Zoom and email but were unable to resolve the motion.

SHULLMAN FUGATE PLLC

By: */s/ Sarah M. Papadelias* .
Deanna K. Shullman (SBN 514462)
Sarah M. Papadelias (SBN 0125098)
2101 Vista Parkway, Ste. 4006
West Palm Beach, Florida 33411
Telephone: (561) 429-3619
dshullman@shullmanfugate.com
spapadelias@shullmanfugate.com

*Counsel for Defendants Nandini Jammi and Claire Atkin*

DAVIS WRIGHT TREMAINE LLP

John M. Browning*
Katherine M. Bolger*

1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 489-8230
jackbrowning@dwt.com
katebolger@dwt.com

*Admitted *Pro Hac Vice*