# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RUMBLE INC.,

               Plaintiff,

     v.

NANDINI JAMMI, CLAIRE ATKIN, and
JOHN DOE NOS. 1–10,

               Defendants.

**Case No. 8:23-cv-02718-CEH-LSG**

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiff Rumble Inc. respectfully moves for partial summary judgment in its favor on the following elements of its claim for defamation: (1) of and concerning; (2) publication; and (3) falsity. Defendants Nandini Jammi and Claire Atkin have stipulated that the defamatory statements were of and concerning Rumble, and they do not dispute that they published the defamatory statements.[1]

---

[1] Pursuant to Middle District of Florida Local Rule 1.11, Rumble is filing concurrently with its Motion for Summary Judgment a Motion for Leave to File Under Seal certain redacted portions of its Memorandum of Law (denoted in red text in the unredacted version) and Exhibit U. It is also filing provisionally under seal exhibits H, O, P, T, W, X, and Z and information derived from those exhibits (denoted in green text in the unredacted versions of Rumble's Memorandum of Law and the Declaration of Nicholas J. Brechbill) which Defendants have designated as "Confidential" or "Confidential – Attorneys' Eyes Only" in accordance with the Parties' Joint Confidentiality Agreement.

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RUMBLE INC.,

         Plaintiff,

    v.

NANDINI JAMMI, CLAIRE ATKIN, and
JOHN DOE NOS. 1–10,

         Defendants.

**Case No. 8:23-cv-02718-CEH-LSG**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND ................................................................................2

PROCEDURAL BACKGROUND .......................................................................7

LEGAL STANDARD ...........................................................................................9

ARGUMENT .......................................................................................................10

I.    Defendants Stipulate That Their Defamatory Statements Are Of And
      Concerning Rumble. .................................................................................10

II.   Defendants Do Not Dispute That They Published The Defamatory
      Statements About Rumble. .......................................................................11

III.  The Defamatory Statements Defendants Published About Rumble
      Are False. ..................................................................................................13

CONCLUSION ....................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

***Cases***

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..................................................................................9

*Coomer v. Byrne*,
   2025 WL 90097 (M.D. Fla. Jan. 14, 2025) .......................................................13

*Edmondson v. Velvet Lifestyles, LLC*,
   43 F.4th 1153 (11th Cir. 2022)....................................................................9

*Jews for Jesus, Inc. v. Rapp*,
   997 So. 2d 1098 (Fla. 2008)..............................................................10, 16

*Kieffer v. Atheists of Fla., Inc.*,
   269 So. 3d 656 (Fla. 2d DCA 2019) ...............................................................13

*Klayman v. Jud. Watch, Inc.*,
   22 F. Supp. 3d 1240 (S.D. Fla. 2014)............................................................11

*Klentzman v. Brady*,
   456 S.W.3d 239 (Tex. App. 2014) ...............................................................11

*McCormick v. City of Fort Lauderdale*,
   333 F.3d 1234 (11th Cir. 2003)...............................................................9

*PI Telecom Infrastructure, LLC v. City of Jacksonville*,
   104 F. Supp. 3d 1321 (M.D. Fla. 2015) .....................................................9, 10

*Reed v. Chamblee*,
   2023 WL 6292578 (M.D. Fla. Sept. 27, 2023) ...............................................10

*Tovarian v. Rubic, LLC*,
   2024 WL 5378093 (S.D. Fla. Nov. 13, 2024)................................................10

*US Dominion, Inc. v. Fox News Network, LLC*,
   293 A.3d 1002 (Del. Super. Ct. 2023)..........................................................13

***Rules***

Fed. R. Civ. P. 56(a) ..................................................................................8

## INTRODUCTION

Defendants Claire Atkin and Nandini Jammi hate Rumble—a proudly content neutral video sharing platform that prides itself on its commitment to independence from Big Tech, like Google. They think Rumble is "the most toxic place on the internet." (Ex. L.) And for years, they have tried to "demonetize[]" Rumble by spreading lies about its sources of revenue to paint Rumble as hypocritical, misleading its stakeholders, and subject to nonexistent material financial risks that have it teetering on the verge of collapse. (Ex. N.)

Between August and October 2023, Defendants published four social media posts on X (formerly, Twitter) and an article on their website, CheckMyAds.org, falsely claiming that Rumble is "largely" and "heavily monetized" by Google Ads (Exs. M, R); "heavily dependent on Google Ads" (Ex. R); "90% funded by" Google Ads (Ex. L); and a "house of cards" that (Ex. K) "would not be viable" without Google Ads (Ex. Q). As Defendants knew, the claims they published about Rumble are false, and indisputably so.

In late 2023, when Defendants published their false statements about Rumble, Rumble received about 1% of its total revenue from Google Ads. (Ex. U at Rumble00014673–74.) Rumble was not "largely monetized" by, "heavily dependent" on, or vulnerable to collapse without the miniscule percentage of

revenue it received from Google Ads.  Defendants published these lies—which they knew were false—expressly to harm Rumble's business and reputation.

So, why did Defendants peddle these lies about Rumble?  Simple: they dislike the content posted by some content creators on the video sharing platform.  Indeed, this is not the first time Defendants have tried to "defund" a media organization whose content they disagree with.  For example, in late 2023, Defendants—through their organization Check My Ads—also sought to defund Fox News.  (Ex. S.)

Defendants purport to be adtech crusaders dedicated to "reshaping the digital adtech industry from within its ranks" by "holding the surveillance adtech industry accountable for abuses against advertisers and consumers."  (Ex. S.)  In reality, they use their sizeable social media and online following as a bully pulpit to attack, disparage, and defame organizations they just do not like, like Rumble.

Defendants admit that the statements on which Rumble's claims are based were about Rumble.  (Ex. Y.)  They also do not contest that they published those statements.  (Ex. Y.)  And the record makes clear that those statements are false.  (Ex. U.)  The Court should grant Rumble's Motion for Partial Summary Judgment.

## FACTUAL BACKGROUND

Rumble is a content-neutral online video sharing platform.  (*E.g.*, Ex. A.)  As such, it permits users to publish content espousing diverse views across the political spectrum.  (*Id.*)  Rumble does not arbitrarily censor content based on political

2

viewpoint.  (*Id.*)  Defendants Nandini Jammi and Claire Atkin oppose Rumble and its mission because they disagree with the political views held by some content creators who post on Rumble.  (*See, e.g.*, Ex. L (Rumble is "the most toxic place on the internet."); Ex. R (same).)  Driven by their disdain for Rumble, Defendants waged a coordinated smear campaign based on false information to destroy Rumble's business.  (Ex. N.)

Rumble has asserted claims against Jammi, Atkin, and unidentified John Doe defendants for defamation and defamation by implication based on statements Jammi and Atkin made in four separate posts on X between August and October 2023 and in an article published on their website, CheckMyAds.org.  (Am. Compl. ¶¶ 83–103, ECF No. 42; Exs. K, L, M, Q, R.)

Defendants' stated objective is to "demonetiz[e]" Rumble by damaging its business and brand, which Defendants know is built in part around Rumble's commitment to independence from Big Tech.  (Exs. N, R ("Rumble loves to boast about being free from Big Tech.").)  To harm Rumble's brand and paint it as hypocritical, Defendants falsely claimed that Rumble is "heavily monetized" by and wholly dependent on Google Ads.  (*E.g.*, Ex. R.)  They also claimed that, without Google Ads, Rumble "would not be viable."  (Ex. Q.)

Specifically, on May 21, 2023, Jammi posted on X (in response to a tweet from a content creator who posts content on Rumble) that Rumble's multi-billion-dollar valuation was "just a garden variety grift." (Ex. I.)

On August 16, 2023, Jammi posted on X: "Rumble is all posturing, all the time. They're not a Google Ads killer or even close to it – ***they depend on Google for their business. We're talking a house of cards***." (Ex. K (emphasis added).)

On September 26, 2023, Jammi posted on X that Rumble "is ***largely monetized*** through Google Video Partners," and she included a link to a Check My Ads article with instructions for advertisers to block Rumble from their ad campaigns. (Ex. M (emphasis added).)

The same day, Atkin posted on X: "Rumble, the most toxic place on the internet, is ***90% funded*** by @GoogleAds," and she included a link to the same Check My Ads article as Jammi containing instructions for advertisers to block Rumble from their ad campaigns. (Ex. L (emphasis added).)

On October 3, 2023, Jammi posted on X: "***Without @GoogleAds, Rumble would not be viable***. … It's criminal behavior by Google, which has promised brand safety to its clients." (Ex. Q (emphasis added).)

Defendants made similar claims in an article they published on the website for their non-profit organization, CheckMyAds.org, on October 24, 2023. That article said:

4

***Rumble is heavily monetized by Google Ads***.  Rumble loves to boast about being free from Big Tech.  In reality, ***the business appears to be heavily dependent on Google Ads***, by far its largest advertising partner — and advertisers often have no idea their ads are appearing there. Rumble is part of Google Video Partners, which means Google dumps inventory there that many advertisers assume is going to YouTube.

And it seems to know brands wouldn't appreciate appearing next to some of Rumble's content: it has taken steps to minimize the risk of advertisers waking up to screenshots of their ads next to Alex Jones' face.  Its two-tier system for ads monetizes the worst videos through Rumble Ads, its in-house ad platform, while featuring Google Ads on mainstream channels, such as Reuters.

(Ex. R (emphasis added).)  The byline lists Jammi and Atkin as the authors.

In addition, Defendants reached out directly to companies that advertised on Rumble, including ███████████████████████████████████, to convince those companies to block Rumble and stop advertising on the video sharing platform.  (Exs. H, O, P.)[2]



In reality, as Defendants well knew, when they published their false statements between August and October 2023, the revenue Rumble received from Google Ads had precipitously declined since 2022, because Rumble created its own advertising platform—the Rumble Advertising Center ("RAC")—prior to going public. Before launching RAC, 86% of Rumble's total revenue in the first three quarters of 2021 was derived from Google Ads. (Ex. B.) By Q1 2022, after Rumble launched RAC in January 2022, that percentage had fallen to less than 56%. (Ex. C.) By Q2 2022, that percentage had fallen further to less than 45%—a fact that Rumble disclosed in its public SEC filings. (Ex. E.) And by Q3 2022, the revenue Rumble received from two advertising networks, Google Ads and another external advertising network, represented merely 19% of Rumble's total revenue, a fact which Rumble once again reported in its public SEC filings and told to Jammi directly in a post on X. (Exs. D, F.)

Since then, the percentage of revenue Rumble derives from Google Ads has continued its steep downward trajectory. As such, Rumble stopped reporting revenue from Google Ads as a material financial risk in its securities filings. In fact, as of late 2023, Rumble's revenue from Google ads was barely a rounding error on Rumble's balance sheet. Between August and October 2023—when Defendants published their defamatory statements—Rumble derived about 1% of its revenue from Google Ads. (Ex. U at Rumble00014673–74.) This rapid decline was due in

6

large part to the roll out of RAC.  (*E.g.*, Ex. G at Rumble00005269 ("The increase in advertising revenue was driven by an increase in consumption as well the introduction of new advertising solutions for creators, publishers and advertisers, including host read advertising and our online advertising management exchange ('Rumble Advertising Center' or 'RAC'), both of which we started to build and test in the second half of 2022.").)

In other words, when Defendants published their false and defamatory statements, Rumble was not heavily dependent on Google Ads.  It was not (and is not) heavily or largely monetized by Google Ads.  It did not (and does not) receive 90% of its funding from Google Ads.  It was not (and is not) a house of cards or garden variety grift.  And it absolutely would have been (and is) viable without revenue from Google Ads.

## PROCEDURAL BACKGROUND

Rumble filed its Complaint on November 29, 2023.  (ECF No. 1.)  On April 5, 2024, Defendants moved to dismiss and stay discovery.  (ECF Nos. 30, 35.)  On April 11, 2024, the Court entered a Case Management and Scheduling Order that set a March 4, 2025 deadline for the Parties to file dispositive motions.  (ECF No. 37.)

On April 26, 2024, Rumble filed an Amended Complaint.  (ECF No. 42.)  On May 10, 2024, Defendants once again moved to dismiss for failure to state a claim (ECF No. 44) and to stay all discovery pending a decision on their Motion to Dismiss

(ECF No. 46).  On September 13, 2024, the Court denied Defendants' Motion for a Stay of Discovery.  (ECF No. 66.)  Defendants' Motion to Dismiss remains pending.[3]

On November 27, 2024, the Parties filed a Joint Motion to Modify the Scheduling Order and extend all deadlines by six months, including the deadline for dispositive motions.  (ECF No. 83.)  The Parties agreed that the "existing schedule cannot be met despite the exercise of reasonable diligence" in part because the Parties were (and are) "unsure about what effect the Court's forthcoming order on Defendants' pending motion to dismiss will have on the scope and timeframe of this action."  (*Id.*)  Notably, the Court indicated during oral argument that, "if it dismisses any of Rumble's claims, it would most likely give Rumble an opportunity to amend its complaint with the benefit of the Court's guidance."  (*Id.*)

In light of the pending motion to dismiss and based on the Parties' mutual belief that the Court would most likely give Rumble an opportunity to replead its claims, the Parties agreed to continue discovery beyond the deadline set in the Court's Case Management and Scheduling Order.  The Parties also agreed that they would proceed with depositions now, but that they could reserve time and reopen

---

[3] Defendants' Motion to Dismiss has been fully briefed, and a hearing was held on November 7–8, 2024.

those depositions once additional discovery is complete if the Court grants the pending Motion to Modify the Scheduling Order and extend discovery.[4]

## LEGAL STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *PI Telecom Infrastructure, LLC v. City of Jacksonville*, 104 F. Supp. 3d 1321, 1336 (M.D. Fla. 2015) (quoting Fed. R. Civ. P. 56(a)). "Only disputes of material fact are important at summary judgment," and "'[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.'" *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see also Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159–60 (11th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)) ("If there is not sufficient evidence for a jury to find for the non-moving party, or '[i]f the evidence is merely

---

[4] The parties have engaged, and continue to engage, in discovery in accordance with their prior agreements. Today, however, Defendants filed a Notice reneging on and withdrawing their consent to the Parties' joint request to modify the scheduling order, in a clear attempt to prejudice Rumble. Because discovery remains ongoing and Defendants' Motion to Dismiss remains pending (ECF No. 44), Rumble is only filing its Motion for Summary Judgment now under the Court's current scheduling order out of an abundance of caution to preserve its rights given the existing deadline. Rumble reserves its right to file a successive Motion for Summary Judgment once the scope of the case is clearer, following a decision on Defendants' pending Motion to Dismiss.

colorable,' ... then summary judgment is appropriate."). "'The principles governing summary judgment do not change when the parties file cross-motions for summary judgment.'" *PI Telecom Infrastructure*, 104 F. Supp. 3d at 1336.

Under Florida law, a claim for defamation has the following elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008); *Reed v. Chamblee*, 2023 WL 6292578, at *9 (M.D. Fla. Sept. 27, 2023) (publication must be "of and concerning" plaintiff).

## ARGUMENT

### I.    Defendants Stipulate That Their Defamatory Statements Are Of And Concerning Rumble.

There is no dispute that the defamatory statements at issue in this action are "concerning" Rumble. *Jews for Jesus*, 997 So. 2d at 1106. The fact that they are about Rumble is obvious from the face of the statements, which all identify Rumble by name. (Exs. K, L, M, Q, R.) Although a defamatory statement need not identify a plaintiff by name to be of and concerning the plaintiff, where, as here, a statement does identify the plaintiff by name, there is no doubt that the of and concerning element is satisfied. *See Tovarian v. Rubic, LLC*, 2024 WL 5378093, at *4–5 (S.D. Fla. Nov. 13, 2024) (noting that "[t]here is no strict requirement in Florida that an

10

allegedly defamed person be named in a publication for the statement to be actionable" and holding that article at issue "unquestionably concern[ed] [plaintiff], by name and by implication"); *accord Klentzman v. Brady*, 456 S.W.3d 239, 254 (Tex. App. 2014) (holding that an article which "mentioned [plaintiff] by name more than once" was necessarily of and concerning the plaintiff). Recognizing that they have no defense to this element of Rumble's defamation claim, Defendants concede and stipulate that their statements are of and concerning Rumble. (Ex. Y.)

## II. Defendants Do Not Dispute That They Published The Defamatory Statements About Rumble.

The "publication" element of a defamation claim "only requires the dissemination of a false statement to a person other than the defamed person." *Klayman v. Jud. Watch, Inc.*, 22 F. Supp. 3d 1240, 1251 (S.D. Fla. 2014) (internal citations omitted).

Defendants do not contest that their statements were published to third parties. (Ex. Y.) And for good reason. There is no question that Defendants' defamatory X posts were disseminated to and viewed by hundreds of thousands of people on X. (Ex. K (4,798 views); Ex. L (365,300 views); Ex. M (23,100 views); Ex. Q (4,153 views).) Likewise, there is no dispute that Jammi was solely responsible for the posts published on her personal X account, @nandoodles. (Ex. Z, Response to Interrog. No. 1 (███████████████████████████████); Ex. V at 75:24–76:8; Ex. X at 65:17–22.) And there is no dispute that Atkin was solely

11

responsible for the defamatory post published on her personal X account, @catthekin. (Ex. Z, Response to Interrog. No. 1 (███████████████████ █████████████████████████); *see also* Ex. V at 77:24–78:10; Ex. X at 67:1–4.)

There is also no dispute that Defendants' defamatory October 24, 2023 article was disseminated to a global internet audience via the Check My Ads website, CheckMyAds.org. (Ex. R; Ex. W at 126:21–22 (███████████████████ █████████████████████████); Ex. X (same).) The article was also ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ (Ex. X at 21:3–6, 91:17– 92:11.)

████████████████████████████████████████ (Ex. X at 90:15–23.) Defendants are listed as the authors on the face of the article. (Ex. R; Ex. W at 127:15–17 (███████████████████████████████ █████████  █████████); Ex. V at 93:17–24; Ex. X at 92:17–24.) And Defendants concede that they ████████████████████████. (Ex. Z, Response to Interrog. No. 1 (███████████████████████████████████████████ ████████████████████████████); *see also* Ex. X at 97:4–12 (███ ████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ (Ex. W at 27:9–22 (████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████).)

Thus, there is no factual dispute that Defendants published the defamatory statements about Rumble.  *See Coomer v. Byrne*, 2025 WL 90097, at *5 (M.D. Fla. Jan. 14, 2025) (collecting cases and noting that "[t]he Florida Supreme Court has held that 'every one who takes part in the publication ... is charged with publication'"); *see also US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1040 (Del. Super. Ct. 2023) (similar).

## III.    The Defamatory Statements Defendants Published About Rumble Are False.

The undisputed record evidence establishes that Defendants' statements are false.  Although "the question of falsity ... overlooks minor inaccuracies," *Kieffer v. Atheists of Fla., Inc.*, 269 So. 3d 656, 659 (Fla. 2d DCA 2019), there was nothing minor about the inaccuracies in Defendants' statements.  Defendants claimed that:

- Rumble was "heavily monetized by Google Ads" (Ex. R at Rumble00014708);

- Rumble's "business appear[ed] to be heavily dependent on Google Ads" (*id.*);

- Rumble was "all posturing, all the time.  They're not a Google Ads

13

killer or even close to it – they depend on Google for their business. We're talking a house of cards."  (Ex. K);

- Rumble is "90% funded by @GoogleAds" (Ex. L);

- Rumble is "largely monetized through Google Video Partners" (Ex. M); and

- "Without @GoogleAds, Rumble would not be viable" (Ex. Q).

When Defendants made these false statements at the end of 2023, Rumble received *less than 1%* of its overall revenue from Google Ads—a far cry from the 90% that Atkin claimed, and certainly not enough that Rumble would cease to be viable without Google Ads.  (Ex. U at Rumble00014673–74.)

Moreover, as Rumble's public SEC filings show, the ad revenue that Rumble received from Google Ads had been on a sharp downward trajectory for two years prior to Defendants' false and defamatory statements.  In the first three quarters of 2021, Rumble received 86% of its total revenue from Google Ads.  (Ex. B.)  By Q1 2022, Rumble received 56% of its overall revenue from Google Ads and one other ad exchange.  (Ex. C.)  In Q2 2022, that percentage had fallen to 45%.  (Ex. E.)  And in Q3 2022—a full year before Defendants published their defamatory statements— the revenue Rumble received from Google Ads and another external advertising network represented only 19% of Rumble's total revenue, a fact that Rumble conveyed directly to Jammi on X *the year before* their false and defamatory statements.  (Ex. F.)  In fact, in Q3 2022, Rumble only received 9% of its overall

revenue from Google Ads.  (Am. Compl. ¶15; Ex. U at Rumble00014671.)

In reality, Rumble has never earned more than ███ of its total revenue from Google ads in any month between September 2022 (the end of Q3) and September 2024.  (Ex. U at Rumble00014671–76.)  In 2023, Rumble only earned █████ of its total annual revenue from Google Ads, and for the first three quarters of 2024, Rumble only earned █████ of its total revenue from Google Ads.  (Ex. U at Rumble00014677.)

In addition, an October 2022 study published by Media Matters for America—an organization whose publications Defendants and Check My Ads often cite to and rely on (*see, e.g.*, Ex. R at Rumble00014707)—stated that "Google's ad network made up 2% of total advertiser spending on Rumble.com in the last year." (Ex. AA.)  Brandon Hardin, a former Check My Ads employee who edited the October 24, 2023 article, testified that ███████████████████████ ████████████████████████████████.  (Ex. X at 141:18–142:4 (████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████).)

The explanation for Rumble's decreased reliance on Google Ads is obvious: Rumble's in-house advertising platform, RAC, started generating revenue in January

2022, and Rumble has significantly increased the amount of ad revenue generated through RAC—and decreased the amount of ad revenue generated through Google Ads—since.  Defendants were well aware of RAC, as their social media posts demonstrate.  (Ex. J (X post with screenshot from Rumble SEC filing explaining that Rumble's "increase in advertising revenue" in Q1 2023 was "driven by ... the introduction of new advertising solutions ... including ... our online advertising management exchange (RAC)"); Ex. K.)  Defendants even reference RAC in the October 24, 2023 Check My Ads article.  (Ex. R at Rumble00014708 (referring to "Rumble Ads, its in-house ad platform").)  Nonetheless, they disregarded this information, the information in Rumble's public SEC filings, and the information that Rumble shared directly with Jammi on X in pursuit of their preconceived takedown narrative aimed at demonetizing Rumble.

Defendants contend that their statements are not "false under the applicable substantial truth standard." (Ex. Y.)  Not so.  Florida law of substantial truth is clear, and the Florida Supreme Court has expressly held that "'a statement is substantially true *if its substance or gist* conveys essentially the same meaning that the truth would have conveyed.'"  *Jews for Jesus*, 997 So. 2d at 1107 (italics in original).  The substance or gist of Defendants' statements is that Rumble's business was wholly reliant on revenue derived from Google Ads for its survival, and without that revenue, Rumble would have ceased to exist as a going concern.  The truth, however,

is that, when Defendants made their defamatory statements (and for nearly a year prior), revenue from Google Ads was little more than a rounding error on Rumble's balance sheet. Far from being substantially true, the gist of Defendants' statements was not even remotely true. Thus, the Court should grant summary judgment in Rumble's favor on falsity.

## CONCLUSION

The Court should grant Rumble's Motion for Partial Summary Judgment and issue an Order that there is no factual dispute that the defamatory statements at issue were (1) of and concerning Rumble, (2) published by Defendants, and (3) false.

## <u>LOCAL RULE 3.01(G) CERTIFICATION</u>

Counsel for Rumble conferred with counsel for Defendants via email on February 25 and 26, 2025. Defendants stipulate that the statements were of and concerning Rumble. They do not contest that they published the statements. They contest that the statements are not substantially true. (Ex. Y.)

Dated: March 4, 2025                Respectfully submitted,

s/ *Jered T. Ede*
Jered T. Ede (Florida Bar No. 1045898)
Elizabeth M. Locke, P.C. (admitted *pro hac vice*)
Nicholas J. Brechbill (admitted *pro hac vice*)
Kathryn G. Humphrey (admitted *pro hac vice*)
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
Telephone: (202) 628-7400
Email: jered@clarelocke.com
Email: libby@clarelocke.com
Email: nick@clarelocke.com
Email: kathryn@clarelocke.com

*Attorneys for Plaintiff Rumble Inc.*