# Exhibit V



UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA

CASE NO.: 8:23-CV-02718-CEH-LSG

RUMBLE INC.,

     PLAINTIFF,

vs.

NANDINI JAMMI, CLAIRE ATKIN, AND JOHN DOES 1-10,

     DEFENDANTS.
_____/

DEPOSITION OF RACHEL GILMORE
Volume 1
Pages 1 through 164
Video Conference

Tuesday, February 4, 2025
10:01 a.m. - 1:54 p.m.
US Legal Support, Inc. - via remote Zoom link

Stenographically Reported By:
DANA G. STURDEVANT, RPR
Registered Professional Reporter



1                    APPEARANCES

2  On Behalf of the Plaintiff:
     CLARE LOCKE, LLP
3      10 Prince Street
     Alexandria, Virginia 22314
4      jered@clarelocke.com
     BY: NICHOLAS J. BRECHBILL, ESQ., via Zoom
5      BY: KATHRYN HUMPHREY, ESQ., via Zoom
     BY: WARREN BIANCHI, ESQ., via Zoom
6
     On Behalf of the Defendant:
7      DAVIS, WRIGHT & TREMAINE, LLP
     1251 Avenue of the Americas, 21st Floor
8      New York, New York 10020
     212.603.6410
9      Jackbrowning@dwt.com
     BY: JOHN M. BROWNING, ESQ. via zoom
10

11  Also Present:
     MJ Zimdahl, Videographer
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF PROCEEDINGS

2                                        Page

3   Deposition of RACHEL GILMORE

4   Direct Examination by Ms. Humphrey                6

5   Certificate of Oath                    161
    Certificate of Reporter                162
6   Read and Sign Letter                   163
    Errata Sheet                          164

7

8

9                    EXHIBITS

10

    Number      Description                Page

11
    Exhibit 1    PX-001                    11

12
    Exhibit 2    PX-002                    15

13
    Exhibit 3    PX-003                    16

14
    Exhibit 4    PX-004                    26

15
    Exhibit 5    PX-005                    30

16
    Exhibit 9    PX-009                    93

17
    Exhibit 11   PX-011                    111

18
    Exhibit 12   PX-0012                   112

19
    Exhibit 13   PX-13                     122

20
    Exhibit 14   PX-014                    122

21
    Exhibit 15   PX-015                    124

22
    Exhibit 16   PX-016                    125

23
    Exhibit 17   PX-017                    126

24
    Exhibit 18   PX-18                     128

25



EXHIBITS

| Number | Description | Page |
|--------|-------------|------|
| Exhibit 19 | PX-019 | 129 |
| Exhibit 20 | PX-20 | 140 |
| Exhibit 23 | PX-23 | 151 |
| Exhibit 24 | PX-24 | 115 |
| Exhibit 25 | PX-25 | 149 |

EXHIBITS 6, 7, 8, 10, 21 & 22 NOT MARKED

1          Deposition taken before Dana G. Sturdevant,

2     Registered Professional Reporter, and Notary Public in and for

3     the State of Florida at Large in the above cause.

4                    *****

5          THE VIDEOGRAPHER:  Good morning.  We're going on the

6     record today at 15:01 UTC time on February 4th, 2025.

7     Audio and video recording will continue to take place

8     unless all parties agree to go off the record.

9          Please note the microphones are sensitive, and they

10    may -- they may pick up whispering and private

11    conversations.

12          This is a video recorded proceeding of Rachel

13    Gilmore taken in the matter of Rumble, Inc. versus

14    Nandini Jammi, Claire Atkin, and John Does 1 through 10.

15          This proceeding is being held via remote video

16    conference.  My name is MJ Zimdahl.  I'm a videographer

17    on behalf of US Legal Support.  I am not related to any

18    party in this action, nor am I financially interested in

19    the outcome.

20          The court reporter is Dana Sturdevant, also from

21    US Legal Support.  Counsel will state their appearances

22    for the record, after which the court reporter will enter

23    the statement for the remote proceeding into the record

24    and then swear in the witness.

25          MS. HUMPHREY:  Kathryn Humphrey, here from Clare

1    Locke, representing Rumble, and I'm here with my

2    colleagues Warren Bianchi and Nick Brechbill.

3         MR. BROWNING:  John Browning, Davis Wright Tremaine.

4    I represent Ms. Jammi and Ms. Atkin in this action, and

5    I'm representing Ms. Gilmore for the purpose of her

6    deposition.

7         THE REPORTER:  Okay.  Could you raise your right

8    hand, please?

9         THE WITNESS:  (Complies.)

10        THE REPORTER:  Do you solemnly swear that the

11    testimony you're about to give will be the truth, the

12    whole truth, and nothing but the truth, so help you God?

13        THE WITNESS:  I do.

14        THE REPORTER:  Thank you.

15   THEREUPON,

16               RACHEL GILMORE,

17   having been first duly sworn, was examined and testified as

18   follows:

19               DIRECT EXAMINATION

20   BY MS. HUMPHREY:

21     Q.   Ms. Gilmore, could you please state your full name

22   and your current address for the record?

23     A.   Rachel Gilmore, 405 Plano Pedam Est, Montreal,

24   Quebec, Canada.

25     Q.   Thank you.  And, again, my name is Kathryn Humphrey.

1    I am representing Rumble today for this deposition.  I know

2    we've never met before, so I just want to go over a couple

3    things about the rules of the road for today and how a

4    deposition goes, and let you know that if at any time you

5    don't understand a question that I ask or need me to repeating

6    something, please feel free to ask.

7         So first of all, have you ever provided deposition

8    testimony before today?

9    A.  No.

10   Q.  Are you -- today you're represented by counsel,

11   correct?

12   A.  Yes.

13   Q.  And that's Mr. Browning who's on with us?

14   A.  Yes.

15   Q.  Did you meet with Mr. Browning before today to

16   prepare for this deposition?

17   A.  Yes.

18   Q.  And are you paying Mr. Browning to represent you?

19   A.  No.

20   Q.  All right.  Is someone else paying Mr. Browning to

21   represent you?

22   A.  I believe so, yes.

23   Q.  Who is paying Mr. Browning to represent you?

24        MR. BROWNING:  Objection; calls for speculation.

25   A.  I don't actually know exactly.

1   BY MS. HUMPHREY:

2      Q.   Okay.  Who do you believe is representing or paying

3   Mr. Browning to represent you?

4          MR. BROWNING:  Same objection.

5      A.   Do I still answer after an objection?

6   BY MS. HUMPHREY:

7      Q.   You may answer the question.

8      A.   Okay.  Great.  Check My Ads.

9      Q.   And that's your former employer, correct?

10     A.   Yes.  I just don't know who among them or how that

11  works to pay.

12     Q.   But you -- you believe that someone related to Check

13  My Ads is paying Mr. Browning to represent you, whether it's

14  the company or insurance or someone who works there?

15         MR. BROWNING:  Objection form.

16  BY MS. HUMPHREY:

17     Q.   Is that fair to say?

18         MR. BROWNING:  Objection.

19     A.   I believe so.

20  BY MS. HUMPHREY:

21     Q.   Okay.  My job today is to ask you questions, as I've

22  been doing, and your job, as you have been doing, is to answer

23  those questions truthfully and to the best of your ability; is

24  that fair?

25     A.   Yes.

1    Q.   Okay.  And as you've been doing, you'll need to

2    continue answering the questions verbally because it's

3    difficult for the -- the court reporter to take note of a nod

4    or a head shake or a some kind of "umh-hum," something like

5    that.  Okay?

6    A.   Yup.

7    Q.   All right.  As you've been doing, please wait until

8    I finish asking my question before you answer the question so

9    that we don't have an issue speaking over one of another --

10   one another, which is again difficult for the court reporter.

11   Okay?

12   A.   For sure.

13   Q.   Got it.  And you understand that your testimony

14   today is under oath?

15   A.   Yes.

16   Q.   And that is the same oath that you would swear if

17   you were testifying in a court of law?

18   A.   Yes.

19   Q.   Okay.  Is there any reason that you are unable to

20   testify truthfully today?

21   A.   No.

22   Q.   As I stated, if you're unclear about any of my

23   questions, please feel free to ask for clarification, but if

24   you don't and you answer my question, I'm going to assume that

25   you understood it; is that fair?

1    A.  Yes, I think so.

2    Q.  Okay.  Do -- do I need to -- do you want me to

3  repeat that?

4    A.  Yeah.  Do you mind?

5    Q.  Sure.  So if you're unclear about any of my

6  questions, please feel free to ask for a clarification.  You

7  understand that?

8    A.  Yes.

9    Q.  Okay.  If you answer a question that I've asked, I'm

10  going to assume that you understood the question and are

11  completely clear on what was asked; is that fair?

12     A.  I think so, unless I indicate in that response that

13  I didn't understand the question.

14     Q.  Got it.  I think we're on the same page.  Okay.

15         If you see a document that refreshes your memory

16  about something that I've asked or if you remember something

17  and need to change your testimony from earlier later on in the

18  deposition, just let me know.  Okay?

19     A.  Okay.

20     Q.  Sand if you ever need to take a break, let me know.

21  I'm happy to accommodate any breaks.  I just ask that we

22  answer whatever the pending question is before taking that

23  break; is that fair?

24     A.  Yeah, for sure.

25         MS. HUMPHREY:  Okay.  I am going to ask Mr. Bianchi

1   to pull up a document that has been premarked as PX-001

2   so we can all see that on the screen.

3       MR. BIANCHI:  I'm just going to share my screen

4   here.  (Complies.)

5       (Exhibit PX-001 marked for identification.)

6   BY MS. HUMPHREY:

7   Q.  Ms. Gilmore, can you see that document?

8   A.  Yes.

9   Q.  Okay.  And do you recognize PX --

10      THE VIDEOGRAPHER:  I'm sorry.  For the video real

11   quick do you want to focus on the witness or do you want

12   to do side by side with the exhibit?

13      MS. HUMPHREY:  Could we do side by side?

14      THE VIDEOGRAPHER:  Umh-huh, no problem.

15      MS. HUMPHREY:  That sounds great.

16      THE VIDEOGRAPHER:  Okay.

17  BY MS. HUMPHREY:

18  Q.  Okay.  Do you recognize PX-001 as the subpoena that

19  was served by Rumble directing you to appear for this

20  deposition today?

21  A.  I believe so, yes.

22  Q.  Okay.  Did you talk to anyone about this deposition?

23  A.  In what capacity?  Like --

24  Q.  At all.

25  A.  At all?  Yes.

1    Q.  Who did you speak to?

2    A.  Counsel.

3        MR. BROWNING:  And, actually, Kathryn --

4    BY MS. HUMPHREY:

5    Q.  Anyone else?

6        MR. BROWNING:  Kathryn, I'm just going to step in

7    here and remind Ms. Gilmore not to disclose the content

8    of any of our attorney-client communications, which she

9    has not done, but it seems like a timely place for a

10    reminder.

11       MS. HUMPHREY:  Fair.

12   BY MS. HUMPHREY:

13   Q.  Aside from counsel, did you discuss this deposition

14   with anyone else?

15   A.  Like my mom and my partner, who's at home as we're

16   doing this.

17   Q.  Okay.  You said you discussed with your mom.  What

18   exactly did you discuss with your mom?

19   A.  Just that this was happening.

20   Q.  Did you discuss the facts of the case?

21   A.  What would you define as the facts?  Like --

22   Q.  Did you discuss why you believed you were being

23   subpoenaed today?

24   A.  In -- in a fairly vague sense.

25   Q.  Okay.  Did you discuss the documents that you were

1  asked to provide with your mom?

2      A.  I don't think I was asked to provide any documents

3  personally.

4      Q.  You said you discussed with your partner?

5      A.  Oh, sorry.  Let me -- I realize I did search through

6  my computer to see if I had any documents related to Rumble

7  and shared with the lawyers, so that those would have been

8  documents to provide.  So, yes, I did provide documents.

9          But, no, I don't believe I discussed those.  No, I

10  did not discuss documents that we provided with my mom, I

11  don't believe.

12          MR. BROWNING:  I'm just going to interject again to

13      remind Ms. Gilmore, we haven't yet, but we're getting

14      close to our discussions --

15          THE WITNESS:  Right.

16          MR. BROWNING:  -- discussions around documents,

17      which are privileged, so I'd instruct you not to go down

18      that path any further.

19          THE WITNESS:  Cool.

20  BY MS. HUMPHREY:

21      Q.  You said you also discussed this with your partner;

22  is that correct?

23      A.  Yes.

24      Q.  And, again, did you discuss the facts of the case

25  with your partner?

1    A.   Some.

2    Q.   Okay.  What did you discuss with your partner?

3    A.   Just that this was happening, and my -- you know,

4  the fact that I'm being asked to do this, and a little bit

5  about, like, how -- you know, just the facts of the case, like

6  what it is concerning.

7    Q.   And -- and what when you say "what it is

8  concerning," what do you mean?

9    A.   Well, you know, Rumble and what Rumble's concerns

10  seem to be based on what Rumble has raised.

11    Q.   Okay.  Did you discuss any of the documents that you

12  provided to your counsel with your partner?

13        MR. BROWNING:  Objection --

14    A.   No.

15        MR. BROWNING:  -- form of the question.

16  BY MS. HUMPHREY:

17    Q.   Okay.

18        MR. BROWNING:  And you can answer.

19        THE WITNESS:  Oh, sorry.

20        MR. BROWNING:  And remember --

21        THE WITNESS:  Yeah.

22        MR. BROWNING:  -- not to disclose the content of any

23   of our communications regarding those documents or

24   anything else.

25  BY MS. HUMPHREY:

1    Q.  And you said that your partner is present now during

2  this deposition; is that correct?

3    A.  He's in another room right now, but he might come

4  out to make a coffee or something.

5    Q.  Okay.

6    A.  My apartment's a bit small.

7    Q.  Fair.  But he's not sitting with you or in any way

8  influence your testimony, correct?

9    A.  No, no.

10    Q.  All right.  Great.

11      MS. HUMPHREY:  Now I'm going to ask Mr. Bianchi to

12    pull up what has been premarked as PX-002.

13      MR. BIANCHI:  (Complies.)  Can you all see that?

14      MS. HUMPHREY:  Yes, I can see it.

15      (Exhibit PX-002 marked for identification.)

16  BY MS. HUMPHREY:

17    Q.  Can you see it, Ms. Gilmore?

18    A.  Yes.

19    Q.  Okay.  And do you recognize this as the subpoena

20  that was served by Rumble asking you to produce certain

21  documents and electronically-stored information?

22    A.  I believe this is my first time seeing this, but

23  based on my -- as I sit here now reading it, it seems to be

24  that document.

25    Q.  Okay.  So you had not previously read this subpoena,

1   correct?

2        MR. BROWNING:  Objection; misstates her prior

3   testimony.

4   A.  I -- I don't recall.

5        MS. HUMPHREY:  Okay.  And if we could go to PX-003.

6        MR. BIANCHI:  (Complies.)

7        (Exhibit PX-003 marked for identification.)

8   BY MS. HUMPHREY:

9   Q.  Ms. Gilmore, do you see PX-003 on the screen?

10  A.  Yes.

11  Q.  Have you seen this document before?

12  A.  I don't recall seeing it.

13       MR. BROWNING:  Just a suggestion, might we scroll

14  through it?  This is just the top of the document.

15       MS. HUMPHREY:  Sure.

16       MR. BROWNING:  And just a further instruction for

17  Rachel, if you want to see all of a document, just --

18  just ask us to --

19       THE WITNESS:  Yeah.

20       MR. BIANCHI:  -- scroll through it for you.

21       THE WITNESS:  Okay.  Yeah, because it's hard to tell

22  based on just the top.

23       MR. BIANCHI:  Just let me know if I'm going too

24  fast.

25  A.  (Perusing document.)

1  BY MS. HUMPHREY:

2     Q.   Ms. Gilmore, after looking through all 11 pages of

3  PX-003, do you recall whether or not you have seen this

4  document before?

5     A.   I -- I don't recognize it as I sit here today.

6     Q.   Okay.  If I represent to you that this was included

7  as Attachment A to this document subpoena that we just looked

8  at, do you have any reason to doubt that representation?

9     A.   No.

10    Q.   Okay.  You previously stated that you searched your

11 computer for some documents based on the subpoena.  Do you

12 recall where exactly in your computer you searched?

13    A.   I --

14         MR. BROWNING:  I'm going to instruct the witness not

15    to answer this question.  This is getting into our

16    privileged communications with respect what she searched.

17    And if you guys have issues with that, we can take that

18    off -- offline, but I don't think this is an appropriate

19    line of questioning.

20         MS. HUMPHREY:  Respectfully, Counsel, I'm not asking

21    her to disclose your conversations.  I'm asking what she

22    did.

23         MR. BROWNING:  Okay.  Then if she can answer this

24    question without disclosing the substance of our

25    communications, she can answer, but I'm instructing her

1    to limit her answer to that only.

2   BY MS. HUMPHREY:

3       Q.   Ms. Gilmore, please answer what you did to search

4   for documents responsive to the subpoena.

5           MR. BROWNING:  That wasn't the -- with respect, that

6       wasn't the question.  You -- the question was whether you

7       searched, right, or -- I think this is a different

8       question.

9           MS. HUMPHREY:  She had previously stated that she

10      searched her computer.  I'm asking where on her computer

11      she searched.

12   BY MS. HUMPHREY:

13      Q.   Please answer, Ms. Gilmore, if you can.

14          MR. BROWNING:  And a reminder just to limit your

15      testimony to that question only narrowly.

16      A.   I searched my computer.

17   BY MS. HUMPHREY:

18      Q.   What does that mean?

19          MR. BROWNING:  Same instruction.

20      A.   I searched my computer.

21   BY MS. HUMPHREY:

22      Q.   Did you search your e-mail?

23          MR. BROWNING:  Same instruction.

24      A.   I searched my computer.

25   BY MS. HUMPHREY:

1    Q.  This is -- I'm asking you:  Did you search your

2  e-mail?

3    A.  And I can tell you I search my computer.

4    Q.  Do you have an e-mail account, Ms. Gilmore?

5    A.  Yes.

6    Q.  What is your e-mail account?

7    A.  Um, I have multiple e-mail accounts.

8    Q.  Okay.  What e-mail accounts do you have?

9    A.  G-mail.

10    Q.  Okay.  Just one --

11    A.  I --

12    Q.  I'll just stop you right there so we can go through

13  them one at a time.  Sorry.  I don't mean to interrupt, but do

14  you have one G-mail account or multiple G-mail accounts?

15    A.  One.

16    Q.  Okay.  Did you search on G-mail in response to the

17  subpoena?

18    A.  Yes.

19       MR. BROWNING:  Sorry.  I'm just going to put an

20  objection to relevance, but you can answer.

21    A.  Yes, I her searched my computer.

22  BY MS. HUMPHREY:

23    Q.  Okay.  What other e-mail accounts do you have aside

24  from G-mail?

25    A.  Currently?

1    Q.  Yes.

2    A.  I have a -- a Hotmail account that is basically just

3  used for spam.

4    Q.  Did you search your Hotmail account in response to

5  the subpoena?

6    A.  I searched --

7        MR. BROWNING:  Again --

8    A.  -- my computer.

9  BY MS. HUMPHREY:

10   Q.  That is not my question.

11       Did you search your Hotmail account in response to

12  the subpoena?

13       MR. BROWNING:  Objection to the form of the

14   question.

15   A.  I searched --

16  BY MS. HUMPHREY:

17   Q.  Please answer.

18   A.  I searched my computer.

19   Q.  Ms. Gilmore, you just told me you have a Hotmail

20  account, correct?

21   A.  Yes.

22   Q.  Does your Hotmail account have a platform like a

23  website that you go to?

24   A.  Yes, but you can also access it through apps.

25   Q.  Okay.  Do you access it through an app or through

1  the website?

2      A.  Either.

3      Q.  Okay.  Did you go to the website and search for

4  terms related to the subpoena that we saw as PX-002?

5      A.  I searched my --

6          MR. BROWNING:  I'm going to object to the form of

7      that question, but you can answer it.

8      A.  I searched my computer, like --

9  BY MS. HUMPHREY:

10      Q.  How did you search your computer?

11      A.  Um, I'm just -- I don't want to get into privileged

12  stuff here.

13          MR. BROWNING:  If you can't --

14  BY MS. HUMPHREY:

15      Q.  I'm not asking you to tell me what your counsel told

16  you to do.  I'm just asking what you did.

17      A.  I --

18          MR. BROWNING:  Counsel, if she can't answer the

19      question without revealing the content of our

20      communications about what she searched and why, she can't

21      answer the question.

22          MS. HUMPHREY:  I don't understand how she can't, but

23      respectfully, there's nothing privileged about her

24      actions.

25          MR. BROWNING:  There is if they would implicate the

1    instructions that directed those actions, and I think

2    we're getting dangerously close to here, and I don't want

3    her to tread on the privilege.

4        MS. HUMPHREY:  I'm not asking her why she took the

5    actions.  I'm asking her what she did.

6        MR. BROWNING:  And if she can't answer the question

7    without revealing -- you know, if what she did reveals

8    the nature of the instruction, she can't answer the

9    question.

10       MS. HUMPHREY:  This -- that is not how privilege

11    works, respectfully.  I think -- can we go off the

12    record?

13       MR. BROWNING:  Sure.

14       THE VIDEOGRAPHER:  All right.  The time is 15:20 UTC

15    time, and we are off the record.

16       (Discussion off the record.)

17       THE VIDEOGRAPHER:  The time is 15:23 UTC time, and

18    we are back on the record.

19  BY MS. HUMPHREY:

20    Q.  Ms. Gilmore, when we left off we were talking about

21  places -- we were talking about the search for the documents.

22        Again, to be very clear, I am not asking you about

23  any conversations that you've had with your counsel or what

24  your counsel specifically instructed you to do.  I am only

25  asking you about your actions.  So I'm going to back up a

1    little bit so we can try to make this as clear as possible.

2        You received the subpoena and Attachment A that

3    we've put up as PX-002 and 003, correct?

4        A.  I believe so.

5        Q.  And based on those documents, you conducted a search

6    of your computer, correct?

7        A.  I --

8            MR. BROWNING:  Objection to the form of the

9        question, but you can answer.

10       A.  I searched my computer.

11   BY MS. HUMPHREY:

12       Q.  Okay.  You were the one who personally did that

13   search?

14           MR. BROWNING:  Objection to the form of the

15       question.  You can answer.

16       A.  I searched my computer.

17   BY MS. HUMPHREY:

18       Q.  Did you personally search your computer?

19       A.  Yes.

20       Q.  When you say "searched your computer," can you

21   explain to me where on your computer you searched?

22           MR. BROWNING:  To the extent that that would reflect

23       instructions from counsel, I'm instructing you not to

24       answer.

25   BY MS. HUMPHREY:

1    Q.  Did you open up -- you said you have an iMac; is

2  that correct?

3    A.  Yes.

4    Q.  Okay.  Did you open up the Finder application to

5  conduct your search?

6    A.  Yes.

7    Q.  Okay.  Did you -- without telling me what terms, did

8  you input any terms into the Finder application to conduct

9  your search?

10       MR. BROWNING:  I'll instruct the witness to -- I'll

11    instruct her to answer just that very narrow question.

12    We're getting very close to privilege here.

13    A.  I searched on my computer.

14  BY MS. HUMPHREY:

15    Q.  Okay.  Using the Finder application?

16    A.  That was one way I searched.

17    Q.  Okay.  Did you search your Hotmail account?

18    A.  My Hotmail account is on my computer.

19    Q.  So was that included in the search of your computer?

20    A.  I believe it would have been most likely, but again,

21  I -- I just don't want to step into privilege.

22    Q.  Okay.  What other e-mail addresses do you have aside

23  from your G-mail and your Hotmail currently?

24    A.  Currently it's just those two --

25    Q.  Okay.  Great.

1   A.  -- that are active, yeah.

2   Q.  Do you have any paper documents that you searched?

3   A.  I don't believe I had paper documents, but because

4   we were all remote.

5   Q.  Got it.  Is there anything else, aside from what was

6   on your computer, that you recall searching in response to the

7   subpoena?

8       MR. BROWNING:  I'm going to put in my same

9   objection.  To the extent you can answer that question

10  without disclosing our privileged communications, go

11  ahead; but if you can't, please don't.

12  A.  I'm confident I searched the relevant areas.

13  BY MS. HUMPHREY:

14  Q.  That -- Ms. Gilmore, that's not what I asked you.

15      MR. BROWNING:  Can you repeat the question then

16  maybe?

17  BY MS. HUMPHREY:

18  Q.  Aside from your computer, is there any other

19  location that you searched in response to the subpoena?

20      MR. BROWNING:  Same instruction.

21  A.  I am confident that I searched all the relevant

22  areas.

23  BY MS. HUMPHREY:

24  Q.  Again, that is not the question I asked you.

25      Aside from your computer, is there any other

1    location that you searched for documents?

2          MR. BROWNING:  Same instruction.

3      A.   I'm confident that everywhere relevant was searched.

4    BY MS. HUMPHREY:

5      Q.   Where is everywhere relevant?

6      A.   Anything that I ever worked on for Check My Ads.

7      Q.   Okay.  Is there anything that you checked on for

8    Check My Ads that was not located in your computer?

9          MR. BROWNING:  Objection to the extent it calls for

10      speculation.

11    BY MS. HUMPHREY:

12      Q.   Please answer the question.

13      A.   You're -- well, I would have to think about it, but

14    I don't believe so.

15      Q.   Thank you.

16          MS. HUMPHREY:  Can we pull up PX-004?

17          MR. BIANCHI:  (Complies.)

18          (Exhibit PX-004 marked for identification.)

19    BY MS. HUMPHREY:

20      Q.   And, Ms. Gilmore, I'm going to represent to you that

21    this is the amended complaint filed by Rumble against

22    Ms. Jammi and Ms. Atkin, as well as John Does 1-10.

23          Have you seen this document before?

24      A.   I believe so, yes.

25      Q.   Have you read the amended complaint?

1    A.  Yes, I believe so.  This is what was made public

2  initially, right?

3    Q.  I don't know what you mean by made public.

4    A.  It was accessible to the public?

5    Q.  Have you read the complaint in this case?

6    A.  Could you scroll through the whole thing because I

7  just want to make sure I don't misrepresent.

8        MR. BIANCHI:  (Complies.)

9    A.  (Perusing document.)  So, I do recognize this

10  document.  When you say amended complaint, I -- I'm unclear at

11  what point it was amended or what the specifics of that are,

12  so I can't tell you that I've read this specific document, but

13  I am familiar with the content of the complaint overall.

14  BY MS. HUMPHREY:

15    Q.  Understood.  Thank you, Ms. Gilmore.

16        I want to move on from these questions and ask --

17  turn to start asking you about your role at Check My Ads.

18        So you joined Check My Ads in April 2023; is that

19  correct?

20    A.  Yes.

21    Q.  And at that time in April of 2023 what was your

22  role?

23    A.  A reporter, I believe.  I -- we went back and forth

24  on the title a few times, but journalism.

25    Q.  So what -- what work did that entail?

1    A.   Researching and writing articles, eventually doing

2    interviews.  When I first began though I was part time because

3    I was also employed by McGill University to do research.

4    Q.   Okay.  And when you say part time, was -- how many

5    hours a week was that?

6    A.   20.

7    Q.   How long were you part time?

8    A.   From April until the end of December I believe.  I

9    think I went full time right away in the new year.

10   Q.   So full time starting January 2024; is that correct?

11   A.   Yeah, I believe so.

12   Q.   Did your title change at that time?

13   A.   I -- my title changed a few times, but the -- the

14   spirit of what I did remained the same.  I believe it did stay

15   the same when I went full time.

16   Q.   Okay.  So you said you started out with the title of

17   reporter in April 2023.  Can you tell me what the changes were

18   in your title after that?

19   A.   It might have been investigative reporter or

20   investigative journalist.  This is a long time ago now, and

21   the only changes were things like whether to call me -- and --

22   and I, again, would have to look at what they were, but we had

23   discussions about whether to call me, like, a journalist, a

24   reporter, what word we liked best.  And, yeah, but the spirit

25   of it all was within the capacity of being a journalist.

1    Q.   Understood.  So did any of your responsibilities

2    change with those title changes?

3    A.   No.

4    Q.   And do you recall that you posted your role on your

5    LinkedIn?

6    A.   Yes.

7    Q.   And on LinkedIn you describe that role as "Reporting

8    on the business of hate and its main source of revenue:  Ads."

9        Do you recall that?

10   A.   I can't tell you that I remember writing that.

11   Q.   Do you recall that?

12   A.   Sorry?

13   Q.   Do you recall that it says that on your LinkedIn?

14   A.   I trust that you're not misrepresenting it, but I

15   would have to look at it myself.  It was a long time ago.

16   Q.   You have no reason to doubt that that is, in fact,

17   what it says, correct?

18   A.   I mean, only in so far as we're in a deposition.  I

19   would hope you wouldn't represent it.

20   Q.   Well, let me ask you a different question.

21   A.   Umh-huh.

22   Q.   Is that how you viewed your reporting at Check My

23   Ads, reporting on the business of hate?

24       MR. BROWNING:  Objection to the form of the

25   question.

1    A.  I -- I viewed it as --

2   BY MS. HUMPHREY:

3    Q.  I'll rephrase.  I'll rephrase.

4        Did you -- did you view your reporting -- did you

5   review your role at Check My Ads as reporting on the business

6   of hate?

7        MR. BROWNING:  Objection to the form of the

8    question.

9    A.  Yeah, I think it depends what you mean by "business

10   of hate."

11       MS. HUMPHREY:  Mr. Bianchi, can you pull up PX-005,

12    please?

13       MR. BIANCHI:  (Complies.)

14       (Exhibit PX-005 marked for identification.)

15   BY MS. HUMPHREY:

16    Q.  Ms. Gilmore, do you recognize PX-005 as your

17   LinkedIn page?

18    A.  Yes.  It's not my current LinkedIn page, but yes.  I

19   don't believe.  I think I changed my cover photo.  I could be

20   misremembering, but --

21    Q.  Okay.  Do you see at the top of the document to

22   the -- I guess my right side, the right side of the screen, it

23   says --

24    A.  The date.

25    Q.  -- the date?

1    A.  Yes, I do see that.

2    Q.  January 30th of 2025?

3    A.  Okay.  So, yes, then that would be my current.  I

4  need to update it.  I went through and updated a lot of my

5  social banners.

6        MS. HUMPHREY:  And if we could scroll down a little

7    bit to the description of your employment.

8        MR. BIANCHI:  (Complies.)

9  BY MS. HUMPHREY:

10    Q.  And do you see the second thing listed under

11  experience there is your Check My Ads position as

12  investigative reporter?

13    A.  Yes.

14    Q.  And do you see that it says "Reporting on the

15  business of hate and its main source of revenue:  Ads"?

16    A.  Yes.

17    Q.  What did you mean when you wrote that?

18    A.  It was a long time ago, so I can only speculate.  I

19  can tell you what that means to me now.

20    Q.  What does that mean to you now?  Thank you.

21    A.  For sure.  So I think we could agree that racism is

22  hate, that things that are defined as hate speech in law,

23  there -- there is a definition to hate, right?  Some of it is

24  subjective; some of it is not.  And there is evidence of ads

25  ending up on websites that share information that has been

1  deemed to be hateful in accordance with those definitions.

2      Q.  Okay.  And, again, when you say "those definitions,"

3  it sounds like you are referring to the legal def- --

4  definition of hate speech; is that -- is that fair?

5      A.  Well, it -- it depends on jurisdiction.  For

6  example, the -- there's a lot of litigation or legal

7  involvement with the London riots, and that was a story that,

8  at least in part, originated on a website that the -- the

9  falsehoods around who was responsible for the stabbing

10  incident that then led to those riots.  The falsehood that it

11  was a refugee, that was published on a website that ran ads,

12  so to give you an example.

13      Q.  Okay.  Understood.

14          Is there anything else that that statement,

15  "Reporting on the business of hate and its main source of

16  revenue:  Ads," means to you today, other than what you've

17  just described?

18      A.  I -- I can't think right now.  I'm sure if you ask

19  me an hour from now maybe I would think of something else,

20  but...

21      Q.  Thank you.  So tell me about Check My Ads.  What is

22  it?

23      A.  It is an ad tech watchdog.

24      Q.  And what is an ad tech watchdog?

25      A.  There's a lot of opacity in the ad tech industry.

1    If you go through the supply chain, it's very difficult, as

2    studies have shown, to follow the purchase of, you know,

3    the -- the spending of ad dollars, all the way through to an

4    ad running on a website, so a watchdog digs into that.

5        Q.  Okay.  So is it fair to say that Check My Ads'

6    purpose was to combat ad spending that was going to support

7    these types of businesses that the organization viewed as

8    supporting hate?

9        MR. BROWNING:  Objection to the form of the

10       question, and calls for speculation.

11       A.  Yeah, I -- I don't think that's a fair

12   characterization.

13   BY MS. HUMPHREY:

14       Q.  What was Check My Ads' purpose?

15       A.  To provide more transparency in the ad tech business

16   so that advertisers can make a choice about where their ads go

17   in accordance with their decision-making, not Check My Ads'.

18       Q.  And who founded Check My Ads?

19       A.  Claire Atkin and Nandini Jammi.

20       Q.  When did they found Check My Ads?

21       A.  I'd have to Google it, but I know it was young when

22   I joined.  I believe it would have been -- it was just over I

23   think a year old when I joined, so it would have been maybe

24   2021, 2022, but, again, it's -- I'd want to fact check myself.

25   I'd want to Google that.

1    Q.  All right.  And how does Check My Ads raise money?

2    A.  That's not my area.

3    Q.  Okay.  Do you know how Check My Ads raises money?

4    A.  It's -- it's not something that I could give you

5    specific answers on.  It's -- yeah --

6    Q.  Do you know if --

7    A.  -- that wasn't my area.

8    Q.  Do you know if Check My Ads receives donations?

9    A.  We have that on our website that there's a --

10   there's donation links there.

11   Q.  Do you know who are Check My Ads' largest donors?

12   A.  No.

13   Q.  Do you know if Check My Ads has any investors?

14   A.  I don't know that stuff.  That's not my area.  I was

15   a journalist.

16   Q.  When you were at Check My Ads, did anyone track who

17   viewed the content published on Check My Ads' website?

18       MR. BROWNING:  Objection to the form of the

19   question.

20   A.  I -- I don't even know what that would mean.

21   BY MS. HUMPHREY:

22   Q.  Check My Ads had a website, correct?

23   A.  Yes.

24   Q.  And it posted content on that website, correct?

25   A.  Yes.

1    Q.   Are you aware of any metric tracking that was done

2    on that content?

3         MR. BROWNING:  Objection to the form.

4    A.   I -- I -- I don't know.

5    BY MS. HUMPHREY:

6    Q.   Are you aware -- or strike that.

7         Did anyone track how many people viewed the content

8    on Check My Ads' website?

9    A.   I'm not aware of that.

10   Q.   I want to talk about Check My Ads' organizational

11   structure.  Who is in charge at Check My Ads?

12   A.   We have two cofounders --

13   Q.   Do you --

14   A.   -- but -- sorry.  Go ahead.

15   Q.   No, please finish.

16   A.   Well, it depends on how you define in charge,

17   like -- like who's in charge of the organization or different

18   departments, stuff like that.

19   Q.   Who's in charge of the overall organization?

20   A.   I -- I would say Claire and Nandini were the -- were

21   the bosses, but I also had other bosses.

22   Q.   Okay.  Did Claire and Nandini share equal

23   responsibility for Check My Ads?

24        MR. BROWNING:  Objection to the form.

25   A.   They -- I mean, it's hard to say.  They had

1   different roles, different things they looked at, like we all

2   did.

3   BY MS. HUMPHREY:

4       Q.   What was Claire, Ms. Atkin's, role?

5       A.   I believe her title was CEO.

6       Q.   And what was she in charge of?

7       A.   That's hard for me to say.  I don't know what her,

8   like, day-to-day looked like and what she was managing because

9   she was the CEO.

10      Q.   And what about Ms. Jammi, what was her title?

11      A.   I don't actually know.  I think co- -- I know she's

12  cofounder.  I don't know her other...

13      Q.   What was her role in the organization?

14      A.   Again, I think that's a question that you'd want to

15  ask her.

16      Q.   Okay.  Who would decide the organization's

17  priorities?

18          MR. BROWNING:  Objection to the form.

19      A.   Yeah, it depends how you define priorities.

20  BY MS. HUMPHREY:

21      Q.   Did the -- who -- did the organization have specific

22  objectives?

23          MR. BROWNING:  Objection to the form.

24      A.   And, again, it depends how you define an objective.

25  BY MS. HUMPHREY:

1    Q.   How about this:  Who would decide what content Check

2  My Ads published?

3    A.   I mean, again, how would you define content?

4    Q.   What went on its website?  Who made that decision?

5    A.   It depends on the part of the website.

6    Q.   Who had the ultimate say on what went on Check My

7  Ads' website?

8    A.   It depends what part of the website you're talking

9  about when using --

10    Q.   When Check --

11    A.   -- that term.

12    Q.   When Check My Ads would publish articles, who

13  decided on whether or not those articles got published?

14    A.   It -- it changed.

15    Q.   Who were the people who might decide?

16    A.   I don't want to get into the day-to-day editorial

17  decisions for our overall work.  If you want to ask me about,

18  you know, the articles that we're discussing on this case, I

19  can talk about that, but it's -- you're asking me to get into

20  editorial discussions.

21    Q.   Yes, I am.

22        MR. BROWNING:  Well, actually, I can help here.  I

23    mean, I think the line of the privilege is just to just

24    set out our stall here.  Ms. Gilmore's asserting a

25    privilege over unpublished news gathering material,



1    confidential sources, anything related to articles not in

2    the suit here, but Ms. Gilmore you can answer the

3    question sort of generically as to who made these

4    decisions generally at various points in time.

5         THE WITNESS:  Yeah.  Okay.

6    A.   So there was -- there was the initial editor, and

7    then there was a different editor and then there was a

8    director of communications as well who at some point was

9    involved.  And at times we would have discussions with

10   founders, but it wasn't -- that wasn't day-to-day.

11   BY MS. HUMPHREY:

12   Q.   Okay.  Who was the initial editor?

13   A.   Ben Popkin.

14   Q.   And you said then there was a different editor.  Who

15   was that?

16   A.   Brandon Hardin.

17   Q.   And then I believe you said director of

18   communications; is that correct?  Who was that?

19   A.   I believe that was their title.  Rory.

20   Q.   What was Rory's last name?

21   A.   Rory's last name's Gory.  I -- I'd have to recall.

22   That was their name on Zoom and stuff, so I -- I don't

23   remember their legal last name.

24   Q.   And then you said sometimes the founders would be

25   involved.  And just to be clear, that is Ms. Atkin and

1  Ms. Jammi, correct?

2        MR. BROWNING:  Objection; misstates prior testimony,

3    but you can answer.

4    A.  From time to time we would discuss stuff with them.

5    Q.  Was there anyone else who involved in deciding which

6  articles were published by Check My Ads?

7    A.  Well, to be clear, if the question is about who's

8  involved in deciding which articles are published or are not,

9  that was not necessarily something that Clair and Nandini had,

10  like, final say on, but I believe that was the bulk of who

11  would be involved in these discussions.  Alec D'Angelo would

12  be involved in discussions, but that would --

13    Q.  Okay.

14    A.  Yeah.  This is just sort of -- I'm giving you a very

15  broad picture of the -- anyone who could be involved in any

16  editorial discussions.

17    Q.  And I appreciate that.  That is exactly what I'm

18  asking for.  Okay.

19        How was the decision made about what articles to

20  publish on Check My Ads?

21        MR. BROWNING:  And I'm just going to remind

22    Ms. Gilmore it's fine to answer this question sort of

23    generally, but please don't go into specific articles not

24    at issue in this lawsuit.

25        THE WITNESS:  Okay.

1    A.  Well, I mean, like any newsroom, we'd bring pitches

2    to the table.  Sometimes pitches would come from various

3    sources, you know, like, depends on the story.  We would

4    discuss the pitches, research and investigate them to make

5    sure that we can factually and responsibility report them, and

6    that's how we would decide what to move forward on and what

7    not to, like with any newsroom.

8        Q.   And so when you say you brought pitches to the

9    table, other than the people that we've already mentioned, is

10   there anyone else that was sitting at this table, so to speak?

11       A.  Um, well, to be clear, not all the individuals I

12   mentioned were always at that table, but no, there was -- I --

13   I don't believe that anyone else was ever involved in that

14   level of discussion on editorial.

15       Q.  Okay.  And then --

16       A.  There might be -- yeah, not -- not with respect to

17   what was the content of what we would be publishing.

18       Q.  Okay.  Thank you.

19           Does Check My Ads have a board of directors?

20       A.  I believe so, yes.

21       Q.  Okay.  Do you know who's on the board?

22       A.  Not really.  I had an initial introductory, like,

23   e-mail thing, "Hey, she's hired."

24       Q.  Okay.

25       A.  But I -- I don't know.  It -- that wasn't something

1   I had a -- any decision-making power or, like, involvement in

2   discussions of.

3       Q.   And what, to your knowledge, is the board of

4   director's role at Check My Ads?

5       A.   I honestly couldn't tell you.

6       Q.   Does Check My Ads ever collaborate with any other

7   organizations?

8           MR. BROWNING:  Objection to the form of the

9   question.

10          THE WITNESS:  Pardon?

11          MR. BROWNING:  Objection to the form of the

12   question, and also to the extent that this question is

13   going down a path where we're talking about

14   collaborations on articles that are not at issue here,

15   I'm going to instruct you not to answer that question.

16          MS. HUMPHREY:  Respectfully, Counsel, I think I can

17   ask generally speaking what -- who Check My Ads

18   collaborates with.  It doesn't necessarily have to be

19   related to one of the specific articles at issue here.

20   I'm just asking information about the organization.

21          MR. BROWNING:  All right.  Can I hear the question

22   again, please, because I'm just -- I just want to be

23   careful that my client does not inadvertently disclose

24   privileged information.

25          MS. HUMPHREY:  Sure.

1    BY MS. HUMPHREY:

2       Q.   To your knowledge, Ms. Gilmore, does Check My Ads

3    collaborate with any other organizations?

4           MR. BROWNING:  Object to the form of the question,

5       but you can answer.

6       A.   How would you define collaborate?

7    BY MS. HUMPHREY:

8       Q.   Work with.

9       A.   How would you define work?

10      Q.   Does Check My Ads ever receive information from any

11   other organizations?

12      A.   Are you asking me to disclose sources?

13      Q.   I'm asking you whether or not Check My Ads receives

14   information from any other organizations, just whether --

15      A.   Well, what would you define --

16      Q.   -- they --

17      A.   Well, what would you define as an organization?

18      Q.   What would you define as an organization?

19      A.   I mean, it -- I'm trying to answer your question,

20   so...

21      Q.   I'm -- has Check My Ads ever asked a business or an

22   individual to provide it with any specific information?

23          MR. BROWNING:  You can answer that --

24      A.   I'm a journalist.

25          MR. BROWNING:  All right.  To the extent that you

1    can answer that question without disclosing specific

2    sourcing information related to articles not at issue in

3    this suit, you can answer it, but I am instructing you

4    not to disclose any information relating to sourcing.

5    A.   I'm a journalist, so I speak to individuals and

6    organizations.

7    BY MS. HUMPHREY:

8    Q.   And not just speak to them though.  I'm asking:

9    Have you ever requested that they provide you with specific

10   information?

11       MR. BROWNING:  Same instruction.

12    A.   What do you mean when you say specific information?

13   BY MS. HUMPHREY:

14    Q.   Have you ever requested a report from an

15   organization or an individual?

16       MR. BROWNING:  Same instruction, to the extent you

17    can answer that question without disclosing source

18    information, you can; but if you can't, I'm instructing

19    you not to answer.

20    A.   I -- I don't think I can answer that.

21   BY MS. HUMPHREY:

22    Q.   You can't answer whether or not you have ever done

23   that without --

24    A.   Could you repeat the question?

25    Q.   Sure.  Have you -- let me strike that.

1        Has Check My Ads ever requested a report from a

2   business or individual?

3        MR. BROWNING:  Same instruction.

4     A.  I don't think I can answer that without speaking to

5   privileged information regarding sourcing.

6   BY MS. HUMPHREY:

7     Q.  Respectfully, I'm not asking you at this point --

8   well, I'm not necessarily agreeing that there is a privilege

9   to any type of sourcing.  I'm not asking you about the

10   specific sourcing.

11        I'm just asking you as to whether or not Check My

12   Ads has ever asked a business or individual to provide it with

13   a report?

14     A.  How would you define a report?

15     Q.  How would you define a report?

16     A.  It's your question, so I need your answer to that

17   before I can answer you.

18     Q.  I'm the one who's supposed to be asking the

19   questions here.  I'd like you to just answer to the best of

20   your ability.

21     A.  It's hard for me to do that if I don't understand

22   the definitions of the questions you're asking --

23     Q.  Do you know what --

24     A.  -- so...

25     Q.  -- the word "report" means?

1    A.  So in journalism report can mean an article.  It

2    could mean -- like, there's all kinds of things it could mean,

3    so I'm just asking you, like, specifically like --

4    Q.  Any of those.

5    A.  So any material whatsoever, like, any written word?

6    Q.  Sure.  Yes.

7        MR. BROWNING:  Just as to police the privilege line

8    here, you can answer that very specific question --

9        THE WITNESS:  Okay.

10        MR. BROWNING:  -- really without as to specific

11    sourcing.

12    A.  Yes, I have received or discussed information.

13    BY MS. HUMPHREY:

14    Q.  Okay.  With businesses and individuals?

15    A.  Um, all right.  I just want to -- it's hard, because

16    as a journalist it's an ethical line of sources, so I'm just

17    navigating that.

18        Um, I guess in -- in the broadest sense, sure.

19    Q.  Okay.  And, again, Check My Ads is a ad tech

20    watchdog, correct?

21    A.  Overall, yes.

22    Q.  Okay.  So which organizations has Check My Ads

23    collaborated with?

24        MR. BROWNING:  I'm instructing Ms. Gilmore not to

25    answer this question.  It's impossible to -- to the

1    extent that you're asking her to disclose her sources,

2    which this question seems to be aimed at, she's not going

3    to do that at this deposition today.

4        MS. HUMPHREY:  I am asking her to tell me what --

5    who Check My Ads has worked with.  Check My Ads is an ad

6    tech watchdog.

7        MR. BROWNING:  To the extent that you want to ask

8    her questions unrelated to the journalism, that might be

9    okay, but I'd have to listen to the question.  But to the

10    extent that you're asking her who they've collaborated on

11    for news articles or sourcing, except with respect to the

12    article specifically at issue in this lawsuit, I'm

13    instructing her not to answer those questions.  So if you

14    want to make your question more specific and take it out

15    of the journalistic realm, maybe she can answer, but this

16    question she can't.

17        MS. HUMPHREY:  Can we go off the record?

18        MR. BROWNING:  Yeah.

19        THE VIDEOGRAPHER:  Okay.  The time is 15:57 UTC

20    time, and we are off the record.

21        (Discussion off the record.)

22        THE VIDEOGRAPHER:  Okay.  The time's 16:00 UTC time,

23    and we are back on the record.

24    BY MS. HUMPHREY:

25    Q.   Okay.  Ms. Gilmore, when we left off I had asked you

1    which organizations Check My Ads had collaborated with.  Do

2    you recall that?

3        A.  I recall you asking that.

4        Q.  Okay.  And I believe your counsel objected on your

5    behalf based on the journalist privilege.  Do you recall that?

6        A.  Yes.

7        Q.  Okay.  I'm just having this conversation again

8    because we were off the record, so I want to make sure that

9    it's clear on the record what occurred.

10           And do you recall that we refuted that assertion of

11   privilege or disagreed with it?

12       A.  When you say "we," do you mean yourself?

13       Q.  We means me, me.

14       A.  Yeah, you pushed back on it.

15       Q.  Okay.  And at this time I'm going to ask you:  Are

16   you going to follow your counsel's advice not to answer the

17   question?

18       A.  Yes.

19       Q.  Okay.  Thank you.

20           MS. HUMPHREY:  And I think we can take a short break

21   now if that's good for everyone.  How much time do you

22   need, Ms. Gilmore?  Five minutes, ten minutes?

23           THE WITNESS:  Yeah, just five minutes is fine.  I

24   just have to give my dog his pill.

25           THE VIDEOGRAPHER:  All right.

1    MS. HUMPHREY:  Five minutes if that works for

2   everyone.

3        THE VIDEOGRAPHER:  All right.  The time is 16:01 UTC

4   time, and we are off the record.

5        MS. HUMPHREY:  Thank you.

6        (Break taken from 11:01 a.m. to 11:07 a.m.)

7        THE VIDEOGRAPHER:  All right.  The time is 16:07 UTC

8   time, and we are back on the record.

9   BY MS. HUMPHREY:

10      Q.  All right.  Ms. Gilmore, in your view does Check My

11  Ads have a political slant?

12        MR. BROWNING:  Objection to form.

13      A.  How would you define a political slant?

14  BY MS. HUMPHREY:

15      Q.  Does Check My Ads have a political viewpoint?

16      A.  They're nonpartisan.

17      Q.  Okay.  Were politics discussed at Check My Ads?

18      A.  When you say "at Check My Ads," do you mean like in

19  a formal capacity?

20      Q.  Yes.

21      A.  No.  I wouldn't say -- it depends -- what do you

22  mean when you say discussing -- like, politics discussed,

23  because, like, we're also in different countries, like...

24      Q.  What -- what do you think discussing politics is?

25      A.  So it's hard for me to answer because I was a

1  politics reporter for years, so I tell all my friends

2  everything's -- you can tie everything to politics.  Like,

3  they have committee hearings on concussions in hockey, you

4  know, like, so what do you mean?

5     Q.  Did you discuss things that were going on in the

6  political sphere at Check My Ads?

7     A.  We would talk about -- I mean, it's -- it's a

8  workplace, but we're all fully remote, so sometimes we'd ask

9  each other about our weekends and stuff.

10    Q.  Okay.  Did you view Check My Ads as a progressive

11 organization?

12       MR. BROWNING:  Objection to the form.

13    A.  How do you define progressive?

14 BY MS. HUMPHREY:

15    Q.  How do you define progressive?

16    A.  I -- well, to answer your question, I need to

17 understand how you define it.

18    Q.  I'm asking how you define it.  Let me know how you

19 define it, and then I will assume that that is the definition

20 that you are using in giving me an answer.

21    A.  Honestly, it's hard to say because it's a word that

22 can be used, like, for example, in Canada we have a political

23 party called "The Progressive Conservatives," and in some

24 ways, by certain definitions they wouldn't be considered

25 progressive but they use that word, but like by other

1 definitions they would consider themselves to be progressive,

2 so it's kind of -- it -- it's just a -- like, it's so

3 subjective, and frankly my interpretation of it isn't -- is --

4 is slightly -- I -- I couldn't really use it to answer

5 anything definitively here.

6    Q.  Okay.  So that's why I'm trying to understand your

7 interpretation of the word "progressive."

8    A.  Yeah, but I just told you, like, why personally I

9 struggle to interpret it.

10    Q.  All right.  Well, it sounds like you were telling me

11 how an organization called The Progressive Conservatives can

12 have some things that are progressive and some things that are

13 not progressive?

14    A.  Depending on whose definition of progressive.

15    Q.  So what is your definition of progressive?

16    A.  I would -- I -- I honestly -- like, the definition I

17 give you now could be different in half an hour, so it's

18 hard or --

19    Q.  Okay.  Tell me what your definition --

20    A.  -- or in a few seconds it could be different,

21 like --

22    Q.  What's your definition right now as you sit here

23 today?

24    A.  Again, like, it's hard because if I give you a

25 definition now, if I answer a question two minutes from now, I

1    could theoretically have, like, thought of something that is

2    slightly different.  Like, I just -- I think that

3    progressivism is a highly subjective concept that, depending

4    on who you're speaking to, could have different meaning.  And

5    personally that is the lens through which I view the word.  I

6    think it's a word that is so deeply subjective, that I could

7    not necessarily define it for you right now.

8        Q.   All right.  Let me ask you a different question.

9        A.   Yeah.

10       Q.   Do you view Check My Ads as a conservative

11   organization?

12       A.   Again, it depends, like, conservative can even have

13   different meaning.  Like, I'm sure that American politicians

14   might not view the Canadian conservative party as necessarily

15   conservative by their definitions.  There's conservatism with

16   respect to the environment.  Like, there's so many different

17   ways that you can interpret that word, and so it's really hard

18   for me to say.  But I can tell you that they are nonpartisan,

19   and all they do is shine a light on issues and allow others to

20   have the freedom of choice based on factual information.

21   That's not political, that's just reality.

22       Q.   Would you say that Check My Ads generally worked

23   against conservative-leaning media outlets?

24           MR. BROWNING:  Objection to the form.

25       A.   I would once again ask how you define

1   conservative-leaning media.

2   BY MS. HUMPHREY:

3       Q.   Well, Check My Ads has worked to defund Fox News,

4   correct?

5           MR. BROWNING:  Objection to the form.

6       A.   They -- I mean, that stuff was before I was hired.

7   The article -- there is an article that may or may not use

8   that terminology, but that was before my time there, so I

9   can't speak to their motivations in writing it.

10  BY MS. HUMPHREY:

11      Q.   Would you define Fox News as a conservative-leaning

12  organization?

13      A.   It depends on your definition of conservative.

14      Q.   Would you define Fox News as progressive?

15      A.   It depends on your definition of progressive and it

16  depends on the program.  It depends on the host.  There's just

17  so many variables there.  It's really hard to answer

18  definitively.

19      Q.   How did you first learn about Check My Ads?

20      A.   Um, I think just seeing them online.

21      Q.   Where online did you see Check My Ads?

22      A.   Primarily social media.

23      Q.   Which social media sites?

24      A.   Twitter.

25      Q.   Any others?



1    A.   That was where I was first introduced was I saw

2   Nandini Jammi's Twitter account.

3    Q.   And when you first learned about Check My Ads, what

4   did you understand its mission to be?

5         MR. BROWNING:  Objection to the form.

6    A.   Um, you're asking me to remember my first -- first

7   impression of an organization that I couldn't even tell you

8   when I realized what Check My Ads was, because, like, I was

9   introduced to Nandini as an individual through, like, seeing

10   random tweets in passing first, and then later -- I -- I

11   couldn't tell you even when I definitively learned that Check

12   My Ads as an organization exists, so it's really hard for me

13   to say what I initially thought in that moment.

14   BY MS. HUMPHREY:

15    Q.   What is your first recollection, as you sit here

16   today, of your understanding of Check My Ads' purpose?

17         MR. BROWNING:  Objection to the form.

18    A.   How would you define purpose?

19   BY MS. HUMPHREY:

20    Q.   The same as I would define mission.  What was it

21   doing in the world?

22    A.   It was focusing on the ad tech industry.

23    Q.   Okay.  And what was the -- what specifically was it

24   focusing on?

25    A.   The ad tech industry, the opacity of the ad tech

1    industry and ensuring that advertisers have facts at their

2    fingertips.

3       Q.   And today what do you understand its mission to be?

4       A.   It's an ad tech watchdog.

5       Q.   Okay.  Has your understanding of its mission changed

6    from, you know, your first recollection to today?

7       A.   I've learn- -- I mean, I've learned more about it.

8       Q.   Okay.  And has that changed your understanding of

9    its mission?

10      A.   Not really.

11      Q.   You said you were -- you became introduced to

12   Ms. Jammi personally.  Did you go through a hiring process

13   when you got your role at Check My Ads?

14      A.   I did.

15      Q.   And tell me about that hiring process.

16      A.   I interviewed with several individuals.  I sent them

17   my resume and following that interview process was informed I

18   had been hired.

19      Q.   Okay.  Was there a job posting that you were

20   responding to?

21      A.   No.

22      Q.   And how did you become aware that there could be a

23   role available?

24      A.   Nandini messaged me.

25      Q.   When she messaged you, how did she describe the

1    role?

2      A.   That they're launching a newsroom, a newsroom arm.

3      Q.   Okay.  And did she say anything specifically about

4    what role you would be applying for?

5      A.   That they wanted to hire me as a journalist.  I -- I

6    mean, I -- this is all para- -- paraphrase, to be clear, but,

7    yeah, I -- that was my understanding.

8      Q.   You said you interviewed with some people --

9      A.   Yes.

10     Q.   -- correct?

11          Who did you interview with?

12     A.   I had an interview with Sarah Kay Wiley, and an

13   interview with Claire Atkin.

14     Q.   And who is Sarah Kay Wiley?

15     A.   I don't know her exact title, but she was -- I

16   believe she's -- actually, I think she's director of policy is

17   the title, but I'd have to double check that.

18     Q.   You said you submitted a resume?

19     A.   Yes.

20     Q.   Did you submit any other materials?

21     A.   I'd -- I'd have to double check.  I don't think so.

22   I think it was a resume.

23     Q.   Okay.

24     A.   I don't recall if I wrote a cover letter.

25     Q.   And anyone else you interviewed with besides

1    Ms. Atkin and Ms. Wiley?

2        A.  I don't believe so.  I had a conversation with HR at

3    one point, but I don't recall if that was before or after the

4    hiring.

5        Q.   And who did you have a conversation with at HR?

6        A.   Barbi Sprute was the head of all that kind of stuff.

7        Q.   Okay.  You said that you had met Ms. Jammi prior to

8    this.  Can you give me more information about how you met

9    Ms. Jammi?

10        A.   Um, this is a difficult one because it relates to an

11    article I was working on for a previous newsroom.

12            MR. BROWNING:  I -- I can help here.  So I'm totally

13        happy for you to testify about that published article --

14            THE WITNESS:  Okay.

15            MR. BROWNING:  -- and going into your news for it,

16        but to the intent -- extent that the question relates to

17        published information, fine.

18        A.   Yeah, the -- the article we didn't end up -- it

19    got -- like, we didn't pursue it in the end, so it was just

20    factual.  It was research, so there's no published article in

21    the end.

22    BY MS. HUMPHREY:

23        Q.   So, you met Ms. Jammi through researching an article

24    for another organizations; is that fair?

25        A.   Yes.  Yeah, that's fair.

1    Q.  And was that when you were working at McGill?

2    A.  No.

3    Q.  What organization were you working for at that

4  point?

5    A.  Global News.

6    Q.  How long after you met Ms. Jammi did you start

7  speaking with her about the role at Check My Ads?

8    A.  I believe about four or five months.

9    Q.  When you met Ms. Jammi, did you know about her work

10  at Sleeping Giants?

11    A.  Yes.

12    Q.  And what did you know about her work at Sleeping

13  Giants?

14    A.  Um, I just knew what I had seen in the news.

15    Q.  What had you seen in the news?

16    A.  Um, that Sleeping Giants existed and had informed

17  advertisers of where their ads were going.

18    Q.  Do you recall that Sleeping Giants had defunded

19  Breitbart News?

20      MR. BROWNING:  Objection to the form.

21    A.  How would you define defunded?

22  BY MS. HUMPHREY:

23    Q.  How would you define defunded?

24    A.  I'm once again going to ask for yours just because,

25  again, it's your question.

1    Q.   So when I say defunded, I'll try to put it in the

2  terms that you're using.  Are you aware that Sleeping Giants

3  had publically informed advertisers that their ads were

4  appearing on Breitbart News?

5    A.   Yes.

6    Q.   Since you met Ms. Jammi and joined Check My Ads, is

7  there anything else that you have learned about Sleeping

8  Giants?

9    A.   Um, I mean, I -- I read more articles on it.

10    Q.   And did you receive any new information from those

11  articles?

12    A.   Um, I guess I'd have to remember exactly what I knew

13  before, so it's hard kind of hard to say.  Um, I knew -- I --

14  I learned that she left Sleeping Giants.  Um, I -- I knew she

15  was no longer with them, but yeah, I learned that she left and

16  made -- had made public statements related to that, so I read

17  those subsequently.

18         Um, what else?  I saw Steve -- a video of Steve

19  Bannon discussing Sleeping Giants in his own words.  I don't

20  believe I saw that until afterwards, but yeah.

21    Q.   Okay.  Are you aware that Ms. Jammi was a cofounder

22  of Sleeping Giants?

23    A.   Yes.

24    Q.   And how would you describe the organizations that

25  Sleeping Giants informed advertisers about?

1        MR. BROWNING:  Objection to the form.

2    A.  I -- I mean, could -- sorry.  Could you repeat the

3   question?

4   BY MS. HUMPHREY:

5    Q.  Sure.  I believe the question was:  How would you

6   describe the types of organizations that Sleeping Giants

7   informed advertisers about?

8        MR. BROWNING:  Same objection.

9    A.  There's a lot of, like -- okay.  When you say

10  "informed," do you mean, like, that they posted on social

11  media about?

12  BY MS. HUMPHREY:

13   Q.  Yes.

14   A.  Um, I don't know all the companies they -- or all

15  the organizations that they posted about, so I -- I couldn't

16  really definitively say anything about them without looking

17  at, like, a list of them, which I definitely am not aware of.

18  Like, I don't know all the companies they posted about or

19  organizations or individuals or anything else.

20   Q.  Okay.  Let's move on to talk about your specific

21  responsibilities at Check My Ads.

22        I think you already said that you were responsible

23  for drafting publications; is that correct?

24   A.  Yes.

25   Q.  And how many publications would you say you drafted

1  during your time at Check My Ads?

2      A.  I couldn't tell you.  A lot, several.

3      Q.  Can you give me a rough estimate?

4      A.  No.  I'm sorry.  I'd have to go back and count.

5      Q.  Did you ever draft any publications relating to

6  Rumble?

7      A.  Yes.

8      Q.  Do you recall how many you drafted relating to

9  Rumble?

10      A.  No, not specifically.  I'd have to --

11      Q.  Do you recall the titles of any of those

12  publications about Rumble?

13      A.  I couldn't recite them word for word right now.  I

14  know that there's a specific article at issue here that I

15  certainly would be closest to being able to recite, but I

16  couldn't recite it word for word.

17      Q.  Could you paraphrase, please, the articles that --

18  the titles of the articles you -- you drafted about Rumble?

19          MR. BROWNING:  Objection.

20      A.  I don't think I could.  Maybe like -- yeah, no.  I'm

21  sorry.  I don't want to try because I don't want to get it

22  wrong.

23  BY MS. HUMPHREY:

24      Q.  Could you give me the topics of articles you drafted

25  about Rumble?

1    A.  Well, first and foremost, I don't -- I couldn't tell

2    you all the articles necessarily that involved or mentioned

3    Rumble because I wrote so many articles, um, so it's difficult

4    to answer that.

5        Q.  So as you sit here today, you can't tell me any of

6    the topics on which you wrote articles about Rumble; is that

7    correct?

8           MR. BROWNING:  Objection to the form.

9        A.  When you say topics, like, it -- what do you mean

10   when you say topics?

11   BY MS. HUMPHREY:

12       Q.  Can you tell me anything about any article that you

13   wrote about Rumble?

14          MR. BROWNING:  And at this point I just want to

15          interject to say, Rachel, you can testify about published

16          articles, things that are published, but please do not

17          disclose any unpublished new gathering information except

18          with regards to the article at issue in this lawsuit.

19          THE WITNESS:  Yeah.

20       A.  I -- my problem is I don't want to speculate and

21   misremember something, so I -- I could -- I know from --

22   because this lawsuit is happening, that we wrote an article

23   about Rumble that explained stuff about it.

24   BY MS. HUMPHREY:

25       Q.  Okay.  So you -- other than the article at issue in

1    this lawsuit, as you sit here today, do you recall any of the

2    other articles that you wrote about Rumble?

3        MR. BROWNING:  Same instruction.

4      A.  Um, there might have been one published about -- no.

5    Again, I -- I just -- I don't want to speculate and get it

6    wrong.  If, like, the -- sorry.  Let me think for one second,

7    because I want to see if I can say anything helpful to answer

8    your question.

9        I -- like, I -- I know that I wrote some stuff about

10   Russell Brand at some point, but I don't know the degree to

11   which -- like, I -- I don't know if that was about Rumble

12   specifically.  I -- know that Rumble was in the headlines for

13   continuing to work with Russell Brand, so I -- there may have

14   been something tied to that, but again, it's -- that might

15   have actually been in the article at issue here, so...

16   BY MS. HUMPHREY:

17     Q.  Anything else you recall writing on that dealt with

18   Rumble while you were at Check My Ads?

19       MR. BROWNING:  Same instruction.

20     A.  I -- I can't recall specifically, but I can tell

21   you -- I'm -- I'm sure it came up in other articles.

22   BY MS. HUMPHREY:

23     Q.  Did you conduct research on Rumble's online

24   advertising practices while you at Check My Ads?

25       MR. BROWNING:  And, again, you can answer the

1    question to the extent that it relates to the article at

2    issue, but I'm instructing you that other articles of

3    non-published information is privileged.

4        A.  With respect to the article at issue, my area of

5    expertise is on the kind of characters and folks who have

6    publically been documented as saying false things or saying

7    something.  Yeah, so -- so my -- my focus tended to be on

8    also, like, conspiracy theories and research and reporting

9    I've done on that, because I have a reputation as a

10   disinformation reporter.  So, yeah.  So with respect to this

11   article, the aspects that I would have been researching would

12   have been the aspects that I had greater expertise in.

13   BY MS. HUMPHREY:

14       Q.  So is it fair to say that the answer to my question

15   is that you did not conduct research on Rumble's online

16   advertising practices?

17       MR. BROWNING:  Objection to the form and misstates

18   prior testimony, but if you understand the question, you

19   can answer it.

20       A.  Um, I -- I -- I couldn't -- I -- I don't think I can

21   answer that specifically.  Sorry.  Could you repeat it one

22   more time?

23       MS. HUMPHREY:  Strike that question.

24   BY MS. HUMPHREY:

25       Q.  Did you ever research Rumble's online advertising

1  practices?

2      A.  Ever?

3      Q.  Yes, while you were at Check My Ads?

4          MR. BROWNING:  I'm going to give you the -- the

5      privilege instruction.  Can you --

6          THE WITNESS:  Yeah.

7      A.  Yeah, with respect to within the -- the article at

8  issue, my focus was on the -- the areas that I have expertise

9  in.  Um, I'm sure I read some material, but overall that was

10  not the aspect I focused on.

11  BY MS. HUMPHREY:

12      Q.  Do you recall any publicly available material that

13  you read about Rumble's online advertising practices?

14      A.  That wasn't the area I was focusing on for this

15  article, so...

16      Q.  So is the answer no, you don't recall?

17      A.  Um, I -- I couldn't recall specifics because, once

18  again, that was not the area of the article that I was

19  focusing on.

20      Q.  Do you know if you ever looked at Rumble's publicly

21  available SEC filings?

22          MR. BROWNING:  And, actually, just to continue the

23      instruction, please limit your answer to the scope of

24      this article at issue.

25      A.  With respect to researching this specific article, I

1    don't believe that in that capacity I looked at their SEC

2    filings personally.

3    BY MS. HUMPHREY:

4        Q.   I'm actually asking a little bit more broad of a

5    question, and my question is:  While you were at Check My Ads,

6    did you ever review Rumble's S -- publically available SEC

7    filings as part of your research for any article?

8        A.   I believe you're asking me to disclose research for

9    other articles, and that's privileged, as I understand it.

10        Q.   And I'm asking you if you ever looked at publicly

11    available information.  I'm not asking you to disclose any

12    anonymous sources or anything of that nature.

13            MR. BROWNING:  And to the extent that this question

14        is requiring you to disclose whether or not you read the

15        SEC article or SEC filings as part of your research for

16        articles not at issue, I'm going to instruct you not to

17        answer.  If you read it for fun or outside of that

18        capacity, you can.

19        A.   I -- I don't believe I've read it for fun.

20            MS. HUMPHREY:  Respectfully, Mr. Browning, it is

21        entirely relevant as to whether or not Ms. Gilmore or

22        anyone else at Check My Ads had the information within

23        the SEC filings in their knowledge, regardless of whether

24        they obtained that information as related to the

25        October article at issue or otherwise.

1      MR. BROWNING:  Ms. Gilmore has answered that

2   question I believe with regards to this article.  If you

3   want to ask her a question about, you know, whether she

4   had read the SEC filings at the time she wrote the

5   article, that I think would be limited enough not to

6   stray onto the privilege, but the way the question was

7   asked was requiring her to potentially disclose research

8   for other articles, which she can't do due to the

9   privilege.

10      MS. HUMPHREY:  Okay.

11   BY MS. HUMPHREY:

12      Q.   Ms. Gilmore, prior to the publication of the

13   article -- and just to be clear, the article at issue that

14   we're talking about is the October 24th, 2023 article about

15   Rumble.  Is that fair?  Is that your recollection?

16      A.   I believe so.  I'd want to just double check the

17   date, but that makes sense.

18      Q.   I'm going to represent that to you, and later if we

19   look at it and you decide you were talking about another --

20      A.   I'm sure that's -- yeah.

21      Q.   Prior to the publication of that article on

22   October 24th of 2023, did you ever review Rumble's publicly

23   available SEC filings?

24      A.   As it relates to either that specific article or in

25   a personal interest capacity, I don't believe that I read that

1   in those instances.

2       Q.   And just to be clear, when -- the question I'm

3   asking is a bit more broad than that.

4       I'm asking:  Did you ever review it prior to the

5   publication of the October 24th, 2023 article -- regardless of

6   whether it was in relation to that article or your personal

7   life -- any other time?

8       A.   I -- I mean, I -- I don't recall.  One thing that I

9   should probably say as a blanket here is that this was one

10  article of many, many, many articles that I wrote, so it's

11  hard to remember absolute specifics with respect to, you know,

12  pages of things I may or may not have glanced at, but I -- I

13  don't believe so, but...

14      Q.   Understood.  Did you ever receive any training at

15  Check My Ads in journalistic standards?

16      A.   When you say at Check My Ads, do you mean from Check

17  My Ads?

18      Q.   While you were working at Check My Ads.

19      A.   I took outside -- an outside course from the Knight

20  Foundation on advanced digital investigation techniques.

21      Q.   And while you were at Check My Ads, did it have a

22  code of journalism ethics?

23      A.   Do you mean a -- like a -- how -- how would you

24  define a code of journalism ethics?

25      Q.   How would you define a code of journalism ethics as

1  a journalist?

2      A.  I mean, so for the purposes of answering your

3  question, I think I need to understand what you mean when you

4  say that.

5      Q.  Well, why don't you tell me what you think it means,

6  and I will assume that that is the -- the definition you were

7  using while answering my question.

8      A.  Do -- well, I -- I guess, so I would ask you, like,

9  do you mean a written code?  Do you mean -- because I have

10  personal ethics in my journalism that guide my career, and

11  that are the reason why I've had a career because that's

12  all -- your ethics are incredibly important.

13      Q.  Sure.  So I am referring, not to your personal

14  understanding of journalism ethics, but more to did Check My

15  Ads provide you with any type of guidelines or code about its

16  understanding of journalism -- ethical journalism practices,

17  whether that was in writing or in -- or oral?

18          MR. BROWNING:  Objection to the form.  You can

19      answer.

20  BY MS. HUMPHREY:

21      Q.  So did Check My Ads have any type of guidelines on

22  ethical journalism practices?

23      A.  So Check My Ads hired me as we were launching a

24  newsroom.  So these kinds of conversations were -- I mean,

25  this is the -- the stuff that you develop formally as you go,

1    but I certainly came into it with a professional set of

2    ethics, and I understood that I was expected to be

3    professional and responsible in my journalism.

4        Q.  Okay.  So those ethics that you worked by were your

5    own personal ethics, not those told to you by Check My Ads; is

6    that correct?

7         MR. BROWNING:  Objection to the form.

8        A.  I understood that there were expectations of me,

9    given that I was hired as a journalist, to behalf ethically as

10   a journalist.

11   BY MS. HUMPHREY:

12       Q.   But there was nothing in writing that outlined Check

13   My Ads' specific guidelines on ethical journalism practices,

14   correct?

15       A.  I -- there were a lot of things that I reviewed.

16   And, like, I -- I don't want to disclose stuff that is --

17   like, I don't know how much of this I can get into without

18   getting into something privileged.

19         MR. BROWNING:  I can help you.  To the extent that

20          there were written guidelines or guidelines outside of

21          the context of your own published reporting, you can

22          answer that question; but if there are not equally, you

23          can say that too.

24       A.  Um, I just -- so, I know that there were resources.

25   I don't recall exactly what resources we did and did not have.

1    I would have to review that.

2        I had a -- there were expectations set out with

3    respect to the job title, so -- but, again, that's not

4    something that I recall specifics of, but my understanding

5    certainly was that I was beholden to ethical obligations that

6    would be standard in any newsroom or journalistic hiring.

7    BY MS. HUMPHREY:

8    Q.  What was your understanding of that based on?

9    A.  My long-standing -- all my experience as a

10   journalist --

11   Q.  All right.

12   A.  -- leading up to that.

13   Q.  And is there a specific guideline that you follow

14   when you are trying to adhere to ethical journalism practices?

15   A.  I...

16   Q.  And let me -- let me rephrase my question.  I

17   apologize.

18        Are there any specific written guidelines that you

19   adhere to, to guide you on ethical journalism practices?

20   A.  I -- I mean, I have a degree in journalism.  Um, I

21   have worked for years in newsrooms that had ethical codes,

22   and, you know, all of that has shaped my approach to date

23   unilitically.

24   Q.  Okay.  So is it fair to say that you have pulled

25   your understanding of ethical journalism practices from a

1    number of sources?

2       A.  From -- yeah, from my career basically.

3       Q.  Okay.  Thank you.

4          But Check My Ads did not have its own ethical code

5    when you were there, correct?

6          MR. BROWNING:  Objection to the form.

7       A.  Yeah, it depends how, again, you define it, because

8    we've talked about communicate -- different forms of

9    communicating that.  It's --

10   BY MS. HUMPHREY:

11      Q.  To be clear, Check My Ads did not have its own

12   written ethical code while you were employed there?

13      A.  I -- I would have to review the resources.  I -- I

14   can't recall specifically.

15      Q.  So today, as you sit here, you are uncertain whether

16   or not Check My Ads had any type of written code to inform

17   ethical journalism practices?

18      A.  I certainly understood that if I behaved unethically

19   I would not -- I would be like -- it would not be acceptable.

20      Q.  I understand that.  My question is a little bit

21   different, and I'm really just trying to understand, not

22   whether you believe that you're practicing ethically or, in

23   fact, you were, but whether or not Check My Ads had its own

24   written ethical code for journalists' journalism practices?

25      A.  That is something I would have to review the

1    resources, but I can certainly tell you that I had an

2    understanding that I needed to be ethical.  And you can

3    extrapolate from that, you know, that it was clear to me that

4    I needed to behave ethically.

5        Q.   Okay.  And I'm not trying to attack -- in my

6    questions right now I'm not trying to attack your -- your

7    ethical standards or whether or not you behaved ethically.  I

8    am simply trying to understand.

9           If wanted to know what Check My Ads believed was

10   ethical journalism, is there a document that I can look at

11   that will tell me?

12       A.   And -- and that's the area where I would want to

13   review the resources.  I -- I can't think of, like, a specific

14   thing, but I know that we were, for example, working to draft

15   CP style guidelines, because every newsroom has different, you

16   know, policies on things like Oxford commas, and so, you know,

17   we had resources that we were drafting in general, so I --

18       Q.   So it's fair to say --

19       A.   So I would want to review that to be able to

20   properly answer this question.

21       Q.   But today, without reviewing that, my understanding

22   is you cannot answer whether or not Check My Ads had a written

23   ethical code for journalism practices; is that correct?

24           MR. BROWNING:  Objection to the form.

25       A.   I mean, in so far as I couldn't tell you

1   definitively anything that's written or not with Check My Ads'

2   resources that I do not currently have access to.

3   BY MS. HUMPHREY:

4       Q.  All right.  Thank you.

5           I want to talk a little bit about Ms. Jammi's social

6   media.  So if you could tell me:  Does Ms. Jammi have a social

7   media account on X?

8       A.  Yes.

9       Q.  All right.  And do you --

10      A.  Last I checked.

11      Q.  I'm sorry?

12      A.  I said last I checked.  A lot of people are deleting

13  X accounts these days, so I haven't looked in a while.

14      Q.  And my understanding is that you followed Ms. Jammi

15  on X; is that correct?

16      A.  Yes, yes.

17      Q.  And is that still correct?

18      A.  I believe so.

19      Q.  How long do you think that you followed Ms. Jammi on

20  X?

21      A.  I'd have to look.  I don't recall exactly when I

22  started following her.

23      Q.  Would it have been prior to you joining Check My Ads

24  in 2023?

25      A.  Again, I'd have to check.  I sometimes accept a

1    message or request and don't realize that, you know, like --

2    like, if someone reaches out to me or I reach out to them,

3    sometimes we end up talking and then I forget to follow them

4    and then months later I'm like, "Oh, no, I'm sorry.  I -- I

5    should follow you to be polite," so I -- I couldn't tell you

6    exactly when.

7        Q.   Earlier you told me that how you were introduced to

8    Ms. Jammi was in part by, you know, going back and forth on

9    Twitter, is that correct, or X?

10       A.   So introduce --

11            MR. BROWNING:  Objection, but --

12            THE WITNESS:  Sorry.  Go ahead you.

13            MR. BROWNING:  -- you can answer.

14       A.   Well, I was going to say, like, when you say

15   introduced, you mean like when I first learned of her

16   existence or when I actually met her?

17   BY MS. HUMPHREY:

18       Q.   I guess when you developed -- you first developed a

19   relationship with Ms. Jammi by going back and forth on X,

20   correct?

21       A.   My first interactions with Nandini I believe were on

22   Twitter.

23       Q.   Okay.  Thank you.

24            And do you typically read what Ms. Jammi posts on

25   Twitter?

1    A.  Not all of it.

2    Q.  Do her posts come across your Twitter feed --

3       MR. BROWNING:  Objection.

4  BY MS. HUMPHREY:

5    Q.  -- sometimes at least?

6       MR. BROWNING:  Sorry.  Objection to the form.

7    A.  That -- again, that's -- it's really hard to answer

8  that.  When you say come across, do you mean like are they

9  served up algorithmically?

10  BY MS. HUMPHREY:

11    Q.  Are they -- when you log onto X, is there a -- a

12  feed that you see posts that the platform thinks may be of

13  interest to you?

14    A.  When I -- when I log onto X, there is a "for you"

15  tab and a "following" tab.

16    Q.  Okay.  And do you ever see her posts on the "for

17  you" tab?

18    A.  Not anymore.  It's basically just Elon Musk these

19  days.

20    Q.  Do you ever see her posts on the "following" tab?

21    A.  I -- I mean, I'm sure I've seen them over the --

22  I -- I likely have, but it's hard to say.  I see a lot of

23  posts on Twitter.

24    Q.  When you were at Check My Ads, did you ever help

25  Ms. Jammi with posting on her Twitter account?

1    A.  No.  That was hers.

2    Q.  Was anyone else, aside from Ms. Jammi, responsible

3  for drafting social media posts on the Twitter -- or I mean

4  social media posts for her?

5    A.  For her, on her personal account?

6    Q.  Correct.

7    A.  Her personal account was her personal account, so

8  no.

9    Q.  Did Ms. Jammi ever ask you to conduct research for

10  her social media posts?

11    A.  Not for social media posts, not for Twitter posts, I

12  mean.

13    Q.  Did she ever ask you to fact check her personal

14  social media posts?

15    A.  I mean, also can I ask you what you define as a

16  personal social media posts as well?

17    Q.  My understanding, anything that had her name as

18  opposed to Check My Ads on it.

19    A.  Um, with respect to like Twitter and stuff, no.  I

20  was not involved in her Twitter account.  It's possible that

21  she -- like, we all tweet stuff based on things that we learn,

22  and we learn things through a variety of ways, but I never

23  directed or researched specifically for her Twitter account.

24    Q.  To your knowledge, did anyone else at Check My Ads

25  ever help her specifically with her Twitter account?

1    A.  Not that I'm aware of, no.

2    Q.  And you said -- you clarified your answer earlier

3  that with respect to her Twitter posts, you had never assisted

4  her with those type of social postings?

5    A.  Umh-huh.

6    Q.  What types of social media posts had you assisted

7  her with?

8    A.  Well, so when I first started working for Check My

9  Ads, some of the stuff that I researched, we published on the

10  Check My Ads' LinkedIn page, but I don't believe that had

11  anything to do with her personal.  Yeah, and -- and I think it

12  was all just Check My Ads.

13    Q.  All right.  Thank you.

14        Similarly, I'm asking about Ms. Atkin.  To your

15  knowledge does Ms. Atkin have a Twitter, now X, account?

16    A.  Yes, last I checked.  I, again, don't know if she

17  still does.

18    Q.  Understood.  And do you follow Ms. Atkin on her X

19  account?

20    A.  Last I checked I do.

21    Q.  And do you recall how long you have followed

22  Ms. Atkin on X?

23    A.  I couldn't say.

24    Q.  Did you ever help Ms. Atkin draft her posts on X?

25    A.  No, I did not.

1    Q.  Did you ever conduct research for her posts on X?

2    A.  No, I did not.

3    Q.  Did you ever fact check her posts on X?

4    A.  No, I did not.

5    Q.  Did you ever assist her in any way with her personal

6  social media accounts?

7    A.  No, I did not.

8    Q.  To your knowledge, did anyone else at Check My Ads

9  ever help Ms. Atkin with her personal social media accounts?

10   A.  Not that I'm aware of, no.

11   Q.  And, again, just to be absolutely clear, when I say

12  personal, I mean accounts that had her name on them as opposed

13  to Check My Ads.  Does that change your answers in any way?

14   A.  No, I don't -- no.

15   Q.  Thank you.

16       Now, getting to Check My Ads.  Check My Ads has

17  social media accounts, correct?

18   A.  Yes.

19   Q.  Okay.  Check My Ads has an X account?

20   A.  Yes.

21   Q.  Check My Ads has a LinkedIn?

22   A.  Yes.  And, again, these are all last I checked, so

23  I -- I'm not looking right now.

24   Q.  Check My Ads has a Facebook account?

25   A.  Yes, last I checked.

1    Q.   Check My Ads has an Instagram account?

2    A.   Yes, last I checked.

3    Q.   Does Check My Ads have any other social media

4   accounts that you're aware of?

5    A.   Bluesky I think, um, a TikTok as well, yup.

6    Q.   When you were at Check My Ads, who was responsible

7   for posting on Check My Ads' social media accounts?

8    A.   It varied over the time I was there.

9    Q.   Who -- who could it have been while you were there?

10    A.   I had access.  Brandon Hardin had access.  Nandini

11   had access.  Claire had access I believe.  I think maybe Rory

12   had access.  I don't know.  I don't actually know the list of

13   exactly who because it wasn't my responsibility to -- I wasn't

14   responsible for those kinds of decisions, so I -- I couldn't

15   tell you exactly who had log-in access.

16    Q.   And I'm sorry.  Who was the last individual that you

17   mentioned?  I didn't hear that.

18    A.   Rory, I think.

19    Q.   Rory?  Okay.

20    A.   Yeah.  I mean, I -- I'm not sure if Rory ever

21   actually posted, but they were the director of communications

22   though, so...

23    Q.   While you were at Check My Ads, was there a single

24   person who was responsible for approving content that would go

25   on the Check My Ads' social media accounts?

1    A.  It changed.  Largely, I would say that, like,

2    overall from the time he became the editor, Brandon Hardin had

3    a lot of responsibility for our socials, but yeah, it -- and I

4    think that he didn't have to get permission necessarily.

5    Q.  Who else or who would have to get permission and --

6    A.  Well, I would probably ask Brandon before I posted

7    anything because he was my boss, my direct boss.

8    Q.  Is there anyone else that you would have asked for

9    permission before posting on Check My Ads' social media

10   accounts?

11   A.  Generally if Brandon gave permission, that was all I

12   needed.

13   Q.  If Brandon wasn't available, who would you ask?

14   A.  Rory.

15   Q.  If Rory wasn't available, who would you ask?

16   A.  Um, I don't know if there was ever a situation where

17   neither Brandon nor Rory were available.

18   Q.  When you would post on Check My Ads' social media

19   accounts, did you draft those posts yourself?

20   A.  Um, it depended.  Sometimes I'd be asked to post

21   something for Brandon, for example.

22   Q.  But you could be asked to post for Brandon.  Would

23   anyone else ask you to post for them?

24   A.  I -- I don't recall.  Primarily my day-to-day was

25   with Brandon.

1    Q.   Did you conduct research for those social media

2    posts that you put on Check My Ads' accounts?

3    A.   Well, I mean, we filmed and edited TikToks, so those

4    would have been researched, for example.

5    Q.   Did you edit any other -- any posts that were going

6    on the Check My Ads' social accounts?

7    A.   When you say edit, do you mean like video specific?

8    Q.   I mean video or written word.

9    A.   I mean, I would generally check any social stuff

10   with Brandon first.

11   Q.   Did you fact check social media posts before

12   publicizing them on Check My Ads' accounts?

13   A.   Yes.

14   Q.   Were there any other editorial roles that you had in

15   dealing with Check My Ads' social media accounts?

16   A.   How would you define an editorial role?

17       THE WITNESS:  Sorry.  Go ahead, John.

18       MR. BROWNING:  No, that's --

19   BY MR. BROWNING:

20   Q.   Well, you are the journalist, so I'm going to ask

21   you for the definition of an editorial role.

22   A.   Again, to be able to answer your question, I need to

23   know what you mean with the question you're asking me.

24   Q.   So why don't you let me know what you think an

25   editorial role is, and I will assume that that's the

1    definition you're using while you're answering my question.

2        A.  Could you repeat the question?

3        Q.  Sure.  Did you have any other editorial roles in

4    posting to Check My Ads' social media accounts?

5        A.  So I would take editorial role to be writing,

6    editing, researching, fact-checking I guess.

7        Q.  Okay.

8        A.  Is that fair?

9        Q.  Yes.

10       A.  Yes?  I would say that that was the bulk of my

11   editorial roles, and filming I guess, depending.  Um, those --

12   like, sometimes we had artwork for them, but I wasn't

13   responsible for that.

14       Q.  Okay.  What do you know about Rumble?

15       A.  That it's a video platform.

16       Q.  How did you first learn about Rumble?

17       A.  I don't recall my first instance of discovering

18   Rumble.

19       Q.  Have you ever used Rumble?

20       A.  What do you mean by used?

21       Q.  Have you ever posted on Rumble?

22       A.  I've never posted on Rumble.

23       Q.  Have you ever visited Rumble?

24       A.  Yes, I've visited Rumble.

25       Q.  For what purpose did you visit Rumble?

1    A.  Several purposes.  For example, one of their live

2    streamers has said things like he would laugh if I was raped

3    and has threatened me and his organization has, such that I

4    reported to law enforcement.  So there are times when I've

5    went and visited his channel which is still live on Rumble.

6    Q.  Okay.  Did you ever visit Rumble for professional

7    purposes on Check My Ads?

8    A.  Yes.

9    Q.  And how often would you visit Rumble for

10   professional purposes for your employer Check My Ads?

11       MR. BROWNING:  Okay.  I'm just going to check in

12    here to say I'm okay with this sort of general line of

13    questioning, but if we get into specifics on articles,

14    unpublished details of articles that are not the article

15    in suit, I'm instructing you not to answer.

16    A.  Um, I mean, first and foremost I -- I couldn't

17   necessarily tell you how many times I've visited.  Um, yeah,

18   I -- I -- sorry.  I couldn't tell you how many times I've

19   visited Rumble.

20   BY MS. HUMPHREY:

21    Q.  Would you say you visited Rumble weekly, monthly,

22   something different?

23    A.  That's hard to answer because it might have been

24   something, like, depending on what I'm working on, depending

25   on personal stuff, depending on, you know, work I'm doing

1   independently of Check My Ads.

2       Q.   Okay.  Were you familiar with Rumble before you

3   joined Check My Ads?

4       A.   Oh, likely.  That's hard to say.  I'd have to

5   speculate because I -- I just don't know the timeline of when

6   I first discovered it.  It would make sense if -- because I

7   did a lot of reporting of extremism and white nationalist

8   groups, far right extremist groups, that I would have done

9   some research on that platform because some of those voices

10  are on Rumble.

11      Q.   What is your opinion of Rumble, as you sit here

12  today?

13      A.   Um, what do you mean by, like -- like, when you say

14  opinion, what kind of -- oh, do you mean journalistic opinion,

15  personal opinion, like what?

16      Q.   All of the above.  What is your opinion on Rumble?

17      A.   Um, I think Rumble is a video platform that allows

18  individuals to post on their platform when they are -- even

19  when they are -- I guess they would put it as censored by

20  other social media platforms.  And at times that certainly

21  allows for the proliferation of disinformation, hateful

22  speech, and just demonstrably incorrect information, like,

23  QAnon conspiracies, COVID-19 disinformation, things like that.

24      Q.   Are you aware that Rumble generates some of its

25  revenue through advertisements that are placed on Rumble?

1    A.  Yes.

2    Q.  And how did you learn that?

3    A.  Well, I think it's kind of -- anyone that grew up

4  with the Internet knows that websites make money from ads.

5  That's why we have to watch them.

6    Q.  What sources do you believe that Rumble generates

7  its ad revenue from?

8    A.  Define source.

9    Q.  Where does Rumble's ad revenue come from?

10    A.  I'm aware that it has a Google ID.

11    Q.  What does that mean?

12    A.  That means that it is plugged into Google's

13  advertising network.

14    Q.  And how did you become aware that Rumble was plugged

15  into Google's advertising network?

16    A.  Over the course of the last year I guess through

17  various research, conversations, um, yeah.

18    Q.  Is it fair to say that that advertising comes from

19  your work at Check My Ads?

20    A.  Not necessarily because that wasn't what I focused

21  on for that article.

22    Q.  Okay.

23    A.  But I'm answering about that article specifically.

24    Q.  I guess I don't understand your answer to my

25  question.

1      You learned this over the course of the last year,

2   you said.  Where did you learn it from?

3      MR. BROWNING:  Objection to the form.

4   A.  Yeah, I'm sorry.  I'm not sure I understand the

5   question.  Sorry.

6   BY MS. HUMPHREY:

7   Q.  Did you tell me -- okay.

8      So you told me that you learned that -- that Rumble

9   is plugged into Google's advertising network, correct?

10   A.  Umh-hum, yes.

11   Q.  And I asked you where that -- what that

12   understanding is based on or how you learned that, and my

13   under- -- your answer was that you learned it over the course

14   of the last year; is that correct?

15   A.  Well, I was just giving a really rough timeline of

16   when I likely would have become aware of this, but it's

17   difficult because on the one hand I don't want to get into any

18   research that I may have done for things we may or may not

19   have published that are unrelated this specific article.

20      With respect to this article, I focused on areas

21   that were less to do with the ad network and more in line with

22   what my predominant expertise was in.  But obviously, like, I

23   know today that for a variety of reasons, up to and including

24   the fact that we're sitting here today, that it has a Google

25   ID and it's locked into the Google Ad network.

1    Q.   Did you -- prior to October 24th of 2023, did you

2    know that Google was -- or, pardon me, Rumble had a Google ID?

3    A.   I don't recall.  I -- I -- I'm not sure.

4    Q.   Okay.  While you were working at Check My Ads, did

5    you know that Rumble had a Google ID?

6    A.   I honestly don't remember if I knew that

7    specifically or not.  It wasn't what I researched for that

8    article specifically or the --

9    Q.   Do --

10   A.   -- the focus of my research.

11   Q.   Do you believe that Rumble would not be viable

12   without revenue from Google Ads?

13   A.   I'm not familiar with Rumble -- I -- I don't know

14   enough about its behind-the-scenes mod- -- like income streams

15   and whatnot.

16   Q.   Are you familiar with the Rumble advertising center?

17   A.   Um, is -- could you explain it to me?  I -- I'm not

18   sure if I'm familiar with it just based on the title.

19   Q.   Sure.  Do -- are you familiar with the fact that

20   Rumble was creating its own source of advertising revenue?

21   A.   Um, I understand that Rumble was working in some

22   capacity to get involved in the business of ads.  I don't know

23   the nature of what that looks like per se, because, again, my

24   area of expertise was focused elsewhere when I was researching

25   this article.

1    Q.  Are you aware that Rumble's a public company?

2    A.  Is public?  Yes I am aware of that.

3    Q.  Are you aware that public companies are required to

4  report material financial risks and public filings with the

5  SEC?

6        MR. BROWNING:  Objection to the form.

7    A.  Um, I -- I'm -- no, I don't think so.  I'm -- again,

8  my area of expertise tends to be on disinformation and

9  grifters.

10  BY MS. HUMPHREY:

11    Q.  Were you aware that as a public company Rumble would

12  have to make public filings with the SEC?

13        MR. BROWNING:  Objection to the form.

14    A.  Did you say -- sorry.  Could you repeat the

15  question?

16  BY MS. HUMPHREY:

17    Q.  Sure.  Are you aware that as a public company Rumble

18  was required to make public filings with the SEC?

19        MR. BROWNING:  Same objection.

20    A.  Do you mean am I aware of that as I sit here today?

21  BY MS. HUMPHREY:

22    Q.  Yes.

23    A.  Um, I -- I don't know that for a fact.  If you are

24  representing that to me as a fact, I could check it

25  afterwards.

1    Q.  No.  I'm just asking for your understanding.

2        To your knowledge, has Check My Ads ever engaged in

3    any efforts to inform advertisers that their ads were

4    appearing on Rumble?

5    A.  My understanding is that Check My Ads informs

6    advertisers where their ads are going.

7    Q.  And, to your knowledge, did Check My Ads ever do

8    that with respect to Rumble?

9    A.  Um, inform specific advertisers?  I couldn't say.

10   I'd have to go back over everything.

11   Q.  What efforts are you aware of that Check My Ads took

12   to let advertisers know that their ads could be appearing on

13   Rumble?

14       MR. BROWNING:  Object to -- to the form.

15   A.  Um, when you say "efforts," do you mean, like, are

16   you talking about specifically formal stuff that Check My Ads

17   did in its, like, official capacity or are we talking about,

18   like -- what are we referring to here?

19   BY MS. HUMPHREY:

20   Q.  We're referring to anything that Check My Ads did to

21   let advertisers know that their ads could be appearing on

22   Rumble.

23   A.  Well, we certainly wrote an article that Rumble's

24   running ads.

25   Q.  Okay.  Are there any other things that Check My Ads

1  did in addition to writing that article?

2      A.  Um, what do you mean by things?

3      Q.  I mean anything.

4      A.  And like, do you mean Check My -- so, I mean, I -- I

5  couldn't tell you right here today every single -- you know,

6  I -- I -- it's hard to say.

7      Q.  What can you tell me?

8      A.  Um, I can tell you that we published that article.

9  I'm sure that we socialed it, as we'd say, like pub- -- like,

10  anytime we publish an article, we put it on social media for

11  the most part.

12         Um, I'm -- I'm sure that others shared it in their

13  personal capacity, but that was not -- you know, that was them

14  as individuals.

15         Um, I -- I couldn't really tell you what else.

16  The -- there's materials I've seen in the context of this

17  litigation, so -- that, like, relate to public conversations

18  about this.

19      Q.  When you say you would have socialed it, what social

20  media platforms would you have posted the article to?

21      A.  That's hard to say because we changed -- like, for

22  example, Bluesky didn't I believe exist at the time, and,

23  like, you know, so you're asking me to recall what specific

24  social media decisions I made I -- like, over a year ago, so I

25  couldn't tell you.  Likely on various platforms.  Um, I don't

1  know if we did.

2     Q.  What kind?

3     A.  Well, I would say probably Twitter, but again, I

4  would have to double check that because it was so long ago.

5     Q.  All right.  Did you personally share the

6  October 24th, 2023 article?

7     A.  I would have to double check.  I don't remember it.

8  I probably did, but I would -- I -- that's speculation.  I --

9  I -- I mean, I tend to share articles I write, so --

10    Q.  Let's look at --

11    A.  -- or have a hand in writing.

12    Q.  Sure.

13       MS. HUMPHREY:  Let's look at what's been premarked

14    as PX-007.

15       MR. BROWNING:  Ms. Humphrey, right before we do

16    that, I'm happy to go down this line, but if we could

17    take a break at some point in the near future, I don't

18    when the best time for that --

19       MS. HUMPHREY:  Sure.  We can go ahead and take a

20    break now if that works for everyone.  Want to take a

21    five-minute break?

22       MR. BROWNING:  Just five minutes is fine for me, but

23    how much do you think you need, Rachel?

24       THE WITNESS:  Five minutes would be fine.

25       MS. HUMPHREY:  Great.

1        THE VIDEOGRAPHER:  All right.  The time is 17:11 UTC

2    time, and we are off the record.

3        (Break taken from 12:11 p.m. to 12:19 p.m.)

4        THE VIDEOGRAPHER:  The time is 17:20 UTC time, and

5    we are back on record.

6        MS. HUMPHREY:  Okay.  If we could take a look at

7    what has been P -- premarked, pardon me, PX-009.  Sorry,

8    Warren, I switched things up on you.

9        MR. BIANCHI:  (Complies.)

10        MS. HUMPHREY:  Okay.

11        MR. BROWNING:  Just so you guys know, this is

12    showing -- oh, yeah, no, these are all exhibits.  I just

13    don't want you to inadvertently show me something I

14    shouldn't see, so, but I am seeing a number of documents

15    here.

16        MR. BIANCHI:  Okay.  Is -- is the screen showing

17    PX-009 now?

18        MS. HUMPHREY:  Yeah, but we can also see the rest of

19    your screen.

20        MR. BIANCHI:  Hold on.  Sorry.

21        MS. HUMPHREY:  Expand it.

22        MR. BIANCHI:  (Complies.)

23        MS. HUMPHREY:  There we go.  That's probably good.

24        MR. BIANCHI:  Okay.

25        MS. HUMPHREY:  Okay.

1          (Exhibit PX-009 marked for identification.)

2    BY MS. HUMPHREY:

3      Q.   Ms. Gilmore, I'm going to represent to you that this

4    is a copy of the -- pardon me -- October 24th, 2023 article

5    that Check My Ads put out with the title "Eight Things to Know

6    About Rumble, The Toxic Platform That Will Stream the GOP

7    Debate."

8          Does -- do you recognize that?

9      A.   Yes.

10     Q.   Okay.  And this article was published on

11   checkmyads.com, correct -- or .org, apologies, correct?

12     A.   Yes, on checkmyads.org.

13     Q.   Okay.  And if I could just direct you to right below

14   the -- the title it says that it was published on October 24th

15   of 2023, correct?

16     A.   It does say that, yes.

17     Q.   Okay.  And next to that it says Nandini and Claire,

18   correct?

19     A.   Yes.

20     Q.   All right.  And Nandini -- or Nandini, I apologize,

21   refers to Nandini Jammi; is that correct?

22     A.   Yes.

23     Q.   Okay.  And Claire refers to Claire Atkin?

24     A.   Yes.

25     Q.   And you were involved in the drafting of this

1  article, correct?

2      A.  Yes.

3      Q.  Do you recall whose idea it was to write this

4  article?

5      A.  No, I don't.

6      Q.  Do you recall why Check My Ads decided to publish

7  this article?

8      A.  I don't recall exactly why.  I can tell you from a

9  journalistic perspective that generally when something's in

10  the news we call that a news hook, so the fact that Rumble's

11  streaming the GOP debate makes sense for the news hook, for

12  the timeliness.

13      Q.  Okay.  Are there any other reasons why Check My Ads

14  decided to publish this article that you can recall?

15      A.  Not that I recall.  I -- yeah, I just don't recall

16  that conversation.

17      Q.  What was your role on this article exactly?

18      A.  I wrote parts of it and researched those parts.

19      Q.  Okay.  When you say you researched those parts, to

20  be clear, as we've already discussed, you did not look at

21  Rumble's SEC filings, correct?

22      A.  So the -- well, sorry.  You mean as a part of this

23  research I did not look at --

24      Q.  Correct.

25      A.  -- or see -- so first of all, I can't say for sure

1    whether or not I saw those because, you know, we worked in

2    a -- a -- there's a shared document, but the aspects that I

3    was writing about were less to do with the advertising side

4    and more about the kinds of content on the platform and --

5    yeah.

6        Q.   Okay.  Did you -- do you recall if you reviewed any

7    of Rumble's press releases when researching for this article?

8        A.   Could you just repeat that?  I think -- I don't know

9    if you froze for a second or if it was my headphones.

10       Q.   Do you recall reviewing any of Rumble's press

11   releases when researching for this article?

12       A.   Um, I -- I do know that at some point I read through

13   various aspects of its own published materials on its website,

14   like, about it and stuff and its timeline, things like that.

15   I don't know if timeline's the right word, but it got a bunch

16   of information on their website.

17       Q.   All right.  Did you review any of the old social

18   media posts when researching for this article?

19       A.   Likely.  I -- I don't recall exactly what I did and

20   didn't do because, again, it was so long ago and I've written

21   so many articles since, but, um, I'm sure I saw some.

22       Q.   Did you review any of Ms. Jammi's social media posts

23   when writing this article -- when researching this article?

24   Apologizes.

25       A.   I don't think so.

1    Q.  Did you --

2    A.  I'm not sure.  I --

3    Q.  Did you review --

4    A.  I don't know why I would have.

5    Q.  Okay.  Did you review any of Ms. Atkin's social

6  media posts when researching for this article?

7    A.  I -- I don't believe so.

8    Q.  What do you recall reviewing in your research for

9  this article?

10    A.  Um, if we looked at the article itself, like, if we

11  scrolled down a bit, I might be able to speak to that a little

12  more specifically.

13    Q.  Sure.

14      MR. BIANCHI:  Complies.

15    A.  Because, honestly, it was so long ago.  Um, if you

16  could -- I don't believe -- yeah, if you could keep going.

17      MR. BIANCHI:  (Complies.)

18    A.  So stop here.

19      MR. BIANCHI:  (Complies.)

20    A.  (Perusing document.)  I likely read the way that it

21  describes itself in its own documentation, and articles about

22  Rumble I'm sure I would have read, and I --

23    Q.  Do you remember any -- pardon me.

24    A.  Sorry?

25    Q.  Do you remember any specific articles that you read

1   about Rumble?

2       A.  I definitely read about advertisers choosing to not

3   place their ads on Rumble because they didn't know that they

4   were advertising on Rumble, and when they learned that, they

5   expressed their, you know, freedom of speech in that way to

6   not fund that.

7       Q.  What specific advertisers are you referring to?

8       A.  I'd have to double check.  I believe HelloFresh

9   might have be one of them, but again, that's something I

10  would -- I would need to double check.

11      Q.  And how did HelloFresh learn that its ads were being

12  placed on Rumble?

13      A.  I'm not sure.  I'd have to review those materials.

14      Q.  Did Check My Ads inform HelloFresh that its ads were

15  being placed on Rumble?

16      A.  I don't recall.  I don't believe so, but I'd have to

17  double check.

18      Q.  What other materials did you review in researching

19  this article?

20      A.  If you wouldn't mind scrolling down a little more,

21  please?

22          MR. BIANCHI:  (Complies.)

23      A.  (Perusing document.)  Yeah, I definitely researched

24  some of the personalities that were on Rumble and had

25  partnerships with Rumble or Rumble had made public overtures

1   to seeking partnerships, so, you know --

2   BY MS. HUMPHREY:

3      Q.   What do you mean by personalities?

4      A.   Like Joe Rogan, who is not a personality with

5   Rumble, as I understand it, but who Rumble made an overture to

6   and expressed a desire to have a financial deal with, a

7   financial partnership.

8          Russell Brand, who Rumble publically stood behind

9   when he was facing multiple sexual assault allegations.

10         Alex Jones; Nick Fuentes, the white nationalist.

11  Alex Jones and who has faced and lost defamation lawsuits with

12  respect to how he spoke about the family members of child

13  victims of a mass shooting.  You know, those kinds of

14  personalities that Rumble likes to platform.

15         And, yeah, those would be the personalities I'm

16  referring to.  Dan Bongino, who I believe is a shareholder or

17  has some kind of business association with and has also

18  platformed there, who engages in election denial, things like

19  that.  So those would be the personalities.

20         And I can also tell you that I certainly went to

21  Rumble and reviewed -- it ranks the top videos and -- and

22  such, and I know that I checked those for a period of time to

23  see what kinds of things it was offering up on -- on its own

24  in those areas to get a better sense of what kind of content

25  is both popular and then amplified by the platform.

1    Q.   Anything else that you recall reviewing while

2    researching this article?

3    A.   If we could just scroll through it a little bit

4    more, that may help jog my memory, but I likely read that

5    Media Matters analysis that was public.

6    Q.   And where did you get that Media Matters analysis

7    from?

8    A.   Well, it was -- I was Googling and researching

9    Rumble, so I'm sure that would have come up in that capacity,

10   but I can't say for sure, but I -- they had a lot of -- they

11   had reporting on Rumble, so it was a lot of -- I read so many

12   articles about it, and so I'm sure that was just one of them.

13   Q.   Did you research -- so they're reporting on Rumble.

14   Did you get that from your Googling?

15   A.   I couldn't tell you exactly, but that would make

16   sense because that --

17   Q.   Okay.

18   A.   -- that's -- that fits my methodology for how I

19   research this kind of thing.

20   Q.   Okay.  Anything else that you're recalling as we

21   scroll through this?

22   A.   I think that's basically all I can think of.  Um,

23   yeah, because there's -- there's aspects I wrote and aspects I

24   didn't, that my colleague Alec I believe wrote.  Nandini and

25   Claire did not write this.  It was just published under their

1   byline because I want a public employee yet.

2       Q.  Okay.  So what is a byline?  Can you tell us about

3   that?

4       A.  It's the name associated with an article, but it can

5   be -- there are a lot of decisions made around it.  For

6   example, if an article is likely to lead to harassment against

7   a journalist, they might publish something as staff, for

8   example, like New York Times staff New York Post staff.

9       Q.  Okay.  But often a byline is used to alert a reader

10  to who actually wrote the article, correct?

11      A.  Um, often.

12      Q.  And it's -- one of its purposes can be to give those

13  writers credit for the article, correct?

14      A.  That is -- can be one, but there's many reasons why

15  someone might have a byline.

16      Q.  Is it fair to say that if someone reviews or reads

17  an article with a specific byline, it indicates that that

18  person was involved in writing the article?

19      A.  I do think that's generally fair to say, but

20  obviously there are some exceptions.

21      Q.  Okay.

22      A.  Like, for example, the staff example.

23      Q.  Sure.  When there's not a specific person listed, it

24  would be difficult to -- for someone to determine who actually

25  wrote that article, correct?

1    A.  Umh-hum.

2    Q.  But in an instance where there are specific

3  individuals, a reader will -- can assume that those are the

4  people involved in writing the article, correct?

5    A.  I don't think that's necessarily always the case

6  because there could be contextual clues that suggest that, you

7  know, for example, if every single article is signed off on

8  with the first names of an individual, not first/last name,

9  which is standard nomenclature for bylines, you know, you

10  could assume that maybe that's the equivalent of staff or --

11    Q.  Why would --

12    A.  -- other publication.

13    Q.  -- you assume that?

14    A.  Because it's not a formal byline as indicated by the

15  fact that it's not written in a traditional manner.

16    Q.  Do you think that that is something that the average

17  reader would understand?

18    A.  Um, well, I think that likely they would be clued

19  off that something outside standard practice is occurring when

20  there's no last name, and therefore would maybe be less

21  inclined to make the standard assumptions.

22    Q.  In this particular case, Ms. Jammi and Ms. Atkin's

23  name is on the byline as we discussed, correct?

24    A.  Well, their first names are.

25    Q.  Their first names, fair.

1        But it's correct that their first names are listed

2   on the byline, correct?

3   A.  Yes.

4   Q.  And did Ms. Jammi review the article prior to its

5   publication?

6   A.  I don't recall.

7   Q.  Did Ms. Atkin review the article prior to its

8   publication?

9   A.  I don't recall.

10   Q.  Did Ms. Jammi give Check My Ads permission to put

11   her name on the article?

12       MR. BROWNING:  Objection to form.

13   A.  Yeah, it's -- it's hard to say because, again, what

14   you do you consider to be permission?  And I don't -- I also

15   wouldn't necessarily have been privy to any such discussions

16   if they even occurred.

17   BY MS. HUMPHREY:

18   Q.  Who made the decision about whose name would go on

19   the byline?

20   A.  I don't recall.  Not me.

21   Q.  Was Ms. Jammi informed in making the decision as to

22   whether or not her name would be on the byline?

23   A.  I couldn't speak to that.

24   Q.  Was Ms. Atkin involved in making the decision as to

25   whether or not her name would be on the byline?

1    A.  I couldn't speak to that because, again, I'm -- I

2  don't know that I was a part of those conversations.

3    Q.  Have you ever had your name placed on the byline of

4  an article you didn't write or weren't involved in?

5    A.  I've had -- when colleagues have used significant

6  portion of previous articles, like at Global News and stuff,

7  they might just throw me a double byline out of respect for,

8  you know, whatever.  So, yes, in some ways that does happen.

9    Q.  Okay.  When that would occur, would they tell you

10  that they were going to place your name on the byline?

11    A.  Generally, but again, like, if I'm not working, for

12  example, it's possible.

13    Q.  Do you recall a specific instance where anyone put

14  your name on the byline of an article without telling you?

15    A.  Um, a specific instance, I couldn't say, but I've

16  written so many articles over my career that I could not tell

17  you the byline decisions of every single one.

18    Q.  Understood.  And this article was published on Check

19  My Ads' website, correct?

20    A.  Yes, I believe so.

21    Q.  Do you know how many views this article had?

22    A.  I couldn't say.

23    Q.  Do you know if it was published anywhere else?

24    A.  I don't believe so, but I -- sometimes there are

25  websites that steal content, but I -- I couldn't say.

1    Q.  I'd like to direct your attention to the last -- to

2  the last fact here, Number 8.  Do you see that?

3    A.  Umh-hum, I do.

4    Q.  Okay.  And this section is -- has a subheading

5  "Rumble Is Heavily Monetized By Google Ads."

6       Do you see that?

7    A.  I do.

8    Q.  Have you gotten a chance to review this section of

9  the article?

10   A.  Um, I have reviewed it.

11   Q.  Do you agree with the statement that Rumble is

12  heavily monetized by Google ads?

13   A.  Um, well, it -- it depends again on how you define

14  heavily in this instance.

15   Q.  So what did you understand heavily monetized to mean

16  when this article was published?

17   A.  Well, this wasn't the area that I focused on, so...

18   Q.  Did you have any role in publishing this subheading

19  of the article?

20   A.  I don't recall.  Likely not really.

21   Q.  Who did?

22   A.  I -- um, I couldn't say for sure.  I -- I -- I

23  would -- I know that Alec D'Angelo and Brandon Hardin were the

24  other employees who were involved in this article and the

25  drafting.

1      Q.   Okay.

2      A.   So I would -- but I -- I couldn't tell you for sure.

3  I can just tell you that I don't believe I wrote this part.

4      Q.   Okay.  Do you know if anyone else was involved in

5  drafting this part of the article?

6      A.   I don't know.

7      Q.   Okay.  And what was Alec D'Angelo's role in drafting

8  this portion of the article?

9          MR. BROWNING:  Objection to form, to the extent that

10      it calls for speculation.

11  BY MS. HUMPHREY:

12      Q.   Do you know what --

13      A.   When you say -- do you mean his formal role?

14      Q.   Well, let me ask a different question.

15      A.   Yes.

16      Q.   Do you know what Alec D'Angelo -- Alec D'Angelo's

17  role was in drafting this portion of the article?

18      A.   How do you define role?  Like, are you asking --

19  what are you asking?

20      Q.   What did he do to help publish this portion of the

21  article?

22      A.   I mean, I couldn't say necessarily because I wasn't

23  really involved in this part.  I focused on other things,

24  but -- but he likely researched it, fact checked, wrote,

25  edited -- well, Brandon would have edited, and he would have

1  responded to edits.

2  Q.  Okay.

3  A.  But that's speculation based on my -- you know, how

4  these things usually go in general.

5  Q.  Okay.  And what about Brandon Hardin, do you know

6  what he did on this article prior to it being published?

7  A.  Again, I -- I couldn't.  You'd have to ask Brandon

8  that.

9  Q.  Okay.  Well, you said he likely edited earlier?

10  A.  Yeah.  That would make sense, but again, I just --

11  you would have to ask him because I'm not him.

12  Q.  Do you agree with this statement that Rumble is

13  heavily dependent on Google Ads?

14  A.  It depends how you define heavily and it depends how

15  you define dependent.

16  Q.  How do you define heavily dependent?

17  A.  It's your question.

18  Q.  And I'm asking you what you understand heavily

19  dependent to mean?

20  A.  It depends on the context.

21  Q.  Okay.  And the context of who is providing ad

22  revenue to Rumble, what does heavily depend --

23  A.  It's impossible to answer without looking at --

24  because I don't know their -- the breakdown of the decisions

25  that they make, how they spend their money, all kinds of

1  things that could influence whether any amount of money is

2  heavy or not or dependent or not or --

3      Q.  Okay.

4      A.  -- something they're dependent on or not.

5      Q.  So as you sit here today, you are unable to

6  determine whether or not Rumble's business is actually heavily

7  dependent on Google Ads?

8          MR. BROWNING:  Objection to the form of the

9      question.

10     A.  Yeah, I'm not -- I'm not sure that's a fair

11 characterization.

12 BY MS. HUMPHREY:

13     Q.  Well, I'm asking you:  Do you agree with the

14 statement that Rumble's business appears to be heavily

15 dependant on Google Ads?

16     A.  What I can tell you is that we know that Rumble has

17 a Google ID, and is therefore involved in the Google Ad

18 business.

19         We also know separately as a fact that the

20 Department of Justice is currently pursuing antitrust action

21 against Google for it's -- what they refer to as a monopoly on

22 the digital ads business.  Therefore, as I sit here today, it

23 stands to reason that if this -- you know, in this industry,

24 where there is so much opacity where it's hard for even

25 everyone involved at any level to know exactly where money is

1    coming from or going, it is hard for any individual to

2    definitively say whether someone is heavily dependent on

3    something or not, but it stands to reason that Google's

4    monopoly suggests that -- or alleged monopoly suggests --

5    would suggest that anyone involved in profiting from digital

6    ads would likely need some kind of involvement with Google, as

7    I sit here today thinking about that question.

8        Q.   Okay.  So your understanding of how heavily Rumble

9    is funded by Google Ads is based on your understanding of

10   Google Ads in general in the marketplace; is that correct?

11       MR. BROWNING:  Objection to the form.

12       A.   Um, it's -- it's based on several factors of which

13   that is one but not the only one.

14   BY MS. HUMPHREY:

15       Q.   What are the other factors?

16       A.   Well, Rumble has Google ID.

17       Q.   All right.

18       A.   There's tons of opacity in this business, so many

19   folks, you know -- there are middlemen along the way in the ad

20   industry that may not be Google by name, but have partnerships

21   or affiliations or end up giving money to Google.  There's

22   people who -- you know, there's just middlemen upon middlemen

23   upon middlemen.

24           So there are so many factors going into it, to the

25   degree that I believe it was the ISBA did a study trying to

1    track the money that went from an initial advertiser to a

2    website, with the full participation of everyone in the supply

3    chain, and they found 15 percent went to an unknown delta.

4    And then a year later when it was a bit better, it was down to

5    3 percent.  That's a significant amount of money in an

6    industry that's set to be worth a trillion dollars.

7         So I would -- I'm kind of losing my train of

8    thought, but overall -- could you repeat the question so that

9    I can make sure I'm not getting off topic?

10        MS. HUMPHREY:  To be honest, I don't recall the

11    question.  Madam Court Reporter, could you please repeat

12    the question?

13        THE REPORTER:  Well, the question was:  What are the

14    other factors?

15        So if you want the previous question as well?

16        THE WITNESS:  No, that's fine.

17        THE REPORTER:  Okay.

18        THE WITNESS:  I think it's the other factors that

19    would inform the heavy monetization question.

20    A.   So, yeah, all of that, that I just described to you,

21    which I understand is a lot of information, is the reality of

22    how cumbersome the digital ad business is, but that is the

23    digital ad business that Google allegedly has a monopoly over.

24    So that wide variety of factors, coupled with the reality that

25    Rumble has a Google ID and is, you know, tethered into that ad

1  network as a result, means that it -- as I sit here today, it

2  stands to reason, it makes logical sense, that they would have

3  some kind of a business relationship with Google Ads,

4  particularly if ads are any significant aspect of their

5  business model, but I don't know that, what their business

6  model exactly looks like.

7  BY MS. HUMPHREY:

8    Q.  I just want to make sure that I understand the --

9  the sort of like main buckets of information that -- that are

10  factors.

11    A.  Sure.

12    Q.  Because it sounds like you're saying that the

13  factors that you would look at are Google's place in the --

14  you know, the -- the advertising sphere in the marketplace,

15  and the fact that Rumble has a Google ID, and then the opacity

16  of the advertising market in general; is that fair?

17      MR. BROWNING:  Objection to the form.  You can

18    answer.

19    A.  Um, I wouldn't say that that -- those are the only

20  reasons, but I would say that those are some of the reasons.

21  BY MS. HUMPHREY:

22    Q.  What are the other reasons?

23    A.  I mean, the other returns why, as I sit here today,

24  I -- I mean, it -- again, it -- it's just it's hard to even

25  say what those reasons could or could not be because, again,

1   there could be several factors at play, particularly with

2   respect to the definitional issues with the very question

3   you're asking.  So it's -- it's a bit hard to answer.  I just

4   don't want to definitively say that those are the only

5   factors.

6       Q.   Before an article is published containing your work,

7   do you generally review the entire article?

8       A.   Um, depends on the article.

9       Q.   Okay.  In this specific case as it relates to this

10  October 24th, 2023 article marked as PX-9, do recall if you

11  reviewed the entire article prior to its publication?

12      A.   I generally don't recall.

13          MS. HUMPHREY:  I'm going to show you -- or if we can

14      pull up PX-011, PX-11.

15          MR. BIANCHI:  (Complies.)

16          (Exhibit PX-011 marked for identification.)

17  BY MS. HUMPHREY:

18      Q.   And I'm going to represent to you that this is a

19  tweet from Ms. Jammi from December 26 of 2022, to which Rumble

20  has replied.  Do you recognize this document?

21      A.   Insofar as I've seen the complaint.

22      Q.   Had you ever seen this -- this Twitter post prior to

23  reviewing the complaint?

24      A.   I don't recall.

25      Q.   Okay.

1    A.  I don't believe so, but maybe, like...

2    Q.  Sure.

3        MS. HUMPHREY:  If we could pull up what's been

4    premarked as PX-0012.

5        MR. BIANCHI:  (Complies.)

6        (Exhibit PX-0012 marked for identification.)

7    BY MS. HUMPHREY:

8    Q.  Okay.  And, Ms. Gilmore, do you recognize this

9    document?

10    A.  No, not -- no, not in the way that it's -- no, I

11    don't.

12    Q.  Okay.  Do you -- can you tell me anything about what

13    this is, even if --

14    A.  I --

15    Q.  -- you've never seen this particular e-mail before?

16    A.  I mean, I -- I would be speculating.  It -- it looks

17    like it's a -- potentially an outline.

18    Q.  Okay.  I'll represent to you that this document was

19    produced by the defendants in discovery in this action.

20        And I'm going to ask you:  It says it's from Notion.

21    Do you know what Notion is?

22    A.  Yes, I do.

23    Q.  What is Notion?

24    A.  Um, oh, God.  It -- it's like a -- a work app that

25    has different pages you can work in.  You can do a lot of

1    stuff in it, and it's -- we used it a lot at Check My Ads.

2        Q.  Got it.  And here it says it's to Nandini at

3    checkmyads.org.

4           To your knowledge, is that Ms. Jammi's Check My Ads'

5    e-mail address?

6        A.  Yes.

7        Q.  Okay.  And this first page it says, "Brandon Hardin

8    edited."  Is that Brandon Hardin referring to the same

9    Mr. Hardin that you've been mentioning?

10        A.  I believe so.

11        Q.  Okay.

12        A.  That would make sense.

13           MS. HUMPHREY:  All right.  And if we can go down to

14    Page 4, which is Bates stamped ending in 1635.

15           MR. BIANCHI:  (Complies.)

16           MS. HUMPHREY:  There we go.

17    BY MS. HUMPHREY:

18        Q.  Do you see there it says "Farah Sattar edited"?

19        A.  Yes.

20        Q.  Okay.  Who is that person?

21        A.  So Farah Sattar was a previous employee who did --

22    she was a previous employee at Check My Ads.

23        Q.  And what was her role at Check My Ads?

24        A.  Um, I -- I -- we didn't work super closely, so I

25    couldn't say everything that she did.  I know she some- -- I

1   know that she was the person who sometimes handled security

2   because I dealt with a lot of death threats, so I would often

3   bring those to her.  Like, when I had my live location shared

4   one day, she helped me through that.  But I -- I know she did

5   a lot of other stuff too.  I just don't know exactly what they

6   were.

7      Q.   And why would she be editing this article?

8         MR. BROWNING:  Objection to --

9      A.   She might have been asked.

10        THE WITNESS:  Sorry.  Go ahead.

11        MR. BROWNING:  Yeah.  My objection calls for

12   speculation.

13     A.   And as evidenced by my "might have."

14  BY MS. HUMPHREY:

15     Q.   Right.  Do you know if she had a role in editing the

16  October 24, 2023 article?

17     A.   I don't know.

18     Q.   Do you know if she's still employed by Check My Ads?

19     A.   I believe she's not.

20        MS. HUMPHREY:  All right.  If we could go down to

21   Page 5, which ends in Bates Stamp 1636.

22        MR. BIANCHI:  (Complies.)

23  BY MS. HUMPHREY:

24     Q.   And do you see at the top there it says "Sarah

25  edited"?

1    A.  Yes.

2    Q.  Who is that referring to?

3    A.  I would guess Sarah Wiley, Sarah Kay Wiley.

4    Q.  And I believe earlier you said Ms. Wiley was the

5   director of policy; is that correct?

6    A.  I believe so, but she also has a legal background,

7   so, you know, she could sometimes be helpful.

8    Q.  Okay.

9    A.  Anyone who had, you know, research and stuff, there

10  was a chance that they would at some point have a

11  conversation, you know.

12   Q.  Do you know recall if she was involved with editing

13  the October 24th, 2023 article?

14   A.  Um, I -- I don't recall specifically.  It looks,

15  based on this document, clearly she at least changed one

16  sentence, but I -- I couldn't tell you otherwise.  I -- I

17  don't recall.

18   Q.  Okay.  Do you know if she's still employed by Check

19  My Ads?

20   A.  I believe she is.

21      MS. HUMPHREY:  I now want to turn to a document we

22  have premarked as PX-24.

23      MR. BIANCHI:  (Complies.)

24      (Exhibit PX-24 marked for identification.)

25  BY MS. HUMPHREY:


1    Q.   Now, do you recognize this document, Ms. Gilmore?

2    A.   Um, I don't recognize this document specifically.

3    Q.   Okay.  It says it's to rachel@checkmyads.org.  Is

4    that your Check My Ads e-mail address?

5    A.   Yes, it is.

6    Q.   Is this document -- is it fair to say that this

7    document is similarly from that Notion platform that you were

8    discussing earlier?

9    A.   Yeah, it looks like it.

10   Q.   Okay.  And so is this an auto-generated e-mail to

11   you about edits that had occurred by October 20th, 2023 to the

12   October 24th, 2023 article?

13   A.   Based on the information in front of me it appears

14   to be that.

15        MS. HUMPHREY:  Okay.  If we can go down to the 13th

16   page, which is Bates stamped ending in 2298.

17        MR. BIANCHI:  (Complies.)

18   BY MS. HUMPHREY:

19   Q.   And right at the top there below that red text it

20   looks like it says, "So if we want to stop it from hurting

21   democracy, this is what we prevent it from doing, AKA go after

22   the new ad exchange."

23        What does that mean to you?

24   A.   Honestly, it's hard to say.

25   Q.   Okay.  Do you know what the new ad exchange was

1  referring to?

2      A.  Um...

3      Q.  And we can go up a little bit if that would be

4  helpful.

5      A.  Yeah, maybe.

6          MR. BIANCHI:  (Complies.)

7          THE WITNESS:  Thank you.

8  BY MS. HUMPHREY:

9      Q.  You can review the document.

10     A.  (Perusing document.)

11         MS. HUMPHREY:  And maybe further.

12         MR. BIANCHI:  (Complies.)

13     A.  (Perusing document.)  Yeah, this looks like it's

14  potentially my research.

15  BY MS. HUMPHREY:

16     Q.  Okay.

17     A.  I don't know if it all is.  Some of it is because I

18  remember seeing the Macedonia stuff.

19     Q.  Do you believe that the new ad exchange was

20  referring to Rumble releasing its own ad exchange?

21     A.  Um, likely.

22     Q.  Okay.  And by "go after the new ad exchange," do you

23  recall what that meant?

24     A.  I honestly -- the -- the reality is, at the time

25  this wasn't the area that my expertise was focused on, so if I

1  wrote that, it was probably partially me working through my

2  thoughts trying to understand how the dynamics work between

3  older ad tech, newer ad exchange, and that's why I didn't

4  write this part is because it was a bit outside of my -- at

5  the time, it wasn't where I had my special expertise, I would

6  say.

7      Q.   And I just want to be fair to you.  Do you actually

8  know if you wrote that portion?

9      A.   Um, I think it's likely because of the other caps

10  things and the fact that I recognized some of the research.

11     Q.   Okay.

12     A.   I couldn't say definitively because I don't recall

13  writing it exactly.  So I would say it's likely me, but I

14  can't say for sure.

15     Q.   Okay.  Do you know if anybody else would have been

16  involved in this research?

17     A.   I would have shared this research likely with

18  Brandon and Alec --

19     Q.   Okay.  Got it.

20     A.   -- but I don't know how much of it they would have

21  read depending on the part.  You know, for example, the part

22  that Alec was working on, he did more of the ad tech stuff.

23     Q.   Got it.

24         MS. HUMPHREY:  Okay.  If we can go to the second to

25      last page with the Bates stamp ending 2303.

1        MR. BIANCHI:  (Complies.)

2   BY MS. HUMPHREY:

3     Q.   And here if you see it says "Brandon Hardin edited,"

4   and then below that first bigger blue box where it says, "And

5   Media Matters found ads for Rumble's live stream of the first

6   republican presidential primary debate on numerous pro-Hitler

7   and neo-Nazi videos."

8        Do you see that there?

9     A.   I do see that.

10    Q.   Okay.

11    A.   I also see the underline that implies that's a link

12   as well.

13    Q.   Oh, you believe that to be a link?

14    A.   It would make sense.

15    Q.   Okay.  Do you know who provided -- is this a

16   document that you found while searching your computer?

17    A.   This?  Like, sorry, which document are you referring

18   to?

19    Q.   This document that we're looking at now.

20    A.   The PX-024?

21    Q.   Umh-huh.

22    A.   I -- I don't know.

23    Q.   Okay.

24    A.   It's unlikely because I was no longer -- well, if

25   this is from my e-mail, my e-mail would have been with Check

1    My Ads, not with me anymore.

2         MR. BROWNING:  I can actually help with this,

3    Kathryn, because Rachel wouldn't know it, but this is

4    from a search of her working that she has no longer

5    personal access to, so it wouldn't have been anything she

6    searched.  I think we pulled it up.

7    BY MS. HUMPHREY:

8      Q.  Do you know where this information from Media

9    Matters came from?

10     A.  I don't know.  I would assume -- and this is

11   speculation -- that it's probably one of their public

12   published articles that its referencing, just like it's

13   referencing several other articles throughout this document

14   from several different sources.

15     Q.  Do you know if Media Matters provided any

16   information directly to Check My Ads --

17     A.  Not that I'm aware of.

18     Q.  -- for this article?

19     A.  None that I'm aware of.

20     Q.  Okay.

21     A.  I never worked directly with Media Matters.

22     Q.  Okay.

23         MS. HUMPHREY:  I want to go back to -- and we can

24   take this off the screen.

25         MR. BIANCHI:  (Complies.)

1    BY MS. HUMPHREY:

2        Q.   If we can just go back to discussing the

3    October 2023 article and who was involved.

4             What was Ms. Jammi's role in the October 24, 2023

5    article?

6        A.   Um, I don't recall exactly.  Um, yeah, I --

7        Q.   Okay.

8        A.   I couldn't tell you exactly because it's so long

9    ago.

10       Q.   Okay.  Do you recall if she made any comments on the

11   October 2023 article?

12       A.   Um, I would say it's possible, but I would have to

13   review the documentation because I -- I don't recall

14   specifically.

15       Q.   Did Ms. Jammi ever say anything to you that you can

16   recall about the October 2023 article?

17       A.   I honestly don't recall.

18       Q.   Okay.  What about Ms. Atkin, what was her role in

19   the October 24, 2023 article?

20       A.   Claire would have had even, like, less of a role,

21   but I don't recall if there was any involvement whatsoever.

22       Q.   Okay.  Did Ms. Atkin make any comments on the

23   October 24, 2023 article?

24       A.   I don't recall any --

25       Q.   Do you recall --

1      A.  -- unless I review documentation.

2      Q.  Do you recall if Ms. Atkin ever said anything

3  directly to you about that October 2023 article?

4      A.  I -- I don't recall her doing so.

5          MS. HUMPHREY:  Okay.  If we can pull up what's been

6      premarked as PX-13.

7          MR. BIANCHI:  (Complies.)

8          (Exhibit PX-013 marked for identification.)

9  BY MS. HUMPHREY:

10     Q.  So here, Ms. Gilmore, I'll represent to you that

11 this is a Twitter post from Ms. Jammi from August 16th, 2023.

12 Do you recognize this?

13     A.  Only from the -- reviewing the complaint and stuff.

14     Q.  So you never saw this prior to your review of the

15 complaint; is that correct?

16     A.  I don't recall seeing it.  It's possible I've seen

17 it, but I -- I don't recall specifically.

18     Q.  Okay.  And based on our discussion earlier, you

19 wouldn't have had any involvement in the drafting or

20 researching or fact-checking of this post, correct?

21     A.  Correct.  I would not have.

22         MS. HUMPHREY:  If we could pull up PX-014.

23         MR. BIANCHI:  (Complies.)

24         (Exhibit PX-014 marked for identification.)

25 BY MS. HUMPHREY:

1    Q.   And I'll represent that this is a tweet from

2   Ms. Atkin from September 26th of 2023.  Do you recognize this

3   document, Ms. Gilmore?

4    A.   Only insofar as I've seen it as part of the

5   complaint.

6    Q.   Okay.  So you don't recall ever reviewing this

7   social media post prior to seeing the complaint?

8    A.   Correct.  I did not review this before.

9    Q.   And linked here is an article from Check My Ads,

10   correct?

11    A.   Yes.

12    Q.   Okay.  And so, given that this post was on September

13   26th of 2023, this article would have been -- is a different

14   article than the October article we looked at, correct?

15    A.   Yes.

16    Q.   All right.  And it says sort of at the bottom of

17   the -- the image there, "How To Block Rumble From Your Ad

18   Campaigns."

19    A.   Yes.

20    Q.   Do you see that?

21    A.   I do.

22    Q.   Do you believe that was the title of the article

23   that's linked?

24    A.   Given what I understand about Twitter formatting,

25   that would make sense.

1    Q.   Okay.  And do you recall if you were involved in the

2   drafting of that particular article?

3        THE WITNESS:  Is that getting into privilege

4   other -- because it's a different article?

5        MR. BROWNING:  You can answer that question whether

6   you were involved, but beyond your involvement, that

7   article is not in suit, and so you can't answer any

8   questions about its creation.

9    A.   I -- I was involved with the -- this article.

10  BY MS. HUMPHREY:

11   Q.   Okay.  And, again, based on our prior conversations,

12  it sounds like you would not have been involved in either

13  drafting, fact-checking, or researching this social media post

14  from Ms. Atkin; is that correct?

15   A.   That is correct.  I would not have been involved in

16  this social media post.

17       MS. HUMPHREY:  Okay.  Now if we could pull up

18  PX-015, please.

19       MR. BIANCHI:  (Complies.)

20       (Exhibit PX-015 marked for identification.)

21  BY MS. HUMPHREY:

22   Q.   And I'll represent that this is a post from

23  Ms. Jammi from September 26th, 2023 to Twitter.  Do you

24  recognize this, Ms. Gilmore?

25   A.   Insofar as I've seen it as part of the complaint.

1    Q.   Okay.  So you did not view this post prior to seeing

2   the complaint in this case, correct?

3    A.   Again, it's -- it's possible, but I don't recall

4   specifically seeing it.

5    Q.   Okay.  And it appears --

6    A.   I see a lot of Twitter posts.

7    Q.   It appears that this particular post links to that

8   same article, "How to Block Rumble From Your Ad Campaigns;" is

9   that correct?

10    A.   Yes, it is correct.

11    Q.   Okay.  And, again, you would not have had any role

12   in drafting this particular post, fact-checking it, or

13   researching it, correct?

14    A.   The social media post?  Correct, I would not have

15   had any role in that.

16        MS. HUMPHREY:  Okay.  If we could pull up PX-016.

17        MR. BIANCHI:  (Complies.)

18        (Exhibit PX-016 marked for identification.)

19   BY MS. HUMPHREY:

20    Q.   And I'll represent this is a Twitter post from

21   Ms. Jammi on October 3rd, I think, of 2023.  Do you recognize

22   this post, Ms. Gilmore?

23    A.   Insofar as -- as I've seen it as part of the

24   complaint.

25    Q.   Okay.  So, again, you would not have seen this

1    post -- or you don't recall seeing this post prior to

2    reviewing the complaint; is that correct?

3        A.   Yeah.  I don't have a specific memory of seeing it.

4        Q.   Okay.  And you would not have been involved in

5    drafting, fact-checking, or researching for this particular

6    Twitter post, correct?

7        A.   Correct.

8            MS. HUMPHREY:  If we could pull up PX-17 or 017.

9            MR. BIANCHI:  (Complies.)

10           (Exhibit PX-017 marked for identification.)

11   BY MS. HUMPHREY:

12       Q.   And this is a Twitter post from Ms. Jammi from May

13   21st of 2023.  Do you recognize this -- this post,

14   Ms. Gilmore?

15       A.   Insofar as it's part of the complaint.

16       Q.   Okay.  So as far as you can recall right now, you

17   did not review it prior to seeing the complaint; is that

18   correct?

19       A.   Yeah.  I don't have a specific memory of reviewing

20   this.

21       Q.   Okay.  And you wouldn't have been involved with

22   drafting this post, with fact-checking it, or with researching

23   it, correct?

24       A.   Correct.

25       Q.   Do you see in this particular post Ms. Jammi

1   references Rumble's Q1 2023 earnings report?

2       A.  I do see that here.

3       Q.  Do you recall if you have read Rumble's Q1 2023

4   earnings report?

5       A.  I don't recall.

6       Q.  And do you see that Ms. Jammi wrote, "There's no

7   multibillion dollar valuation here, just a garden variety

8   grift."

9           What do you understand her to mean by "just a garden

10  variety grift"?

11      A.  You'd have to ask her.  I had nothing to do with

12  this.

13      Q.  As you are reading this, what does this mean to you?

14      A.  It's really hard to say without having Nandini here

15  to explain what she meant.

16      Q.  So if you were just to come across this post on

17  Twitter, what would you take from it?

18      A.  It depends on a variety of factors.  Do I know

19  who -- I mean, me personally as someone who knows who Dan

20  Bongino is and that he's engaged in election denial, and --

21      Q.  Yes.

22      A.  Yup, um, I would guess that she's saying that he is

23  attempting to -- I mean, grifting generally means making

24  money.  Garden variety means basic or normal.

25      Q.  Okay.  Can you clarify to me, when you say grifting

1    means making money, what do you mean by that?

2        A.   That grifting generally involves people trying to

3    make money.

4        Q.   Is there any other connotation that you would give

5    to the term "grifting"?

6        A.   It generally implies some kind of element of -- I

7    guess it -- it's hard because it's -- it's very general, like,

8    there's a lot of different things that you could apply this

9    to, but perhaps misrepresentations, bad faith information,

10   nefariousness, but it really depends on the individual.  For

11   example, if I were to discuss Dan Bongino, there's plenty of

12   evidence to underpin the fact that the election was not

13   rigged, and he continues to profess that and receives monetary

14   compensation through the platforms on which he shares that

15   information, that if he did his due diligence, he would

16   understand to be false.

17       Q.   Thank you.

18           MS. HUMPHREY:  If we could look at PX-18.

19           MR. BIANCHI:  (Complies.)

20           (Exhibit PX-018 marked for identification.)

21   BY MS. HUMPHREY:

22       Q.   Again, this is a Twitter post from Ms. Jammi from

23   May 21st, 2023.  Have you seen this post before, Ms. Gilmore?

24       A.   I'm assuming I saw it as part of the complaint.

25       Q.   Okay.  Do you recall ever seeing this -- this post

1    prior to viewing it in the complaint?

2        A.  I don't recall specifically.

3        Q.   And, again, would you have been involved in

4    drafting, fact-checking, or researching this particular post?

5        A.   No, I would not have been involved.

6            MS. HUMPHREY:  If we could pull up PX-019.

7            MR. BIANCHI:  (Complies.)

8            (Exhibit PX-019 marked for identification.)

9    BY MS. HUMPHREY:

10       Q.   Ms. Gilmore, do you recognize this document?

11       A.   I don't specifically remember it, but I see my name

12   on it, so I am assuming I have seen this.

13       Q.   Can you tell me what it is?

14       A.   It looks like a Notion document, but it's obviously

15   formatted differently because it's been, I guess, exported.

16       Q.   Umh-huh.  Okay.

17       A.   Anyone can add someone as being responsible, but

18   I'm -- I think it would make sense that I would have seen this

19   because why would I have been added if I had nothing to do

20   with it?

21       Q.   Sure.  So you believe you -- who created this

22   document?

23       A.   I don't know.

24       Q.   Do you think you created this document?

25       A.   I don't know.

1    Q.   When was this document created?

2    A.   I would assume prior to May 26th, 2023 based on the

3    information in front of me, but other than that, I -- I don't

4    know.

5    Q.   Okay.  Do you know what platform this document was

6    created on?  Was it -- was it Notion or would it have been

7    something else?

8    A.   I'm -- I do believe this looks like Notion.

9    Q.   Okay.  Do you know if Ms. Jammi would have edited

10   this document?

11   A.   I don't know.

12   Q.   Do you know if Ms. Atkin edited this document?

13   A.   Unlikely, but I don't know.

14   Q.   Okay.  How about did Ms. Jammi review this document?

15   A.   I don't -- I don't recall.

16   Q.   Did she have access to this document?

17   A.   I mean, in theory we all have access to most stuff

18   in Notion, but that doesn't necessarily mean much because

19   there's a lot of pages in Notion.

20   Q.   So do you know if Ms. Atkin reviewed this document?

21   A.   I don't specifically know.  I would think likely

22   not.  She didn't have much editorial involvement.

23   Q.   And would it be fair to say that Ms. Atkin probably

24   did have access to this document if she'd wanted to?

25   A.   In the same way that anyone who had access to the

1  Check My Ads Notion like we did.

2      Q.  Who would have assigned this project?

3      A.  Um, it's hard to say.  It could have been I could

4  have been doing this on my own.  It could have been Brandon,

5  assuming he worked for us at that point.  It could have been

6  Ben, who was Brandon's predecessor.  There's -- there's --

7  I -- I don't recall specifically, but those would be the

8  likely outcomes there.

9      Q.  Okay.  Is it fair to say based on this document that

10  at least as early as May of 2023, you would have been

11  researching a article on Rumble?

12         MR. BROWNING:  Objection to the form.  And, Rachel,

13     if you want to take a minute to read it, you can do that.

14         THE WITNESS:  Yeah.

15     A.  I would have to see whether (perusing document).

16         Can we scroll down just a little more, please?

17         MR. BIANCHI:  (Complies.)

18     A.  Okay.  And can we scroll back up, please?

19         MR. BIANCHI:  (Complies.)

20     A.  Yeah, so if you look at where it says "Project,

21  Bran, did Rumble break down," this could just be one of many

22  documents that existed where we were exploring different story

23  ideas, which is standard in journalism --

24  BY MS. HUMPHREY:

25     Q.  Okay.

1      A.  -- that you'll have lots of ideas going.

2      Q.  Got it.

3         MS. HUMPHREY:  We can take that document down.

4         MR. BIANCHI:  (Complies.)

5   BY MS. HUMPHREY:

6      Q.  Have you heard of Dewey Square Group?

7      A.  Yes.

8      Q.  Okay.  What is it?

9      A.  I don't remember.  I just know the name.

10     Q.  Do you know anyone who works at Dewey Square Group?

11     A.  Um, I -- I don't recall.

12     Q.  How do you know --

13     A.  I -- I may have met someone, but I -- I don't know.

14     Q.  How do you know the name Dewey Square Group?

15     A.  I honestly don't remember.

16     Q.  When you were at Check My Ads, did you ever work

17  with anyone from Dewey Square Group?

18     A.  I honestly don't remember what Dewey Square Group

19  is, so it's -- it's hard in that capacity to remember whether

20  I would have, but we didn't really work with like outside

21  partners very much, and like, yeah, but --

22        MR. BROWNING:  And I --

23        THE WITNESS:  Sorry.  Go ahead.

24        MR. BROWNING:  I didn't mean to interrupt you,

25     Ms. Humphrey.  Do what you want and then I'll say what I

1    have to say about privilege, but that is what --

2        THE WITNESS:  No, I think I'm -- I think I'm done.

3    A.   Like, I -- I just -- I honestly -- like, I -- I

4    recognize the name, so take from that, but I -- but I -- I

5    don't remember why I know that name, and I'm sorry.

6    BY MS. HUMPHREY:

7    Q.   What role --

8        MR. BROWNING:  And, sorry, just to put it on the

9    record, Ms. Gilmore, to the extent that you find yourself

10    testifying about your news gathering or sources for

11    articles not at issue, I remind you that information is

12    privileged and instruct you not to answer the question.

13        MS. HUMPHREY:  And, again, just to make it clear on

14    the record, we disagree with that privilege assertion,

15    and we do reserve our right to challenge that at a later

16    date.

17        MR. BROWNING:  Understood.

18    BY MS. HUMPHREY:

19    Q.   What role did Dewey Square Group have in drafting

20    the October 24th, 2023 article?

21        MR. BROWNING:  Objection to the form.

22    A.   I -- no role that I'm aware of.

23    BY MS. HUMPHREY:

24    Q.   Did Dewey Square Group have a role in researching

25    the October 24th, 2023 article?

1    A.   Not that I recall whatsoever.

2    Q.   What information within the October 23 -- pardon me.

3  Strike that.

4        What, if any, information was in the October 24th,

5  2023 article was provided by Dewey Square Group?

6        MR. BROWNING:  Objection to the form.

7    A.   None that I'm aware of, but there -- you know, there

8  were different people working on it, but I -- I don't think

9  that group had anything to do with that article whatsoever.

10  BY MS. HUMPHREY:

11    Q.   Okay.  What, if any, role did Dewey Square Group

12  have in editing the October 24th, 2023 article?

13        MR. BROWNING:  Objection to the form.

14    A.   None.

15  BY MS. HUMPHREY:

16    Q.   Did Dewey Square Group provide any comments on the

17  October 24, 2023 article?

18        MR. BROWNING:  Objection to the form.

19    A.   I don't -- no.  No, they didn't.

20  BY MS. HUMPHREY:

21    Q.   Okay.  Are you aware of any articles in which Dewey

22  Square Group -- any Check My Ads' articles in which Dewey

23  Square Group had a role?

24    A.   I don't think I can answer that because of

25  privilege.

1          MS. HUMPHREY:  Okay.  Again, I would just note that

2     we disagree with that privilege assertion, and we reserve

3     the right to challenge it at a later date.

4          MR. BROWNING:  Okay.

5     BY MS. HUMPHREY:

6      Q.   Did anyone at Check My Ads communicate with Dewey

7     Square Group?

8          MR. BROWNING:  I'm going to have the same objection.

9     If you can answer that question without going into

10     unpublished news gathering material related not --

11     related to articles not in suit, you can answer it; but

12     if you can't, I instruct you not to answer.

13     A.   Yeah, I don't think I can't answer that.

14          MS. HUMPHREY:  Okay.  Then we reserve our right.

15     BY MS. HUMPHREY:

16     Q.   To be clear, are you saying you can't answer that on

17     the basis of privilege?

18     A.   I can't answer that on the basis of privilege.

19          MS. HUMPHREY:  Okay.  We'd reserve our right to

20     challenge that at a latter date again.  And I'll just --

21     if we can just have a continuing reservation of that,

22     that's --

23          MR. BROWNING:  Yeah, your reservation is noted.

24     We've been teeing this up for a while wit Nick --

25          MS. HUMPHREY:  Yeah.

1          MR. BROWNING:  -- so understood.

2    BY MS. HUMPHREY:

3      Q.   When you were at Check My Ads, did you ever

4    participate in any phone calls with anyone who worked with

5    Dewey Square Group?

6          MR. BROWNING:  To the extent that that question

7      would require you to disclose privileged information, I'm

8      instructing you not to answer it.

9    BY MS. HUMPHREY:

10     Q.   Are -- are you following your counsel's advice?  Is

11   that an issue for privilege?

12     A.   I'm following my counsel's advice.

13     Q.   Okay.  When you were at Check My Ads, did you attend

14   any meetings with anyone who worked for Dewey Square Group?

15         MR. BROWNING:  Same objection, but you can answer if

16     it would not involve the disclosure privileged

17     information.

18     A.   I -- I'm following the advice.

19   BY MS. HUMPHREY:

20     Q.   Okay.  When you were at Check My Ads, were you ever

21   included on any e-mails with anyone who worked for Dewey

22   Square Group?

23         MR. BROWNING:  Same instruction.

24     A.   Yeah, I'm -- I'm just going to follow the advice.

25   BY MS. HUMPHREY:

1    Q.   Okay.  When you were at Check My Ads, did you ever

2  review any analysis conducted by Dewey Square Group?

3       MR. BROWNING:  Same objection.  You can answer if it

4    would not involve disclosing privileged information about

5    unpublished news gathering activity.

6    A.   I'm going to follow that advice.

7  BY MS. HUMPHREY:

8    Q.   Have you ever heard of Media Matters for America?

9    A.   Yes.

10   Q.   Okay.  What is Media Matters for America?

11   A.   They're a nonprofit I believe or -- are they

12  actually specifically a nonprofit?  They -- they do

13  journalism, but mainly on the reporting on, like, media

14  criticism.

15   Q.   Okay.  Do you know anyone who works at Media Matters

16  for America?

17   A.   Insofar as I know other journalists and researchers

18  very, very loosely, through, like, following each other on

19  socials and stuff.

20   Q.   Who do you know?

21   A.   Um, define know.

22   Q.   You just told me that there are other journalists

23  that you would say you know from Media Matters, so who are you

24  referring to?

25   A.   Well, like, do you consider following each other on

1   socials to be knowing each other or do you consider like

2   having met or like -- like, what do you consider knowing?

3   It's hard to know in the online age what the bar for that is.

4       Q.   If you were just thinking of that person when I

5   asked you if you know of anyone who works at Media Matters,

6   please tell me who that person is.

7       A.   Um, I -- I met Kat Abu, who no longer works for

8   Media Matters, in person once at an event that there were tons

9   of other journalists at.  It was The Onion party.

10      Q.   Who else?

11      A.   I recommend Ari Drennen's Substack on my personal

12  Substack --

13      Q.   Okay.

14      A.   -- and started doing that after my employment at

15  Check My Ads, I believe.

16      Q.   Okay.

17      A.   I'd have to double check that, but I didn't launch

18  my Substack formally properly until the final weeks of my

19  employment.

20      Q.   Anyone else?

21      A.   Oh, I met Helena.  I think that's her name.  I don't

22  remember her last name, maybe Hind, at that same Onion

23  party --

24      Q.   Okay.

25      A.   -- and we, like, took a pic together.

1    Q.  Anybody else?

2    A.  I think that's it.  I've messaged a little bit with

3    I think Alejandra Caraballo is a Media Matters researcher.

4    I'm not totally sure, but again, this is all just like in the

5    same way that I've messaged with tons of other journalists,

6    and like, I wouldn't call them friends.

7    Q.  Okay.  I'm just trying to get a -- a sense of who

8    you know in general.  I'm not assigning any --

9    A.  Yeah.

10   Q.  -- like quality of relationship to it.

11       Is there anyone else that you can think of?

12   A.  I think that's the, like, every -- and that's

13   stretching the definition of relationship -- that is basically

14   possible.

15   Q.  Okay.  When you were at Check My Ads, did you ever

16   work with anyone from Media Matters?

17       MR. BROWNING:  Form.

18   A.  No.

19   BY MS. HUMPHREY:

20   Q.  Okay.  To your knowledge, did Media Matters have any

21   role in the October 24th, 2023 article?

22   A.  No.  I did use some of their public reporting for

23   research as I previously disclosed, but that has nothing to do

24   with them doing something as implied by the word "role."

25   Q.  Understood.

1        MS. HUMPHREY:  Can I -- if we can show you what's

2   been marked as PX-20.

3        MR. BIANCHI:  (Complies.)

4        (Exhibit PX-20 marked for identification.)

5   BY MS. HUMPHREY:

6   Q.   Do you recognize this Media Matters article?

7   A.   I don't recognize it today, no.

8   Q.   Okay.

9   A.   It's possible I've seen it before, but I -- I don't

10   recognize it.

11   Q.   So you don't know if this was one of the articles

12   that you're -- that you based your research on?

13   A.   There's a lot of links and sources in those

14   documents, so it's entirely possible that this was among them.

15   I -- I can only see the top of it, so like, maybe if I looked

16   through it and cross-referenced it I could tell you, but there

17   was a lot of research that went into that article, and I've

18   written many articles since, so it's very hard to say.

19   Q.   Okay.  I'd like to direct your attention to Page 2,

20   and do you see where it says (as read):  "According to

21   analysis of data from Pathmatics, a company that tracks

22   digital marketing data, Google Ad -- Google's Ad network made

23   up 2 percent of total advertiser spending on rumble.com in the

24   last year but earned 18 percent of ad impressions."

25   A.   Sorry.  Where is that?  I'm just not seeing it.

1      MS. HUMPHREY:  Um, if you go up that -- maybe it's

2  not on Page 2.  If you go up a bit.

3      MR. BIANCHI:  (Complies.)

4      MS. HUMPHREY:  Um, there we go.  Looks like it was

5  on Page 3.  My mistake.

6  BY MS. HUMPHREY:

7   Q.  Do you see that there?

8   A.  Yes, I do see that.

9   Q.  Okay.  Is there any reason to doubt that claim that

10  Google's Ad network only made up 2 percent of total advertiser

11  spending on rumble.com?

12      MR. BROWNING:  Objection to the form.

13   A.  Um, It's hard to say.  I don't know what methodology

14  went into this article.

15  BY MS. HUMPHREY:

16   Q.  Okay.  Do you generally trust Media Matters for

17  America as a source for information?

18   A.  Generally, but I like to independently verify

19  things.

20   Q.  Okay.  Previously we looked at the Notion documents

21  that contained a lot of your research, correct?

22   A.  Yes, I believe so.  It would have --

23   Q.  And --

24   A.  -- been in most people's research.

25   Q.  Sure.  And you also mentioned a bunch of sources

1  that you may have looked at when you were crafting your

2  portion of the October 24, 2023 article, correct?

3      A.  Yes.

4      Q.  Is there any place else that you would have stored

5  your sources for the October 24, 2023 article?

6      A.  I don't believe so.  It's -- yeah, I can't think

7  of -- I can't think of anywhere else.  It's...

8      Q.  And is there anything else that you can recall now

9  that was a source for the October 24, 2023 article that we

10  have not yet discussed?

11      A.  Um, well, there's a lot that we haven't discussed

12  related to the aspects that I did not write, so I'm sure that

13  there's plenty more information that others could give you

14  with respect to sourcing, but like I only did the parts that I

15  reported on.

16      Q.  So let me rephrase then.

17          Specifically is there anything that you looked at in

18  your research for the October 24th, 2023 article or any other

19  sources in general for the October 24th, 2023 article that we

20  have not yet discussed?

21      A.  That's a difficult answer -- or question to answer

22  definitively, because again, it was so long ago that it's

23  possible that there were things that I saw that informed my

24  reporting that we haven't discussed today.  I -- I just can't

25  say for a fact.



1    Q.  Do you generally keep a list of your sources when

2  you are researching an article?

3        MR. BROWNING:  Objection to the form.

4    A.  Um, what do you mean by list?

5  BY MS. HUMPHREY:

6    Q.  Um, a -- you know, do you keep track of the sources

7  that you've encountered when you're researching an article?

8        MR. BROWNING:  Objection to the form.

9    A.  When you say "researching," do you mean like any --

10  what do you mean when you say researching?  Like, what aspect

11  of the journalistic process or is it all in the journalistic

12  process?

13  BY MS. HUMPHREY:

14    Q.  All of it.

15    A.  So anything I may or may not have seen in, like, the

16  capacity of exploring anything relating to an article?  I -- I

17  wouldn't say that I document all of that, because I see so

18  much stuff, like, yeah.  So there absolutely could be things

19  that I saw that aren't listed anywhere.

20    Q.  Do you include a fact in an article that you are

21  writing?  Do you keep a -- do you document where you found

22  that fact?

23        MR. BROWNING:  Objection to the form.

24    A.  It -- it depends entirely on the nature of the fact.

25  BY MS. HUMPHREY:



1    Q.   Okay.  Is there any documentation related to the

2    October 24th, 2023 article that you would have of your sources

3    that we have not yet looked at?

4    A.   When you say "have," like, do you mean anything like

5    we've disclosed?

6    Q.   I'm just saying:  Do you have -- anywhere do you

7    have a list of sources or -- related to this October 24, 2023

8    article that we have not looked at?

9    A.   I believe you guys have all relevant documentation

10   through the subpoena and everything, right, so...

11   Q.   But to your knowledge no other list of your sources

12   exists; is that correct?

13   A.   No formal list that I can think of, no.

14   Q.   Okay.  Thank you.

15       All right.  Have you heard of GARM?

16   A.   Yes.

17   Q.   What is GARM?

18   A.   I believe it doesn't exist anymore, correct?

19   Q.   What was it?

20   A.   Um, so going off of memory, I believe the Global

21   Alliance for Responsible Media is what it stands for.

22   Q.   Okay.  And did -- do you know anyone who worked at

23   GARM?

24   A.   Not personally, no.

25   Q.   When you were at Check My Ads, did you ever work

1   with anyone from GARM?

2      A.   Not that I recall, no.

3      Q.   Do you recall if GARM ever had a role in any of the

4   Check My Ads' articles?

5      A.   When you say "role," what do you mean?

6      Q.   Any type of role.

7      A.   Um...

8         MR. BROWNING:  Yeah, I mean, to the extent that

9   that's going to call for unpublished news gathering

10   materials for articles outside the scope of this lawsuit,

11   I'll instruct you not to answer, but generally for this

12   article you can answer.

13      A.   I mean, if I looked at the article and I cited any

14   GARM, like, statistics or studies or anything, I guess if you

15   consider that to be a role, but I -- I don't think that that's

16   in there.  If it is, then that would be the only capacity, and

17   GARM would not necessarily be aware of it because it's just

18   research, but they had nothing to do with it.

19   BY MS. HUMPHREY:

20      Q.   Are you -- have you heard of the Center for

21   Countering Digital Hate?

22      A.   Yes.

23      Q.   What is that?

24      A.   Um, it is a center that does research on digital

25   hate.

1    Q.   Okay.  Do you know anyone who worked at the Center

2   for Countering Digital Hate?

3    A.   I don't think so, no.

4    Q.   Okay.  When you were at Check My Ads, did you ever

5   work with anyone who worked at the Center for Countering

6   Digital Hate?

7        MR. BROWNING:  Same objection.  You can answer as

8    long as it doesn't disclose privileged information.

9    A.   Again, I'm just -- I'm not going to answer that one

10   because of privilege.

11   BY MS. HUMPHREY:

12   Q.   Did the Center for Countering Digital Hate have any

13   role in the October 24, 2023 article?

14   A.   No.

15   Q.   Have you heard of The Worker Agency?

16   A.   Yes.

17   Q.   And what is it?

18   A.   It's a PR agency I think.

19   Q.   Did Check My Ads have a relationship with The Worker

20   Agency?

21   A.   Yes, I believe so.

22   Q.   What was that?

23   A.   Um, I didn't really have a lot to do with it, but

24   like if we had a report or something coming out, um, they

25   would sometimes, like, help itch it, like PR agencies do.

1    Q.  Okay.

2    A.  Yeah.

3    Q.  Do you know when that relationship started?

4    A.  I don't, no.

5    Q.  Do you know if that relationship is ongoing?

6    A.  I don't, no.

7    Q.  Do you know anyone who worked at The Worker Agency?

8    A.  I mean, yes, like, not personally, like, outside of

9  our work capacity, but like William, I think was his name.

10    Q.  Okay.  And do you know what Williams' role is?

11    A.  A PR guy.  I don't know his exact title.  Like, this

12  wasn't really my --

13    Q.  Okay.

14    A.  I was doing journalism, so like, I rarely had a lot

15  to do with the PR side, like, that would -- sometimes I'd be

16  asked to -- yeah, I -- yeah.

17    Q.  Okay.  And when you say "William," if I represent to

18  you that that might be William Fitzgerald, does that sound

19  right?

20    A.  I think so.

21    Q.  Okay.  In what kind of capacity would you have

22  worked with someone from The Worker Agency?

23       MR. BROWNING:  Objection to the form of the

24    question.

25  BY MS. HUMPHREY:

1    Q.   In any capacity did you ever work with someone from

2  The Worker Agency?

3    A.   I had -- I went to, like, some meetings that they

4  were at.

5    Q.   What were the meetings?

6    A.   Just about, "Hey, we have an article" or -- I don't

7  know.  It's -- I don't want to step into privilege here,

8  but...

9      MR. BROWNING:  To the extent that the article was

10     published and you're talking about placing it, that would

11     not be privileged.

12     THE WITNESS:  Okay.

13     MR. BROWNING:  If you were talking about what you

14     were reporting before it was published, that would be.

15     THE WITNESS:  Yeah.

16    A.   I -- like, I -- my understanding is, you know,

17  the -- the PR stuff is more about, like, reports that we put

18  out, not necessarily articles, but like, sometimes they would

19  put us -- like, for example, if Wired was interested in

20  something that we uncovered in our research, maybe they would,

21  like, share our research with them or something, but like

22  it's -- it was just like a -- or, like, give a comment from

23  Sarah, like, I never -- I don't think I was ever cited at

24  giving comments or anything like that.  It was like -- that

25  was more of, like, a research side thing, just -- yeah.

1   BY MS. HUMPHREY:

2       Q.   Did you ever work with or did Check My Ads ever work

3   with The Worker Agency on any of the articles it published

4   about Rumble?

5       A.   I couldn't tell you.  I don't remember.

6       Q.   Okay.  Do you recall if The Worker Agency was

7   involved in the October 24th, 2023 article?

8       A.   I don't think so because I feel like the -- the PR

9   stuff was a little bit more recent, but I -- I could be

10  misremembering.

11          MS. HUMPHREY:  Okay.  I want to look at PX-25.

12          MR. BIANCHI:  (Complies.)

13          (Exhibit PX-25 marked for identification.)

14  BY MS. HUMPHREY:

15      Q.   And it looks like this is another e-mail from Notion

16  to your Check My Ads e-mail address.  Does that seem, correct?

17      A.   Yes.

18      Q.   Okay.  And it says "Casey edited."  Who is Casey?

19      A.   Casey is an employee of Check My Ads.

20      Q.   And what was her role at Check My Ads?

21      A.   I don't actually know exactly what her title was.

22  She did a lot of, like, administrative stuff.

23      Q.   Okay.  Do you know what her role is -- was in the

24  October 24th, 2023 article?

25          MR. BROWNING:  Objection; foundation, but you can

1    answer if you can.

2       A.  Yeah, I mean, you're implying she had a role at all.

3    The only thing I see here is, like, it's possible she

4    literally just changed the task type and then sent an e-mail.

5    BY MS. HUMPHREY:

6       Q.  Okay.

7       A.  Like, that would make sense with her administrative

8    stuff, just like reorganizing Notion in general, because it

9    would sometimes be really cluttered.

10      Q.  Okay.  So you're saying that this e-mail does not

11   necessarily indicate to you that she had a role in editing or

12   fact-checking or researching an article; is that fair?

13      A.  That's fair.

14      Q.  Okay.  But certainly she did something on the Notion

15   platform related to the article, correct?

16         MR. BROWNING:  Objection; form.

17      A.  Not necessarily related to the article even --

18   BY MS. HUMPHREY:

19      Q.  Okay.

20      A.  -- because it could have been related to the shell

21   of the Notion shell that the article happened to live in, but

22   that doesn't necessarily mean she even read or looked at a

23   word of the article.

24      Q.  Understood.

25         MS. HUMPHREY:  If we next can pull up PX-23.

1          THE VIDEOGRAPHER:  Just give me one second here.

2          MR. BROWNING:  While we do this, Rachel, are you all

3     good?

4          THE WITNESS:  Yeah.

5          MR. BROWNING:  You're fine?  Okay.

6          MS. HUMPHREY:  I promise we're nearing the end.  I

7     know it doesn't feel like it.

8          THE VIDEOGRAPHER:  And, Kat, do you want me to play

9     this?

10          MS. HUMPHREY:  I don't think we need to play it.

11     Let's see.

12          (Exhibit PX-023 marked for identification.)

13     BY MS. HUMPHREY:

14     Q.  Ms. Gilmore, do you recognize PX-23?

15     A.  Yes.

16     Q.  Okay.  Do you need to see PX-23 to -- to rem- -- to

17     recall it?

18     A.  I don't think so.

19     Q.  Okay.  If at any point you want to actually view it,

20     just let me know and we can do that.

21          Did you make this video?

22     A.  Yes.

23     Q.  Okay.  And that is you appearing in the video,

24     correct?

25     A.  Yes.

1    Q.  Was this posted on social media?

2    A.  Yes.

3    Q.  And which platform was this posted on?

4    A.  I believe TikTok, Instagram.  I don't know if I had

5    been cross-posting.  I -- I don't remember exactly when I

6    cross-posted to, like, YouTube and more platforms than that,

7    but I would say most likely definitely TikTok and Instagram.

8    Q.  Okay.  And do you recall when you posted this video?

9    A.  I think it was around the same time as the article.

10   Q.  Okay.  And to be clear, that would have been in

11   October of 2023-ish?

12   A.  I'd have to double check, but yeah.

13   Q.  But you think around then?

14   A.  It would make sense.

15   Q.  Okay.  Do you know if this video is still online?

16   A.  I don't think it is.

17   Q.  Did you take it down?

18   A.  Yes.

19   Q.  Why did you take it down?

20   A.  Um, I -- I didn't know if I should, like, keep it

21   up.  I don't know.  I -- I just, like, with everything going

22   on, but I -- I didn't realize that -- that, like, I

23   immediately brought it to counsel's attention to make sure I

24   wasn't, like, hiding it, so...

25        MR. BROWNING:  Let me interrupt.

1        THE WITNESS:  Yeah.

2    A.  I don't know.  I just have never been --

3        THE WITNESS:  Yeah, go ahead, John.

4        MR. BROWNING:  To the extent that you're about to

5    talk about our communications, I'm instructing you not

6    to.

7        THE WITNESS:  All right.

8        MR. BROWNING:  But this document clearly was

9    collected, preserved, and produced for the purpose of

10    this litigation.

11        THE WITNESS:  Exactly.

12  BY MS. HUMPHREY:

13    Q.  And I'm not trying to ask you about counsel's

14  conversations with you, and I'm not necessarily trying to

15  imply any wrongdoing.  I'm just asking you why you thought --

16  why you decided to take it down.

17        Um, you said with everything going on.  What are you

18  referring to?

19    A.  Um, so I -- I mean, I wasn't named or had anything

20  to do with any legal action, and I just didn't want to -- I --

21  I had just never been, I guess, adjacent like that, and I

22  tried to...

23    Q.  So just related to the lawsuit is why you took it

24  down?

25    A.  Honestly, like, I -- I don't remember exactly what I

1    thought.  I just -- yeah, I do stand by it.  Like, I would

2    repost it now honestly.

3        Q.   Okay.  So there's nothing in this video that you

4    have decided is incorrect or anything like that?

5        A.   No.  Oh, my God, no.  No.  And I'm -- that's why

6    also, like, it's here for you now.  Like, I -- I honestly

7    should have just left it up because it's a good video.

8        Q.   Why did you make this video?

9        A.   Because I thought it was in the public interest.

10       Q.   Was it part of your role at Check My Ads?

11       A.   No.  This is my independent journalism.

12       Q.   Did anyone tell you to make this video?

13       A.   No.  I made it on my own.

14       Q.   Did anyone assist you in making this video?

15       A.   No.  I did draw from things that I had learned

16   through my research, but it was -- you know, I don't -- I

17   can't split apart my brain like Severance, right, so there's

18   some stuff that I recalled from researching and working on

19   issues related to Rumble that I knew to be true and factual,

20   but this is all my own work.

21       Q.   Got it.

22            Did anyone review this video before you posted it?

23       A.   No.  I -- I do my own stuff independently.

24       Q.   Did you speak to Ms. Atkin about this video before

25   you posted it?

1    A.  No.

2    Q.  Same question for Ms. Jammi:  Did you speak to her

3  about this video before you posted it?

4    A.  No.

5    Q.  Did you make any other content related to Rumble

6  outside of your Check My Ads position?

7    A.  I don't think so.  Like, I might have tweeted about

8  them.  I'm not sure, but I -- I -- I don't recall specifics

9  honestly.

10    Q.  To your knowledge, have you produced everything that

11  you would have made related to Rumble?

12    A.  I believe so.

13    Q.  Okay.  You no longer work at Check My Ads, correct?

14    A.  Correct.

15    Q.  And when was your last day?

16    A.  Um, my -- well, my last -- I don't actually know.  I

17  remember it was -- I remember it was ten days before

18  Christmas --

19    Q.  Okay.

20    A.  -- that I received word that I was being laid off,

21  and I was given two weeks pay in lieu of notice.  So I guess

22  that would have been the last day.  I'd have to double check

23  the date specifically though.

24    Q.  Okay.  But in -- sometime in December just before

25  Christmas it sounds like?

1    A.  Yeah, exactly.  Yeah.

2    Q.  Okay.  And when you left Check My Ads, what exactly

3  was the -- the circumstances?

4    A.  They shuttered their editorial arm, so I was laid

5  off alongside, like, Brandon.  It was just a business

6  decision.

7    Q.  Okay.  And when you say "editorial arm," what does

8  that mean exactly?

9    A.  Like their newsroom that they had been developing.

10   Q.  Got it.  Who told you that you were being

11  terminated?

12   A.  Claire Atkin with Barbi Sprute in a Zoom meeting.

13   Q.  Was Ms. Jammi involved in that meeting?

14   A.  No.

15   Q.  Did they say why they were terminating you?

16   A.  Just related to shutting down, like, shifting the

17  priorities.

18   Q.  Did they say why they were shutting down their

19  editorial arm?

20   A.  Um, no.  I think -- I mean, they might have

21  mentioned that -- yeah, I -- I couldn't say.  It would be

22  speculation.  I don't recall.  I was kind of busy processing

23  losing my job.

24   Q.  What do you recall them saying?

25   A.  I just remember us saying that we're sad and we're

1  going to miss each other.

2      Q.  Okay.

3      A.  It wasn't -- I -- I don't recall, like, it was -- it

4  was amicable.

5      Q.  Have you spoken to any other current or former Check

6  My Ads employees about the -- the layoff?

7      A.  Of course, yeah.  I just said, like, I reached out

8  and said bye.  They reached out to me, a few of them.  We

9  just -- you know, we had a good working relationship so had

10  our little goodbyes.

11     Q.  Did you have any conversations about the reason for

12  the terminations?

13     A.  I don't think so, no, because I -- I assume that

14  everyone's aware.  I mean, it's pretty obvious that there's

15  a -- some kind of a -- focusing on priorities that are not

16  necessarily the newsroom.

17     Q.  What do you think those priorities are?

18     A.  More policy and the advertising watchdog stuff, as

19  opposed to publishing the research and article form,

20  publishing maybe longer reports that are more back-end and

21  less public-facing.

22     Q.  Okay.  Why do you think that priority shift was

23  made?

24     A.  I mean, it makes sense honestly.  Like, there are

25  other newsrooms that will cover the research likely if it's

1  deemed newsworthy, and you don't really need to do that

2  in-house if -- if your stuff's going to be deemed newsworthy

3  regardless, and you can still do the work of being a watchdog

4  in that capacity, so yeah.

5      Q.  Any other reasons that you think that Check My Ads

6  decided to change its priorities?

7      A.  You'd have to ask them.

8      Q.  Do you know if the terminations were related to this

9  lawsuit in any way?

10     A.  I have no reason to believe that.

11     Q.  You worked with Alex D'Angelo [sic] while he was at

12 Check My Ads, correct?

13     A.  Alec, yes.

14     Q.  Alec, pardon me.

15         Did Mr. D'Angelo leave Check My Ads before the

16 editorial arm was shuttered?

17     A.  Yes.

18     Q.  Okay.  And when was that?

19     A.  Oh, I -- I don't actually know the exact date.  It

20 was a while ago.

21     Q.  Do you know why Mr. D'Angelo left Check My Ads?

22     A.  My understanding was just that they -- it's a small

23 organization, right, and so personnel costs are heavy, so I

24 think that it was just a issue of they wanted to hire Arielle

25 Garcia, and so they had to let Alec go to be able to do that.

1    And it was sad.  We all really liked Alec.  He was a really

2    good -- good guy and good worker, but he seems to be doing

3    well.

4       Q.   So it was Check My Ads' decision for him to leave;

5    is that correct?

6       A.   I believe so.  I -- I don't actually -- all I know

7    is what I learned through -- you know, we're all fully remote,

8    so there isn't a great gossip chain.

9          MS. HUMPHREY:  Okay.  If we could just take a very

10         quick break, I think I may be at the end, so if we could

11         have another five minutes.

12         MR. BROWNING:  All right.

13         MS. HUMPHREY:  -- off the record, that would be

14         great.

15         THE VIDEOGRAPHER:  Okay.  The time is 18:49 UTC

16         time, and we are off the record.

17         (Break taken from 1:49 p.m. to 1:53 p.m.)

18         THE VIDEOGRAPHER:  All right.  The time is 18:53 UTC

19         time.  We're back on record.

20         MS. HUMPHREY:  All right.  And at this time these

21         are all the questions I have.  Before we close out, Madam

22         Court Reporter, could I get the -- the time that we have

23         on the record so far?

24         THE REPORTER:  So the entire time that you -- from

25         beginning to end or --

1    MS. HUMPHREY:  On the record --

2    THE REPORTER:  -- just from right now?

3    MS. HUMPHREY:  -- is fine.

4    THE REPORTER:  Actually, I think that MJ has that.

5    MS. HUMPHREY:  Okay.

6    THE VIDEOGRAPHER:  I'll get it for you in just one

7    quick second.  328 as of right now.

8    MS. HUMPHREY:  328?

9    THE VIDEOGRAPHER:  Well, yeah, 329.

10    MS. HUMPHREY:  329.  Okay.  And pursuant to our

11    agreement, we are going to reserve our remaining time to

12    potentially reopen the deposition, but for now those are

13    all the questions that I have.

14    MR. BROWNING:  And I have nothing on redirect.

15    MS. HUMPHREY:  Awesome.  Thank you for your time.

16    THE VIDEOGRAPHER:  The time's 18:54 UTC time, and

17    that concludes the deposition for today.  Thank you,

18    everyone.

19    MS. HUMPHREY:  Thank you all.

20    MR. BROWNING:  Bye.

21    (The deposition concluded at 1:54 p.m.)

22

23

24

25

1          CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA
     COUNTY OF COLLIER

5

6

7          I, Dana G. Sturdevant, Registered Professional

8    Reporter, Notary Public, State of Florida, certify that

9    RACHEL GILMORE, personally appeared before me on

10   the 4th day of February, 2025, and was duly sworn by me.

11

12         Signed this 11th day of February, 2025.

13

14

15         _____

16         DANA G. STURDEVANT, RPR
           Notary Public, State of Florida
           Commission No.: HH 425253
17         Expires:  July 24, 2027

18

19

20

21

22

23

24

25

1              CERTIFICATE OF REPORTER

2    STATE OF FLORIDA
     COUNTY OF COLLIER
3

4

5          I, DANA G. STURDEVANT, Registered Professional

6    Reporter, do hereby certify that I was authorized to and did

7    stenographically report the deposition of

8    RACHEL GILMORE; that a review of the transcript was requested;

9    and that the foregoing transcript, pages 1 through 160 is a

10   true record of my stenographic notes.

11         I FURTHER CERTIFY that I am not a relative,

12   employee, attorney, or counsel of any of the parties, nor am I

13   a relative or employee of any of the parties' attorney or

14   counsel connected with the action, nor am I financially

15   interested in the action.

16         DATED this 11th day of February, 2025 at Naples,

17   Collier County, Florida.

18

19              _____

20              DANA G. STURDEVANT

21              Registered Professional Reporter

22

23

24

25

1          WITNESS NOTIFICATION LETTER

2

3    Tuesday, February 11, 2025

4    RACHEL GILMORE
     C/O JOHN M. BROWNING, ESQ.
5    DAVIS, WRIGHT & TREMAINE, LLP
     1251 AVENUE OF THE AMERICAS, 21ST FLOOR
6    NEW YORK, NEW YORK 10020
     212.603.6410
7    JACKBROWNING@DWT.COM

8

9
     IN RE:  RUMBLE V. JAMMI, ET AL
10        DEPOSITION OF RACHEL GILMORE
          TAKEN FEBRUARY 4, 2025
11          US LEGAL SUPPORT JOB NO. 6795164

12

13   The transcript of the above-referenced proceeding has been
     prepared.
14
     Any corrections you wish to make to the transcript should be
15   made on the errata sheet.  Please do not write on the
     transcript itself.
16
     Please complete review of the transcript within 30 days, and
17   return the errata sheet to our office.  You need not return
     the entire transcript.
18
     Sincerely,
19

20   Dana G. Sturdevant, FPR, RPR

21   US Legal Support - Naples
     239.561.3526
22
     CC: KATHRYN HUMPHREY, ESQ.
23

24

25

ERRATA SHEET
DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES ON THIS PAGE
IN RE:  Rumble v. Jammi, et al
RACHEL GILMORE
USLS Job No: 6795164
TAKEN February 4, 2025

Page No.  Line No.    Change          Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.


_____        _____
Date                        RACHEL GILMORE

**Exhibits**

**EX 0001 Rachel G ilmore 020425**
  3:11  11:1,5,18

**EX 0002 Rachel G ilmore 020425**
  3:12  15:12,15
  21:4  23:3

**EX 0003 Rachel G ilmore 020425**
  3:13  16:5,7,9
  17:3

**EX 0004 Rachel G ilmore 020425**
  3:14  26:16,18

**EX 0005 Rachel G ilmore 020425**
  3:15  30:11,14,
  16

**EX 0009 Rachel G ilmore 020425**
  3:16  92:7,17
  93:1  111:10

**EX 0011 Rachel G ilmore 020425**
  3:17  111:14,16

**EX 0012 Rachel G ilmore 020425**
  3:18  112:4,6

**EX 0013 Rachel G ilmore 020425**
  3:19  122:6

**EX 0014 Rachel G ilmore 020425**
  3:20  122:22,24

**EX 0015 Rachel G ilmore 020425**
  3:21  124:18,20

**EX 0016 Rachel G ilmore 020425**

  3:22  125:16,18

**EX 0017 Rachel G ilmore 020425**
  3:23  126:8,10

**EX 0018 Rachel G ilmore 020425**
  3:24  128:18

**EX 0019 Rachel G ilmore 020425**
  4:3  129:6,8

**EX 0020 Rachel G ilmore 020425**
  4:4  140:2,4

**EX 0023 Rachel G ilmore 020425**
  4:5  150:25
  151:14,16

**EX 0024 Rachel G ilmore 020425**
  4:6  115:22,24

**EX 0025 Rachel G ilmore 020425**
  4:7  149:11,13

_____

**0**

**003**  23:3

**017**  126:8

_____

**1**

**1**  5:14

**1-10**  26:22

**10**  5:14

**11**  17:2

**11:01**  48:6

**11:07**  48:6

**12:11**  92:3

**12:19**  92:3

**13th**  116:15

**15**  109:3

**15:01**  5:6

**15:20**  22:14

**15:23**  22:17

**15:57**  46:19

**1635**  113:14

**1636**  114:21

**16:00**  46:22

**16:01**  48:3

**16:07**  48:7

**16th**  122:11

**17:11**  92:1

**17:20**  92:4

**18**  140:24

**18:49**  159:15

**18:53**  159:18

**18:54**  160:16

**1:49**  159:17

**1:53**  159:17

**1:54**  160:21

_____

**2**

**2**  140:19,23
  141:2,10

**20**  28:6

**2021**  33:24

**2022**  33:24
  111:19

**2023**  27:18,21
  28:17  66:14,22
  67:5  73:24
  87:1  91:6
  93:4,15  111:10
  114:16  115:13

  116:11,12
  121:3,4,11,16,
  19,23  122:3,11
  123:2,13
  124:23  125:21
  126:13  127:1,3
  128:23  130:2
  131:10  133:20,
  25  134:5,12,17
  139:21  142:2,
  5,9,18,19
  144:2,7  146:13
  149:7,24

**2023-ish**  152:11

**2024**  28:10

**2025**  5:6  31:2

**20th**  116:11

**21st**  126:13
  128:23

**2298**  116:16

**23**  134:2

**2303**  118:25

**24**  114:16
  121:4,19,23
  134:17  142:2,
  5,9  144:7
  146:13

**24th**  66:14,22
  67:5  87:1  91:6
  93:4,14  111:10
  115:13  116:12
  133:20,25
  134:4,12
  139:21  142:18,
  19  144:2
  149:7,24

**26**  111:19

**26th**  123:2,13
  124:23  130:2

**3**

**3**   109:5 141:5

**30th**   31:2

**328**   160:7,8

**329**   160:9,10

**3rd**   125:21

**4**

**4**   113:14

**405**   6:23

**4th**   5:6

**5**

**5**   114:21

**8**

**8**   104:2

**A**

**a.m.**   48:6

**ability**   8:23
44:20

**able**   60:15
72:19 81:22
96:11 158:25

**above**   5:3 84:16

**absolute**   67:11

**absolutely**
78:11 143:18

**Abu**   138:7

**accept**   73:25

**acceptable**
71:19

**access**   20:24,25
73:2 79:10,11,
12,15 120:5
130:16,17,24,
25

**accessible**   27:4

**accommodate**
10:21

**accordance**   32:1
33:17

**account**   19:4,6,
14 20:2,4,11,
20,22 24:17,18
53:2 73:7
75:25 76:5,7,
20,23,25
77:15,19
78:19,24 79:1

**accounts**   19:7,
8,14,23 73:13
78:6,9,12,17
79:4,7,25
80:10,19 81:2,
6,12,15 82:4

**across**   75:2,8
127:16

**action**   5:18 6:4
107:20 112:19
153:20

**actions**   21:24
22:1,5,25

**active**   25:1

**activity**   137:5

**ad**   32:23,24,25
33:3,4,6,15
45:19 46:5
53:22,25 54:4
85:7,9 86:21,
25 106:21
107:17 108:19
109:22,23,25
116:22,25

**access**   117:19,20,22
118:3,22
123:17 125:8
140:22,24
141:10

**add**   129:17

**added**   129:19

**addition**   90:1

**address**   6:22
113:5 116:4
149:16

**addresses**   24:22

**adhere**   70:14,19

**adjacent**   153:21

**administrative**
149:22 150:7

**ads**   8:8,13
26:6,8 27:17,
18 29:8,23
30:5 31:11,15,
24 32:11,16,21
33:16,18,20
34:1,3,8,13,
16,22 35:11,23
37:2,12 39:6,
20 40:19 41:4,
6,17 42:2,10,
13,21 44:1,12
45:19,22 46:5
47:1 48:11,15,
17,18 49:6,10
51:10,22 52:3,
19,21 53:3,8,
12 54:13 57:7,
17 58:3,6
59:21 60:1
62:18,24 64:3
65:5,22 67:15,
16,17,18,21
68:15,21,23
69:5 71:4,11,
16,23 72:9,22
73:23 75:24

**76:18,24 77:9,
12 78:8,13,16,
19,21,24 79:1,
3,6,23 83:7,10
84:1,3 85:4,19
87:4,12,22
89:2,3,5,6,7,
11,12,16,20,
21,24,25 93:5
94:6,13 97:3,
11,14 102:10
104:5,12
106:13 107:7,
15,22 108:6,9,
10 110:3,4
113:1,22,23
114:18 115:19
116:4 119:5
120:1,16 123:9
131:1 132:16
135:6 136:3,
13,20 137:1
138:15 139:15
144:25 146:4,
19 149:2,16,
19,20 154:10
155:6,13 156:2
157:6 158:5,
12,15,21

**Ads'**   33:5,14,17
34:11,17 35:8,
10 37:7 53:16
69:13 73:1
77:10 79:7,25
80:9,18 81:2,
6,12,15 82:4
103:19 113:4
134:22 145:4
159:4

**advanced**   67:20

**advertisements**
84:25

**advertiser**
109:1 140:23
141:10

advertisers
33:16 54:1
57:17 58:3,25
59:7 89:3,6,9,
12,21 97:2,7

advertising
62:24 63:16,25
64:13 85:13,
15,18 86:9
87:16,20 95:3
97:4 110:14,16
157:18

advice 47:16
136:10,12,18,
24 137:6

affiliations
108:21

afterwards
58:20 88:25

age 138:3

agencies 146:25

agency 146:15,
18,20 147:7,22
148:2 149:3,6

ago 28:20 29:15
31:18 90:24
91:4 95:20
96:15 121:9
142:22 158:20

agree 5:8 31:21
104:11 106:12
107:13

agreeing 44:8

agreement
160:11

ahead 25:11
35:14 74:12
81:17 91:19
114:10 132:23
153:3

aimed 46:2

AKA 116:21

Alec 39:11
99:24 104:23
105:7,16
118:18,22
158:13,14,25
159:1

Alejandra 139:3

alert 100:9

Alex 98:10,11
158:11

algorithmically
75:9

allegations
98:9

alleged 108:4

allegedly
109:23

Alliance 144:21

allow 51:19

allows 84:17,21

alongside 156:5

amended 26:21,
25 27:10,11

America 137:8,
10,16 141:17

American 51:13

amicable 157:4

amount 107:1
109:5

amplified 98:25

analysis 99:5,6
137:2 140:21

anonymous 65:12

answer 8:5,7,22
9:8,24 10:9,22

14:18 17:15,
23,25 18:1,3,
13 19:20 20:17
21:7,18,21
22:6,8 23:9,
15,24 24:11
25:9 26:12
38:2 39:3,22
41:15 42:5,19,
23 43:1,3,17,
19,20,22 44:4,
16,17,19 45:8,
25 46:13,15
47:16 48:25
49:16,20 50:4,
25 52:17 61:4
62:7,25 63:14,
19,21 64:16,23
65:17 68:19
69:22 72:20,22
74:13 75:7
77:2 81:22
83:15,23 85:24
86:13 106:23
110:18 111:3
124:5,7 133:12
134:24 135:9,
11,12,13,16,18
136:8,15 137:3
142:21 145:11,
12 146:7,9
150:1

answered 66:1

answering 9:2
68:2,7 82:1
85:23

answers 34:5
78:13

antitrust
107:20

anybody 118:15
139:1

anymore 75:18
120:1 144:18

anyone 11:22
12:5,14 34:16
35:7 39:5,15
40:10,13 55:25
65:22 76:2,24
78:8 80:8,23
85:3 103:13
105:4 108:5
115:9 129:17
130:25 132:10,
17 135:6
136:4,14,21
137:15 138:5,
20 139:11,16
144:22 145:1
146:1,5 147:7
154:12,14,22

anytime 90:10

apart 154:17

apartment's
15:6

apologies 93:11

apologize 70:17
93:20

Apologizes
95:24

app 20:25
112:24

appearances
5:21

appearing 58:4
89:4,12,21
151:23

appears 107:14
116:13 125:5,7

application
24:4,8,15

apply 128:8

applying 55:4

appreciate

39:17

**approach**   70:22

**appropriate**
17:18

**approving**   79:24

**apps**   20:24

**April**   27:18,21
28:8,17

**area**   34:2,7,14
63:4 64:14,18
72:12 87:24
88:8 104:17
117:25

**areally**   159:1

**areas**   25:12,22
64:8 86:20
98:24

**Ari**   138:11

**Arielle**   158:24

**arm**   55:2 156:4,
7,19 158:16

**around**   13:16
32:9 100:5
152:9,13

**article**   45:1
46:12 52:7
56:11,13,18,
20,23 60:14
61:12,18,22,25
62:15 63:1,4,
11 64:7,15,18,
24,25 65:7,15,
25 66:2,5,13,
14,21,24 67:5,
6,10 83:14
85:21,23
86:19,20 87:8,
25 89:23 90:1,
8,10,20 91:6
93:4,10 94:1,
4,7,14,17

95:7,11,18,23
96:6,9,10
97:19 99:2
100:4,6,10,13,
17,18,25
101:4,7 102:4,
7,11 103:4,14,
18,21 104:9,
16,19,24
105:5,8,17,21
106:6 111:6,7,
8,10,11 114:7,
16 115:13
116:12 120:18
121:3,5,11,16,
19,23 122:3
123:9,13,14,22
124:2,4,7,9
125:8 131:11
133:20,25
134:5,9,12,17
139:21 140:6,
17 141:14
142:2,5,9,18,
19 143:2,7,16,
20 144:2,8
145:12,13
146:13 148:6,9
149:7,24
150:12,15,17,
21,23 152:9
157:19

**articles**   28:1
37:12,13,18
38:1 39:6,8,
19,23 41:14,19
43:2 46:11
58:9,11 60:17,
18,24 61:2,3,
6,16 62:2,21
63:2 65:9,16
66:8 67:10
83:13,14 91:9
95:21 96:21,25
99:12 103:6,16
120:12,13

133:11 134:21,
22 135:11
140:11,18
145:4,10
148:18 149:3

**artwork**   82:12

**asked**   10:9,11,
16 13:1,2 14:4
25:14,24 42:21
44:12 46:25
66:7 80:8,20,
22 86:11 114:9
138:5 147:16

**asking**   9:8
15:20 17:20,21
18:10 19:1
21:15,16 22:4,
5,22,25 27:17
37:19 39:18
41:20 42:12,13
43:8 44:7,9,
11,18,22 45:3
46:1,4,10 47:3
49:18 53:6
65:4,8,10,11
67:3,4 77:14
81:23 89:1
90:23 105:18,
19 106:18
107:13 111:3
153:15

**aspect**   64:10
110:4 143:10

**aspects**   63:11,
12 95:2,13
99:23 142:12

**assault**   98:9

**asserting**   37:24

**assertion**   47:10
133:14 135:2

**assigned**   131:2

**assigning**   139:8

**assist**   78:5
154:14

**assisted**   77:3,6

**associated**
100:4

**association**
98:17

**assume**   9:24
10:10 49:19
68:6 81:25
101:3,10,13
120:10 130:2
157:13

**assuming**   128:24
129:12 131:5

**assumptions**
101:21

**Atkin**   5:14 6:4
26:22 33:19
38:25 55:13
56:1 77:14,15,
18,22,24 78:9
93:23 102:7,24
121:18,22
122:2 123:2
124:14 130:12,
20,23 154:24
156:12

**Atkin's**   36:4
96:5 101:22

**Attachment**   17:7
23:2

**attack**   72:5,6

**attempting**
127:23

**attend**   136:13

**attention**   104:1
140:19 152:23

**attorney-client**
12:8

**Audio**  5:7

**August**  122:11

**auto-generated**
116:10

**available**  54:23
64:12,21 65:6,
11 66:23
80:13,15,17

**average**  101:16

**aware**  35:1,6,9
54:22 58:2,21
59:17 77:1
78:10 79:4
84:24 85:10,14
86:16 88:1,2,
3,11,17,20
89:11 120:17,
19 133:22
134:7,21
145:17 157:14

**Awesome**  160:15

---

**B**

---

**back**  22:18,25
27:23 46:23
47:14 48:8
60:4 74:8,19
89:10 92:5
120:23 121:2
131:18 159:19

**back-end**  157:20

**background**
115:6

**bad**  128:9

**banners**  31:5

**Bannon**  58:19

**bar**  138:3

**Barbi**  56:6
156:12

**based**  14:10
15:23 16:22
17:11 23:5
47:5 51:20
70:8 76:21
86:12 87:18
106:3 108:9,12
115:15 116:13
122:18 124:11
130:2 131:9
140:12

**basic**  127:24

**basically**  20:2
71:2 75:18
99:22 139:13

**basis**  135:17,18

**Bates**  113:14
114:21 116:16
118:25

**began**  28:2

**beginning**
159:25

**behalf**  5:17
47:5 69:9

**behave**  72:4

**behaved**  71:18
72:7

**behind**  98:8

**behind-the-
scenes**  87:14

**beholden**  70:5

**believe**  7:22
8:2,12,19
11:21 13:9,11
15:22 23:4
24:20 25:3
26:14,24 27:1,
23 28:8,11,14
30:19 33:22
36:5 38:17,19
39:10 40:13,20

**47**:4 55:16
56:2 57:8
58:20 59:5
65:1,8,19
66:2,16,25
67:13 71:22
73:18 74:21
77:10 79:11
85:6 87:11
90:22 96:7,16
97:8,16 98:16
99:24 103:20,
24 105:3
108:25 112:1
113:10 114:19
115:4,6,20
117:19 119:13
123:22 129:21
130:8 137:11
138:15 141:22
142:6 144:9,
18,20 146:21
152:4 155:12
158:10 159:6

**believed**  12:22
72:9

**below**  93:13
116:19 119:4

**Ben**  38:13 131:6

**besides**  55:25

**best**  8:23 28:24
44:19 91:18

**better**  98:24
109:4

**Bianchi**  6:2
10:25 11:3
15:11,13 16:6,
20,23 26:17
27:8 30:11,13
31:8 92:9,16,
20,22,24
96:14,17,19
97:22 111:15

**112**:5 113:15
114:22 115:23
116:17 117:6,
12 119:1
120:25 122:7,
23 124:19
125:17 126:9
128:19 129:7
131:17,19
132:4 140:3
141:3 149:12

**bigger**  119:4

**bit**  14:4 15:6
23:1 31:7 65:4
67:3 71:20
73:5 96:11
99:3 109:4
111:3 117:3
118:4 139:2
141:2 149:9

**blanket**  67:9

**Block**  123:17
125:8

**blue**  119:4

**Bluesky**  79:5
90:22

**board**  40:19,21
41:3

**Bongino**  98:16
127:20 128:11

**boss**  80:7

**bosses**  35:21

**bottom**  123:16

**box**  119:4

**brain**  154:17

**Bran**  131:21

**Brand**  62:10,13
98:8

**Brandon**  38:16
79:10 80:2,6,

11,13,17,21,
22,25 81:10
104:23 105:25
106:5,7 113:7,
8 118:18 119:3
131:4 156:5

**Brandon's** 131:6

**break** 10:20,23
47:20 48:6
91:17,20,21
92:3 131:21
159:10,17

**breakdown**
106:24

**breaks** 10:21

**Brechbill** 6:2

**Breitbart** 57:19
58:4

**bring** 40:1
114:3

**broad** 39:15
65:4 67:3

**broadest** 45:18

**brought** 40:8
152:23

**Browning** 6:3
7:13,15,18,20,
23,24 8:3,4,
13,15,18 12:3,
6 13:12,16
14:13,15,18,
20,22 16:2,13,
16 17:14,23
18:5,14,19,23
19:19 20:7,13
21:6,13,18,25
22:6,13 23:8,
14,22 24:10
25:8,15,20
26:2,9 29:24
30:7 33:9
34:18 35:3,24

36:18,23 37:22
39:2,21 41:8,
11,21 42:4,23,
25 43:11,16
44:3 45:7,10,
24 46:7,18
48:12 49:12
51:24 52:5
53:5,17 56:12,
15 57:20 59:1,
8 60:19 61:8,
14 62:3,19,25
63:17 64:4,22
65:13,20 66:1
68:18 69:7,19
71:6 72:24
74:11,13 75:3,
6 81:18,19
83:11 86:3
88:6,13,19
89:14 91:15,22
92:11 102:12
105:9 107:8
108:11 110:17
114:8,11 120:2
124:5 131:12
132:22,24
133:8,17,21
134:6,13,18
135:4,8,23
136:1,6,15,23
137:3 139:17
141:12 143:3,
8,23 145:8
146:7 147:23
148:9,13
149:25 150:16
151:2,5 152:25
153:4,8 159:12
160:14,20

**buckets** 110:9

**bulk** 39:10
82:10

**bunch** 95:15
141:25

**business** 29:8,
23 30:5,9
31:15 32:15
33:15 42:21
44:2,12 87:22
98:17 107:6,
14,18,22
108:18 109:22,
23 110:3,5
156:5

**businesses** 33:7
45:14

**busy** 156:22

**bye** 157:8
160:20

**byline** 100:1,2,
9,15,17
101:14,23
102:2,19,22,25
103:3,7,10,14,
17

**bylines** 101:9

---

**C**

---

**call** 28:21,23
94:10 139:6
145:9

**called** 49:23
50:11

**calls** 7:24 26:9
33:10 105:10
114:11 136:4

**Campaigns**
123:18 125:8

**Canada** 6:24
49:22

**Canadian** 51:14

**capacity** 11:23
28:25 48:19
65:1,18 66:25

87:22 89:17
90:13 99:9
132:19 143:16
145:16 147:9,
21 148:1 158:4

**caps** 118:9

**Caraballo** 139:3

**career** 68:10,11
71:2 103:16

**careful** 41:23

**case** 12:20
13:24 14:5
27:5 37:18
101:5,22 111:9
125:2

**Casey** 149:18,19

**censored** 84:19

**center** 87:16
145:20,24
146:1,5,12

**CEO** 36:5,9

**certain** 15:20
49:24

**certainly** 60:15
69:1 70:5
71:18 72:1
84:20 89:23
98:20 150:14

**chain** 33:1
109:3 159:8

**challenge**
133:15 135:3,
20

**chance** 104:8
115:10

**change** 10:17
28:12 29:2
78:13 158:6

**changed** 28:13
30:19 37:14

54:5,8 80:1
90:21 115:15
150:4

**changes** 28:17,
21 29:2

**channel** 83:5

**characterization**
33:12 107:11

**characters** 63:5

**charge** 35:11,
16,17,19 36:6

**check** 8:8,12
26:6,8 27:17,
18 29:22 30:5
31:11 32:21
33:5,14,17,18,
20,24 34:1,3,
8,11,13,16,17,
22 35:8,10,11,
23 37:1,6,10,
12 39:6,20
40:19 41:4,6,
17 42:2,10,13,
21 44:1,11
45:19,22 46:5
47:1 48:10,15,
17,18 49:6,10
51:10,22 52:3,
19,21 53:3,8,
11,16 54:13
55:17,21 57:7
58:6 59:21
60:1 62:18,24
64:3 65:5,22
66:16 67:15,
16,18,21
68:14,21,23
69:5,12 71:4,
11,16,23 72:9,
22 73:1,23,25
75:24 76:13,
18,24 77:8,10,
12 78:3,8,13,
16,19,21,24

79:1,3,6,7,23,
25 80:9,18
81:2,6,9,11,
12,15 82:4
83:7,10,11
84:1,3 85:19
87:4 88:24
89:2,5,7,11,
16,20,25 90:4
91:4,7 93:5
94:6,13 97:8,
10,14,17
102:10 103:18
113:1,4,22,23
114:18 115:18
116:4 119:25
120:16 123:9
131:1 132:16
134:22 135:6
136:3,13,20
137:1 138:15,
17 139:15
144:25 145:4
146:4,19
149:2,16,19,20
152:12 154:10
155:6,13,22
156:2 157:5
158:5,12,15,21
159:4

**checked** 26:7
73:10,12
77:16,20
78:22,25 79:2
98:22 105:24

**checkmyads.com**
93:11

**checkmyads.org.**
93:12 113:3

**child** 98:12

**choice** 33:16
51:20

**choosing** 97:2

**Christmas**
155:18,25

**circumstances**
156:3

**cited** 145:13
148:23

**claim** 141:9

**Clair** 39:9

**Claire** 5:14
33:19 35:20,22
36:4 55:13
79:11 93:17,23
99:25 121:20
156:12

**Clare** 5:25

**clarification**
9:23 10:6

**clarified** 77:2

**clarify** 127:25

**clear** 10:11
22:22 23:1
38:25 39:7
40:11 47:9
55:6 66:13
67:2 71:11
72:3 78:11
94:20 133:13
135:16 152:10

**clearly** 115:15
153:8

**client** 41:23

**close** 13:14
22:2 24:12
159:21

**closely** 113:24

**closest** 60:15

**clued** 101:18

**clues** 101:6

**cluttered** 150:9

**co-** 36:11

**code** 67:22,24,
25 68:9,15
71:4,12,16,24
72:23

**codes** 70:21

**coffee** 15:4

**cofounder** 36:12
58:21

**cofounders**
35:12

**collaborate**
41:6 42:3,6

**collaborated**
45:23 46:10
47:1

**collaborates**
41:18

**collaborations**
41:14

**colleague** 99:24

**colleagues** 6:2
103:5

**collected** 153:9

**combat** 33:6

**come** 15:3 40:2
75:2,8 85:9
99:9 127:16

**comes** 85:18

**commas** 72:16

**comment** 148:22

**comments**
121:10,22
134:16 148:24

**committee** 49:3

**communicate**
71:8 135:6

communicating
  71:9

communications
  12:8 14:23
  17:16,25 21:20
  25:10 38:8,18
  79:21 153:5

companies
  59:14,18 88:3

company  8:14
  88:1,11,17
  140:21

compensation
  128:14

complaint
  26:21,25 27:5,
  10,13 111:21,
  23 122:13,15
  123:5,7 124:25
  125:2,24
  126:2,15,17
  128:24 129:1

completely
  10:11

Complies  6:9
  11:4 15:13
  16:6 26:17
  27:8 30:13
  31:8 92:9,22
  96:14,17,19
  97:22 111:15
  112:5 113:15
  114:22 115:23
  116:17 117:6,
  12 119:1
  120:25 122:7,
  23 124:19
  125:17 126:9
  128:19 129:7
  131:17,19
  132:4 140:3
  141:3 149:12

computer  13:6

17:11,12
18:10,16,20,24
19:3,21 20:8,
18 21:8,10
23:6,10,16,18,
20,21 24:13,
18,19 25:6,18,
25 26:8 119:16

concept  51:3

concerns  14:9

concluded
  160:21

concludes
  160:17

concussions
  49:3

conduct  24:5,8
  62:23 63:15
  76:9 78:1 81:1

conducted  23:5
  137:2

conference  5:16

confident
  25:12,21 26:3

confidential
  38:1

connotation
  128:4

conservatism
  51:15

conservative
  51:10,12,14,15
  52:13

conservative-
leaning  51:23
  52:1,11

Conservatives
  49:23 50:11

consider  50:1
  102:14 137:25

138:1,2 145:15

considered
  49:24

conspiracies
  84:23

conspiracy  63:8

contained
  141:21

content  12:7
  14:22 21:19
  27:13 34:17,24
  35:2,7 37:1,3
  40:17 79:24
  95:4 98:24
  103:25 155:5

context  69:21
  90:16 106:20,
  21

contextual
  101:6

continue  5:7
  9:2 64:22

continues
  128:13

continuing
  62:13 135:21

conversation
  47:7 56:2,5
  94:16 115:11

conversations
  5:11 17:21
  22:23 68:24
  85:17 90:17
  103:2 124:11
  153:14 157:11

Cool  13:19

copy  93:4

correct  7:11
  8:9 13:22
  15:2,8 16:1

20:20 23:3,6
24:2 27:19
28:10 29:17
34:22,24 38:18
39:1 45:20
52:4 55:10
59:23 61:7
69:6,14 71:5
72:23 73:15,17
74:9,20 76:6
78:17 86:9,14
93:11,15,18,21
94:1,21,24
100:10,13,25
101:4,23
102:1,2 103:19
108:10 115:5
122:15,20,21
123:8,10,14
124:14,15
125:2,9,10,13,
14 126:2,6,7,
18,23,24
141:21 142:2
144:12,18
149:16 150:15
151:24 155:13,
14 158:12
159:5

costs  158:23

counsel  5:21
  7:10 12:2,13
  14:12 17:20
  21:15,18
  22:23,24 23:23
  41:16 47:4

counsel's  47:16
  136:10,12
  152:23 153:13

count  60:4

Countering
  145:21 146:2,
  5,12

countries  48:23

couple  7:2

coupled  109:24

course  67:19
  85:16 86:1,13
  157:7

court  5:20,22
  9:3,10,17
  109:11 159:22

cover  30:19
  55:24 157:25

COVID-19  84:23

CP  72:15

crafting  142:1

created  129:21,
  24 130:1,6

creating  87:20

creation  124:8

credit  100:13

criticism
  137:14

cross-posted
  152:6

cross-posting
  152:5

cross-referenced
  140:16

cumbersome
  109:22

current  6:22
  30:18 31:3
  157:5

---

**D**

D'ANGELO  39:11
  104:23 105:16
  158:11,15,21

D'Angelo's
  105:7,16

Dan  98:16
  127:19 128:11

Dana  5:1,20

dangerously
  22:2

data  140:21,22

date  30:24,25
  66:17 70:22
  133:16 135:3,
  20 155:23
  158:19

Davis  6:3

day  114:4
  155:15,22

day-to-day  36:8
  37:16 38:10
  80:24

days  73:13
  75:19 155:17

deal  98:6

dealing  81:15

dealt  62:17
  114:2

death  114:2

debate  93:7
  94:11 119:6

December  28:8
  111:19 155:24

decide  36:16
  37:1,15 40:6
  66:19

decided  37:13
  94:6,14 153:16
  154:4 158:6

deciding  39:5,8

decision  37:4

39:19 102:18,
  21,24 156:6
  159:4

decision-making
  33:17 41:1

decisions  37:17
  38:4 79:14
  90:24 100:5
  103:17 106:24

deemed  32:1
  158:1,2

deeply  51:6

def-  32:3

defamation
  98:11

defendants
  112:19

define  12:21
  35:16 36:19,24
  37:3 42:6,9,
  15,17,18
  44:14,15 48:13
  49:13,15,17,
  18,19 51:7,25
  52:11,14
  53:18,20
  57:21,23
  67:24,25 71:7
  76:15 81:16
  85:8 104:13
  105:18 106:14,
  15,16 137:21

defined  31:22

definitely
  59:17 97:2,23
  152:7

definition
  31:23 32:4
  49:19 50:14,
  15,16,19,22,25
  52:13,15 68:6
  81:21 82:1

139:13

definitional
  111:2

definitions
  32:1,2 44:22
  49:24 50:1
  51:15

definitively
  50:5 52:18
  53:11 59:16
  73:1 108:2
  111:4 118:12
  142:22

defund  52:3

defunded  57:18,
  21,23 58:1

degree  62:10
  70:20 108:25

deleting  73:12

delta  109:3

democracy
  116:21

demonstrably
  84:22

denial  98:18
  127:20

Department
  107:20

departments
  35:18

depend  106:22

dependant
  107:15

depended  80:20

dependent
  106:13,15,16,
  19 107:2,4,7
  108:2

**depending** 50:14
51:3 82:11
83:24,25
118:21

**depends** 30:9
32:5 35:16
36:19,24 37:5,
8 40:3 48:21
51:12 52:13,
15,16 71:7
104:13 106:14,
20 111:8
127:18 128:10
143:24

**deposition** 5:1
6:6 7:1,4,7,16
10:18 11:20,22
12:13 15:2
29:18 46:3
160:12,17,21

**describe** 29:7
54:25 58:24
59:6

**described** 32:17
109:20

**describes** 96:21

**description**
31:7

**desire** 98:6

**details** 83:14

**determine**
100:24 107:6

**develop** 68:25

**developed** 74:18

**developing**
156:9

**Dewey** 132:6,10,
14,17,18
133:19,24
134:5,11,16,
21,22 135:6

136:5,14,21
137:2

**different** 18:7
29:20 35:17
36:1 38:7,14
48:23 50:17,20
51:2,4,8,13,16
71:8,21 72:15
83:22 105:14
112:25 120:14
123:13 124:4
128:8 131:22
134:8

**differently**
129:15

**difficult** 9:3,
10 33:1 56:10
61:3 86:17
100:24 142:21

**digital** 67:20
107:22 108:5
109:22,23
140:22 145:21,
24 146:2,6,12

**digs** 33:4

**diligence**
128:15

**direct** 6:19
80:7 93:13
104:1 140:19

**directed** 22:1
76:23

**directing** 11:19

**directly**
120:16,21
122:3

**director** 38:8,
17 55:16 79:21
115:5

**director's** 41:4

**directors** 40:19

**disagree** 133:14
135:2

**disagreed** 47:11

**disclose** 12:7
14:22 17:21
41:23 42:12
43:4 46:1
61:17 65:8,11,
14 66:7 69:16
136:7 146:8

**disclosed**
139:23 144:5

**disclosing**
17:24 25:10
43:1,17 137:4

**disclosure**
136:16

**discovered** 84:6

**discovering**
82:17

**discovery**
112:19

**discuss** 12:13,
18,20,22,25
13:10,24 14:2,
11 39:4 40:4
49:5 128:11

**discussed** 12:17
13:4,9,21
45:12 48:17,22
94:20 101:23
142:10,11,20,
24

**discussing**
37:18 48:22,24
58:19 116:8
121:2

**discussion**
22:16 40:14
46:21 122:18

**discussions**
13:14,16 28:23
37:20 38:9
39:11,12,16
41:2 102:15

**disinformation**
63:10 84:21,23
88:8

**document** 10:15
11:1,7 15:24
16:11,14,17,25
17:4,7 26:23
27:9,10,12
30:21 72:10
95:2 96:20
97:23 111:20
112:9,18
115:15,21
116:1,2,6,7
117:9,10,13
119:16,17,19
120:13 123:3
129:10,14,22,
24 130:1,5,10,
12,14,16,20,24
131:9,15 132:3
143:17,21
153:8

**documentation**
96:21 121:13
122:1 144:1,9

**documented** 63:6

**documents** 12:25
13:2,6,8,10,16
14:11,23 15:21
17:11 18:4
22:21 23:5
25:2,3 26:1
92:14 131:22
140:14 141:20

**dog** 47:24

**doing** 8:22 9:1,
7 12:16 28:1

53:21 83:25
116:21 122:4
131:4 138:14
139:24 147:14
159:2

**dollar**  127:7

**dollars**  33:3
109:6

**donation**  34:10

**donations**  34:8

**donors**  34:11

**double**  55:17,21
66:16 91:4,7
97:8,10,17
103:7 138:17
152:12 155:22

**doubt**  17:8
29:16 141:9

**draft**  60:5
72:14 77:24
80:19

**drafted**  59:25
60:8,18,24

**drafting**  59:23
72:17 76:3
93:25 104:25
105:5,7,17
122:19 124:2,
13 125:12
126:5,22 129:4
133:19

**draw**  154:15

**Drennen's**
138:11

**due**  66:8 128:15

**duly**  6:17

**dynamics**  118:2

---

**E**

---

**e-mail**  18:22
19:2,4,6,7,8,
23 24:22 40:23
112:15 113:5
116:4,10
119:25 149:15,
16 150:4,10

**e-mails**  136:21

**earlier**  10:17
74:7 77:2
106:9 115:4
116:8 122:18

**early**  131:10

**earned**  140:24

**earnings**  127:1,
4

**edit**  81:5,7

**edited**  81:3
105:25 106:9
113:8,18
114:25 119:3
130:9,12
149:18

**editing**  82:6
114:7,15
115:12 134:12
150:11

**editor**  38:6,7,
12,14 80:2

**editorial**
37:16,20 39:16
40:14 81:14,
16,21,25 82:3,
5,11 130:22
156:4,7,19
158:16

**edits**  106:1
116:11

**efforts**  89:3,
11,15

**Eight**  93:5

**either**  21:2
66:24 124:12

**election**  98:18
127:20 128:12

**electronically-
stored**  15:21

**element**  128:6

**Elon**  75:18

**employed**  28:3
71:12 114:18
115:18

**employee**  100:1
113:21,22
149:19

**employees**
104:24 157:6

**employer**  8:9
83:10

**employment**  31:7
138:14,19

**encountered**
143:7

**end**  28:8 56:18,
19,21 74:3
108:21 151:6
159:10,25

**ending**  31:25
113:14 116:16
118:25

**ends**  114:21

**enforcement**
83:4

**engaged**  89:2
127:20

**engages**  98:18

**ensuring**  54:1

**entail**  27:25

**enter**  5:22

**entire**  111:7,11
159:24

**entirely**  65:21
140:14 143:24

**environment**
51:16

**equal**  35:22

**equally**  69:22

**equivalent**
101:10

**Est**  6:23

**estimate**  60:3

**ethical**  45:16
68:16,22 69:13
70:5,14,19,21,
25 71:4,12,17,
24 72:2,7,10,
23

**ethically**  69:9
71:22 72:4,7

**ethics**  67:22,
24,25 68:10,
12,14 69:2,4,5

**event**  138:8

**eventually**  28:1

**everyone**  47:21
48:2 91:20
107:25 109:2
160:18

**everyone's**
157:14

**everything's**
49:2

**evidence**  31:24
128:12

**evidenced**
114:13

**exact**  55:15
147:11 158:19

**exactly**  7:25
12:18 17:12
39:17 58:12
69:25 73:21
74:6 79:13,15
94:8,17 95:19
99:15 107:25
110:6 114:5
118:13 121:6,8
149:21 152:5
153:11,25
156:1,2,8

**EXAMINATION**
6:19

**examined**  6:17

**exceptions**
100:20

**exchange**
116:22,25
117:19,20,22
118:3

**exhibit**  11:5,12
15:15 16:7
26:18 30:14
93:1 111:16
112:6 115:24
122:8,24
124:20 125:18
126:10 128:20
129:8 140:4
149:13 151:12

**exhibits**  92:12

**exist**  90:22
144:18

**existed**  57:16
131:22

**existence**  74:16

**exists**  53:12
144:12

**Expand**  92:21

**expectations**
69:8 70:2

**expected**  69:2

**experience**
31:11 70:9

**expertise**  63:5,
12 64:8 86:22
87:24 88:8
117:25 118:5

**explain**  23:21
87:17 127:15

**explained**  61:23

**exploring**
131:22 143:16

**exported**  129:15

**expressed**  97:5
98:6

**extent**  23:22
25:9 26:9
41:12 42:25
43:16 46:1,7,
10 56:16 63:1
65:13 69:19
105:9 133:9
136:6 145:8
148:9 153:4

**extrapolate**
72:3

**extremism**  84:7

**extremist**  84:8

— — — — — —

**F**

— — — — — —

**Facebook**  78:24

**faced**  98:11

**facing**  98:9

**fact**  14:4 29:16
33:24 71:23
76:13 78:3
81:11 86:24
87:19 88:23,24
94:10 101:15
104:2 105:24
107:19 110:15
118:10 128:12
142:25 143:20,
22,24

**fact-checking**
82:6 122:20
124:13 125:12
126:5,22 129:4
150:12

**factors**  108:12,
15,24 109:14,
18,24 110:10,
13 111:1,5
127:18

**facts**  12:20,21
13:24 14:5
54:1

**factual**  51:20
56:20 154:19

**factually**  40:5

**fair**  8:17,24
9:25 10:11,23
12:11 15:7
32:4 33:5,11
56:24,25 63:14
66:15 70:24
72:18 82:8
85:18 100:16,
19 101:25
107:10 110:16
116:6 118:7
130:23 131:9
150:12,13

**fairly**  12:24

**faith**  128:9

**false**  63:6
128:16

**falsehood**  32:10

**falsehoods**  32:9

**familiar**  27:13
84:2 87:13,16,
18,19

**family**  98:12

**far**  29:18 72:25
84:8 126:16
159:23

**Farah**  113:18,21

**fast**  16:24

**February**  5:6

**feed**  75:2,12

**feel**  7:6 9:23
10:6 149:8
151:7

**filed**  26:21

**filings**  64:21
65:2,7,15,23
66:4,23 88:4,
12,18 94:21

**filmed**  81:3

**filming**  82:11

**final**  39:10
138:18

**financial**  88:4
98:6,7

**financially**
5:18

**find**  133:9

**Finder**  24:4,8,
15

**fine**  39:22
47:23 56:17
91:22,24
109:16 151:5

160:3

**fingertips**  54:2

**finish**  9:8
35:15

**first**  6:17 7:7
15:22 28:2
52:19 53:1,3,
6,10,15 54:6
61:1 74:15,18,
21 77:8 81:10
82:16,17 83:16
84:6 94:25
101:8,24,25
102:1 113:7
119:4,5

**first/last**
101:8

**fits**  99:18

**Fitzgerald**
147:18

**five**  47:22,23
48:1 57:8
91:22,24
159:11

**five-minute**
91:21

**Florida**  5:3

**focus**  11:11
63:7 64:8
87:10

**focused**  64:10
85:20 86:20
87:24 104:17
105:23 117:25

**focusing**  53:22,
24 64:14,19
157:15

**folks**  63:5
108:19

**follow**  33:2

47:16 70:13
74:3,5 77:18
136:24 137:6

**followed**  73:14,
19 77:21

**following**  54:17
73:22 75:15,20
136:10,12,18
137:18,25

**follows**  6:18

**foremost**  61:1
83:16

**forget**  74:3

**form**  8:15 14:15
20:13 21:6
23:8,14 29:24
30:7 33:9
34:18 35:3,24
36:18,23 41:8,
11 42:4 48:12
49:12 51:24
52:5 53:5,17
57:20 59:1
61:8 63:17
68:18 69:7
71:6 72:24
75:6 86:3
88:6,13 89:14
102:12 105:9
107:8 108:11
110:17 131:12
133:21 134:6,
13,18 139:17
141:12 143:3,
8,23 147:23
150:16 157:19

**formal**  48:19
89:16 101:14
105:13 144:13

**formally**  68:25
138:18

**formatted**
129:15

**formatting**
123:24

**forms**  71:8

**forth**  27:23
74:8,19

**forward**  40:6

**found**  33:20
109:3 119:5,16
143:21

**foundation**
67:20 149:25

**founded**  33:18

**founders**  38:10,
24

**four**  57:8

**Fox**  52:3,11,14

**frankly**  50:3

**free**  7:6 9:23
10:6

**freedom**  51:20
97:5

**friends**  49:1
139:6

**front**  116:13
130:3

**froze**  95:9

**Fuentes**  98:10

**full**  6:21 28:9,
10,15 109:2

**fully**  49:8
159:7

**fun**  65:17,19

**fund**  97:6

**funded**  108:9

**future**  91:17

_____

**G**

**G-MAIL**  19:9,14,
16,24 24:23

**Garcia**  158:25

**garden**  127:7,9,
24

**GARM**  144:15,17,
23 145:1,3,14,
17

**gathering**  37:25
61:17 133:10
135:10 137:5
145:9

**gave**  80:11

**general**  72:17
83:12 106:4
108:10 110:16
128:7 139:8
142:19 150:8

**generally**  38:4
39:23 41:17
51:22 80:11
81:9 94:9
100:19 103:11
111:7,12
127:23 128:2,6
141:16,18
143:1 145:11

**generates**  84:24
85:6

**generically**
38:3

**getting**  13:13
17:15 22:2
24:12 69:18
78:16 109:9
124:3

**Giants**  57:10,
13,16,18 58:2,
8,14,19,22,25

59:6

**Gilmore**  5:13
6:5,16,21,23
11:7 12:7
13:13 15:17
16:9 17:2
18:3,13 19:4
20:19 22:20
25:14 26:20
27:15 30:16
38:2 39:22
42:2 45:24
46:25 47:22
48:10 65:21
66:1,12 93:3
112:8 116:1
122:10 123:3
124:24 125:22
126:14 128:23
129:10 133:9
151:14

**Gilmore's**  37:24

**give**  6:11 32:12
34:4 47:24
50:17,24 56:8
60:3,24 64:4
100:12 102:10
128:4 142:13
148:22 151:1

**given**  69:9
123:12,24
155:21

**giving**  39:14
49:20 86:15
108:21 148:24

**glanced**  67:12

**Global**  57:5
103:6 144:20

**God**  6:12 112:24
154:5

**goes**  7:4

**going**  5:5 9:24

10:10,25 11:3
12:6 13:12
15:11 16:23
17:14 19:19
21:6 22:25
25:8 26:20
33:6 39:21
41:13,15 46:2
47:15,16 49:5
56:15 57:17,24
64:4 65:16
66:18 74:8,14,
19 81:5,20
83:11 89:6
93:3 96:16
103:10 108:1,
24 111:13,18
112:20 132:1
135:8,9 136:24
137:6 144:20
145:9 146:9
152:21 153:17
157:1 158:2
160:11

**good**  5:5 47:21
92:23 151:3
154:7 157:9
159:2

**goodbyes**  157:10

**Google**  33:21,25
85:10 86:24,25
87:2,5,12
104:5,12
106:13 107:7,
15,17,21
108:6,9,10,16,
20,21 109:23,
25 110:3,15
140:22

**Google's**  85:12,
15 86:9 108:3
110:13 140:22
141:10

**Googling**  99:8,

14

**GOP**  93:6 94:11

**Gory**  38:21

**gossip**  159:8

**great**  8:8 11:15
15:10 24:25
91:25 159:8,14

**greater**  63:12

**grew**  85:3

**grift**  127:8,10

**grifters**  88:9

**grifting**
127:23,25
128:2,5

**group**  132:6,10,
14,17,18
133:19,24
134:5,9,11,16,
22,23 135:7
136:5,14,22
137:2

**groups**  84:8

**guess**  30:22
45:18 58:12
68:8 74:18
82:6,11 84:19
85:16,24 115:3
127:22 128:7
129:15 145:14
153:21 155:21

**guide**  68:10
70:19

**guideline**  70:13

**guidelines**
68:15,21
69:13,20 70:18
72:15

**guy**  147:11
159:2

**guys**  17:17
92:11 144:9

---

**H**

**half**  50:17

**hand**  6:8 86:17
91:11

**handled**  114:1

**happen**  103:8

**happened**  150:21

**happening**  12:19
14:3 61:22

**happy**  10:21
56:13 91:16

**harassment**
100:6

**hard**  16:21
35:25 36:7
44:21 45:15
48:25 49:21
50:18,24 51:17
52:17 53:12
58:13 67:11
75:7,22 83:23
84:4 90:6,21
102:13 107:24
108:1 110:24
111:3 116:24
127:14 128:7
131:3 132:19
138:3 140:18
141:13

**Hardin**  38:16
79:10 80:2
104:23 106:5
113:7,8,9
119:3

**hate**  29:8,23
30:6,10 31:15,
22,23 32:4,15
33:8 145:21,25

146:2,6,12

**hateful** 32:1
84:21

**head** 9:4 56:6

**headlines** 62:12

**headphones** 95:9

**hear** 41:21
79:17

**heard** 132:6
137:8 144:15
145:20 146:15

**hearings** 49:3

**heavily** 104:5,
12,14,15
106:13,14,16,
18,22 107:6,14
108:2,8

**heavy** 107:2
109:19 158:23

**held** 5:15

**Helena** 138:21

**Hellofresh**
97:8,11,14

**help** 6:12 37:22
56:12 69:19
75:24 76:25
77:24 78:9
99:4 105:20
120:2 146:25

**helped** 114:4

**helpful** 62:7
115:7 117:4

**Hey** 40:23 148:6

**hiding** 152:24

**highly** 51:3

**Hind** 138:22

**hire** 55:5
158:24

**hired** 40:23
52:6 54:18
68:23 69:9

**hiring** 54:12,15
56:4 70:6

**hockey** 49:3

**Hold** 92:20

**home** 12:15

**honest** 109:10

**honestly** 41:5
49:21 50:16
87:6 96:15
116:24 117:24
121:17 132:15,
18 133:3
153:25 154:2,6
155:9 157:24

**hook** 94:10,11

**hope** 29:19

**host** 52:16

**Hotmail** 20:2,4,
11,19,22
24:17,18,23

**hour** 32:19
50:17

**hours** 28:5

**HR** 56:2,5

**Humphrey** 5:25
6:20,25 8:1,6,
16,20 10:25
11:6,13,15,17
12:4,11,12
13:20 14:16,25
15:11,14,16
16:5,8,15
17:1,20 18:2,
9,12,17,21,25
19:22 20:9,16
21:9,14,22
22:4,10,19

23:11,17,25
24:14 25:13,
17,23 26:4,11,
16,19 27:14
30:2,11,15
31:6,9 33:13
34:21 35:5
36:3,20,25
38:11 41:16,25
42:1,7 43:7,
13,21 44:6
45:13 46:4,17,
24 47:20 48:1,
5,9,14 49:14
52:2,10 53:14,
19 56:22 57:22
59:4,12 60:23
61:11,24
62:16,22
63:13,23,24
64:11 65:3,20
66:10,11 68:20
69:11 70:7
71:10 73:3
74:17 75:4,10
83:20 86:6
88:10,16,21
89:19 91:13,
15,19,25 92:6,
10,18,21,23,25
93:2 98:2
102:17 105:11
107:12 108:14
109:10 110:7,
21 111:13,17
112:3,7
113:13,16,17
114:14,20,23
115:21,25
116:15,18
117:8,11,15
118:24 119:2
120:7,23 121:1
122:5,9,22,25
124:10,17,21
125:16,19

126:8,11
128:18,21
129:6,9 131:24
132:3,5,25
133:6,13,18,23
134:10,15,20
135:1,5,14,15,
19,25 136:2,9,
19,25 137:7
139:19 140:1,5
141:1,4,6,15
143:5,13,25
145:19 146:11
147:25 149:1,
11,14 150:5,
18,25 151:6,
10,13 153:12
159:9,13,20
160:1,3,5,8,
10,15,19

**hurting** 116:20

---

**I**

**ID** 85:10 86:25
87:2,5 107:17
108:16 109:25
110:15

**idea** 94:3

**ideas** 131:23
132:1

**identification**
11:5 15:15
16:7 26:18
30:14 93:1
111:16 112:6
115:24 122:8,
24 124:20
125:18 126:10
128:20 129:8
140:4 149:13
151:12

**imac** 24:1

image  123:17

immediately
152:23

implicate  21:25

implied  139:24

implies  119:11
128:6

imply  153:15

implying  150:2

important  68:12

impossible
45:25 106:23

impression  53:7

impressions
140:24

in-house  158:2

inadvertently
41:23 92:13

incident  32:10

inclined  101:21

include  143:20

included  17:6
24:19 136:21

including  86:23

income  87:14

incorrect  84:22
154:4

incredibly
68:12

independent
154:11

independently
84:1 141:18
154:23

indicate  10:12
150:11

indicated
101:14

indicates
100:17

individual
42:22 43:15
44:2,12 53:9
79:16 101:8
108:1 128:10

individuals
40:11 43:5
45:14 54:16
59:19 84:18
90:14 101:3

industry  32:25
53:22,25 54:1
107:23 108:20
109:6

influence  15:8
107:1

inform  71:16
89:3,9 97:14
109:19

information
15:21 31:25
41:20,24
42:10,14,22
43:2,4,10,12,
18 44:5 45:12
51:20 56:8,17
58:10 61:17
63:3 65:11,22,
24 84:22 95:16
109:21 110:9
116:13 120:8,
16 128:9,15
130:3 133:11
134:2,4 136:7,
17 137:4
141:17 142:13
146:8

informed  54:17
57:16 58:3,25

59:7,10 102:21
142:23

informs  89:5

initial  38:6,12
40:22 109:1

initially  27:2
53:13

input  24:8

Instagram  79:1
152:4,7

instance  82:17
101:2 103:13,
15 104:14

instances  67:1

instruct  13:17
17:14 24:10,11
41:15 65:16
133:12 135:12
145:11

instructed
22:24

instructing
17:25 23:23
43:3,18 45:24
46:13 63:2
83:15 136:8
153:5

instruction
16:16 18:19,23
22:8 25:20
26:2 43:11,16
44:3 62:3,19
64:5,23 136:23

instructions
22:1 23:23

insurance  8:14

intent  56:16

interactions
74:21

interest  66:25
75:13 154:9

interested  5:18
148:19

interject  13:12
61:15

Internet  85:4

interpret  50:9
51:17

interpretation
50:3,7

interrupt  19:13
132:24 152:25

interview  54:17
55:11,12,13

interviewed
54:16 55:8,25

interviews  28:2

introduce  74:10

introduced
53:1,9 54:11
74:7,15

introductory
40:22

investigate
40:4

investigation
67:20

investigative
28:19,20 31:12

investors  34:13

involve  136:16
137:4

involved  38:9,
25 39:5,8,11,
12,15 40:13
61:2 76:20
87:22 93:25
100:18 101:4

102:24 103:4
104:24 105:4,
23 107:17,25
108:5 115:12
118:16 121:3
124:1,6,9,12,
15 126:4,21
129:3,5 149:7
156:13

**involvement**
32:7 41:1
108:6 121:21
122:19 124:6
130:22

**involves**   128:2

**ISBA**   108:25

**issue**   9:9 39:24
41:14,19 43:2
46:12 60:14
61:18,25 62:15
63:2,4 64:8,24
65:16,25 66:13
133:11 136:11
158:24

**issues**   17:17
51:19 111:2
154:19

**itch**   146:25

---

### J

**Jammi**   5:14 6:4
26:22 33:19
36:10 39:1
54:12 56:7,9,
23 57:6,9
58:6,21 73:6,
14,19 74:8,19,
24 75:25 76:2,
9 93:21 101:22
102:4,10,21
111:19 121:15
122:11 124:23

125:21 126:12,
25 127:6
128:22 130:9,
14 155:2
156:13

**Jammi's**   53:2
73:5 95:22
113:4 121:4

**January**   28:10
31:2

**job**   8:21,22
54:19 70:3
156:23

**Joe**   98:4

**jog**   99:4

**John**   5:14 6:3
26:22 81:17
153:3

**joined**   27:18
33:22,23 58:6
84:3

**joining**   73:23

**Jones**   98:10,11

**journalism**
27:24 45:1
46:8 67:22,24,
25 68:10,14,
16,22 69:3,13
70:14,19,20,25
71:17,24
72:10,23
131:23 137:13
147:14 154:11

**journalist**
28:20,23,25
34:15 42:24
43:5 45:16
47:5 55:5 68:1
69:9,10 70:10
81:20 100:7

**journalistic**

46:15 67:15
70:6 84:14
94:9 143:11

**journalists**
137:17,22
138:9 139:5

**journalists'**
71:24

**jurisdiction**
32:5

**Justice**   107:20

---

### K

**Kat**   138:7 151:8

**Kathryn**   5:25
6:25 12:3,6
120:3

**Kay**   55:12,14
115:3

**keep**   96:16
143:1,6,21
152:20

**kind**   9:4 50:2
56:6 58:13
63:5 84:14
85:3 91:2
98:17,24 99:19
108:6 109:7
110:3 128:6
147:21 156:22
157:15

**kinds**   45:2
68:24 79:14
95:4 98:13,23
106:25

**knew**   57:14
58:12,13,14
87:6 154:19

**Knight**   67:19

**know**   7:1,4,25

8:10 10:18,20
14:3,5,9 16:23
22:7 27:3
33:2,21 34:3,
6,8,11,13,14,
20 35:4 36:7,
11,12 37:18
40:3,21,25
44:23 49:4,18
54:6 55:15
57:9,12 59:14,
18 60:14 61:21
62:9,10,11,12
64:20 66:3
67:11 69:17,24
70:22 72:3,9,
14,16 74:1,8
77:16 79:12
80:16 81:23,24
82:14 83:25
84:5 86:23
87:2,5,13,22
88:23 89:12,21
90:5,13,23
91:1 92:11
93:5 95:1,8,
12,15 96:4
97:3,5 98:1,
13,22 101:7,9
103:2,8,21,23
104:23 105:4,
6,12,16 106:3,
5,24 107:16,
19,23,25
108:19,22
109:25 110:5,
14 112:21
113:25 114:1,
4,5,15,17,18
115:7,9,11,12,
18 116:25
117:17 118:8,
15,20,21
119:15,22
120:3,8,10,15
127:18 129:23,

25 130:4,5,9,
11,12,13,20,21
132:9,10,12,
13,14 133:5
134:7 137:15,
17,20,21,23
138:3,5 139:8
140:11 141:13
143:6 144:22
146:1 147:3,5,
7,10,11 148:7,
16 149:21,23
151:7,20
152:4,15,20,21
153:2 154:16
155:16 157:9
158:8,19,21
159:6,7

**knowing** 138:1,2

**knowledge** 41:3
42:2 65:23
76:24 77:15
78:8 89:2,7
113:4 139:20
144:11 155:10

---

**L**

**laid** 155:20
156:4

**Large** 5:3

**Largely** 80:1

**largest** 34:11

**laugh** 83:2

**launch** 138:17

**launching** 55:2
68:23

**law** 9:17 31:22
83:4

**lawsuit** 39:24
46:12 61:18,22
62:1 145:10

153:23 158:9

**lawsuits** 98:11

**lawyers** 13:7

**layoff** 157:6

**lead** 100:6

**leading** 70:12

**learn** 52:19
76:21,22 82:16
85:2 86:2
97:11

**learn-** 54:7

**learned** 53:3,11
54:7 58:7,14,
15 74:15 86:1,
8,12,13 97:4
154:15 159:7

**leave** 158:15
159:4

**led** 32:10

**left** 22:20
46:25 58:14,15
154:7 156:2
158:21

**legal** 5:17,21
32:3,6 38:23
115:6 153:20

**lens** 51:5

**letter** 55:24

**level** 40:14
107:25

**lieu** 155:21

**life** 67:7

**light** 51:19

**likes** 98:14

**limit** 18:1,14
64:23

**limited** 66:5

**line** 17:19
37:23 45:7,16
83:12 86:21
91:16

**link** 119:11,13

**linked** 123:9,23

**Linkedin** 29:5,
7,13 30:17,18
77:10 78:21

**links** 34:10
125:7 140:13

**list** 59:17
79:12 143:1,4
144:7,11,13

**listed** 31:10
100:23 102:1
143:19

**listen** 46:9

**literally** 150:4

**litigation** 32:6
90:17 153:10

**little** 14:4
23:1 31:6 65:4
71:20 73:5
96:11 97:20
99:3 117:3
131:16 139:2
149:9 157:10

**live** 83:1,5
114:3 119:5
150:21

**located** 26:8

**location** 25:19
26:1 114:3

**Locke** 6:1

**locked** 86:25

**log** 75:11,14

**log-in** 79:15

**logical** 110:2

**London** 32:7

**long** 28:7,20
29:15 31:18
57:6 73:19
77:21 91:4
95:20 96:15
121:8 142:22
146:8

**long-standing**
70:9

**longer** 58:15
119:24 120:4
138:7 155:13
157:20

**look** 28:22
29:15 66:19
72:10 73:21
91:10,13 92:6
94:20,23
110:13 128:18
131:20 149:11

**looked** 17:7
36:1,8 64:20
65:1,10 73:13
96:10 123:14
140:15 141:20
142:1,17
144:3,8 145:13
150:22

**looking** 17:2
59:16 78:23
106:23 119:19

**looks** 87:23
110:6 112:16
115:14 116:9,
20 117:13
129:14 130:8
141:4 149:15

**loosely** 137:18

**losing** 109:7
156:23

lost 98:11

lot 31:4 32:6,
25 59:9 60:2
69:15 73:12
75:22 80:3
84:7 99:10,11
100:5 109:21
112:25 113:1
114:2,5 125:6
128:8 130:19
140:13,17
141:21 142:11
146:23 147:14
149:22

lots 132:1

**M**

Macedonia
117:18

Madam 109:11
159:21

made 27:1,3
37:4 38:3
39:19 58:16
90:24 97:25
98:5 100:5
102:18 121:10
140:22 141:10
154:13 155:11
157:23

main 29:8 31:15
32:15 110:9

make 15:4 23:1
27:7 33:16
40:4 46:14
47:8 84:6 85:4
88:12,18 99:15
101:21 106:10,
25 109:9 110:8
113:12 119:14
121:22 123:25
128:3 129:18

133:13 150:7
151:21 152:14,
23 154:8,12
155:5

makes 66:17
94:11 110:2
157:24

making 102:21,
24 127:23
128:1 154:14

managing 36:8

manner 101:15

marked 11:5
15:15 16:7
26:18 30:14
93:1 111:10,16
112:6 115:24
122:8,24
124:20 125:18
126:10 128:20
129:8 140:2,4
149:13 151:12

market 110:16

marketing
140:22

marketplace
108:10 110:14

mass 98:13

material 37:25
45:5 64:9,12
88:4 135:10

materials 55:20
90:16 95:13
97:13,18
145:10

matter 5:13

Matters 99:5,6
119:5 120:9,
15,21 137:8,
10,15,23
138:5,8 139:3,

16,20 140:6
141:16

Mcgill 28:3
57:1

mean 14:8 18:18
19:13 27:3
29:18 30:9
31:17,20 34:20
35:25 37:3,23
40:1 42:19
43:12 45:1,2
47:12 48:18,22
49:4,7 52:6
54:7 55:6 58:9
59:2,10 61:9
67:8,16,23
68:2,3,9,24
70:20 72:25
74:15 75:8,21
76:3,12,15
78:12 79:20
81:3,7,8,9,23
82:20 83:16
84:13,14 85:11
88:20 89:15
90:2,3,4 91:9
94:22 98:3
104:15 105:13,
22 106:19
110:23,24
112:16 116:23
127:9,13,19,23
128:1 130:17,
18 132:24
143:4,9,10
144:4 145:5,8,
13 147:8
150:2,22
153:19 156:8,
20 157:14,24

meaning 51:4,13

means 31:19
32:16 44:25
47:13 68:5
85:12 110:1

127:23,24
128:1

meant 117:23
127:15

media 51:23
52:1,22,23
59:11 73:6,7
76:3,4,10,11,
14,16 77:6
78:6,9,17
79:3,7,25
80:9,18 81:1,
11,15 82:4
84:20 90:10,
20,24 95:18,22
96:6 99:5,6
119:5 120:8,
15,21 123:7
124:13,16
125:14 137:8,
10,13,15,23
138:5,8 139:3,
16,20 140:6
141:16 144:21
152:1

meet 7:15

meeting 156:12,
13

meetings 136:14
148:3,5

members 98:12

memory 10:15
99:4 126:3,19
144:20

mentioned 40:9,
12 61:2 79:17
141:25 156:21

mentioning
113:9

message 74:1

messaged 54:24,
25 139:2,5

**met**  7:2 56:7,8,
23 57:6,9 58:6
74:16 132:13
138:2,7,21

**methodology**
99:18 141:13

**metric**  35:1

**microphones**  5:9

**middlemen**
108:19,22,23

**mind**  10:4 97:20

**minute**  131:13

**minutes**  47:22,
23 48:1 50:25
91:22,24
159:11

**misremember**
61:21

**misremembering**
30:20 149:10

**misrepresent**
27:7

**misrepresentatio
ns**  128:9

**misrepresenting**
29:14

**mission**  53:4,20
54:3,5,9

**misstates**  16:2
39:2 63:17

**mistake**  141:5

**MJ**  5:16 160:4

**mod-**  87:14

**model**  110:5,6

**mom**  12:15,17,18
13:1,10

**moment**  53:13

**monetary**  128:13

**monetization**
109:19

**monetized**
104:5,12,15

**money**  34:1,3
85:4 106:25
107:1,25
108:21 109:1,5
127:24 128:1,3

**monopoly**  107:21
108:4 109:23

**monthly**  83:21

**months**  57:8
74:4

**Montreal**  6:23

**morning**  5:5

**motivations**
52:9

**move**  27:16 40:6
59:20

**multibillion**
127:7

**multiple**  19:7,
14 98:9

**Musk**  75:18

**N**

**name**  5:16 6:21,
25 38:20,22,23
76:17 78:12
100:4 101:8,
20,23 102:11,
18,22,25
103:3,10,14
108:20 129:11
132:9,14
133:4,5
138:21,22
147:9

**name's**  38:21

**named**  153:19

**names**  101:8,24,
25 102:1

**Nandini**  5:14
33:19 35:20,22
39:9 53:2,9
54:24 74:21
79:10 93:17,
20,21 99:24
113:2 127:14

**narrow**  24:11

**narrowly**  18:15

**nationalist**
84:7 98:10

**nature**  22:8
65:12 87:23
143:24

**navigating**
45:17

**nearing**  151:6

**necessarily**
39:9 41:18
44:8 51:7,14
61:2 80:4
83:17 85:20
101:5 102:15
105:22 130:18
145:17 148:18
150:11,17,22
153:14 157:16

**need**  7:5 9:1
10:2,17,20
31:4 44:16
47:22 49:16
68:3 81:22
91:23 97:10
108:6 151:10,
16 158:1

**needed**  72:2,4
80:12

**nefariousness**
128:10

**neo-nazi**  119:7

**network**  85:13,
15 86:9,21,25
110:1 140:22
141:10

**never**  7:2 76:22
77:3 82:22
112:15 120:21
122:14 148:23
153:2,21

**newer**  118:3

**news**  37:25
46:11 52:3,11,
14 56:15 57:5,
14,15,19 58:4
94:10,11 103:6
133:10 135:10
137:5 145:9

**newsroom**  40:1,7
55:2 56:11
68:24 70:6
72:15 156:9
157:16

**newsrooms**  70:21
157:25

**newsworthy**
158:1,2

**Nick**  6:2 98:10
135:24

**nod**  9:3

**nomenclature**
101:9

**non-published**
63:3

**nonpartisan**
48:16 51:18

**nonprofit**
137:11,12

**normal** 127:24

**Notary** 5:2

**note** 5:9 9:3
  135:1

**noted** 135:23

**notice** 155:21

**Notion** 112:20,
  21,23 116:7
  129:14 130:6,
  8,18,19 131:1
  141:20 149:15
  150:8,14,21

**number** 71:1
  92:14 104:2

**numerous** 119:6

---

**O**

**oath** 9:14,16

**object** 21:6
  42:4 89:14

**objected** 47:4

**objection** 7:24
  8:4,5,15,18
  14:13 16:2
  19:20 20:13
  23:8,14 25:9
  26:9 29:24
  30:7 33:9
  34:18 35:3,24
  36:18,23 39:2
  41:8,11 48:12
  49:12 51:24
  52:5 53:5,17
  57:20 59:1,8
  60:19 61:8
  63:17 68:18
  69:7 71:6
  72:24 74:11
  75:3,6 86:3
  88:6,13,19
  102:12 105:9

107:8 108:11
  110:17 114:8,
  11 131:12
  133:21 134:6,
  13,18 135:8
  136:15 137:3
  141:12 143:3,
  8,23 146:7
  147:23 149:25
  150:16

**objective** 36:24

**objectives**
  36:22

**obligations**
  70:5

**obtained** 65:24

**obvious** 157:14

**obviously** 86:22
  100:20 129:14

**occur** 103:9

**occurred** 47:9
  102:16 116:11

**occurring**
  101:19

**October** 65:25
  66:14,22 67:5
  87:1 91:6
  93:4,14 111:10
  114:16 115:13
  116:11,12
  121:3,4,11,16,
  19,23 122:3
  123:14 125:21
  133:20,25
  134:2,4,12,17
  139:21 142:2,
  5,9,18,19
  144:2,7 146:13
  149:7,24
  152:11

**offering** 98:23

**official** 89:17

**offline** 17:18

**okay** 6:7 8:2,8,
  21 9:1,5,11,19
  10:2,9,14,18,
  19,25 11:9,16,
  18,22 12:17,25
  14:2,11,17
  15:5,19,25
  16:5,21 17:6,
  10,23 19:8,10,
  16,23 20:25
  21:3 23:12
  24:4,7,15,17,
  22,25 26:7
  28:4,16 30:21
  31:3 32:2,13
  33:5 34:3
  35:22 36:16
  38:5,12 39:13,
  18,25 40:15,
  18,21,24 45:9,
  14,19,22 46:9,
  19,22,25 47:4,
  7,15,19 48:17
  49:10 50:6,19
  53:23 54:5,8,
  19 55:3,23
  56:7,14 58:21
  59:9,20 61:25
  66:10 69:4
  70:24 71:3
  72:5 74:23
  75:16 78:19
  79:19 82:7,14
  83:6,11,12
  84:2 85:22
  86:7 87:4
  89:25 92:6,10,
  16,24,25
  93:10,13,17,23
  94:13,19 95:6
  96:5 99:17,20
  100:2,9,21
  103:9 104:4

105:1,4,7
  106:2,5,9,21
  107:3 108:8
  109:17 111:9,
  25 112:8,12,18
  113:7,11,20
  115:8,18
  116:3,10,15,25
  117:16,22
  118:11,15,19,
  24 119:10,15,
  23 120:20,22
  121:7,10,18,22
  122:5,18
  123:6,12
  124:1,11,17
  125:1,5,11,16,
  25 126:4,16,21
  127:25 128:25
  129:16 130:5,
  9,14 131:9,18,
  25 132:8
  134:11,21
  135:1,4,14,19
  136:13,20
  137:1,10,15
  138:13,16,24
  139:7,15,20
  140:8,19
  141:9,16,20
  144:1,14,22
  146:1,4 147:1,
  10,13,17,21
  148:12 149:6,
  11,18,23
  150:6,10,14,19
  151:5,16,19,23
  152:8,10,15
  154:3 155:13,
  19,24 156:2,7
  157:2,22
  158:18 159:9,
  15 160:5,10

**older** 118:3

**once** 51:25

57:24 64:17
138:8

**one**  9:9,10
19:10,13,14,15
23:12 24:16
41:19 44:18
56:3,10 62:4,6
63:21 67:8,9
83:1 86:17
97:9 99:12
100:12,14
103:17 108:13
114:4 115:15
120:11 131:21
140:11 146:9
151:1 160:6

**ongoing**  147:5

**Onion**  138:9,22

**online**  52:20,21
62:23 63:15,25
64:13 138:3
152:15

**opacity**  32:25
53:25 107:24
108:18 110:15

**open**  24:1,4

**opinion**  84:11,
14,15,16

**opposed**  76:18
78:12 157:19

**oral**  68:17

**org**  93:11

**organization**
33:7 35:17,19
36:13,21 41:20
42:17,18 43:15
49:11 50:11
51:11 52:12
53:7,12 57:3
83:3 158:23

**organization's**

36:16

**organizational**
35:10

**organizations**
41:7 42:3,11,
14 43:6 45:22
47:1 56:24
58:24 59:6,15,
19

**originated**  32:8

**outcome**  5:19

**outcomes**  131:8

**outlets**  51:23

**outline**  112:17

**outlined**  69:12

**outside**  65:17
67:19 69:20
101:19 118:4
132:20 145:10
147:8 155:6

**overture**  98:5

**overtures**  97:25

**Oxford**  72:16

---

**P**

---

**p.m.**  92:3
159:17 160:21

**page**  10:14
30:17,18 77:10
113:7,14
114:21 116:16
118:25 140:19
141:2,5

**pages**  17:2
67:12 112:25
130:19

**paper**  25:2,3

**para-**  55:6

**paraphrase**  55:6
60:17

**pardon**  41:10
87:2 92:7 93:4
96:23 134:2
158:14

**part**  28:2,4,7
32:8 37:5,8
65:7,15 74:8
90:11 94:22
103:2 105:3,5,
23 118:4,21
123:4 124:25
125:23 126:15
128:24 154:10

**partially**  118:1

**participate**
136:4

**participation**
109:2

**particular**
101:22 112:15
124:2 125:7,12
126:5,25 129:4

**parties**  5:8

**partner**  12:15
13:4,21,25
14:2,12 15:1

**partners**  132:21

**partnership**
98:7

**partnerships**
97:25 98:1
108:20

**parts**  94:18,19
142:14

**party**  5:18
49:23 51:14
138:9,23

**passing**  53:10

**paraphrase**  55:6
60:17

**path**  13:18
41:13

**Pathmatics**
140:21

**pay**  8:11 155:21

**paying**  7:18,20,
23 8:2,13

**Pedam**  6:23

**pending**  10:22

**people**  35:7
37:15 40:9
55:8 73:12
101:4 108:22
128:2 134:8

**people's**  141:24

**percent**  109:3,5
140:23,24
141:10

**period**  98:22

**permission**
80:4,5,9,11
102:10,14

**person**  79:24
100:18,23
113:20 114:1
138:4,6,8

**personal**  66:25
67:6 68:10,13
69:5 76:5,7,
13,16 77:11
78:5,9,12
83:25 84:15
90:13 120:5
138:11

**personalities**
97:24 98:3,14,
15,19

**personality**
98:4

**personally**  13:3

23:12,18 50:8
51:5 54:12
65:2 91:5
127:19 144:24
147:8

**personnel**
158:23

**perspective**
94:9

**perusing**  16:25
27:9 96:20
97:23 117:10,
13 131:15

**phone**  136:4

**photo**  30:19

**pic**  138:25

**pick**  5:10

**picture**  39:15

**pill**  47:24

**pitches**  40:1,2,
4,8

**place**  5:7 12:9
97:3 103:10
110:13 142:4

**places**  22:21

**placing**  148:10

**Plano**  6:23

**platform**  20:22
75:12 82:15
84:9,17,18
93:6 95:4
98:14,25 116:7
130:5 150:15
152:3

**platformed**
98:18

**platforms**  84:20
90:20,25
128:14 152:6

**play**  111:1
151:8,10

**please**  5:9 6:8,
21 7:6 9:7,23
10:6 18:3,13
20:17 25:11
26:12 30:12
35:15 39:23
41:22 60:17
61:16 64:23
97:21 109:11
124:18 131:16,
18 138:6

**plenty**  128:11
142:13

**plugged**  85:12,
14 86:9

**point**  27:11
38:8 44:7 56:3
57:4 61:14
62:10 91:17
95:12 115:10
131:5 151:19

**points**  38:4

**police**  45:7

**policies**  72:16

**policy**  55:16
115:5 157:18

**polite**  74:5

**political**
48:11,13,15
49:6,22 51:21

**politicians**
51:13

**politics**  48:17,
22,24 49:1,2

**Popkin**  38:13

**popular**  98:25

**portion**  103:6
105:8,17,20

118:8 142:2

**position**  31:11
155:6

**possible**  23:1
76:20 103:12
121:12 122:16
125:3 139:14
140:9,14
142:23 150:3

**post**  80:18,20,
22,23 84:18
100:8 111:22
122:11,20
123:7,12
124:13,16,22
125:1,7,12,14,
20,22 126:1,6,
12,13,22,25
127:16 128:22,
23,25 129:4

**posted**  29:4
34:24 59:10,
15,18 79:21
80:6 82:21,22
90:20 152:1,3,
8 154:22,25
155:3

**posting**  54:19
75:25 79:7
80:9 82:4

**postings**  77:4

**posts**  74:24
75:2,12,16,20,
23 76:3,4,10,
11,14,16 77:3,
6,24 78:1,3
80:19 81:2,5,
11 95:18,22
96:6 125:6

**potentially**
66:7 112:17
117:14 160:12

**power**  41:1

**PR**  146:18,25
147:11,15
148:17 149:8

**practice**  101:19

**practices**  62:24
63:16 64:1,13
68:16,22 69:13
70:14,19,25
71:17,24 72:23

**practicing**
71:22

**predecessor**
131:6

**predominant**
86:22

**premarked**  11:1
15:12 91:13
92:7 112:4
115:22 122:6

**prepare**  7:16

**present**  15:1

**preserved**  153:9

**presidential**
119:6

**press**  95:7,10

**pretty**  157:14

**prevent**  116:21

**previous**  56:11
103:6 109:15
113:21,22

**previously**
15:25 17:10
18:9 139:23
141:20

**Primarily**  52:22
80:24

**primary**  119:6

**prior** 16:2 39:2
56:7 63:18
66:12,21 67:4
73:23 87:1
102:4,7 106:6
111:11,22
122:14 123:7
124:11 125:1
126:1,17 129:1
130:2

**priorities**
36:17,19
156:17 157:15,
17 158:6

**priority** 157:22

**private** 5:10

**privilege** 22:3,
10 24:12,21
37:23,25 44:8
45:7 47:5,11
64:5 66:6,9
124:3 133:1,14
134:25 135:2,
17,18 136:11
146:10 148:7

**privileged**
13:17 17:16
21:11,23 25:10
41:24 44:5
63:3 65:9
69:18 133:12
136:7,16 137:4
146:8 148:11

**privy** 102:15

**pro-hitler**
119:6

**probably** 67:9
80:6 91:3,8
92:23 118:1
120:11 130:23

**problem** 11:14
61:20

**proceeding**
5:12,15,23

**process** 54:12,
15,17 143:11,
12

**processing**
156:22

**produce** 15:20

**produced** 112:19
153:9 155:10

**profess** 128:13

**professional**
5:2 69:1,3
83:6,10

**profiting** 108:5

**program** 52:16

**progressive**
49:10,13,15,
23,25 50:1,7,
11,12,13,14,15
52:14,15

**progressivism**
51:3

**project** 131:2,
20

**proliferation**
84:21

**promise** 151:6

**properly** 72:20
138:18

**provide** 13:1,2,
8 33:15 42:22
43:9 44:12
68:15 134:16

**provided** 7:7
13:10 14:12
119:15 120:15
134:5

**providing**

106:21

**pub-** 90:9

**public** 5:2
27:1,3,4 58:16
88:1,2,3,4,11,
12,17,18 90:17
97:25 99:5
100:1 120:11
139:22 154:9

**public-facing**
157:21

**publically** 58:3
63:6 65:6 98:8

**publication**
66:12,21 67:5
101:12 102:5,8
111:11

**publications**
59:23,25 60:5,
12

**publicizing**
81:12

**publicly** 64:12,
20 65:10 66:22

**publish** 37:12
39:20 90:10
94:6,14 100:7
105:20

**published** 32:11
34:17 37:2,13
39:6,8 56:13,
17,20 61:15,16
62:4 69:21
77:9 86:19
90:8 93:10,14
95:13 99:25
103:18,23
104:16 106:6
111:6 120:12
148:10,14
149:3

**publishing**
40:17 104:18
157:19,20

**pull** 11:1 15:12
26:16 30:11
111:14 112:3
122:5,22
124:17 125:16
126:8 129:6
150:25

**pulled** 70:24
120:6

**purchase** 33:2

**purpose** 6:5
33:6,14 53:16,
18 82:25 153:9

**purposes** 68:2
83:1,7,10
100:12

**pursuant** 160:10

**pursue** 56:19

**pursuing** 107:20

**pushed** 47:14

**put** 19:19 23:3
25:8 58:1 81:2
84:19 90:10
93:5 102:10
103:13 133:8
148:17,19

**PX** 11:9

**PX-001** 11:1,5,
18

**PX-0012** 112:4,6

**PX-002** 15:12,15
21:4 23:3

**PX-003** 16:5,7,9
17:3

**PX-004** 26:16,18

**PX-005** 30:11,

14,16

**PX-007** 91:14

**PX-009** 92:7,17
93:1

**PX-011** 111:14,
16

**PX-013** 122:8

**PX-014** 122:22,
24

**PX-015** 124:18,
20

**PX-016** 125:16,
18

**PX-017** 126:10

**PX-018** 128:20

**PX-019** 129:6,8

**PX-023** 151:12

**PX-024** 119:20

**PX-11** 111:14

**PX-13** 122:6

**PX-17** 126:8

**PX-18** 128:18

**PX-20** 140:2,4

**PX-23** 150:25
151:14,16

**PX-24** 115:22,24

**PX-25** 149:11,13

**PX-9** 111:10

---

**Q**

---

**Q1** 127:1,3

**QANON** 84:23

**quality** 139:10

**Quebec** 6:24

**question** 7:5
8:7 9:8,24
10:9,10,13,22
14:15 17:15,24
18:6,8,15
20:10,14 21:7,
19,21 22:6,9
23:9,15 24:11
25:9,15,24
26:12 29:20,25
30:8 33:10
34:19 36:14
38:3 39:7,22
41:9,12,15,21
42:4,19 43:1,
17,24 44:16
45:8,25 46:2,
9,14,16 47:17
49:16 50:25
51:8 56:16
57:25 59:3,5
62:8 63:1,14,
18,23 65:5,13
66:2,3,6 67:2
68:3,7 69:22
70:16 71:20
72:20 81:22,23
82:1,2 85:25
86:5 88:15
105:14 106:17
107:9 108:7
109:8,11,12,
13,15,19 111:2
124:5 133:12
135:9 136:6
142:21 147:24
155:2

**questioning**
17:19 83:13

**questions** 8:21,
23 9:2,23 10:6
27:16 44:19,22
46:8,13 72:6
124:8 159:21
160:13

**quick** 11:11
159:10 160:7

---

**R**

---

**Rachel** 5:12
6:16,23 16:17
61:15 91:23
120:3 131:12
151:2

**rachel@
checkmyads.org.**
116:3

**racism** 31:21

**raise** 6:7 34:1

**raised** 14:10

**raises** 34:3

**ran** 32:11

**random** 53:10

**ranks** 98:21

**raped** 83:2

**rarely** 147:14

**reach** 74:2

**reached** 157:7,8

**reaches** 74:2

**read** 15:25
26:25 27:5,12
58:9,16 64:9,
13 65:14,17,19
66:4,25 74:24
95:12 96:20,
22,25 97:2
99:4,11 118:21
127:3 131:13
140:20 150:22

**reader** 100:9
101:3,17

**reading** 15:23
127:13

**reads** 100:16

**real** 11:10

**reality** 51:21
109:21,24
117:24

**realize** 13:5
74:1 152:22

**realized** 53:8

**realm** 46:15

**reason** 9:19
17:8 29:16
68:11 107:23
108:3 110:2
141:9 157:11
158:10

**reasons** 86:23
94:13 100:14
110:20,22,25
158:5

**recall** 16:4,12
17:3,12 25:6
29:4,9,11,13
38:21 47:2,3,
5,10 55:24
56:3 57:18
60:8,11 62:1,
17,20 64:12,
16,17 67:8
69:25 70:4
71:14 73:21
77:21 80:24
82:17 87:3
90:23 94:3,6,
8,14,15 95:6,
10,19 96:8
97:16 99:1
102:6,9,20
103:13 104:20
109:10 111:10,
12,24 115:12,
14,17 117:23
118:12 121:6,
10,13,16,17,

21,24,25
122:2,4,16,17
123:6 124:1
125:3 126:1,16
127:3,5 128:25
129:2 130:15
131:7 132:11
134:1 142:8
145:2,3 149:6
151:17 152:8
155:8 156:22,
24 157:3

**recalled** 154:18

**recalling** 99:20

**receive** 42:10
58:10 67:14

**received** 23:2
45:12 155:20

**receives** 34:8
42:13 128:13

**recent** 149:9

**recite** 60:13,
15,16

**recognize** 11:9,
18 15:19 17:5
27:9 30:16
93:8 111:20
112:8 116:1,2
122:12 123:2
124:24 125:21
126:13 129:10
133:4 140:6,7,
10 151:14

**recognized**
118:10

**recollection**
53:15 54:6
66:15

**recommend**
138:11

**record** 5:6,8,

22,23 6:22
22:12,15,16,18
46:17,20,21,23
47:8,9 48:4,8
92:2,5 133:9,
14 159:13,16,
19,23 160:1

**recorded** 5:12

**recording** 5:7

**red** 116:19

**redirect** 160:14

**refer** 107:21

**references**
127:1

**referencing**
120:12,13

**referring** 32:3
68:13 89:18,20
97:7 98:16
113:8 115:2
117:1,20
119:17 137:24
153:18

**refers** 93:21,23

**reflect** 23:22

**refreshes** 10:15

**refugee** 32:11

**refuted** 47:10

**regarding** 14:23
44:5

**Registered** 5:2

**relate** 90:17

**related** 5:17
8:12 13:6 21:4
38:1 41:19
43:2 58:16
65:24 135:10,
11 142:12
144:1,7

150:15,17,20
153:23 154:19
155:5,11
156:16 158:8

**relates** 56:10,
16 63:1 66:24
111:9

**relating** 43:4
60:5,8 143:16

**relation** 67:6

**relationship**
74:19 110:3
139:10,13
146:19 147:3,5
157:9

**releases** 95:7,
11

**releasing**
117:20

**relevance** 19:20

**relevant** 25:12,
21 26:3,5
65:21 144:9

**rem-** 151:16

**remained** 28:14

**remaining**
160:11

**remember** 10:16
14:20 29:10
38:23 53:6
58:12 67:11
87:6 91:7
96:23,25
117:18 129:11
132:9,15,18,19
133:5 138:22
149:5 152:5
153:25 155:17
156:25

**remind** 12:7
13:13 39:21

133:11

**reminder** 12:10
18:14

**remote** 5:15,23
25:4 49:8
159:7

**reopen** 160:12

**reorganizing**
150:8

**repeat** 10:3
25:15 43:24
59:2 63:21
82:2 88:14
95:8 109:8,11

**repeating** 7:5

**rephrase** 30:3
70:16 142:16

**replied** 111:20

**report** 40:5
43:14 44:1,13,
14,15,25 45:1
88:4 127:1,4
146:24

**reported** 83:4
142:15

**reporter** 5:2,
20,22 6:7,10,
14 9:3,10
27:23 28:17,
19,24 31:12
49:1 63:10
109:11,13,17
159:22,24
160:2,4

**reporting** 29:7,
22,23 30:4,5
31:14 32:15
63:8 69:21
84:7 99:11,13
137:13 139:22
142:24 148:14

**reports**  148:17
  157:20

**repost**  154:2

**represent**  6:4
  7:18,21,23
  8:3,13 17:6
  26:20 29:19
  66:18 93:3
  111:18 112:18
  122:10 123:1
  124:22 125:20
  147:17

**representation**
  17:8

**represented**
  7:10

**representing**
  6:1,5 7:1 8:2
  88:24

**republican**
  119:6

**reputation**  63:9

**request**  74:1

**requested**  43:9,
  14 44:1

**require**  136:7

**required**  88:3,
  18

**requiring**  65:14
  66:7

**research**  28:3
  40:4 56:20
  62:23 63:8,15,
  25 65:7,8,15
  66:7 76:9 78:1
  81:1 84:9
  85:17 86:18
  87:10 94:23
  96:8 99:13,19
  115:9 117:14
  118:10,16,17

139:23 140:12,
  17 141:21,24
  142:18 145:18,
  24 148:20,21,
  25 154:16
  157:19,25

**researched**
  76:23 77:9
  81:4 87:7
  94:18,19 97:23
  105:24

**researcher**
  139:3

**researchers**
  137:17

**researching**
  28:1 56:23
  63:11 64:25
  82:6 87:24
  95:7,11,18,23
  96:6 97:18
  99:2,8 122:20
  124:13 125:13
  126:5,22 129:4
  131:11 133:24
  143:2,7,9,10
  150:12 154:18

**reservation**
  135:21,23

**reserve**  133:15
  135:2,14,19
  160:11

**resources**
  69:24,25 71:13
  72:1,13,17
  73:2

**respect**  17:16
  18:5 40:16
  46:11 51:16
  63:4,10 64:7,
  25 67:11 70:3
  76:19 77:3
  86:20 89:8

98:12 103:7
  111:2 142:14

**respectfully**
  17:20 21:23
  22:11 41:16
  44:7 65:20

**responded**  106:1

**responding**
  54:20

**response**  10:12
  19:16 20:4,11
  25:6,19

**responsibilities**
  29:1 59:21

**responsibility**
  35:23 40:5
  79:13 80:3

**responsible**
  32:9 59:22
  69:3 76:2
  79:6,14,24
  82:13 129:17
  144:21

**responsive**  18:4

**rest**  92:18

**result**  110:1

**resume**  54:17
  55:18,22

**returns**  110:23

**revealing**  21:19
  22:7

**reveals**  22:7

**revenue**  29:8
  31:15 32:16
  84:25 85:7,9
  87:12,20
  106:22

**review**  30:5
  65:6 66:22
  67:4 70:1

71:13,25
  72:13,19
  95:17,22 96:3,
  5 97:13,18
  102:4,7 104:8
  111:7 117:9
  121:13 122:1,
  14 123:8
  126:17 130:14
  137:2 154:22

**reviewed**  69:15
  95:6 98:21
  104:10 111:11
  130:20

**reviewing**  72:21
  95:10 96:8
  99:1 111:23
  122:13 123:6
  126:2,19

**reviews**  100:16

**rigged**  128:13

**right**  6:7 7:20
  9:7 13:15
  15:3,10 18:7
  19:12 22:14
  27:2 28:9
  30:22 31:23
  32:18 34:1
  41:21 42:25
  45:15 47:25
  48:3,7,10
  50:10,22 51:7,
  8 60:13 70:11
  72:6 73:4,9
  77:13 78:23
  84:8 90:5
  91:5,15 92:1
  93:13,20
  95:15,17
  108:17 113:13
  114:15,20
  116:19 123:16
  126:16 133:15
  135:3,14,19

144:10,15
147:19 153:7
154:17 158:23
159:12,18,20
160:2,7

**riots** 32:7,10

**risks** 88:4

**road** 7:3

**Rogan** 98:4

**role** 27:17,22
29:4,7 30:5
36:4,13 41:4
54:13,23 55:1,
4 57:7 81:16,
21,25 82:5
94:17 104:18
105:7,13,17,18
113:23 114:15
121:4,18,20
125:11,15
133:7,19,22,24
134:11,23
139:21,24
145:3,5,6,15
146:13 147:10
149:20,23
150:2,11
154:10

**roles** 36:1
81:14 82:3,11

**room** 15:3

**Rory** 38:19
79:11,18,19,20
80:14,15,17

**Rory's** 38:20,21

**rough** 60:3
86:15

**rules** 7:3

**Rumble** 5:13 6:1
7:1 11:19 13:6
14:9,10 15:20

26:21 60:6,9,
12,18,25 61:3,
6,13,23 62:2,
11,12,18 66:15
82:14,16,18,
19,21,22,23,
24,25 83:5,6,
9,19,21 84:2,
10,11,16,17,
24,25 85:6,14
86:8 87:2,5,
11,13,16,20,21
88:11,17 89:4,
8,13,22 93:6
96:22 97:1,3,
4,12,15,24,25
98:5,8,14,21
99:9,11,13
104:5,11
106:12,22
107:16 108:8,
16 109:25
110:15 111:19
117:20 123:17
125:8 131:11,
21 149:4
154:19 155:5,
11

**Rumble's** 14:9
62:23 63:15,25
64:13,20 65:6
66:22 85:9
88:1 89:23
94:10,21 95:7,
10 107:6,14
119:5 127:1,3

**rumble.com**
140:23 141:11

**running** 33:4
89:24

**Russell** 62:10,
13 98:8

─────────────

**S**

**sad** 156:25
159:1

**Sand** 10:20

**Sarah** 55:12,14
114:24 115:3
148:23

**Sattar** 113:18,
21

**saying** 63:6
110:12 127:22
135:16 144:6
150:10 156:24,
25

**says** 29:13,17
30:23 31:14
93:14,17
112:20 113:2,
7,18 114:24
116:3,20
119:3,4 123:16
131:20 140:20
149:18

**scope** 64:23
145:10

**screen** 11:2,3
16:9 30:22
92:16,19
120:24

**scroll** 16:13,20
27:6 31:6
99:3,21
131:16,18

**scrolled** 96:11

**scrolling** 97:20

**search** 13:5
18:3,22 19:1,
3,16 20:4,11
21:3,10 22:21
23:5,13,18

24:5,9,17,19
120:4

**searched** 17:10,
12,16 18:7,10,
11,16,20,24
19:21 20:6,15,
18 21:5,8,20
23:10,16,20,21
24:13,16 25:2,
12,19,21 26:1,
3 120:6

**searching** 25:6
119:16

**SEC** 64:21 65:1,
6,15,23 66:4,
23 88:5,12,18
94:21

**second** 31:10
62:6 95:9
118:24 151:1
160:7

**seconds** 50:20

**section** 104:4,8

**security** 114:1

**see** 10:15 11:2,
7 13:6 15:13,
14,17 16:9,17
30:21 31:1,10,
14 52:21 62:7
75:12,16,20,22
92:14,18 94:25
98:23 104:2,6
113:18 114:24
119:3,8,9,11
123:20 125:6
126:25 127:2,6
129:11 131:15
140:15,20
141:7,8 143:17
150:3 151:11,
16

**seeing** 15:22
16:12 52:20

53:9 92:14
117:18 122:16
123:7 125:1,4
126:1,3,17
128:25 140:25

**seeking** 98:1

**sense** 12:24
45:18 66:17
84:6 94:11
98:24 99:16
106:10 110:2
113:12 119:14
123:25 129:18
139:7 150:7
152:14 157:24

**sensitive** 5:9

**sentence** 115:16

**separately**
107:19

**September**
123:2,12
124:23

**served** 11:19
15:20 75:9

**set** 37:24 69:1
70:2 109:6

**several** 54:16
60:2 83:1
108:12 111:1
120:13,14

**Severance**
154:17

**sexual** 98:9

**shake** 9:4

**shaped** 70:22

**share** 11:3
31:25 35:22
91:5,9 148:21

**shared** 13:7
90:12 95:2

114:3 118:17

**shareholder**
98:16

**shares** 128:14

**she'd** 130:24

**shell** 150:20,21

**shift** 157:22

**shifting** 156:16

**shine** 51:19

**shooting** 98:13

**short** 47:20

**show** 92:13
111:13 140:1

**showing** 92:12,
16

**shown** 33:2

**shuttered** 156:4
158:16

**shutting**
156:16,18

**sic** 158:11

**side** 11:12,13
30:22 95:3
147:15 148:25

**signed** 101:7

**significant**
103:5 109:5
110:4

**similarly** 77:14
116:7

**simply** 72:8

**single** 79:23
90:5 101:7
103:17

**sit** 15:23 17:5
50:22 53:15
61:5 62:1

71:15 84:11
88:20 107:5,22
108:7 110:1,23

**sites** 52:23

**sitting** 15:7
40:10 86:24

**situation** 80:16

**slant** 48:11,13

**Sleeping** 57:10,
12,16,18 58:2,
7,14,19,22,25
59:6

**slightly** 50:4
51:2

**small** 15:6
158:22

**social** 31:5
52:22,23 59:10
73:5,6 76:3,4,
10,11,14,16
77:4,6 78:6,9,
17 79:3,7,25
80:9,18 81:1,
6,9,11,15 82:4
84:20 90:10,
19,24 95:17,22
96:5 123:7
124:13,16
125:14 152:1

**socialed** 90:9,
19

**socials** 80:3
137:19 138:1

**solemnly** 6:10

**some-** 113:25

**something's**
94:9

**sort** 38:3
39:14,22 83:12
110:9 123:16

**sound** 147:18

**sounds** 11:15
32:3 50:10
110:12 124:12
155:25

**source** 29:8
31:15 32:15
43:17 85:8
87:20 141:17
142:9

**sources** 38:1
40:3 42:12
45:16 46:1
65:12 71:1
85:6 120:14
133:10 140:13
141:25 142:5,
19 143:1,6
144:2,7,11

**sourcing** 43:2,4
44:5,9,10
45:11 46:11
142:14

**spam** 20:3

**speak** 12:1
40:10 43:5,8
52:9 96:11
102:23 103:1
154:24 155:2

**speaking** 9:9
41:17 44:4
51:4 57:7

**special** 118:5

**specific** 27:12
34:5 36:21
39:23 41:19
42:22 43:1,9,
12 44:10 45:8,
10 46:14 59:20
60:14 64:25
66:24 69:13
70:13,18 72:13
81:7 86:19

89:9 90:23
96:25 97:7
100:17,23
101:2 103:13,
15 111:9
126:3,19

**specifically**
22:24 45:3
46:12 53:23
55:3 60:10
62:12,20 63:21
71:14 76:23,25
85:23 87:7,8
89:16 96:12
115:14 116:2
121:14 122:17
125:4 129:2,11
130:21 131:7
137:12 142:17
155:23

**specifics** 27:11
64:17 67:11
70:4 83:13
155:8

**speculate** 31:18
61:20 62:5
84:5

**speculating**
112:16

**speculation**
7:24 26:10
33:10 91:8
105:10 106:3
114:12 120:11
156:22

**speech** 31:22
32:4 84:22
97:5

**spend** 106:25

**spending** 33:3,6
140:23 141:11

**sphere** 49:6
110:14

**spirit** 28:14,24

**split** 154:17

**spoke** 98:12

**spoken** 157:5

**Sprute** 56:6
156:12

**Square** 132:6,
10,14,17,18
133:19,24
134:5,11,16,
22,23 135:7
136:5,14,22
137:2

**stabbing** 32:9

**staff** 100:7,8,
22 101:10

**stall** 37:24

**stamp** 114:21
118:25

**stamped** 113:14
116:16

**stand** 154:1

**standard** 70:6
101:9,19,21
131:23

**standards** 67:15
72:7

**stands** 107:23
108:3 110:2
144:21

**start** 27:17
57:6

**started** 28:16
73:22 77:8
138:14 147:3

**starting** 28:10

**state** 5:3,21
6:21

**stated** 9:22
17:10 18:9

**statement** 5:23
32:14 104:11
106:12 107:14

**statements**
58:16

**statistics**
145:14

**stay** 28:14

**steal** 103:25

**step** 12:6 24:21
148:7

**Steve** 58:18

**stood** 98:8

**stop** 19:12
96:18 116:20

**stored** 142:4

**story** 32:7 40:3
131:22

**stray** 66:6

**stream** 93:6
119:5

**streamers** 83:2

**streaming** 94:11

**streams** 87:14

**stretching**
139:13

**strike** 35:6
43:25 63:23
134:3

**structure** 35:11

**struggle** 50:9

**studies** 33:2
145:14

**study** 108:25

**stuff** 21:12
34:14 35:18
38:22 39:4
49:9 52:6 56:6
61:23 62:9
68:25 69:16
76:19,21 77:9
81:9 83:25
89:16 95:14
103:6 113:1
114:5 115:9
117:18 118:22
122:13 130:17
137:19 143:18
148:17 149:9,
22 150:8
154:18,23
157:18

**stuff's** 158:2

**Sturdevant** 5:1,
20

**style** 72:15

**subheading**
104:4,18

**subjective**
31:24 50:3
51:3,6

**submit** 55:20

**submitted** 55:18

**subpoena** 11:18
15:19,25 17:7,
11 18:4 19:17
20:5,12 21:4
23:2 25:7,19
144:10

**subpoenaed**
12:23

**subsequently**
58:17

**Substack**
138:11,12,18

substance  17:24

suggest  101:6
  108:5

suggestion
  16:13

suggests  108:4

suit  38:2 43:3
  83:15 124:7
  135:11

super  113:24

supply  33:1
  109:2

support  5:17,21
  33:6

supporting  33:8

supposed  44:18

sure  9:12 10:5,
  24 16:15 22:13
  27:7 31:21
  32:18 40:5
  41:25 43:25
  45:6,18 47:8
  51:13 59:5
  62:21 64:9
  66:20 68:13
  75:21 79:20
  82:3 86:4
  87:3,18,19
  88:17 90:9,12
  91:12,19 94:25
  95:21 96:2,13,
  22 97:13 99:9,
  10,12 100:23
  104:22 105:2
  107:10 109:9
  110:8,11 112:2
  118:14 129:21
  139:4 141:25
  142:12 152:23
  155:8

swear  5:24 6:10
  9:16

switched  92:8

sworn  6:17

_____

**T**

tab  75:15,17,20

table  40:2,9,
  10,12

take  5:7 9:3
  10:20 17:17
  46:14 47:20
  82:5 91:17,19,
  20 92:6 120:24
  127:17 131:13
  132:3 133:4
  152:17,19
  153:16 159:9

taken  5:1,13
  48:6 92:3
  159:17

taking  10:22

talk  11:22
  35:10 37:19
  49:7 59:20
  73:5 153:5

talked  71:8

talking  22:20,
  21 37:8 41:13
  66:14,19 74:3
  89:16,17
  148:10,13

task  150:4

tech  32:23,24,
  25 33:15 45:19
  46:6 53:22,25
  54:4 118:3,22

techniques
  67:20

teeing  135:24

tell  16:21 19:3
  21:15 27:12

28:17 29:10
31:19 32:21
41:5 46:4 49:1
50:19 51:18
53:7,11 54:15
60:2 61:1,5,12
62:20 68:5
72:1,11,25
73:6 74:5
79:15 83:17,18
86:7 90:5,7,8,
15,25 94:8
98:20 99:15
100:2 103:9,16
105:2,3 107:16
112:12 115:16
121:8 129:13
138:6 140:16
149:5 154:12

telling  24:7
  50:10 103:14

ten  47:22
  155:17

tend  91:9

tended  63:7

term  37:11
  128:5

terminated
  156:11

terminating
  156:15

terminations
  157:12 158:8

terminology
  52:8

terms  21:4
  24:7,8 58:2

testified  6:17

testify  9:20
  56:13 61:15

testifying  9:17
  133:10

testimony  6:11
  7:8 9:13 10:17
  15:8 16:3
  18:15 39:2
  63:18

tethered  109:25

text  116:19

Thank  6:14,25
  26:15 27:15
  31:20 32:21
  40:18 47:19
  48:5 71:3 73:4
  74:23 77:13
  78:15 117:7
  128:17 144:14
  160:15,17,19

theoretically
  51:1

theories  63:8

theory  130:17

thing  27:6
  31:10 40:23
  67:8 72:14
  99:19 148:25
  150:3

things  7:3
  28:21 31:22
  36:1 45:2 49:5
  50:12 61:16
  63:6 67:12
  69:15 72:16
  76:21,22 83:2
  84:23 86:18
  89:25 90:2
  92:8 93:5
  95:14 98:18,23
  105:23 106:4
  107:1 118:10
  128:8 141:19
  142:23 143:18
  154:15

**think** 10:1,12,
14 13:2 17:18
18:7 22:1,11
26:13 28:9
30:9,19 31:21
32:18,19
33:11,23
36:11,14 37:23
41:16 43:20
44:4 47:20
48:24 51:2,6
52:20 55:16,
21,22 59:22
60:20 62:6
63:20 66:5
68:3,5 72:13
73:19 77:11
79:5,11,18
80:4 81:24
84:17 85:3
88:7 91:23
95:8,25 99:22
100:19 101:5,
16,18 109:18
118:9 120:6
125:21 129:18,
24 130:21
133:2 134:8,24
135:13 138:21
139:2,3,11,12
142:6,7 144:13
145:15 146:3,
18 147:9,20
148:23 149:8
151:10,18
152:9,13,16
155:7 156:20
157:13,17,22
158:5,24
159:10 160:4

**thinking** 108:7
138:4

**thinks** 75:12

**thought** 51:1
53:13 109:8

153:15 154:1,9

**thoughts** 118:2

**threatened** 83:3

**threats** 114:2

**throw** 103:7

**tie** 49:2

**tied** 62:14

**Tiktok** 79:5
152:4,7

**Tiktoks** 81:3

**time** 5:6 7:4
15:22 19:13
22:14,15,17
27:21 28:2,4,
7,9,10,12,15,
20 29:15 31:18
38:4 39:4
46:19,20,22
47:15,21 48:3,
4,7,8 52:8
60:1 63:22
66:4 67:7 79:8
80:2 90:22
91:18 92:1,2,4
98:22 117:24
118:5 152:9
159:15,16,18,
19,20,22,24
160:11,15,16

**time's** 46:22
160:16

**timeline** 84:5
86:15 95:14

**timeline's**
95:15

**timeliness**
94:12

**timely** 12:9

**times** 27:24
28:13 38:9

83:4,17,18
84:20 100:8

**title** 27:24
28:12,13,16,18
29:2 36:5,10
38:19 55:15,17
70:3 87:18
93:5,14 123:22
147:11 149:21

**titles** 60:11,18

**today** 5:6 7:1,
3,8,10,15 8:21
9:14,20 11:20
12:23 17:5
32:16 46:3
50:23 53:16
54:3,6 61:5
62:1 71:15
72:21 84:12
86:23,24 88:20
90:5 107:5,22
108:7 110:1,23
140:7 142:24
160:17

**told** 20:19
21:15 50:8
69:5 74:7 86:8
137:22 156:10

**tons** 108:18
138:8 139:5

**top** 16:14,22
30:21 98:21
114:24 116:19
140:15

**topic** 109:9

**topics** 60:24
61:6,9,10

**total** 140:23
141:10

**totally** 56:12
139:4

**Toxic** 93:6

**track** 34:16
35:7 109:1
143:6

**tracking** 35:1

**tracks** 140:21

**traditional**
101:15

**train** 109:7

**training** 67:14

**transparency**
33:15

**tread** 22:3

**Tremaine** 6:3

**trillion** 109:6

**true** 154:19

**trust** 29:14
141:16

**truth** 6:11,12

**truthfully** 8:23
9:20

**try** 23:1 58:1
60:21

**trying** 42:19
50:6 70:14
71:21 72:5,6,8
108:25 118:2
128:2 139:7
153:13,14

**turn** 27:17
115:21

**tweet** 76:21
111:19 123:1

**tweeted** 155:7

**tweets** 53:10

**Twitter** 52:24
53:2 74:9,22,
25 75:2,23,25

76:3,11,19,20,
23,25 77:3,15
91:3 111:22
122:11 123:24
124:23 125:6,
20 126:6,12
127:17 128:22

**two**  24:24 35:12
50:25 155:21

**type**  44:9
68:15,21 71:16
77:4 145:6
150:4

**types**  33:7 59:6
77:6

**typically**  74:24

---

**U**

**ultimate**  37:6

**Umh-huh**  11:14
29:21 77:5
119:21 129:16

**umh-hum**  9:4
86:10 101:1
104:3

**unable**  9:19
107:5

**uncertain**  71:15

**unclear**  9:22
10:5 27:10

**uncovered**
148:20

**under-**  86:13

**underline**
119:11

**underpin**  128:12

**understand**  7:5
9:13 10:7,13
21:22 44:21

49:17 50:6
53:4 54:3
63:18 65:9
68:3 71:20,21
72:8 85:24
86:4 87:21
98:5 101:17
104:15 106:18
109:21 110:8
118:2 123:24
127:9 128:16

**understanding**
53:16 54:5,8
55:7 68:14,16
70:4,8,25
72:2,21 73:14
76:17 86:12
89:1,5 108:8,9
148:16 158:22

**understood**  9:25
10:10 27:15
29:1 32:13
67:14 69:2,8
71:18 77:18
103:18 133:17
136:1 139:25
150:24

**unethically**
71:18

**unilitically**
70:23

**University**  28:3

**unknown**  109:3

**unpublished**
37:25 61:17
83:14 135:10
137:5 145:9

**unrelated**  46:8
86:19

**update**  31:4

**updated**  31:4

**UTC**  5:6 22:14,
17 46:19,22
48:3,7 92:1,4
159:15,18
160:16

---

**V**

**vague**  12:24

**valuation**  127:7

**variables**  52:17

**varied**  79:8

**variety**  76:22
86:23 109:24
127:7,10,18,24

**various**  38:4
40:2 85:17
90:25 95:13

**verbally**  9:2

**verify**  141:18

**versus**  5:13

**viable**  87:11

**victims**  98:13

**video**  5:7,12,15
11:10 58:18
81:7,8 82:15
84:17 151:21,
23 152:8,15
154:3,7,8,12,
14,22,24 155:3

**videographer**
5:5,16 11:10,
14,16 22:14,17
46:19,22 47:25
48:3,7 92:1,4
151:1,8
159:15,18
160:6,9,16

**videos**  98:21
119:7

**view**  30:4 48:10
49:10 51:5,10,
14 125:1
151:19

**viewed**  29:22
30:1 33:7
34:17 35:7

**viewing**  129:1

**viewpoint**  48:15

**views**  103:21

**visit**  82:25
83:6,9

**visited**  82:23,
24 83:5,17,19,
21

**voices**  84:9

---

**W**

**wait**  9:7

**want**  7:2 10:2
11:11 16:17
21:11 22:2
24:21 27:7,16
33:24,25 35:10
36:14 37:16,17
41:22 45:15
46:7,14 47:8
60:21 61:14,20
62:5,7 66:3,16
69:16 72:12,19
73:5 86:17
91:20 92:13
100:1 109:15
110:8 111:4
115:21 116:20
118:7 120:23
131:13 132:25
148:7 149:11
151:8,19
153:20

**wanted**  55:5

72:9 130:24
158:24

**Warren**  6:2 92:8

**watch**  85:5

**watchdog**  32:23,
24 33:4 45:20
46:6 54:4
157:18 158:3

**way**  15:7 24:16
33:3 66:6
78:5,13 96:20
97:5 108:19
112:10 130:25
139:5 158:9

**ways**  49:24
51:17 76:22
103:8

**website**  20:23
21:1,3 32:8,11
33:4 34:9,17,
22,24 35:8
37:4,5,7,8
95:13,16
103:19 109:2

**websites**  31:25
85:4 103:25

**week**  28:5

**weekends**  49:9

**weekly**  83:21

**weeks**  138:18
155:21

**went**  27:23
28:9,15 31:4
37:4,6 83:5
98:20 109:1,3
140:17 141:14
148:3

**whatnot**  87:15

**whatsoever**  45:5
121:21 134:1,9

**whispering**  5:10

**white**  84:7
98:10

**wide**  109:24

**Wiley**  55:12,14
56:1 115:3,4

**William**  147:9,
17,18

**Williams'**
147:10

**Wired**  148:19

**wit**  135:24

**witness**  5:24
6:9,13 11:11
13:15,19
14:19,21
16:19,21 17:14
24:10 38:5
39:25 41:10
45:9 47:23
56:14 61:19
64:6 74:12
81:17 91:24
109:16,18
114:10 117:7
124:3 131:14
132:23 133:2
148:12,15
151:4 153:1,3,
7,11

**word**  28:24
44:25 45:5
49:21,25 50:7
51:5,6,17
60:13,16 81:8
95:15 139:24
150:23 155:20

**words**  58:19

**work**  27:25
37:17 42:8,9
57:9,12 62:13
83:25 85:19

111:6 112:24,
25 113:24
118:2 132:16,
20 139:16
144:25 146:5
147:9 148:1
149:2 154:20
155:13 158:3

**worked**  26:6
46:5 51:22
52:3 69:4
70:21 95:1
120:21 131:5
136:4,14,21
144:22 146:1,5
147:7,22
158:11

**worker**  146:15,
19 147:7,22
148:2 149:3,6
159:2

**working**  56:11
57:1,3 67:18
72:14 77:8
83:24 87:4,21
103:11 118:1,
22 120:4 134:8
154:18 157:9

**workplace**  49:8

**works**  8:11,14
22:11 48:1
91:20 132:10
137:15 138:5,7

**world**  53:21

**worth**  109:6

**Wright**  6:3

**write**  91:9 94:3
99:25 103:4
118:4 142:12

**writers**  100:13

**writing**  28:1
29:10 52:9

62:17 68:17
69:12 82:5
90:1 91:11
95:3,23 100:18
101:4 118:13
143:21

**written**  45:5
68:9 69:20
70:18 71:12,
16,24 72:22
73:1 81:8
95:20 101:15
103:16 140:18

**wrong**  60:22
62:6

**wrongdoing**
153:15

**wrote**  31:17
55:24 61:3,6,
13,22 62:2,9
66:4 67:10
89:23 94:18
99:23,24
100:10,25
105:3,24
118:1,8 127:6

---

**Y**

**yeah**  10:4,24
14:21 16:19,21
25:1 28:11,24
30:9 33:11
34:5 36:19
38:5 39:14
40:16 46:18
47:14,23 50:8
51:9 55:7
56:18,25
58:15,20 60:20
61:19 63:7,10
64:6,7 66:20
71:2,7 77:11
79:20 80:3

83:17 85:17
86:4 92:12,18
94:15 95:5
96:16 97:23
98:15 99:23
102:13 106:10
107:10 109:20
114:11 116:9
117:5,13 121:6
126:3,19
131:14,20
132:21 135:13,
23,25 136:24
139:9 142:6
143:18 145:8
147:2,16
148:15,25
150:2 151:4
152:12 153:1,3
154:1 156:1,21
157:7 158:4
160:9

**year**  28:9 33:23
85:16 86:1,14
90:24 109:4
140:24

**years**  49:1
70:21

**York**  100:8

**young**  33:21

**Youtube**  152:6

**yup**  9:6 79:5
127:22

**Z**

**Zimdahl**  5:16

**Zoom**  38:22
156:12