UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

RUMBLE, INC.,

    Plaintiffs,

v.

NANDINI JAMMI, CLAIRE ATKIN,
AND JOHN DOE NOS. 1-10,

    Defendants.

_____

Case No. 8:23-CV-02718-CEH

**DECLARATION OF NANDINI JAMMI IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

I, Nandini Jammi, pursuant to 28 U.S.C. § 1746, declare and say as follows under penalty of perjury:

1. I make this declaration based on my personal knowledge, except where otherwise stated. I am over the age of 18 years and am fully competent to testify to the matters stated in this declaration.

**Background**

2. I am a graduate of the University of Maryland, Robert H. Smith School of Business, and hold a Bachelor of Science in marketing. As a marketing student, I learned that advertising is a marketing investment designed to attract, engage and retain customers in order to fulfill business goals.

3. After graduating from university in 2011, I worked in various digital marketing jobs including as the Head of Growth for a startup called ProdPad.

4. While at ProdPad, I was asked to run a Google Ads campaign for the first time in my career. Google Ads operates the world's biggest online advertising

exchange and, in that capacity, it partners with website operators (known as "publishers") who are willing to sell space on their websites to host digital ads from third parties. Advertisers then pay Google to place their ads on websites where their customers are likely to see them. One of the supposed benefits of using Google Ads is that it allows advertisers to advertise on a broad range of high-quality websites without partnering with each website individually.

5.      While reviewing the campaign's results, however, I was alarmed to find that a significant amount of ProdPad's ad budget was being spent to place ads on websites where we did not want them to appear, ranging from spam to conspiracy theory sites. I also noted that many ad placements were wasteful because they were not effectively targeted at the customers we wanted to reach or the brands that we wanted to be associated with. Additionally, I noted that some ad placements potentially created harmful and risky associations for my brand, which I believed could lead to a loss of business.

6.      As a new user of the Google Ads platform, I found it relatively difficult to discover the wasteful and potentially harmful ways in which ProdPad's ads were being distributed. This initial experience informed my view today that the current state of digital advertising is opaque and deeply inefficient for advertisers. I also learned that this marketplace requires constant scrutiny.

7.      Between 2016 and 2020, I led social media campaigns for Sleeping Giants, an advocacy group that I founded to solve some of the problems I had discovered from my personal experience as a marketer working with Google Ads. The

campaign primarily focused on alerting advertisers that their ads were being placed alongside hateful content and, consequently, funding websites that may have been out of line with their brand strategy.

8. During this period, I learned through personal conversations and news articles that the Sleeping Giants campaign caused many small businesses and multi-national brands to audit their digital ad campaigns for wasteful, fraudulent and/or undesirable ad placements.

### Check My Ads Institute

9. In 2021, I co-founded the non-profit, independent digital advertising watchdog Check My Ads Institute ("Check My Ads").

10. Check My Ads was founded because I observed advertisers continuing to struggle to gain meaningful control of their online ad placements even after awareness of the problem had become more widespread and new technological solutions had been introduced.

11. The organization's mission is to advance standards of transparency and control for advertisers in what we observe to be an opaque digital advertising marketplace.

12. During my time at Check My Ads, I have fulfilled several roles in support of the organization's mission, including increasing public awareness of how advertising dollars flow from advertisers to publishers, through intermediaries like Google that place ads on websites.

**Google Ads and Programmatic Advertising**

13. Google operates the world's largest programmatic advertising exchange, which Google essentially operates as a clearinghouse. Advertisers provide Google with ads and Google uses complex algorithms to place those ads on websites belonging to the publishers who partner with Google to make videos and webpages available to host third-party ads. A share of the money that advertisers pay Google to place their ads flows to the publishers, who may distribute a portion of that revenue to "creators" who post content on their websites.

14. Due to the complexity and opacity of Google's digital advertising ecosystem, it is difficult, if not impossible for advertisers to ascertain where all of their ads appear across the internet. In order to provide reassurance to advertisers that their content will not appear next to objectionable content, Google claims to employ safeguards to ensure that ads do not appear anywhere that might be deemed "brand unsafe."

15. "Brand safety" is a term used in the advertising industry to refer to the practice of protecting their ads from being associated with harmful, illegal, risky or disreputable content online. It is standard practice for ad tech vendors like Google to outline and communicate their own platform standards in the form of publicly available policies. Annexed hereto as Exhibit A is a true and correct copy of guidelines related to Google's brand safety policies.

16. In my experience of the ad tech industry, Google's brand safety policies do not, in practice, ensure that Google will prevent ads from being placed alongside

4

content that should have been excluded from the Google Ads program under its guidelines. I have personally seen examples of ads for major brands alongside videos or other content that I believe violated Google policies, and I believe that these advertisers have a right to know that this is happening – which they may not given the opacity of the market.

17. One of the functions I previously performed at Check My Ads is a form of advocacy that we sometimes referred to as "defunding" or "demonetizing." The essential purpose of this practice is to alert advertisers when Google is placing their ads in a way that potentially violates its brand safety promises.

18. In order to perform this function, I used social media, email and other means designed to get the attention of major advertisers who might otherwise not take note of my communications and provide them with evidence that they can evaluate from themselves. The general goal of my communications was to provide a tangible starting point for the advertiser to investigate these ad placements internally, if they so choose. To that end, I generally provided screenshots containing evidence of what I believed the advertiser would consider a potential policy violation. Where possible, I used publicly available source code to identify which ad vendors may have been responsible for placing the ad.

19. Once notified, it is up to each advertiser whether or not to take steps to remove their ads from the relevant platform. If the advertiser wants to keep their ads in place, Check My Ads does not and cannot prevent them from making that informed decision. If, however, the advertiser wants to curtail their brand's association with a

publisher they consider undesirable, Check My Ads provides resources to guide them through the process of preventing further ad placements on those websites.

20.     Partially as a result of Check My Ads' activities, advertisers and the general public have become more aware of the problems with Google's enforcement of brand safety policies and, as a result, Check My Ads has turned its focus towards other issues such as digital advertising regulation and policy.

## Rumble

21.     The "content-neutral" video streaming platform Rumble is an example of a publisher that participates in Google's programmatic advertising programs while also hosting content that many advertisers and platforms across the ad industry have deemed to be brand unsafe.  Rumble's business model depends, in part, on broadcasting videos posted by individuals that have been kicked off of social media websites like YouTube for violating their terms of service.  Based on my personal experience of using Rumble, I have confirmed that it hosts content that I believe many advertisers would consider unsafe or harmful to their brands.

22.     For instance, I am aware of a video on Rumble entitled "Another Indian Up to No Good: Nandini Jammi."  A true and correct copy of that video is annexed hereto as Exhibit B.  I consider the video to be racist because it suggests that my work is an example of "anti-American actions Indian immigrants take in positions of power" and demeans me on the basis of my race along with other Indian Americans, including the former CEO of Twitter and the President of Penn State University.

23. Another example of brand unsafe content on Rumble is a video in which a podcaster attacks my Check My Ads colleague, the reporter Rachel Gilmore, by saying that "if [she] got gang raped to death by Indian migrants in the street, I would laugh. I wouldn't even stop them. I would just stand there and go, 'Well, nature's a playground.'" A true and correct copy of that video is annexed hereto as Exhibit C, with the relevant portion beginning at approximately 30:00.

24. As part of my work for Check My Ads, I helped run a campaign to "demonetize" Rumble – by which I mean, once again, that we took steps to alert advertisers and marketers that their ads were appearing on Rumble and gave them the opportunity to make an informed decision about whether to remove them.

25. During this time, I also directly contacted ad tech vendors (which are companies that act as intermediaries in the digital advertising market) that I observed to be serving ads on Rumble to express my concerns that the website contained content that appeared to violate the vendor's brand safety policies.

26. One example of this process is illustrated by an email chain in which I communicated with a representative of Criteo, an ad tech vendor that serves ads on behalf of major consumer and retail brands. A true and correct copy of that email exchange is annexed hereto as Exhibit D.

27. In my first email, I wrote that "I just wanted to flag for you that Criteo is running ads for Rumble" and that "[t]he platform is extremely unsafe for advertisers." After the representative indicated that Criteo would block Rumble, I responded "YOU ROCK. Thank you so much for doing this!" This response reflects my earnestly held

personal opinion that ad tech vendors should enforce their own brand safety standards and that their advertiser clients have a reasonable expectation for them to do so. *Id.*

28. In addition to believing that Rumble is a Google Ads partner that hosts content that violates Google's brand safety policy, I personally disagree with certain content on the platform and believe that it is dangerous for anyone to fund the widespread dissemination of racist, antisemitic, misogynistic or otherwise hateful videos. I have made public statements consistent with these views on social media and elsewhere.

29. In its Complaint in this lawsuit, Rumble has acknowledged that I am "free to disagree with Rumble's policy of content neutrality and the views expressed on the platform by third-party content creators…" Dkt. 42 ¶19. My work to "defund" Rumble is consistent with these basic free speech rights.

30. While I have regularly communicated with both advertisers and ad tech vendors about brand safety, I strongly believe in their right to ignore me. In my experience, some advertisers choose not to engage with me or take any action in response to my inquiries and I respect that decision.

31. These beliefs are rooted in my own experiences as a marketer struggling to maintain control of Google Ads campaigns and do what was best for my company. I believe that advertisers have a right to know where their ads are running, as well as the right to make appropriate decisions for their brands – even if I would have made a different decision with respect to whether or not to advertise next to certain content.

32. In addition, while I may personally disagree with Rumble's business model and some of the content that it promotes, I still believe the sentiment that I expressed in a tweet that my "fight … isn't with … Rumble. It's with the biggest purveyor and funder of disinformation in the world: @GoogleAds." A true and correct copy of that tweet is annexed hereto as Exhibit E.

33. Put another way, I can accept that advertisers have the right to knowingly and voluntarily choose to do business with Rumble. But I do object to Google effectively forcing advertisers to unknowingly support content that appears to violate the brand safety policies that Google is supposed to be enforcing.

34. In any event, my understanding is that Rumble has not sued me for stating that it hosts toxic content or for trying to influence advertisers to remove their programmatic ads. Rather, Rumble has sued me for publishing three tweets and an article stating that Rumble was heavily reliant on Google. I address those statements as follows.

### The Jammi Tweets

35. Between August 16 and October 3, 2023, I posted the following three statements (collectively, the "Jammi Tweets") on my personal @nandoodles X (f/k/a Twitter):

   a. "Rumble is all posturing, all the time. They're not a Google Ads killer or even close to it – they depend on Google for their business. We're talking a house of cards." A true and correct copy of this August 16, 2023 tweet is annexed hereto as Exhibit F.

   b. "A little known fact: @rumblevideo is largely monetized through Google Video Partners (GVP), a network of sites that Google

9

      forcibly opts YouTube advertisers into." A true and correct copy of this September 26, 2023 tweet is annexed hereto as Exhibit G.

c. "Without @GoogleAds, Rumble would not be viable. It gets its revenues by DEFAULT thanks to two Google features: -Performance Max[;] -Google Video Partners[.] It's criminal behavior by Google, which has promised brand safety to its clients." A true and correct copy of this October 3, 2023 tweet is annexed hereto as Exhibit H.

36. I believed that the Jammi Tweets were true at the time I posted them and the basis for that belief is as follows.

37. At the time the Jammi Tweets were published, I was aware that Rumble and individuals involved with Rumble's business had made public statements that it was their intention to be independent from Big Tech companies like Google. I was also aware that Rumble had launched the Rumble Advertising Center in an effort to derive advertising revenue from alternative sources to Google.

38. Nevertheless, Rumble maintained a seller account with Google at the time the Jammi Tweets were published – which it maintains to this day – and I verified that fact by reviewing the relevant ads.txt and sellers.json pages (which are voluntary disclosures by Rumble that it participates in Google Ads programmatic advertising networks).

39. Because Google operates by far the largest programmatic advertising exchange in the world, it was reasonable to infer that Rumble – a video streaming platform that undisputably participates in Google ad markets – generated a material portion of its revenue from Google.

10

40. I was also aware that advertisements from blue-chip advertisers that partner with Google and other programmatic ad platforms – like Mazda, Ruggable, Ford and LifeLock – appeared on Rumble and inferred from these advertisements that significant revenue flows from Google to Rumble.

41. I have also read articles supporting the notion that Rumble relied on revenue it received from Google Ads. Although I cannot recall with precision with articles I reviewed, I believe I read an October 20, 2022 Media Matters article entitled *Google's ad network is driving and monetizing traffic to the fringe video-sharing platform Rumble*. A true and correct copy of that article is annexed hereto as Exhibit I.

42. I am aware that the Media Matters article reported that "[a]ccording to an analysis of data from Pathmatics, a company that tracks digital marketing data, Google's ad network made up 2% of total advertiser spending on Rumble.com in the last year but earned 18% of ad impressions." *Id.* at Rumble00014686. I did not believe these figures to be true at the time I published the Jammi Tweets because Rumble sent me a message in December 2022 indicating that Google Ads provided approximately 20% of its revenue. *See* ¶47, *infra*.

43. I was also skeptical of Pathmatic data because, as a third-party monitoring service, it does not have access to the most reliable data. And this lack of reliable insight illustrates one of the key difficulties with reporting about the opaque programmatic advertising industry.

11

44. I also reviewed and relied upon Check My Ads articles, which Rumble never challenged, that reported on various aspects of Rumble's programmatic advertising partnership with Google.

45. Prior to publishing the Statements, I recall reviewing one or two SEC filings that stated that Rumble received more than half of its revenue from Google (although I do not presently remember exactly which). Upon information and belief, those SEC filings would have been either or both of the amended Form S-4 Rumble filed on May 2022 (which stated that Google Ads provided 86% of Rumble's total revenue in the first three quarters of 2021) or the amended Form S-4 it filed on August 9, 2022 (which set that figure at 56%). True and correct copies of relevant excerpts of those documents are annexed hereto as Exhibit J (*see* p. 62) and Exhibit K (*see* p. 64).

46. On or about December 26, 2022 I received a tweet from Rumble stating that "[t]he top two external ad networks Rumble uses, which includes Google, represent less than 20% of our revenue in Q3, down from 45% in Q2." A true and correct copy of that communication is annexed hereto as Exhibit L.

47. I found Rumble's December 26, 2022 tweet to be confusing because, while it referred to "two external ad networks" it did not specify which one it was referencing apart from Google, nor did it break down the "less than 20%" figure. I understood this to mean that Google contributed up to 20% of Rumble's time period – which I consider to be a large portion of its revenue. And while this tweet suggested that the share of Google revenue had been declining, I did not believe and had no reason to believe that it would continue to decline to an immaterial level.

48. I did not have (and presently do not have) a brightline definition of what I would constitute a large or material share of Rumble's revenue. But, given the scale of Google's operation and amount of money available, I believe that 10% or even less of an online advertising company's programmatic ad revenue could be considered material to Rumble's business.

49. After reading Rumble's December 26, 2022 tweet, I do not recall seeing any other public statements from Rumble on this subject nor do I recall reviewing any other SEC filings stating what proportion of Rumble's revenue derived from Google. Even if I had, I am not a securities expert and may not have deduced from these complex documents that the omission of any reference to the share of revenue Rumble derived from Google meant that this amount was immaterial to Rumble's business.

50. At the time I published the Jammi Tweets, I still believed that Google provided a material fraction of Rumble's programmatic advertising revenue – hence my Statements that Rumble "depend[s] on Google for its business" and was "largely monetized by Google."

51. After this lawsuit was filed, I read for the first time in Rumble's Complaint that Rumble claims that it derived only 1% of its revenue from Google in October 2023. I was not aware of this contention or anything like it at the time I published the Jammi Tweets. And, having seen this figure now, I am still not convinced that Rumble was independent from Google in October 2023 for several reasons.

52. It is my understanding based on my professional experience studying the ad tech industry – and it was my understanding at the time I published the Jammi Tweets – that it is virtually impossible for online businesses to be independent from Google because Google is effectively a monopoly that controls vast swathes of the internet.

53. In this respect, while I still disagree with Rumble's dissemination of toxic content, I actually agree with Rumble that Google has too much control over the internet and that too much money moves through its advertising networks to the exclusion of others. I am sympathetic to Rumble's efforts to create decentralized advertising markets that do not depend on Google. Unfortunately, I also believe that achieving total independence from Google services is not generally possible.

54. I also knew that Rumble relied on Google in ways beyond receiving programmatic advertising revenue. For instance, Rumble relies on Google Analytics for the data it uses in investor documents, uses Google to place ads for Rumble and Google Search to drive traffic to its website and that Rumble offered its content through the Google App Store.

55. I was also aware that Rumble had filed an antitrust lawsuit against Google alleging that it had unlawfully ranked its own YouTube platform in search results above results for Rumble's content. *See Rumble, Inc. v. Google, LLC, et al.*, 21-cv-00229-HSG (N.D. Cal. Apr. 30, 2021). This underscores the fact that Rumble relies on Google to direct traffic to its website.

56. Finally, my work in the digital advertising space has taught me to be skeptical of figures offered by online platforms. Companies often boost or distort their metrics – sometimes inadvertently – and I am aware that Rumble was investigated by the SEC for allegedly inflating its monthly average user numbers in public documents (although those charges were ultimately dropped). Accordingly, I do not believe Rumble's revenue figures automatically and, since Rumble has never verified them for me, I maintain that it is at least plausible that the reality is different from what Rumble says it is.

57. For all these reasons, I believed that the facts set forth in the Jammi Tweets were true when the Article was published and I still believe them to be true to this day.

### The Article

58. On October 24, 2023, Check My Ads posted an article on its website entitled *8 Things to Know about Rumble, the Toxic Platform that Will Stream the GOP Debate* (the "October 24 Article"). The October 24 Article contains the following passage:

> **8. Rumble is heavily monetized by Google Ads**.
>
> Rumble loves to boast about being free from Big Tech. In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner – and advertisers often have no idea their ads are appearing here. Rumble is part of Google Video Partners, which means Google dumps inventory there that many advertisers assume is going to YouTube.
>
> And it seems to know brands wouldn't appreciate appearing next to some of Rumble's content: it has taken steps to minimize the risk of advertisers waking up to screenshots of their ads next to Alex Jones' face. Its' two-tier system for ads monetizes the worst videos through Rumble Ads, its in-house platform,

while featuring Google Ads on mainstream channels, such as Reuters. ("Statement (e).")

A true and correct copy of the Article is annexed hereto as Exhibit M at Rumble00014708.

59. The Article was researched, written and edited by Check My Ads' editorial team, including Alec D'Angelo, Rachel Gilmore and Brandon Hardin. Of relevance to this lawsuit, D'Angelo researched and drafted Statement (e) while Gilmore was responsible for drafting other portions of the Article concerning Rumble's financial backers and prominent creators. Hardin edited the Article, including Statement (e).

60. Check My Ads' editorial team used a computer application called Notion to compile notes in one place and draft or edit articles collaboratively. A true and correct copy of the final Notion page for the Article is annexed hereto as Exhibit N.

61. I reviewed and edited the draft Article after it had been substantially finished and my edits were focused on ensuring that the Article conformed with Check My Ads' house style. Before the Article was drafted, I also trained Alec D'Angelo on ways to investigate the digital advertising market, including the use of ads.txt and sellers.json to determine whether a particular publisher partnered with a particular advertising exchange like Google. At the time the Article was published, I was confident in Alec's ability to do this work.

62. When I reviewed Statement (e) prior to publication, I believed that the contention that "Rumble is heavily monetized by Google Ads" and similar assertions

were true based on my personal experience and the factors set forth above. *See* ¶¶2-57. I also relied on the research and expertise of the Check My Ads editorial team that prepared the Article.

63.  For all these reasons, I believed that the facts set forth in Statement (e) were true when the Article was published and I still believe them to be true to this day.

I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief.

Executed this 4th day of March, 2025, in Maryland.

_____

NANDINI JAMMI

Dated: March 4, 2025

        Respectfully submitted,

        SHULLMAN FUGATE PLLC

        By: */s/ Sarah M. Papadelias*
        Deanna K. Shullman (FBN 514462)
        Sarah M. Papadelias (FBN 0125098)
        100 S. Ashley Dr., Ste. 600
        Tampa, FL 33602
        Telephone: (561) 429-3619
        dshullman@shullmanfugate.com
        spapadelias@shullmanfugate.com

        DAVIS WRIGHT TREMAINE LLP

        John M. Browning*
        Katherine M. Bolger*
        1251 Avenue of the Americas
        New York, New York 1002
        Telephone: (212) 489-8230
        katebolger@dwt.com
        jackbrowning@dwt.com
        *  Admitted *Pro Hac Vice*
        *Counsel for Defendants*