UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Rumble, Inc.,

    Plaintiffs,

v.

Nandini Jammi, Claire Atkin,
and John Doe Nos. 1-10,

    Defendants.

_____

Case No. 8:23-cv-02718-CEH

**DECLARATION OF CLAIRE ATKIN IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

    I, Claire Atkin, pursuant to 28 U.S.C. § 1746, declare and say as follows under penalty of perjury under the laws of the United States of America:

    1.    I make this declaration based on my personal knowledge, except where otherwise stated. I am over the age of 18 years and am fully competent to testify to the matters stated in this declaration.

    2.    I am the co-founder and CEO of Check My Ads Institute ("Check My Ads"). Check My Ads is an independent, non-profit digital advertising watchdog. The purpose of Check My Ads is to educate advertisers, policymakers and the general public about the opaque online advertising markets run by companies like Google and to give advertisers more control over the ads that they distribute through this ecosystem.

    3.    I believe that advertisers have free speech rights, like everyone else, and those rights include the right to make informed decisions about where to place their

ads. And advertisers have the right to remove their ads from content they do not want to endorse or fund.

4. But, in order to meaningfully exercise this right, advertisers need to understand how the digital advertising economy works – including ways in which companies like Google promise advertisers brand safety but ultimately allow third-party ads to appear on platforms promoting racist, antisemitic, misogynistic or otherwise offensive content.

5. One of Check My Ads' primary goals is to raise awareness of this lack of transparency and empower advertisers to make decisions about where their ads appear for themselves.

**Background**

6. After I obtained my master's degree from McMaster University in 2012, I worked at a series of jobs involving various aspects of digital marketing. For example, between November 2016 and February 2018, I was a marketing and communications lead at ReCollect Systems Inc., which is a company that provides technology solutions for the waste management and recycling industry.

7. In February 2018, I started First Mountain, which was a company that helped startup software companies build and deploy digital marketing strategies. As part of this service, First Mountain helped its clients build data-driven marketing plans and analyze various streams of data – including data collected by Google and other companies that effectively operate the online advertising economy.

8. During my time working in marketing, I came to understand that companies like Google hold enormous, effectively monopolistic, power over the largely unregulated $700 billion industry for digital advertising. In my efforts to help companies navigate this challenging environment, I discovered firsthand that the digital advertising ecosystem is so opaque and complex that even sophisticated companies struggle to keep track of where their ads and money are going.

9. In June 2020, I started the company that would become Check My Ads with my co-founder Nandini Jammi. Nandini had also worked in digital marketing and she had similar concerns to mine about the opacity of online advertising markets, particularly the market for programmatic advertising which she describes in her declaration supporting our summary judgment motion. *See* Dkt. 92.

10. We founded Check My Ads to monitor the digital advertising economy, raise awareness of abuses by companies like Google (who promise advertisers placements on quality websites but often fail to deliver) and to provide advertisers with the information needed to make informed decisions about where to place their ads.

11. Check My Ads has engaged in journalistic, advocacy and policy activities to advance its mission. Without the kind of information and knowledge that Check My Ads seeks to provide, advertisers would be at the whim of unchecked, profit-driven companies like Google – who may divert their ads and money to content they or their customers may find offensive or, even worse, dangerous.

12. I am proud of the work we have done at Check My Ads since its inception. In June 2023, for instance, Check My Ads successfully advocated for

3

advertisers to receive refunds from Google Video Partners. Google was placing ads primarily intended for YouTube on third-party websites where they were obscured from view and muted. This made it nearly impossible for viewers to skip the ads, which makes each ad more expensive for advertisers because they pay a higher rate to run ads that users do not skip. Many of these ads had not even been seen by website users. Advertisers demanded refunds with our help. A true and correct copy of a Check My Ads article reporting on this problem is annexed hereto as Exhibit A.

13. Check My Ads also published reporting that exposed the phenomenon of ad-funded fake obituaries. This is a scheme in which publishers use artificial intelligence to generate fake obituaries and publish them next to ads as soon as someone dies, knowing that friends and family will search Google for information about the deceased, see the ads, and thereby provide a lucrative revenue stream to the publisher. The website we identified was taken down after our report. A true and correct copy of Check My Ads' report is annexed hereto as Exhibit B.

14. Another investigative report that Check My Ads published was an article about how Google enabled scammers to sell fake "Keto diet" gummies that scammers had said appeared on the television show *Shark Tank*. Check My Ads revealed how these scammers were able to manipulate Google search results to sell subscriptions to this product to users who thought they were buying something associated with *Shark Tank*. A true and correct copy of Check My Ads' report is annexed hereto as Exhibit C.

15. I am also proud of Check My Ads' efforts to raise awareness of how Google frequently places ads on platforms that likely violate Google's brand safety guarantees. Check My Ads reported, for instance, that Rumble was a participant in the program called Google Video Partners. Through this program, Google takes excess ads that advertisers have submitted for placement on Google's mainstream YouTube platform and places them on other video streaming platforms instead – including Rumble.

16. Rumble characterizes itself as a "content neutral" platform, which means that it deliberately promotes a number of highly controversial creators who were permanently banned from YouTube for violating Google's terms and conditions. Given the opaque nature of programmatic advertising, many advertisers were not aware that their ads were appearing on Rumble and funding brand unsafe content.

17. As I explained in an October 2, 2023, tweet: "[a]dvertisers don't expect to be on Rumble when they sign up to advertise on @YouTube. Advertisers being there without consent is entirely @GoogleAds' fault in the first place." A true and correct copy of this tweet is annexed hereto as Exhibit D.

18. Advertisers who are aware that their content appears on Rumble have the ability to make an informed decision about what to do next. In September 2023, for instance, advertisers removed their ads from Rumble after serious allegations of sexual assault were brought against Russell Brand, who hosted a weekly show on Rumble. Brand had also been suspended from receiving ad money from YouTube, which is owned by Google, because he violated its creator responsibility policy. A true

and correct copy of a news article entitled *Firms pull ads from Rumble platform over Russell Brand videos* is annexed hereto as Exhibit E.

19. As stated above, Check My Ads believes that advertisers participating in programmatic advertising exchanges have a right to know when Google is not complying with its own brand safety commitments. Check My Ads also believes that advertisers should not be forced to support content that they (or their customers) find objectionable. I believe that Check My Ads' work relating to Google and Rumble is consistent with these values.

**Check My Ads Editorial Team**

20. Starting in about August 2022, Check My Ads created an editorial team that took over primary responsibility for drafting and editing news articles on subjects related to Check My Ads' mission.

21. Of relevance to this lawsuit, the editorial team included investigative reporters Alec D'Angelo and Rachel Gilmore, and editor Brandon Hardin.

22. Alec has a master's degree in journalism from American University. At Check My Ads, he received training from Nandini in how to investigate programmatic advertising markets.

23. Rachel is an investigative journalist who had previously worked at various publications in Canada and specialized in reporting on individuals and entities spreading disinformation.

24. Brandon was originally hired as Check My Ads' social media editor but was promoted to managing editor, where he oversaw Check My Ads' editorial

activities. Before joining Check My Ads, Brandon had worked at the Pulitzer Prize winning online news organization BuzzFeed.

25. As the CEO of Check My Ads, I was ultimately responsible for our editorial team and I had faith in its abilities.

26. On October 24, 2023, Check My Ads published a news article entitled *8 Things to Know about Rumble, the Toxic Platform that Will Stream the GOP Debate* (the "Article"). A true and correct copy of the published Article is annexed hereto as Exhibit F

27. As the title suggests, the Article explained various aspects of Rumble's business – which was consistent with Check My Ads' focus on educating advertisers and the public about Google Ads partners who hosted content likely to violate Google's brand safety policies.

28. Rachel was primarily involved in researching and writing the sections of the Article addressing Rumble's policy of content neutrality (*e.g.*, "it's a platform where almost anything goes") and its deliberate decision to promote "toxic" creators – including individuals who had been expelled from YouTube for violating Google's terms and conditions. *See* Ex. F at Rumble0014706.

29. Alec was responsible for drafting the portions of the article dealing with Rumble's business and its relationship with Google, including the following passage:

> **8. Rumble is heavily monetized by Google Ads**.
>
> Rumble loves to boast about being free from Big Tech. In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner – and advertisers often have no idea their ads are appearing here. Rumble is part of Google Video Partners, which means Google dumps inventory there that many advertisers assume is going to YouTube.

> And it seems to know brands wouldn't appreciate appearing next to some of Rumble's content: it has taken steps to minimize the risk of advertisers waking up to screenshots of their ads next to Alex Jones' face. Its' two-tier system for ads monetizes the worst videos through Rumble Ads, its in-house platform, while featuring Google Ads on mainstream channels, such as Reuters.

("Statement (e).") Ex. F at Rumble00014708.

30. Before the Article was published, I had given Alec an assignment to research Rumble and its business model. He researched and drafted a document setting forth findings that ultimately informed Statement (e). A true and correct copy of that document is annexed hereto as Exhibit G.

31. As part of his research he reviewed ads.txt and sellers.json records, confirmed his understanding of that data with Zach Edwards (who is an expert in this field) and reviewed relevant materials such as SEC filings and a relevant article published by a firm called Adalytics. I trusted the veracity of his research.

32. The Article was edited by Brandon Hardin before it was published, together with Check My Ads' policy director Sarah Kay Wiley. Both of these individuals had experience of covering the ad tech industry and I trusted their judgment.

33. Shortly before the Article was published, I reviewed at least part of it to ensure that it conformed with Check My Ads' house style. I believed it to be true at the time it was published based on my personal experience of the ad tech industry – including my knowledge that Rumble was a Google Ads partner – and based on my confidence in our editorial team.

34. Since the Article was published, Check My Ads discontinued its editorial team and terminated the employment of Alec, Rachel, and Brandon. This decision had nothing to do with the Article and was not motivated by concerns about Alec, Rachel or Brandon's competence to do the jobs we had assigned them to do. Rather, these decisions were motivated by budgetary considerations and Check My Ads' desire to focus more of its resources on policy work.

## The Atkin Tweet

35. Although my primary role at Check My Ads is CEO, I have written and published news articles on the website and I supervised the editorial department together with Nandini.

36. To fulfil these functions, I regularly engaged in gathering newsworthy information that either I or one of Check My Ads' reporters could incorporate into news articles.

37. Within the scope of these duties, I received two screen shots from the Similarweb platform from a confidential source. Similarweb is a service that specializes in data analytics relating to website traffic and digital performance. It allows users of its service to review this data for specific websites – including Rumble. A true and correct copy of the relevant screen shots is annexed hereto as Exhibit H (the "Screenshots").

38. The Screenshots purported to break out "Traffic Share" for Rumble's "Monetization Networks." At the time, I understood this to mean that the screenshots listed the proportion of advertising revenue Rumble received from various advertising

exchanges. The documents indicated that Google Display Ads was responsible for 89.09% of Rumble's traffic share in July 2023 and 83.84% in August 2023. *Id.*

39. These figures were consistent with previous reports I had seen indicating that Google provided for approximately 90% of Rumble's ad revenue. While I do not precisely recall where exactly I had seen that ad revenue figure, I note that Rumble's complaint in this action indicates that Rumble was in fact 86% reliant on Google Ads' revenue towards the end of 2021. *See* Dkt. 42 ("Am.Compl.") ¶ 15. I believe that I had the 86% revenue figure in mind when I saw the screenshots and believed that the Similarweb data showed this was approximately share of Google's advertising revenue from Rumble in July and August 2023.

40. On September 26, 2023, I posted the following tweet based upon the Similarweb Screenshots on X (f/k/a Twitter): "Rumble, the most toxic place on the internet, is 90% funded by @GoogleAds. But the advertisers using Google didn't know! Until now" (the "Atkin Tweet"). A true and correct copy of the Atkin Tweet is annexed hereto as Exhibit I.

41. At the time I published the Atkin Tweet I believed it was true based on my understanding of the screenshots at the time and my personal experience set forth above in paragraphs 36-39.

42. On or about October 26, 2023, I received a retraction demand from Rumble stating that the Atkin Tweet was factually incorrect because, Rumble claimed, its share of revenue from Google was "only about 19% of Rumble's total revenue" in

November 2022 and had fallen further since that time. A true and correct copy of that retraction demand is annexed hereto as Exhibit J.

43. Faced with this information, I reconsidered the Atkin Tweet to try to resolve the discrepancy. I determined that the screenshots referred to programmatic advertising revenue (rather than Rumble's total advertising revenue overall) and therefore posted a follow-up tweet on November 21, 2023, stating that, "to clarify, approximately 90% of Rumble's programmatic display ad revenue comes from @GoogleAds."[1] *See* Ex. I.

44. Unfortunately, my follow up tweet was also incorrect. I have since learned that the screenshots did not list revenue shares but rather referred to the proportion of traffic Rumble received from the online display ads Rumble placed for its own content via Google and other online advertising platforms. In other words, the screenshots signified that approximately 90% of the internet users who traveled to Rumble via online ads did so via ads placed by Google.

45. These were honest mistakes that I regret. If I had understood what the Screenshots were signifying, I would not have posted the Atkin Tweet or the follow-up tweet.

46. But, despite my inadvertent errors with respect to the exact proportion of revenue Rumble receives from Google, I believed at the time I posted the Atkin Tweet

---

[1] Programmatic advertising revenue refers to the money publishers like Rumble receive from their participation in advertising exchanges like Google Ads. It is distinguished from sources of non-programmatic advertising revenue, such as the money that advertisers pay Rumble directly to host their ads on its platform.

11

that Rumble obtains a material proportion of its advertising revenue from Google and that it was dependent on Google in other ways. And I continue to believe that, for these reasons, Rumble is heavily reliant on Google.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 4th day of March, 2024, in London, United Kingdom.

CLAIRE ATKIN

Dated: March 4, 2025

Respectfully submitted,

SHULLMAN FUGATE PLLC

By: */s/ Sarah M. Papadelias*
Deanna K. Shullman (FBN 514462)
Sarah M. Papadelias (FBN 0125098)
100 S. Ashley Dr., Ste. 600
Tampa, FL 33602
Telephone: (561) 429-3619
dshullman@shullmanfugate.com
spapadelias@shullmanfugate.com

DAVIS WRIGHT TREMAINE LLP

John M. Browning*
Katherine M. Bolger*
1251 Avenue of the Americas
New York, New York 1002
Telephone: (212) 489-8230
katebolger@dwt.com
jackbrowning@dwt.com
\*  Admitted *Pro Hac Vice*
*Counsel for Defendants*

13