## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

RUMBLE, INC.,

     Plaintiff,

v.

                              Case No. 8:23-CV-02718-CEH

NANDINI JAMMI, CLAIRE ATKIN,
AND JOHN DOE NOS. 1-10,

     Defendants.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The undisputed material facts of this libel action require summary dismissal on every ground Defendants Atkin and Jammi (collectively, "Defendants") raised in their pending Motion to Dismiss and more.[1] The statements in suit are not defamatory because there is nothing defamatory about reporting that Rumble, like virtually every other online business, relies heavily on Google. Rumble's failure to produce any evidence that anyone thought less of it for partnering with Google confirms that point. (*See* POINT I, *infra*.) Even assuming that the statements are defamatory, which they are not, dismissal is necessary because Rumble must prove actual damages as an element of its claim but lacks the evidence needed to do so. (*See* POINT II, *infra*.)

Summary judgment is also mandated on substantial truth, opinion and actual malice grounds. Rumble claims that it was defamed by statements that it depended on Google despite publicly professing a desire to be independent from Big Tech – but this

---

[1] To the extent Defendant's filing of this Motion for Summary Judgment moots their pending Motion to Dismiss, Defendants incorporate their dismissal motion papers by reference and renew them here on summary judgment for a final adjudication on the merits.  *See* Dkts 44-45; 63.

is true. Rumble continues to profit from participating in Google's ad exchange and admits that it is "dependent" on Google in other ways. (*See* POINT III, *infra*.) Rumble also claims that Defendants falsely described it as a "house of cards" that would not be "viable" without Google. But speculation about "financial risks" and what might happen if Google hypothetically cut Rumble off are classic expressions of opinion that cannot support a libel claim. (*See* POINT IV, *infra*.)  Finally, Rumble cannot satisfy its burden of proving actual malice by clear and convincing evidence for the simple reason that the evidence demonstrates that Defendants believed that their statements were true at the time they published them. (*See* POINT V, *infra*.)

For all these reasons, Defendants are entitled to summary judgment.  And, since this meritless lawsuit challenges Defendants exercise of free speech on a matter of public interest, Defendants are also entitled to a mandatory attorneys' fee award pursuant to Florida's anti-SLAPP law.  (*See* POINT VI, *infra*.)

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

### A.    Google and Rumble

1.    Google operates the world's largest programmatic advertising exchange. Declaration of Nandini Jammi ("Jammi Decl.") ¶13. Advertisers pay Google to place display and video ads on third-party platforms known as "publishers," which partner with Google to sell space for ads to appear on their websites. *Id.* Google makes billions of dollars per year from this service and pays publishers a share of the money it receives from advertisers to place their ads. *Id.*; Declaration of Claire Atkin ("Atkin Decl.") ¶8.

2.      This advertising market is opaque and, given the volume of algorithmic transactions involved, it is difficult (if not impossible) for advertisers to track where all their ads end up. Jammi Decl. ¶14; Atkin Decl. ¶8. To reassure advertisers that their ads will not appear next to racist, antisemitic, misogynistic or otherwise offensive content, Google promises to enforce policies to exclude publishers who violate its "brand safety" guidelines. Jammi Decl. ¶14.

3.      Rumble is a "content neutral" video streaming platform that participates in Google's ad exchange as a publisher. Declaration of John M. Browning ("Browning Decl.") Ex. A ¶4; Ex. B, Tr. 171:25-172:1. As such, Rumble sells space on its platform for Google to place third-party ads, and Google provides Rumble with a cut of the money advertisers pay to post those ads. *Id.* Ex. B, Tr. 166:17-167:8.

4.      As late as the third quarter of 2021, Google provided approximately 86% of Rumble's total revenue. Browning Decl. Ex. A ¶15. Between June 2021 and September 2024, Rumble made more than $8.5 million from Google Ads, which amounts to about 27.4% of its total programmatic ad revenue in that time. *Id.* Ex. D.

5.      Rumble's "publicly stated mission" is "to free itself – and its users – from the shackles of Big Tech's censorship and dominance…" *Id.* Ex. A ¶65. In pursuit of "independence from Big Tech" (*id.*), Rumble launched its own "advertising marketplace" – the Rumble Advertising Center ("RAC") – in August 2022. *Id.* ¶5. As the RAC expanded and Rumble diversified into other areas (like cloud computing), the proportion of revenue from Google Ads declined. *Id.* Ex. B, Tr. 185:8-186:18.

6.      But Google still accounted for between 10-20% of Rumble's monthly

3

programmatic ad revenue between August 2023 to September 2024. *Id*. Ex. D, 6-9. Another benefit of partnering with Google <mark>is that Rumble receives non-public information about advertisers, which it would not otherwise be able to access and uses maximize the profitability of RAC.</mark> *Id*. Ex. B, Tr. 173:15-175:22. According to its own SEC filings, Rumble also "rel[ies]" on Google's monthly average user data (which is a key performance metric reported in investor documents) and "depends" on Google platforms to distribute its content. *Id*. Ex. C, Rumble00005351. Rumble also uses Google Tag Manager (which allows users of RAC to track customers), <mark>Gmail for employee emails</mark> and Google Ads/search to direct users to its website. *Id*. Ex. B, Tr. 206:5-207:11; Ex. G; Atkin Decl. Ex. H.

<mark>7.    Rumble has testified that the loss of programmatic ad income from Google "wouldn't have any impact on [its] business" and that it "would move forward" if Google withdrew its services entirely. Browning Decl. Ex. B, Tr. 175:7-10; 210:6-11. Yet Rumble willingly partners with Google and receives the benefits set forth above. *Id*. Tr. 171:25-175:22.</mark>

**B.    Defendants and Check My Ads**

8.    Check My Ads is a digital advertising watchdog. Atkin Decl. ¶2. Its mission is to help advertisers (as well as the general public) understand how opaque digital advertising markets work so that they can gain more control over where ads appear and which publishers profit from hosting their programmatic ads. *Id*. ¶¶9-11. In pursuit of its goal to increase transparency in digital ad markets, Check My Ads has engaged in various journalistic, advocacy and policy activities. *Id*. at ¶11.

9.     Check My Ads has reported on several different aspects of Rumble's business. *Id.* ¶¶15-19; Jammi Decl. ¶¶21-63. One line of reporting relates to the content Rumble permits on its platform – specifically whether Rumble complies with Google's brand safety policies. Atkin Decl. ¶28; Ex. F.

10.    Rumble hosts brand unsafe videos.[2] To raise awareness that Google might be violating its own brand safety policies by partnering with Rumble, Check My Ads has engaged in a practice sometimes called "defunding" or "demonetization." Jammi Decl. ¶¶17-20. This involved notifying advertisers that their ads may be appearing next to brand unsafe material on Rumble. *Id.* ¶¶24-34. The advertisers are then able to make an informed decision about whether to "defund" or "demonetize" Rumble (*i.e.*, pull their ads) or continue advertising there. *Id.*

11.    Rumble has not sued Defendants for flagging "toxic" content to advertisers. Browning Decl. Ex. A. It recognizes Defendants' right "to disagree with Rumble's [content moderation] policy … and the views expressed on the platform by third-party content creators...." *Id.* ¶19. Instead, Rumble has sued Check My Ads over its reporting that Rumble is heavily reliant on Google for its business. *Id.* ¶¶83-93.

**C.    The Statements in Suit**

12.    Rumble sued Defendants for publishing the following statements:

a.   Rumble is all posturing, all the time. They're not a Google Ads killer or

---

[2] Rumble promotes content made by creators who were banned from YouTube for violating Google's brand safety conditions. Atkin Decl. ¶28. Rumble monetizes (*i.e.*, runs ads against) unambiguously antisemitic content such as a video with the title "What is the Jew Purpose of Protecting the Holocaust Lie?" Browning Decl. Ex. J. Rumble refused to acknowledge that this video was antisemitic or that it violated its own antisemitism prohibition. *Id.* Ex. B, Tr. 229:17-253:22; *id.* Ex. A ¶46.

even close to it – they depend on Google for their business. We're talking a house of cards.

b. @rumblevideo is largely monetized through Google Video Partners (GVP), a network of sites that Google forcibly opts YouTube advertisers into.

c. Rumble, the most toxic place on the internet, is 90% funded by @GoogleAds. But the advertisers using Google didn't know! Until now.

d. Without @GoogleAds, Rumble would not be viable…. It's criminal behavior by Google, which has promised brand safety to its clients.

e. Rumble is heavily monetized by Google Ads. Rumble loves to boast about being free from Big Tech. In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner – and advertisers often have no idea their ads are appearing here. Rumble is part of Google Video Partners, which means Google dumps inventory there that many advertisers assume is going to YouTube. And it seems to know brands wouldn't appreciate appearing next to some of Rumble's content: it has taken steps to minimize the risk of advertisers waking up to screenshots of their ads next to Alex Jones' face. Its two-tier system for ads monetizes the worst videos through Rumble Ads, its in-house platform, while featuring Google Ads on mainstream channels, such as Reuters.

Jammi Exs. F-H, M; Atkin Ex. I (collectively, the "Statements").

13.     Statements (a), (b) and (d) are three tweets Jammi posted between August 16 and October 3, 2023. Jammi Decl. ¶35. Jammi's contentions that Rumble was "largely monetized" by Google Ads and "would not be viable without it" were informed by years of experience working in the ad tech space, her knowledge that Rumble was still a Google Ads partner, and public statements by Rumble – including a December 22, 2022 tweet from Rumble suggesting that Google accounted for up to 20% of its revenue. *Id*. ¶¶37-57.

14.     Statement (c) is a tweet that Atkin posted on September 26, 2023 indicating that Rumble is "90% funded by Google Ads." Atkin Decl. ¶40. This Statement was based on "monetization network" data indicating that Google provided Rumble with 89.09% of its display traffic and 83.84% of its video traffic. *Id*. ¶¶37-39.

6

In fact, the data related to the proportion of users who come to Rumble's platform by clicking on ads for Rumble placed by Google and other advertising networks. *Id.* ¶¶42-45. Atkin acknowledges that she made an error, but she believed that Rumble was reliant on Google when she published Statement (c). *Id.*[3]

15.     Statement (e) is the final section of an explainer article entitled "8 Things to Know About Rumble, the Toxic Platform that Will Stream the GOP Debate" which Check My Ads posted to its website on October 24, 2023 (the "Article"). *Id.* ¶29. The Article was written by Check My Ads reporters Alec D'Angelo and Rachel Gilmore and primarily edited by managing editor Brandon Hardin. *Id.* ¶¶26-32.

16.     The portion of the Article quoted as Statement (e) was drafted by D'Angelo based on his knowledge and research – including (among other things) a review of sellers.json/ads.txt data, consultation with an expert, and a relevant article published by the ad transparency firm Adalytics. *Id.*; Browning Decl. Ex. M. Hardin edited Statement (e). *Id.* Ex. N.  Defendants reviewed the Article prior to publication and believed Statement (e) to be true at that time based on personal knowledge and trust in the editorial team. Atkin Decl.¶33; Jammi Decl. ¶¶61-62.

17.     Rumble claims the Statements were false because Google contributed a "miniscule" portion of its revenue at the time of publication. Browning Decl. Ex. A ¶61. Rumble ascribes three defamatory meanings to the Statements:

---

[3] After Atkin received a retraction demand from Rumble, she posted a follow up tweet stating her belief that Google provided 90% of Rumble's programmatic ad revenue (which is a subset of overall advertising revenue). *Id.* ¶¶42-44. Atkin later learned that this was also incorrect because the figure she cited referred to incoming traffic from Rumble ads placed by Google and others, not revenue.

a. Stating "that Rumble is largely dependent on Big Tech platforms like Google Ads…damages its brand, particularly with content creators and users who seek out neutral social media platforms." *Id.*, ¶88.

b. The Statements suggest "that Rumble is susceptible to a material financial risk because of its heavy reliance on Google Ads. *Id.* ¶89.

c. The Statements accuse Rumble of "ma[king] false statements in securities filings, or otherwise misle[ading] investors." *Id.* ¶88.

18.    Rumble alleges that the Statements caused the following damages: (a) reputational harm, (b) the loss of advertisers, (c) a dip in its stock price and (d) the cost of engaging a law firm and public relations agency. Browning Decl. Ex. E, Rog. 4.

a.    Rumble has not produced any communications from third parties mentioning Defendants or the Statements. It has not identified any specific "users, shareholders, putative investors [or members] of Florida's citizenry" for whom the Statements "diminished Rumble's brand." *Id.* Ex. E, Rog. 10. It is not aware of any communications with any third parties who were confused by the Statements. *Id.* Ex. B, Tr. 42:17-44:12.

b.    Rumble "speculated" that the Statements caused it to lose business from two advertisers and an ad-tech firm based on "timing" but has no actual evidence of proximate cause. *Id.* Tr. 95:7-107:5; Browning Decl. Ex. E, Rog. 4. The ad-tech firm left because of Rumble's "extremely unsafe" content, not the Statements. Jammi Decl. ¶¶26-27. Rumble has not identified any other advertiser that declined to do business with it due to the Statements. Browning Decl. Ex. B, Tr. 93:22-95:6.

c.    Rumble admitted that the drop in its stock price was not a "realized loss." *Id.* Tr. 108:14-113:16. The stock price was declining on the day Defendants published the Article and went up slightly in the next two days. Browning

8

Decl. Ex. H. Nearly a week after the Article was published, the stock price declined the trading day after a popular investment website published a recommendation against buying the stock before rebounding. *Id.*; *id.* Ex. I.

> d.    Rumble expended its relevant legal fees on drafting the retraction letter that it was statutorily required to serve in order to commence this defamation action. *Id.* Ex. B, Tr. 257:4-257:25. Rumble hired a public relations company nearly a month after the Article was published, but it did not deliver any work product addressing the Statements nor does the relevant statement of work mention the Statements, Defendants or Check My Ads. *Id.* Tr. 155:17-156:21; Ex. F.

## D.    Procedural History

Rumble filed the Amended Complaint on April 26, 2024. Defendants moved to dismiss on May 10, 2024. Dkts. 44-45. The dismissal motion was fully briefed on July 12, 2024 and oral argument was held on November 7 and 8, 2024. Dkts. 55, 77-79. At oral argument, the Court indicated that it would dismiss Rumble's defamation by implication claim for failure to state a claim.[4] The Motion to Dismiss is otherwise pending.[5] With the benefit of the factual record, and for the reasons set forth below, the Court should grant summary judgment in Defendants' favor.

---

[4] To the extent the defamation by implication claim has not been dismissed already, Defendants move for summary judgment on the grounds set forth in their Motion to Dismiss and all of the grounds set forth herein (which are equally applicable to defamation by implication claims). *See* Dkt. 44, 24-25.

[5] While awaiting a decision on the Motion to Dismiss, the parties proceeded with discovery. On November 27, 2024, the parties jointly moved to extend the case schedule by approximately six months. Dkt. 83. The Court did not rule on the joint motion, and, therefore, the fact discovery period ended on February 4, 2025. Dkt. 37.  On March 4, 2025 Defendants filed a notice withdrawing their

## ARGUMENT

Rumble bears the burden of presenting evidence capable of substantiating its defamation claim. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To avoid dismissal, Rumble must prove each of the following elements: "(1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity…; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citation omitted). The only element Rumble can establish based on this record is publication. It lacks the evidence needed to prove any of the other four elements and Defendants are entitled to summary judgment accordingly.

## I.    RUMBLE FAILED TO ESTABLISH DEFAMATORY MEANING

This Defamation action falls at the first hurdle because Statements that Rumble relied heavily on Google are not defamatory. Not every critical or negative comment is defamatory. *See, e.g.*, *Mennella v. Am. Airlines, Inc.*, 824 F. App'x 696, 701-02 (11th Cir. 2020) (holding that it was not defamatory to accuse an airline passenger of being "drunk"). And, in the business injury context, defamatory statements must convey insolvency or malfeasance – which none of the Statements here do. *See* Dkts. 44-45, 63 (citing cases).[6] While defamatory meaning is a pure question of law, the absence of

---

consent for the joint motion to extend case deadlines because the case is ripe for summary judgment and it would prejudice Defendants to delay final adjudication. *See* Dkt. 86.

[6] Rumble's allegations that the Statements accuse it of securities fraud should be disregarded because, as even Rumble's own witness admitted, the Statements do not expressly convey that message. *See* Browning Decl. Ex. B, Tr. 74:6-75-24; *Mercola v. N.Y. Times Co.*, 2024 WL 551952, at *4 (M.D. Fla. Feb. 12, 2024) (declining to adopt plaintiff's "unreasonable interpretation").

defamatory meaning is clear from Rumble's failure to identify any non-speculative evidence that potential or actual advertisers, users, investors or stakeholders thought less of Rumble because of the Statements. SUMF ¶18.

## II.    RUMBLE FAILED TO ESTABLISH ACTUAL DAMAGES

Defendants are also entitled to summary judgment because a plaintiff suing a media defendant for defamation must "prove[]" actual damages as an element of their claim and cannot simply "presume[]" them as Rumble seeks to do here. *Mid-Florida Television Corp. v. Boyles*, 467 So. 2d 282, 283 (Fla. 1985); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021). Rumble alleges two forms of actual damages – special and general – but has no evidence to support either one.

### A.    Rumble Has No Evidence of Special Damages

Special damages are "a realized or liquidated loss" – *i.e.*, "a loss of money" – that must "be proven by specific evidence as to the time, cause and amount." *Flynn v. CNN, Inc.*, 2023 WL 5985196, at *5 (M.D. Fla. Mar. 17, 2023) (citations omitted). Thus, to sustain a *per quod* defamation claim, Rumble must show "actual, out of pocket [economic] losses," *id.,* that "proximately resulted from" the Statements. *Army Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254, 1259 (N.D. Fla. 2007) (quoting *Bobenhausen v. Cassatt Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. 1st DCA 1977). Rumble "bears the burden of proving by a preponderance of the evidence" that the Statements "caused" a specific economic loss. *Simon v. Shearson Lehman Bros.*, 895 F.2d 1304, 1318 (11th Cir. 1990). Rumble's three theories of special

11

damages – lost advertisers, a dip in its stock price and legal/public relations fees – all fail.[7]

      **1.      Rumble Has Failed to Prove that the Statements Caused Advertisers to Leave Rumble**

Rumble asserts that three companies stopped doing business with it due to the Statements (*see* Browning Decl. Ex. E, Rog. 4), but there is no evidence to support a finding of proximate causation. Rumble claims that it lost deals with C4 Traffic and Gundry MD but failed to identify any communication with these entities or evidence that they even saw the Statements. SUMF ¶¶18(a)-(b). Instead, Rumble assumes causation based on "timing" – *i.e.*, that "[t]hese advertisers walked away … shortly after the October statements were made." *Id.*; Browning Decl. Ex. B, Tr. 96:2-4. This unsupported "inference" is legally insufficient to establish proximate causation, however, because the mere fact that one thing happened after another cannot give rise to special damages. *Simon*, 895 F.2d at 1318 (affirming JNOV because there was "no evidence that [employer] specifically considered the slanderous statement in terminating [plaintiff]").

Rumble also cannot back up its claim that the Statements caused a third company – Criteo – to "block[] Rumble.com and stop[] purchasing ads." Browning Decl. Ex. E, Rog. 4. Rumble "speculated" that the Statements must have influenced Criteo's decision because of the "timing." Browning Decl. Ex. B, Tr. 99:18-101:25.

---

[7] Rumble does not claim any other special damages. Browning Decl. Ex. E, Rogs. 4-10; Ex. B, Tr. 90:16-91:11.

But the facts prove otherwise. On September 29, 2023, Jammi wrote an email to a representative of Criteo to "flag … that Criteo is running ads for Rumble" and that the "platform is extremely unsafe for advertisers." Jammi Decl. Ex. D. That email is not one of the Statements in suit nor does it mention Rumble's reliance on Google. Rather, it raises the issue of Rumble's "brand unsafe" content – which was presumably why Criteo blocked Rumble. *Id*.[8] Since the evidence disproves the claim that the Statements caused a specific out of pocket loss, there can be no special damages.

### 2.    Fluctuations in Rumble's Stock Price Are Not Special Damages

Rumble claims $144 million in special damages based on speculation that its "stock price … fell nearly 13% in the week following Defendants' publication of their defamatory October 24, 2023 article…." Browning Decl. Ex. A ¶81. But "the mere decline in the value of an asset, such as the value of a plaintiff's stock, is not a *realized* pecuniary loss that can support a special damages award." *Sirer v. Aksoy*, 2023 WL 3166453, at *8 (S.D. Fla. Apr. 28, 2023) (citing *Salit v. Ruden, McClosky, Smith, Shuster & Russell, P.A.*, 742 So. 2d 381, 388 (Fla. 4th DCA 1999)). Rumble has conceded that a dip in the value of its stock is not a realized loss (SUMF ¶18(c)) and has therefore cannot establish special damages.

There is also no evidence that the Article caused Rumble's stock price to fall. In lieu of evidence, Rumble assumes that it must have because it "is unaware of any

---

[8] This timeline undermines Rumble's "timing" argument because it appears that at least three of the Statements were made *after* Criteo decided not to do business with Rumble on or about October 2, 2023 – and therefore could not have been the proximate cause. *See* Statements (a)-(c).

[other] event or market condition unique to the company that could account for the decrease." Browning Decl. Ex. E, Rog. 9. *See also* SUMF ¶18(c). This is another "inference," not evidence of proximate cause. *See Simon*, 895 F.2d at 1318. And the chart of Rumble's stock price confirms the absence of proximate cause because the stock price went up in the days following the Article's publication and then dropped the day after a prominent investment website issued a recommendation not to buy the stock (which destroys any inference of a causation based on "timing"). SUMF ¶18(c). The absence of special damages is underscored by the fact that, approximately one day after Rumble's arbitrary look-back window ended, the stock rebounded higher than it was when the Article was published. *Id*.[9]

### 3. Rumble's Legal and Public Relations Fees Are Not Special Damages

Equally untenable are Rumble's special damages claims based on legal and public relations fees. On legal fees, Rumble has conceded (as it must) that litigation fees are not special damages (*see* Dkt. 58 at 14) – and yet the fees Rumble claims as special damages were all spent as a necessary part of commencing this action. All of the relevant fees were "related to steps that Rumble took to seek a retraction." Browning Decl. Ex. B, Tr. 257:18-24. But Retraction demands are a "condition precedent" to filing a defamation suit under Florida law. *See* Fla. Stat. § 770.01.

---

[9] As a policy matter, the Court should not create a novel rule that publicly traded companies can establish special damages whenever its stock price dips around the time a news organization publishes a negative news story. This would eviscerate the *per quod* standard and chill free speech by creating the potential for ruinous damages based on coincidences (rather than the proximate causation required).

Accordingly, the legal fees Rumble paid for the retraction demand are indistinguishable from fees paid to prepare the Complaint – both were necessary to file suit, neither qualifies as special damages.[10]

With respect to the public relations fees, Rumble has once again failed to produce any evidence of proximate cause. Rumble alleges that it hired a "public relations consultant to mitigate damages directly connected to Defendants' false statements." Browning Decl. Ex. A ¶82. But there is no evidence to support this claim. Rumble did engage a public relations company on November 20, 2023, but this was nearly a month after the October 24 Article was published and much too late to address its impact (if any). *Id.* Ex. F, Rumble00014582. Moreover, the contractual scope of work engaging the public relations firm lists generic tasks – such as preparing executives for media appearances – but this document does not mention the Statements, Defendants, or Check My Ads. *Id.* And Rumble failed to identify any work product, such as press releases, that the public relations firm created to rebut the Statements. SUMF ¶18(d). Since there is no evidence that Rumble paid a public relations firm to "mitigate damages" caused by the Statements, this claim of special damages falls with the rest.

### B.    Rumble Has No Evidence of General Damages

Even assuming that the Statements are defamatory *per se* (which they are not

---

[10] If retraction demand fees counted as special damages, it would nullify the heightened defamation *per quod* standards because every plaintiff would automatically establish special damages by following the procedural requirements to sue for defamation.

(*see* Dkt. 44-45, 63), Defendants are still entitled to summary judgment because
Rumble lacks the evidence it needs to establish general damages. General damages
encompass "injury to [a firm's] reputation, decreased standing in the community,
impairment in its ability to conduct its trade or business, loss in membership, or that
the defamatory statements deterred anyone from conducting business with it." *Army
Aviation*, 504 F. Supp. 2d at 1260.[11] General damages "are not conclusively presumed
…," but must instead be "pleaded" and "proved" by evidence. *Boyles*, 467 So. 2d at
282.[12]

     Rumble has failed to make this showing. It asserts in conclusory fashion that
the Statements "caused substantial harm to Rumble's reputation and damaged its
brand" while also "creat[ing] uncertainty with Rumble's users and creators."
Browning Decl. Ex. E, Rog. 4. But there is no evidence to support this contention. In
response to interrogatories calling for Rumble to identify anyone who was confused
by the Statements or thought less of Rumble's brand, Rumble was unable to name a
single person. *Id*. Rog. 10. Rumble also failed to produce a single communication in
which anyone even mentions the Statements, which refutes its speculation that the
Statements caused reputational harm. SUMF ¶18(a). Without proof of reputational

---

[11] Unlike here, *Army Aviation* involved a non-media defendant and therefore "general damages …
need[ed] not be pleaded or proved" in order to state a claim. *Id*. at 1260 (quoting *Bobenhausen*, 344 So.
2d at 281). But the Florida Supreme Court held that this "is no longer accurate regarding a libel action
against the media" and, therefore, Rumble must establish general damages to proceed with its
defamation claim against Defendants. *Boyles*, 467 So. 2d at 282.

[12] *See also Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001) (per curiam) ("[A]
plaintiff suing a media defendant must … plead and prove actual injury."); *Corsi*, 519 F. Supp. 3d at
1119 (same).

harm, Rumble cannot establish the general damages it needs to support a defamation *per se* claim. *See Edelstein*, 798 So. 2d at 798.

## III.    THE STATEMENTS THAT RUMBLE IS "HEAVILY RELIANT" ON GOOGLE ARE SUBSTANTIALLY TRUE

Another independent ground for summary judgment is that the Statements reporting that Rumble "depends on Google for its business" are substantially true.

The First Amendment and Florida law place the burden of proof on Rumble to prove material falsity. *San Juan Prods., Inc. v. River Pools & Spas, Inc.*, 2023 WL 1994087, at *4 (M.D. Fla. Feb. 14, 2023) ("According to the U.S. Supreme Court and Florida case law, falsity only exist[s] if the publication is *substantially and materially false*, not just if it is technically false.") (emphasis added) (citation omitted); *see Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986); *Cheng v. Neumann,* 51 F.4th 438, 443-44 (1st Cir. 2022). Statements need not be literally true for Defendants to prevail. Rather, a "statement is substantially true," and thus not actionable, "*if its substance or gist* conveys essentially the same meaning that the truth would have conveyed." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1107-08 (Fla. 2008); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1240 (11th Cir. 1999) (if "gist" or "sting" of challenged statement is substantially true, statement is not defamatory). Courts must "consider the context" of the statement and "disregard any minor inaccuracies that do not affect the substance of the statement." *Jews for Jesus*, 997 So. 2d at 1107-08 (citation omitted). "[R]ecitations of [plaintiff's] own admitted actions and statements" are substantially true by definition. *Wentz v. Project Veritas*, 2019 WL 1716024, at *5 (M.D. Fla. Apr. 16, 2019).

Rumble alleges it was defamed by Statements that it "depend[s] on Google for [its] business" and is "largely" or "heavily monetized by Google Ads" (Statements (a), (b), and (e)) because "[t]he notion that Rumble is heavily dependent on ad revenue from Google is wholly inconsistent with Rumble's publicly stated mission to be free from the political and economic pressures of Big Tech." Browning Decl. Ex. A ¶9. But these Statements are substantially true on multiple levels. Rumble has been a Google Ads partner for many years and remains one to this day. SUMF ¶¶3-4. ==Rumble has historically depended on Google for as much as 90% of its programmatic ad revenue. Browning Decl. Ex. D, 1-2. Between August and November 2023, when the Statements were published, Google provided 10-20% of Rumble's monthly programmatic ad revenue. *Id.* 6-7. Rumble continues to profit from Google, which contributes more than 10% of programmatic ad revenue in the latest monthly figure. *Id.*, 9. Rumble made over $8.6 million from Google Ads in three years. SUMF ¶¶4-6.==

Beyond accepting ==millions of dollars== from Google, it is undisputed that Rumble depends on Google in other ways. Rumble uses its Google Ads account to =="gain insight into the Google Ads ecosystem" – including non-public information about advertisers who "have made conscious decisions not to do business with [Rumble]."== *Id.* Ex. B, Tr. 173:15-175:21. Rumble also admitted in its annual SEC filing for 2023 that it "rel[ies]" on Google Analytics to calculate the critical monthly average user metric used to quantify its performance in investor documents and SEC filings. *Id.* Ex. C, Rumble00005351. Rumble similarly conceded that it is "dependent" on Google systems like Android, Chrome and the Google Play Store to distribute its content. *Id.*,

Rumble00005350. Rumble uses Gmail for its corporate email accounts and offers Google Tag Manager to users of its RAC platform (which allows them to track consumers online). SUMF ¶6. All of this uncontested evidence confirms the substantial truth of Defendants' Statements that Rumble "depends on Google for its business."

Rumble cannot manufacture material falsity by quibbling with the use of terms like "largely" or "heavily" to characterize its reliance on Google. These terms are not subject to a precise objective definition (*see* Jammi Decl. ¶35), but they are synonymous with the term "materially." Rumble is materially reliant on Google for all the reasons set forth above. Moreover, when 9% of Rumble's revenue came from Google, Rumble characterized that share as "material" in an SEC filing. *Compare* Browning Decl. Ex. A, ¶15 (Rumble derived 9% of revenue from Google Ads in Q3 2022) *with id*. Ex. N (disclosing same share as "material"). When the Statements were published, Google contributed between 10-20% of Rumble's programmatic ad revenue (SUMF ¶6) – which is "material" or "large" according to Rumble's own definition.

Rumble also claims that the Statements accuse it of engaging in business practices that contradict its anti-Big Tech brand – but this is also true. Rumble's "publicly stated mission has been to free itself – and its users – from the shackles of Big Tech's censorship and dominance in the U.S. economy." *Id*. Ex. A ¶65. Rumble has also testified that "it wouldn't have any impact on [its] business whatsoever" if Google "shut off" Rumble and that Rumble would be able to "move forward" without the use of other Google products. *Id*. Ex. B, Tr. 175:7-10. In short, Rumble continues to use

Google services and accept Google money even though it claims Google is immaterial to its business. The "shackles of Big Tech" are thus golden handcuffs that Rumble says it can slip off at any time but chooses not to in order to continue accepting money and other benefits. Rumble's decision to say one thing in public – *i.e.*, it wants independence from Google – then do the opposite – *i.e.*, voluntarily partner with Google for profit – is hypocrisy by any definition.

Finally, the Statement that Rumble was "90% funded by Google Ads" on September 26, 2023 is literally false but, nevertheless, substantially true under the generous standard guaranteed by the First Amendment. Courts have overlooked numerical discrepancies in dismissing defamation claims under the substantial truth standard as long as the gist was correct.[13] The defamatory "gist" here, as alleged by Rumble, is that it falsely accused Rumble of being "largely dependent on Big Tech platforms like Google Ads…." But this is true for all the reasons set forth above.[14]

In sum, the Statements that Rumble were "heavily reliant" on Google are substantially true and therefore cannot serve as the basis for a defamation claim.

---

[13] *See, e.g.*, *See Markle v. Markle*, 2024 WL 1075339, at *10 (M.D. Fla. Mar. 12, 2024) (holding that a mistake regarding whether defendant saw plaintiff thirteen or eighteen years ago was protected by substantial truth doctrine), *appeal docketed*, No. 24-11091 (11th Cir. Apr. 9, 2024); *Woodard v. Sunbeam Tel. Corp.*, 616 So. 2d 501, 502-03 (Fla. 3d DCA 1993) (finding that report that stated bus driver had spent four years in prison, as opposed to two years actually served, was substantially true and could not form the basis for a defamation claim).

[14] The data behind this Statement (which Atkin admittedly misconstrued) also demonstrates yet another facet of Rumble's dependency on Google because it shows Google was responsible for about 90% of traffic that came to Rumble from Rumble's online ads – which is itself another way Google drives revenue to Rumble. Atkin Decl. ¶44.

IV.    **THE STATEMENTS THAT RUMBLE IS A "HOUSE OF CARDS" AND
WOULD NOT BE "VIABLE" WITHOUT GOOGLE ARE OPINION**

The Statements that Rumble "would not be viable" and is "a house of cards"
(Statements (a), (d)) are non-actionable expressions of opinion, as is the Statement that
"the business appears to be heavily dependent on Google Ads" (Statement (e)).

"[S]tatements of pure opinion are protected from defamation actions by the
First Amendment." *Turner*, 879 F.3d at 1262; *see also Gertz v. Robert Welch, Inc.*, 418
U.S. 323, 339-40 (1974); *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st
DCA 1981). "Pure opinion occurs when the defendant makes a comment or states an
opinion based on facts which are set forth in the article or which are otherwise known
or available to the reader or listener as a member of the public." *Basulto v. Netflix, Inc.*,
2023 WL 7129970, at *32 (S.D. Fla. Sept. 20, 2023). Opinion presents an issue of law for
the court to determine based on whether the statement is objectively falsifiable. *Turner*,
879 F.3d at 1262-63. Since "prediction[s]" are not falsifiable, a "statement about the
future, is … an expression of opinion." *Utterback v. Morris*, 2024 WL 3809368, at *9
(N.D. Fla. July 24, 2024) (quoting *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784
F.2d 674, 680 (5th Cir. 1986).[15]

Defendants' speculation about what, hypothetically, might happen to Rumble
if Google withdrew its services is non-actionable opinion. These Statements are

---

[15] *See also Akai Custom Guns, LLC v. KKM Precision, Inc.*, 707 F.Supp.3d 1273, 1294-95 (S.D. Fla. 2023)
(granting summary judgment based on "speculative opinion"); *Borislow v. Canaccord Genuity Grp., Inc.*,
2014 WL 21580259 at *3 (S.D. Fla. June 27, 2014) (dismissing defamation claim based on prediction
that an individual's departure from a company would affect stock price).

undergirded by the true fact that Rumble relies on Google for money and other benefits. *See* 17-20, *supra*. And, while Rumble may claim that the income it receives from Google is immaterial, nobody knows whether Rumble would survive if Google (which controls vast swathes of the internet) cut it off. Moreover, Rumble acknowledges that the gist of these Statements is that it faces "a material financial risk" from relying on Google – but this confirms the presence of opinion because "risks" are future events that have not, in fact, happened. The terms "house of cards" and "viable" are also inherently subjective and readily understood as opinion. And the fact that those Statements were posted on X, where rhetorical hyperbole is expected, underscores the conclusion that these Statements are opinions – and thus not actionable.[16]

The Article's Statement that Rumble "appears to be heavily reliant on Google" is also opinion based on true facts. Rumble does not, and cannot, dispute the factual predicate that Google (the largest ad-brokerage in the world ((SUMF ¶1)) is Rumble's "largest advertising partner." Then, rather than stating the conclusion that Rumble is "heavily dependent" on Google as a fact, the Article signals the presence of opinion by using the words "it appears."[17] Viewed in context, as it must be, this Statement is clearly opinion.

---

[16] *See, e.g.*, *Murray v. Pronto Installations, Inc.*, 2020 WL 6728812, at *5 (M.D. Fla. Nov. 16, 2020) (recognizing that "internet communications" are likely to be recognized as opinion given "freewheeling, anything-goes writing style"); *Rapaport v. Barstool Sports, Inc.*, 2021 WL 1178240, at *12 (S.D.N.Y. Mar. 29, 2021) (same).

[17] *Reed v. Chamblee*, 2023 WL 6292578, at *17 (M.D. Fla. Sept. 27, 2023) (statement that plaintiff "appeared to be" violating "an unwritten code" of ethics was non-actionable opinion).

## V.    RUMBLE HAS FAILED TO ESTABLISH ACTUAL MALICE

Discovery has confirmed that Rumble cannot establish actual malice – *i.e.*, knowledge of falsity or a high degree of awareness that the Statements were probably false – for the reasons set forth in the relevant sections of Defendants' pending Motion to Dismiss. *See* Dkts. 44-45, 63.  Actual malice is judged against the "gist" of the Statements – which means that there is no actual malice if Defendants subjectively believed at the time of publication that Rumble depended on Google, that this constituted a material financial risk and contradicted its anti-Big Tech brand. *See Levan*, 190 F.3d at 1240-41 (granting summary judgment for lack of proof that publisher "'entertained serious doubts' that the underlying thrust of the [publication] was true"); *Berisha v. Lawson*, 973 F.3d 1304, 1315 (11th Cir. 2020) (same). Rumble must prove actual malice by "clear and convincing" evidence. *Id.* at 1312.

Here, there is no evidence whatsoever that Defendant doubted the "gist" of their Statements. Defendants have both offered unrebutted testimony that they believed the Statements were true when they published them. Jammi Decl. ¶¶57, 63; Atkin Decl. ¶¶33, 41-46. Defendants both believed (correctly) that Rumble maintained a seller account with Google through which it received significant revenue. SUMF ¶13. Jammi also relied on Rumble's December 26, 2022 tweet stating that "the top two external ad networks Rumble uses, which includes Google, represent less than 20% of our revenue in Q3, down from 45% in Q2." Jammi Decl. ¶¶46-57. While Rumble asserts that Jammi should have understood this to mean that its share of Google revenue would soon dwindle to virtually nothing, that is not the conclusion Jammi

23

drew. *Id*.[18] Instead, Jammi understood this tweet to mean that Rumble was still heavily

reliant on Google. *Id*. And Rumble has not identified any affirmative statements it

made afterwards to clarify that Google subsequently provided less than approximately

20% of its revenue, as it had previously represented to Jammi.

Nor did Atkin post her tweet with actual malice. While Atkin concedes that she

made a mistake when she posted that Rumble was "90% funded by Google Ads," she

believed in the truth of the gist of her Statement – which is that Rumble was heavily

reliant on Google. SUMF ¶14. This view was informed by her knowledge that Rumble

was a Google Ads partner and recollection that Rumble had previously made a public

statement indicating that it derived approximately 90% of its revenue from Google. *Id*.

at And, while Atkin concedes that she made a regrettable mistake, "[a]ctual malice

requires more than a departure from reasonable journalistic standards" and "a failure

to investigate, standing on its own, does not indicate … actual malice." *Michel v. NYP*

*Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016).

Defendants also did not publish the Article with actual malice. The Article's

reporting that Rumble was "heavily monetized" by Google Ads was consistent with

the gist of their prior Statements, which they believed to be true for the reasons set

forth above. And Defendants were legally entitled to "place[] [their] reliance upon

---

[18] Jammi viewed any suggestion that Rumble was weaning itself off Google with appropriate
skepticism since she understood from experience that the Google Ad ecosystem is opaque and that it
is almost impossible to verify Rumble's claims. *Id*. at ¶56. Her skepticism is justified by the fact that
an October 2022 Media Matters article significantly underestimated the share of Rumble's Google
revenue at 2% soon before Rumble suggested in its December 26, 2022 tweet that the figure was
approximately 20%. *Id*. at ¶¶41-43.

[their editorial team's] reportorial abilities." *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299,1307 (N.Y. 1977); SUMF ¶¶15-16.[19]

## VI.    DEFENDANTS ARE ENTITLED TO ANTI-SLAPP ATTORNEYS' FEES

Florida's anti-SLAPP law provides a substantive, mandatory right for prevailing defendants to recover attorneys' fees incurred to obtain summary judgment against meritless lawsuits that violate their exercise of free speech in connection with a public issue. Fla. Stat. § 768.295(3). This fee-shifting mechanism applies in federal court.[20] For the reasons set forth above, this lawsuit is both without merit and connected to Defendants' speech in connection with a public issue. Defendants are therefore entitled to recover all fees incurred to defend themselves against this defamation action.

## <u>CONCLUSION</u>

Defendants respectfully request summary judgment in their favor, dismissal of this action with prejudice, attorneys' fees and such other relief the Court deems just and proper.

SHULLMAN FUGATE PLLC                     DAVIS WRIGHT TREMAINE LLP

By: */s/ Sarah M. Papadelias* .           John M. Browning*
Deanna K. Shullman (SBN 514462)           Katherine M. Bolger*
Sarah M. Papadelias (SBN 0125098)
2101 Vista Parkway, Ste. 4006             1251 Avenue of the Americas
West Palm Beach, Florida 33411            New York, New York 10020

---

[19] Given that Rumble's own statements tended to confirm that it was materially reliant on Google, its scattershot allegations of ill will, financial motives to defame and failure to follow journalistic standards do not suffice to prove actual malice. *See Brimelow v. N.Y. Times Co.*, 2021 WL 4901969, at *3 (2d Cir. Oct. 21, 2021) (affirming dismissal because there was "no combination of allegations from which one could plausibly infer that [defendant] was purposely avoiding the truth").

[20] *See Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1323 (S.D. Fla. 2020); *Markle v. Markle*, 2023 WL 2711341, at *13 (M.D. Fla. Mar. 30, 2023); *Corsi*, 519 F. Supp. 3d at 1128.

Telephone: (561) 429-3619                Telephone: (212) 489-8230
dshullman@shullmanfugate.com             jackbrowning@dwt.com
spapadelias@shullmanfugate.com           katebolger@dwt.com

*Counsel for Defendants Nandini Jammi and*    *Admitted Pro Hac Vice*
*Claire Atkin*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2024 a true and correct copy of the foregoing

was served via CM/ECF on all counsel of record.

<u>*/s/ Sarah M. Papadelias*</u>
Sarah M. Papadelias