## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

### CASE NO: 8:23-CV-2718

RUMBLE, INC.,                          )
                                       )
                    Plaintiff,         )
                                       )
        vs.                            )
                                       )
NANDINI JAMMI, CLAIRE ATKIN,           )
and JOHN DOE NOS. 1-10,                )
                                       )
                    Defendants.        )
_____    )

### DEFENDANTS' NANDINI JAMMI AND CLAIRE ATKIN'S ANSWER TO PLAINTIFF RUMBLE INC.'S AMENDED COMPLAINT

Defendants Nandini Jammi and Claire Atkin ("Defendants"), by and through its undersigned counsel, hereby file the following Answer to Plaintiff Rumble Inc. ("Plaintiff" or "Rumble")'s Amended Complaint (Dkt. 42) and state as follows. Defendants deny each allegation they do not specifically admit.

### NATURE OF THE ACTION

1.      Nandini Jammi and Claire Atkin, the co-founders of Check My Ads, together with Media Matters for America, purport to be digital advertising crusaders dedicated to fighting the "global disinformation epidemic." Yet, for years, they have engaged in their own hypocritical disinformation campaign to censor, silence, and cancel speech by spreading false, materially misleading, and defamatory statements and engaging in tortious conduct to convince advertisers to withdraw ad spends from

platforms like Rumble that host content creators who espouse views contrary to Defendants' hyper-partisan sensibilities. In the 2010s, their targets were Bill O'Reilly, Breitbart News, and Tucker Carlson. Today, their targets are Elon Musk, X, and Rumble.

**ANSWER**: Defendants admit that they are co-founders of Check My Ads ("CMA"), a digital advertising watchdog that uncovers opaque practices in the online advertising industry. Defendants respectfully refer the Court to the statements referenced in this paragraph for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants deny the remaining allegations in Paragraph 1.

2. Before starting Check My Ads, Jammi helped launch an anonymous Twitter campaign using the Twitter account Sleeping Giants (@slpng_giants) to publicly pressure companies to stop advertising on Breitbart. Sleeping Giants later teamed up with Media Matters to boycott certain Fox News hosts, including Tucker Carlson. Together, Sleeping Giants and Media Matters identified a pressure point to cripple media (and social media) platforms that broadcast content contrary to their progressive world views: advertising dollars. They developed the playbook to cut off ad revenue to these platforms by spreading malicious falsehoods about how large corporate advertisers' products were being featured with—and therefore suggesting an

endorsement of—politically-charged or otherwise controversial content.

**ANSWER**: Defendants admit that Defendant Jammi founded Sleeping Giants prior to starting CMA and that Sleeping Giants was a loose collective that sought to raise awareness that advertisers unknowingly funded brand unsafe publishers, like Breitbart and Tucker Carlson (then at Fox News) without the knowledge of advertisers. Defendants deny the remaining allegations of Paragraph 2.

3.    Big Tech was quick to catch on.  Not wanting to draw the ire of self-proclaimed advertising watchdogs and realizing that they too could fall victim to the Sleeping Giants-Media Matters playbook, Big Tech platforms such as Google, YouTube, Amazon Web Services, Facebook, and others began increasingly to censor content creators based on what they perceived to be the partisan political hot-button issues of the day.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3, and on that basis deny them.

4.    For its part, Rumble has refused to cave to this pressure.  Rumble was created as, and it remains, a proudly content-neutral video platform dedicated to protecting a free and open internet by providing a safe space for open discourse. Rumble's steadfast commitment to free speech is what sets it apart from competing platforms.  Rumble was born of a need to protect small content creators who were

being squeezed out by incumbent Big Tech platforms in favor of large creators, influencers, and brands.  And as Big Tech platforms have increasingly shifted toward preferencing and censorship based on content, not size, Rumble has stayed true to its mission.  Rumble supports small content creators, and unlike its competitors, Rumble is a neutral video platform.  As a result, Rumble hosts a broad spectrum of creators with varying political viewpoints, allowing users to decide for themselves what content to view.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4, and on that basis deny them.

5.    Rumble has also built its platform from the ground up, creating its own technical infrastructure to avoid dependencies on third parties for critical services whenever possible.  And, rather than relying on Google for its advertising revenue, in August 2022 Rumble launched its own platform for advertisers, the Rumble Advertising Center, to further insulate itself and its shareholders from Big Tech.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5, and on that basis deny them.

6.    Rumble has been highly vocal and public about its mission—from its creation, through its 2022 initial public offering, to today, Rumble has been outspoken in its press releases, through its CEO's public statements, and in its U.S. Securities and

4

Exchange Commission ("SEC") filings about its commitment to free speech, its mission to protect a free and open internet, and its development of its own technical infrastructure and ad platform. Investors have taken note, and as of October 23, 2023, Rumble's market capitalization was $1.44 billion.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, and on that basis deny them.

7.    Defendants hate Rumble's content-neutral philosophy—and its progress towards economic independence. Rather than entrusting consumers to make their own choices about what to watch, Defendants believe consumers should only be allowed to have access to content that aligns with Defendants' hyper-partisan political views. And Defendants loathe that Rumble has been so successful raising capital and developing a strong foothold in the market. So, Defendants launched a disinformation campaign to demonetize Rumble, and they have bragged about it publicly:

**ANSWER**:  Defendants respectfully refer the Court to the communications referenced in Paragraph 7 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants deny the remaining allegations in Paragraph 7.

8.    In their campaign against Rumble, Defendants are using the same

recycled playbook that Jammi used at Sleeping Giants.  Step one: manufacture and spread knowingly false statements about Rumble's business practices, ad placements, revenue streams, and overall financial health.  Step two: publicly pressure large advertisers to "drop" Rumble, thereby reducing revenue to the Company, and amplifying the economic risk they pose to their targets to further discourage investors from purchasing or holding Rumble stock.

**ANSWER**: Defendants deny the allegations in Paragraph 8.

9.    As relevant to this action, Defendants falsely accused Rumble—expressly and by implication—of lying to its shareholders and the SEC in its securities filings about the Company's financial health and its sources of ad revenue. Specifically, Defendants have repeatedly peddled the false narrative that Rumble is primarily monetized by and wholly dependent upon revenue from Google Ads, when in reality, Google Ads now represents less than 1% of the Company's revenue.  This narrative is particularly damaging to Rumble.  The notion that Rumble is heavily dependent on ad revenue from Google is wholly inconsistent with Rumble's publicly stated mission to be free from the political and economic pressures of Big Tech.  And it is equally damaging to Rumble because it falsely attributes a material and existential financial risk to the Company that Defendants' stated mission to eliminate Rumble's Google Ad revenue will cause Rumble's financial collapse.

**ANSWER**: Defendants respond that the meaning of the statements referenced

in Paragraph 9 implicates legal questions that do not require a response and respectfully refers the Court to those statements for their for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants further deny the allegation that Defendant's falsely accused Rumble—expressly or by implication—of lying to its shareholders and the SEC about the Company's financial health and its source of ad revenue. Defendants respectfully refer the Court to the statements regarding Defendants' "stated mission" referenced in Paragraph 9 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants deny the remaining allegations in Paragraph 9. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9, and on that basis deny them.

10.    Defendants have peddled this false narrative repeatedly on X, formerly known as Twitter, and in an article published on CheckMyAds.org.  For example, on August 16, 2023, Jammi posted on X: "Rumble is all posturing, all the time.  They're not a Google Ads killer or even close to it – they depend on Google for their business. We're talking a house of cards."

**ANSWER**: Defendants respectfully refer the Court to the communications referenced in Paragraph 10 for their true content and meaning. To the extent that such

communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants deny the remaining allegations in Paragraph 10.

11.    On September 26, 2023, Atkin posted on X: "Rumble, the most toxic place on the internet, is 90% funded by @GoogleAds," and she included a link to a Check My Ads article with instructions for advertisers to block Rumble from their ad campaigns.  The same day, Jammi posted on X: "A little known fact: @rumblevideo is largely monetized through Google Video Partners."

**ANSWER**: Defendants respectfully refer the Court to the communications referenced in Paragraph 11 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

12.    On October 3, 2023, Jammi posted on X: "Without @GoogleAds, Rumble would not be viable. ... It's criminal behavior by Google, which has promised brand safety to its clients."

**ANSWER**: Defendants respectfully refer the Court to the communications referenced in Paragraph 12 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

8

13.    Defendants repeated similar claims in an article published on CheckMyAds.org on October 24, 2023.  The article claimed: "Rumble loves to boast about being free from Big Tech.  In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner."

**ANSWER**: Defendants respectfully refer the Court to the communications referenced in Paragraph 13 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

14.    Defendants' clear intent in manufacturing and publishing this false narrative is to harm Rumble's reputation with advertisers, shareholders, investors, creators, and users by suggesting that Rumble is lying to its stakeholders and the market about a material financial risk to the Company—the risk that Rumble's business would be devastated if Google Ads were to drop Rumble.  This is precisely the result that Defendants' false statements are meant to bring about.  But the notion that Rumble's revenue is incompatible with the brand Rumble has worked hard to build—as an alternative to Big Tech that rejects the cancel culture and censorship that pervade other large social video platforms—is entirely false.  And even if Google Ads were to drop Rumble, Rumble's business would not materially suffer.

**ANSWER**: Defendants deny the allegations in Paragraph 14.

9

15.     As Rumble truthfully disclosed in its securities filings, ad revenue
Rumble generated from Google Ads has declined quickly in the last two years.
Rumble reported in its amended Form S-4 filed on May 12, 2022 that 86% of Rumble's
total revenue in the first three quarters of 2021 was derived from Google Ads.  In its
amended Form S-4 filed on August 9, 2022, Rumble disclosed that, in Q1 2022,
Rumble derived 56% of its total revenue from Google Ads and one other external
advertising network.  By Q2 2022, that percentage had fallen to 45%—a fact that
Rumble disclosed in its Form S-1 filed on November 4, 2022.  In its Q3 2022 Quarterly
Report publicly filed with the SEC, Rumble stated that its revenue from Google Ads
and another external advertising network represented 19% of Rumble's overall
revenue in the quarter.  Although not reported in the Q3 2022 Quarterly Report, the
amount of revenue Rumble derived from Google Ads alone was only 9%.

**ANSWER**:    Defendants respectfully refer the Court to the SEC filings
referenced in Paragraph 15 for their true content and meaning. To the extent that such
communications are inconsistent with the allegations of this paragraph, Defendants
deny every inconsistent allegation. Defendants lack knowledge or information
sufficient to form a belief as to the truth of the allegation that "[a]though not reported
in the Q3 2022 Quarterly Report, the amount of revenue Rumble derived from Google
Ads alone was only 9%," and on that basis deny it.

16.     Since then, the percentage of revenue Rumble derived from Google Ads has continued to decline precipitously.  That percentage is now so small that Rumble stopped reporting it in its securities filings because its possible loss no longer represents a material risk to the Company.  *In October 2023, Rumble derived less than 1% of its revenue from Google Ads*.  This rapid decline was due in large part to the roll out of Rumble's own advertising platform, the Rumble Advertising Center.  Thus, Rumble is not "largely" monetized by Google, Rumble is not reliant on Google Ads, Rumble's financials are not a house of cards built on Google Ads, and Rumble is not "90% funded" by Google Ads as Defendants' claimed.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 16, and on that basis deny them.


17.     Defendants recklessly disregarded the truth and published these claims with actual malice when they manufactured this false narrative.  In fact, Defendants knew their statements about Rumble were false when they made them.  The true facts about Rumble's ad revenue were not only publicly available in the Company's SEC filings, but Rumble responded directly to Jammi on X in late 2022 informing her that revenue from two external ad networks, one of which was Google Ads, was less than 20% of Rumble's overall ad revenue in the prior quarter.  Jammi acknowledged both receiving this message and the accuracy of it.  Indeed, she snarked back: "Phew! Y'all are surprisingly into facts for a company that exists just to stream conspiracy theorists

11

who've been kicked off YouTube. But noted. Thanks."

**ANSWER**: Paragraph 17 states legal conclusions with respect to actual malice and other elements of a defamation claim for which no response is required. To the extent that a response is required, Defendants deny the allegations that they knowingly published false statements about Rumble. Defendants respectfully refer the Court to the SEC filings and communications referenced in Paragraph 17 for their true meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

18.    Defendants' concerted disinformation campaign has had precisely the effect they intended—it has harmed Rumble's brand in the eyes of Rumble's stakeholders, including with investors and partners who share Rumble's mission of restoring the internet to its roots by making it free and open and rejecting Big Tech cancel culture. Following Defendants' false statements imputing to Rumble in the marketplace a material financial risk that does not exist, Rumble lost significant market value. In the week following the defamatory article Jammi and Atkin published on CheckMyAds.org, investors divested their stock in the Company, and Rumble lost nearly $185 million in market capitalization. As a result of Defendants' defamatory falsehoods, Rumble has also been forced to expend tens of thousands of dollars on outside legal counsel and public relations firms to try to mitigate the damage Defendants have caused and continue to cause.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that Rumble lost nearly $185 million in market capitalization, and on that basis deny it. Defendants deny the remaining allegations in Paragraph 18.

19.     While Defendants are free to disagree with Rumble's policy of content neutrality and the views expressed on the platform by third-party content creators, they are not free to knowingly fabricate and publish false statements about the Company to their 150,000 X followers and to a global internet audience in an effort to harm Rumble's business.  As individuals supposedly dedicated to combating disinformation should appreciate, the truth matters.  Rumble brings this lawsuit to set the record straight, vindicate its rights, and recover damages for the harm Defendants' lies have caused to Rumble's business and reputation.

**ANSWER**: Defendants admit that they are free to disagree with Rumble's policy of content neutrality and the views expressed on the platform by third-party content creators and that the truth matters.  Defendants deny knowingly fabricating or publishing false statements about Rumble to their 150,000 X followers and/or to a global internet audience in an effort to harm Rumble's business. Defendants further deny being "supposedly dedicated to combatting disinformation." Defendants lack knowledge or information sufficient to form a belief about the remaining allegations of Paragraph 19 and, on that basis, deny those allegations.

## PARTIES AND RELEVANT NON-PARTIES

20.    Plaintiff Rumble is incorporated under the laws of Delaware, and its headquarters and principal place of business is located at 444 Gulf of Mexico Drive, Longboat Key, Florida.  Many of Rumble's corporate documents and potentially relevant witnesses are in Florida.  The location of Rumble's headquarters is publicly available and widely known, including by Defendants.   Rumble's X profile (@rumblevideo), which Defendants regularly visit and which Jammi and Check My Ads follow, lists Rumble's location as Longboat Key, Florida.  In addition, many of Rumble's public SEC filings, which Defendants have admitted to reviewing, state that Rumble's registered office is in Longboat Key, Florida.  Rumble's press releases, which Defendants have cited, also note its location in Longboat Key, Florida.  And several of Rumble's tweets mention its Florida offices.  Defendants have cited to these press releases and securities filings in articles they published on CheckMyAds.org, and they have tagged and retweeted posts by Rumble, demonstrating that Defendants knew that Rumble is a Florida-based company.

**ANSWER**: Defendants respectfully refer the Court to the SEC filings, press releases and other communications referenced in Paragraph 20 for their true content and meaning.  To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20, and on that basis deny them.

14

21.    Defendant Nandini Jammi is a co-founder of Check My Ads.  Jammi is domiciled in, resides in, and is a citizen of Maryland.   Jammi's X account (@nandoodles) has nearly 100,000 followers.

**ANSWER**:  Defendants admit that Jammi is a co-founder of Check My Ads. Defendants further admit that Jammi is domiciled in, resides in, and is a citizen of Maryland.  Defendants admits that Jammi's X account (@nandoodles) has approximately 83.4k followers, but denies any inconsistent allegation in Paragraph 21.

22.    Defendant Claire Atkin is a co-founder of Check My Ads.  Atkin is domiciled in and is a citizen of British Columbia, Canada.[1]  She currently resides in New York, New York.  Atkin's X account (@catthekin) has nearly 20,000 followers.

**ANSWER**: Defendants admit that Defendant Atkin is a co-founder of Check My Ads. Defendants admit that she is a Canadian citizen and a current resident and domiciliary of New York but denies any inconsistent allegations in Paragraph 22. Defendants admits that Atkins' X account (@catthekin) has approximately 16.2k followers but denies any inconsistent allegation in Paragraph 22.

---

[1] Cheryl Chan, *Vancouver co-founder of Check My Ads takes on Fox News*, Vancouver Sun (June 9, 2022), https://vancouversun.com/news/local-news/check-my-ads-vancouver-cofounder-fox-news.

23.     Check My Ads is a 501(c)(3) tax-exempt corporation organized under the laws of Delaware and purports to be "an independent watchdog reshaping the digital advertising industry."[2]    Defendants Jammi and Atkin reached into Florida and purposefully availed themselves of the privileges of doing business in the State by registering Check My Ads in Florida in October 2023.  Upon information and belief, Defendants Jammi and Atkin have solicited financial donations within Florida and from Florida residents for Check My Ads, benefitting them personally.  Check My Ads' X account (@CheckMyAdsHQ) has nearly 29,000 followers.

**ANSWER**: Defendants admit that Check My Ads is a 501(c)(3) tax-exempt corporation organized under the laws of Delaware. Defendants admit that Check My Ads is an independent watchdog reshaping the digital AdTech industry. Defendants admit that Check My Ads is a registered charity in the state of Florida.  Defendants admit that they have solicited financial donations within Florida and from Florida residents for Check My Ads. Check My Ads currently has approximately 27.4k followers on X. Defendants deny the remaining allegations in Paragraph 23.


24.     Media Matters for America is a nonprofit organization organized under the laws of the District of Columbia with its principal place of business in Washington,

---

[2] Check My Ads, *About*, https://checkmyads.org/about/ (last visited Nov. 28, 2023).

D.C. Media Matters claims to be a "progressive research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in the U.S. media."[3]  On information and belief, Media Matters has worked directly with Defendants in their concerted disinformation campaign aimed at destroying Rumble's business by making false claims to pressure advertisers to stop advertising on Rumble, including by reviewing, editing, and publishing the October 24, 2023 article on CheckMyAds.org, upon which this action is partially based. Indeed, in October 2022, Media Matters published an article similarly focused on how Google Ads ostensibly represented almost half of display ad traffic directing viewers to Rumble's website—basing that claim purportedly upon a non-public report published by Dewey Square, a hyper-partisan public affairs agency itself.[4]

**ANSWER**: Defendants respectfully refer the Court to the October 2022 article, October 24, 2023 article, and other articles referenced in Paragraph 24 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants lack knowledge or information sufficient to form a belief as to the truth of

---

[3] Media Matters for Am., *About Us*, https://www.mediamatters.org/about-us (last visited Nov. 28, 2023).

[4] Kayla Gogarty and Natalie Mathes, *Google's ad network is driving and monetizing traffic to the fringe video-sharing platform Rumble*, Media Matters (October 20, 2022), https://www.mediamatters.org/google/googles-ad-network-driving-and-monetizing-traffic-fringe-video-sharing-platform-rumble (last visited Nov. 28, 2023).

the allegations in the first sentence of Paragraph 24, and on that basis deny them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 24, and on that basis deny them. Defendants deny the remaining allegations in Paragraph 24.

25.     Defendants John Doe Nos. 1–10 are individuals who authored, edited, and published—together with Jammi and Atkin—the defamatory October 24, 2023 article about Rumble on CheckMyAds.org, upon which this action is partially based. Rumble is currently unaware of the names or identities of John Doe Nos. 1–10, and it intends to identify John Doe Nos. 1–10 through discovery in this action.  Upon information and belief, John Does 1–10 are Check My Ads, Media Matters, and/or Dewey Square Group employees.

**ANSWER**: Defendants object to Rumble's claims against fictitious defendants, which are generally not permitted.  Defendants further object to Rumble's lack of diligence in identifying and naming John Does Nos. 1-10 and respectfully submit that those claims should be dismissed.  To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and on that basis deny them.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332 because there exists (and at all times since the commencement of this case has existed) complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Specifically, as pleaded above, Plaintiff Rumble is a citizen of Florida, where it maintains its headquarters and principal place of business, and Delaware, where it is incorporated; Jammi is a citizen of Maryland; and Atkin is a citizen of British Columbia, Canada.

**ANSWER**: To the extent that Paragraph 26 sets forth legal conclusions, no response is required. To the extent that a response is required, Defendants do not contest that this Court has subject matter jurisdiction over this action.

27.     This Court has personal jurisdiction over Defendants pursuant to the U.S. Constitution and Florida's long-arm statute, Fla. Stat. § 48.193. Defendants committed tortious acts within Florida by publishing false and defamatory statements about a Florida-based company that were made accessible to residents of Florida and were in fact accessed and read by Florida residents in Florida.

**ANSWER**: Defendants deny committing tortious acts in Florida by publishing false and defamatory statements about a Florida-based company that were made accessible to residents of Florida and were in fact accessed and read by Florida residents in Florida. To the extent that Paragraph 27 sets forth legal conclusions, no response is required. To the extent that a response is required, Defendants do not

19

contest that this Court has personal jurisdiction over the parties to this action.

28.    For example, while located in Florida, X user @thelumpypotato accessed and viewed the four false and defamatory X posts made by Jammi and Atkin about Rumble at or around the time Defendants published those posts.

**ANSWER**: Defendants deny the allegation that Defendants made four false and defamatory X posts about Rumble. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28, and on that basis deny them.

29.    While located in Florida, Jim Hoft read and accessed the four false and defamatory X posts made by Jammi and Atkin about Rumble at or around the time Defendants published those posts.

**ANSWER**: Defendants deny the allegation that Defendants made four false and defamatory X posts about Rumble. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 29, and on that basis deny them.

30.    While located in Florida, Joe Hoft read and accessed the four false and defamatory X posts made by Jammi and Atkin about Rumble at or around the time Defendants published those posts.

20

**ANSWER**: Defendants deny the allegation that Defendants made four false and defamatory X posts about Rumble. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30, and on that basis deny them.

31.    On information and belief, an individual with the X username @TheKeeper2016 accessed, viewed, and "liked" Jammi's defamatory August 16, 2023 post on X from Florida, which @TheKeeper2016 lists as his location on his X account.

**ANSWER**: Defendants deny the allegation that Defendant Jammi made a defamatory August 16, 2023 post on X. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 31, and on that basis deny them.

32.    On information and belief, individuals with the X usernames @pjitsjustpj, @TheKeeper2016, @_free61, @MIAAgainstFash, @Vollrathian, and @SoFloBri accessed, viewed, and "liked" Jammi's defamatory September 26, 2023 post on X from Florida, which @pjitsjustpj, @TheKeeper2016, @_free61, @MIAAgainstFash, @Vollrathian, and @SoFloBri list as their locations on their X profiles.

**ANSWER**: Defendants deny the allegation that Defendant Jammi made a defamatory September 26, 2023 post on X. Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 32, and on that basis deny them.

33.    On information and belief, individuals with the X usernames @corycandfcp and @hildebran accessed, viewed, reposted, and "liked" Jammi's October 3, 2023 post on X from Florida, which @corycandfcp and @hildebran list as their locations on their X profiles.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33, and on that basis deny them.

34.    On information and belief, individuals with the X usernames @Joanne90364717 and @ScoutsVue accessed, viewed, and reposted Atkin's September 26, 2023 post on X from Florida, which @Joanne90364717 and @ScoutsVue list as their locations on their X profiles.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, and on that basis deny them.

35.    On information and belief, an individual named Max Francisco who, according to his LinkedIn profile, lives in Fort Lauderdale, Florida accessed and viewed the October 24, 2023 article published by Check My Ads. Francisco accessed and "liked" Check My Ads' LinkedIn post, which contained a hyperlink to the article.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and on that basis deny them.

36.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in the Middle District of Florida, and all Defendants are subject to personal jurisdiction in Florida. Rumble's headquarters and principal place of business is in the Middle District of Florida, where it has suffered the brunt of the harm to its reputation and economic injury from Defendants' defamatory statements.  In addition, Defendants' defamatory statements were published and accessed in the Middle District of Florida.

**ANSWER**: To the extent that Paragraph 36 sets forth legal conclusions, no response is required.  To the extent that a response is required, Defendants do not contest that venue is proper in this Court. Defendants deny the remaining allegations in Paragraph 36.

**FACTUAL ALLEGATIONS**

***Rumble Launches a Content-Neutral Video-Sharing Platform as an Alternative to Big Tech.***

37.    Rumble is an online video platform, web hosting, and cloud services business.  From day one, Rumble has publicly sought to differentiate itself from Big Tech.   When Rumble was founded in 2013, incumbent Big Tech platforms

23

deprioritized small content creators in favor of influencers, corporations, and large brands. Rumble sought to provide an alternative platform to empower those small content creators where they could express themselves freely.

**ANSWER**: Defendants admit that Rumble is an online video platform, web hosting and cloud services business that was founded in 2013. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37, and on that basis deny them.

38. Over time, preferencing on social media and video platforms continued to expand and evolve. Big Tech incumbents increasingly employed sophisticated algorithms to amplify certain content creators and censor others. Rumble, by contrast, never took that approach. Unlike incumbent Big Tech platforms, Rumble has never employed black-box algorithms to drive profit or restrict content. Its content policies have always remained consistent and transparent.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38, and on that basis deny them.

39. As Big Tech social platforms have continued to expand censorship policies on user-generated content, Rumble has remained steadfastly and publicly committed to content neutrality. It has created an open platform that welcomes content of all genres.

24

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and on that basis deny them.

40.    Rumble's public commitment to restoring the internet to its roots by making it free and open once again has resonated with users who are fed up with the "cancel culture" running rampant throughout Big Tech, who support diverse opinions and authentic expression, and who recognize the value of and need for open dialogue. In one year, from the third quarter of 2020 to the third quarter of 2021, the number of monthly active users on Rumble increased more than twentyfold, from about 1.6 million to over 36 million.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and on that basis deny them.

### *Rumble Goes Public and Establishes U.S. Headquarters in Florida.*

41.    In December 2021, Rumble announced a business combination with a special purpose acquisition company to take Rumble public.  The combination was successfully completed in September 2022, and Rumble began trading publicly on the Nasdaq Global Market.  The deal provided Rumble with gross proceeds of about $400 million, which has helped Rumble continue to grow and remain competitive with its Big Tech rivals, while remaining true to its core values of content neutrality.  As of the third quarter of 2023, Rumble had an average of approximately 58 million monthly

active users.[5]

**ANSWER**: Defendants admits that Rumble entered into a business combination with a special purpose acquisition company through which Rumble became a publicly traded company on the Nasdaq Global Market.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 41, and on that basis deny them.

42.    In November 2021, Rumble publicly announced that it had signed a lease and would establish its U.S. headquarters in Longboat Key, Florida.  It also announced that it would immediately hire 20 to 25 employees for its U.S. headquarters, with rapid growth planned for the future.  Rumble officially opened its new office in Longboat Key in March 2023.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, and on that basis deny them.

*Jammi Partners With Media Matters to Take Down Media Networks and Personalities with Whom They Disagree Politically.*

43.    In November 2016, Jammi helped launch an anonymous Twitter

---

[5] Rumble, Rumble Reports Third Quarter 2023 Results (Nov. 13, 2023), https://api.mziq.com/mzfilemanager/v2/d/2e1fc959-ad61-4cc5-9c93-6d71e81648f4/bef8dd3c-7c42-fd7d-a08a-94f17d4d565c?origin=1.

campaign using the Twitter account Sleeping Giants to pressure advertisers to drop networks and personalities with which Jammi disagreed politically.  For example, Sleeping Giants went after Breitbart News Network, urging followers to collect screenshots of ads appearing on Breitbart's website and bombarding advertisers with tweets about where their ads were appearing.

**ANSWER**: Defendants deny the first sentence of Paragraph 43.  Defendants respectfully refer the Court to the communications referenced in the second sentence of Paragraph 43 for their true content and meaning.  To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

44.    Eventually, Sleeping Giants teamed up with Media Matters, and together, they set their sights on Fox News—another media outlet whose views they did not share.  They followed the same playbook that Sleeping Giants had used against Breitbart.

**ANSWER**: Defendants deny the allegations of the first sentence of Paragraph 44. Defendants lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44, and on that basis deny them.

45.    Over time, they refined their methods.  Not only were they capturing ads that appeared organically on the sites they sought to take down, but they also

manufactured ad placements they knew advertisers would find problematic—a tactic that Defendants and Media Matters still employ today.  They create fake X profiles and visit sites of particularly controversial content creators, continually refreshing those pages until ads for large brands appear.

**ANSWER**: Defendants deny the allegations of Paragraph 45.

46.    For example, in March 2023, Netflix stopped advertising on Rumble after Media Matters engineered it so that Netflix ads would appear on a user-generated video on Rumble expressing antisemitic views.  Media Matters staff repeatedly refreshed the user-generated video—in some cases, more than 70 times— causing Rumble's advertising system to serve different advertisements until Media Matters found one that it could use as fodder for its public pressure campaign.  As it turned out, the Media Matters employee engaging in this tactic was the only one to actually view the Netflix ad on the video.  And once Rumble learned about this antisemitic content on its platform—a clear violation of Rumble's content moderation policies— it immediately removed the video.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46, and on that basis deny them.

*Using the Same Media Matters and Sleeping Giants Playbook, Defendants Launch a New Online Smear Campaign to Take Down Rumble.*

47.    Jammi and Atkin co-founded the Check My Ads Institute in October 2021, purportedly to serve as a non-profit digital advertising watchdog.  Jammi and Atkin have promised to "rip the beating heart out of the disinformation economy."[6] However, Jammi and Atkin—individually and through Check My Ads—have waged their own disinformation campaign to take down Rumble by spreading lies about Rumble's financial health and its sources of ad revenue—all because Jammi and Atkin disagree with the views of some content creators on Rumble.

**ANSWER**: Defendants admit that Defendants co-founded Check My Ads Institute, a non-profit digital advertising watchdog, and launched in October 2021. Defendants respectfully refer the Court to the statements referenced in Paragraph 47. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants deny the remainder of the allegations in Paragraph 47.

48.    To achieve their objective, Defendants have tried to put public pressure on advertisers to stop doing business with Rumble.  They have encouraged advertisers to "block Rumble from [their] ad campaigns," providing detailed instructions on how

---

[6] Check My Ads, Hey, Check My Ads is 2 years old! (Oct. 27, 2023), https://checkmyads.org/updates/check-my-ads-is-2/.

to do so.[7] And they have urged Google to "drop Rumble[]."[8]

**ANSWER**:  Defendants respectfully refer the Court to the communications referenced in Paragraph 48 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

49.    In an effort to convince Rumble's key stakeholders, including shareholders, putative investors, and advertisers, to "drop Rumble," Defendants have also concocted the false and defamatory narrative that Rumble has lied to investors and stakeholders about its valuation, sources of revenue, and purportedly undisclosed financial risks.

**ANSWER**: Defendants deny the allegations in Paragraph 49.

50.    Specifically, on May 21, 2023, Jammi posted on X (in response to a tweet from Dan Bongino, a content creator on Rumble) that Rumble's multi-billion-dollar valuation was "just a garden variety grift."

**ANSWER**: Defendants respectfully refer the Court to the communication

---

[7] Check My Ads, How to block Rumble from your ad campaigns (Sept. 26, 2023), https://checkmyads.org/branded/how-to-block-rumble-from-your-ad-campaigns/.

[8] Check My Ads, It's not just Russell Brand. Here are other toxic people Rumble is monetizing. (Sept. 28, 2023), https://checkmyads.org/updates/rumble-toxic-influencers-bongino-brand/.

referenced in Paragraph 50 for their true content and meaning. To the extent that such
communications are inconsistent with the allegations of this paragraph, Defendants
deny every inconsistent allegation.

51.    Not only is Jammi's claim false, but it also shows her clear intent to
disseminate misleading information about Rumble.  In support of her false claim that
"there's no multi-billion dollar [sic] valuation" and Rumble is just a "garden variety
grift," Jammi cites to quarterly revenue figures in Rumble's Q1 2023 earnings report.
That is a completely different financial metric than valuation.  Rumble went public
through a business combination agreement with a special purpose acquisition
company sponsored by Cantor Fitzgerald, a respected Wall Street investment bank.
That transaction determined Rumble's enterprise value to be $2.1 billion, with a
potential increase to $3.1 billion if stock price targets are satisfied in the coming years.

**ANSWER**: Defendants respectfully refer the Court to the communications
referenced in Paragraph 51 for their true content and meaning. To the extent that such
communications are inconsistent with the allegations of this paragraph, Defendants
deny every inconsistent allegation. Defendants deny the remaining allegations in
Paragraph 51.

52.    Now that Rumble is publicly traded, its value is easier to determine.  It is
simply Rumble's share price multiplied by the number of shares.  On October 23,

2023—the day before Defendants published their defamatory article on CheckMyAds.org—Rumble's stock closed at $5.15 per share, giving the Company a market capitalization of about $1.44 billion.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52, and on that basis deny them.

53.    On August 16, 2023, Jammi tweeted that Rumble is "not a Google Ads killer … they depend on Google for their business.  We're talking a house of cards."

**ANSWER**: Defendants respectfully refer the Court to the communication referenced in Paragraph 53 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

54.    On September 26, 2023, she made similar claims, posting on X that Rumble "is largely monetized through Google Video Partners."

**ANSWER**: Defendants respectfully refer the Court to the communications referenced in Paragraph 54 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

55.     Later the same day, Rumble's product manager posted on X that Rumble is "fearless" in "pursuit of [its] mission" to "protect a free and open internet." Jammi responded: "I'm pretty sure you're shit scared of losing your Google seller account," underscoring her intent to harm Rumble's business.

**ANSWER**: Defendants respectfully refer the Court to the communications referenced in Paragraph 55 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

56.     A few days later, on October 3, Jammi posted that "[w]ithout @GoogleAds, Rumble would not be viable. ...  It's criminal behavior by Google, which has promised brand safety to its clients."

**ANSWER**: Defendants respectfully refer the Court to the communications referenced in Paragraph 56 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

57.     On September 26, Atkin posted that "Rumble, the most toxic place on the internet, is 90% funded by @GoogleAds." This post also tagged Jammi, an action that would lead to her receiving an alert to her account on X.

**ANSWER**: Defendants respectfully refer the Court to the communications

33

referenced in Paragraph 57 for their true content and meaning. To the extent that such

communications are inconsistent with the allegations of this paragraph, Defendants

deny every inconsistent allegation. Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegation that the publication of this

communication "would lead to [Jammi] receiving an alert to her account on X," and

on that basis deny that allegation.

58.    Upon information and belief, Jammi, Atkin, and John Does 1–10 made

the same claim in an article published by Check My Ads on October 24, 2023. The

article said:

> Rumble is heavily monetized by Google Ads. Rumble loves to
> boast about being free from Big Tech. In reality, the business
> appears to be heavily dependent on Google Ads, by far its largest
> advertising partner — and advertisers often have no idea their
> ads are appearing there. Rumble is part of Google Video
> Partners, which means Google dumps inventory there that many
> advertisers assume is going to YouTube. And it seems to know
> brands wouldn't appreciate appearing next to some of Rumble's
> content: it has taken steps to minimize the risk of advertisers
> waking up to screenshots of their ads next to Alex Jones' face.
> Its two-tier system for ads monetizes the worst videos through
> Rumble Ads, its in-house ad platform, while featuring Google
> Ads on mainstream channels, such as Reuters.[9]

**ANSWER**: Defendants object to Rumble's claims against fictitious defendants,

which are generally not permitted. Defendants further object to Rumble's lack of

---

[9] Check My Ads, 8 Things To Know About Rumble, The Toxic Platform That Will Stream The
GOP Debate (Oct. 24, 2023), https://checkmyads.org/updates/rumble-gop-debate-explainer/.

diligence in identifying and naming John Does Nos. 1-10 and respectfully submit that those claims should be dismissed. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning John Does 1-10, and on that basis deny them. Defendants respectfully refer the Court to the October 24, 2023 article referenced in Paragraph 58 for its true meaning and content. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

59. On information and belief, Jammi and Atkin co-wrote, edited, and published this defamatory article on Check My Ads, along with John Doe Nos. 1– 10.

**ANSWER**: Defendants object to Rumble's claims against fictitious defendants, which are generally not permitted. Defendants further object to Rumble's lack of diligence in identifying and naming John Does Nos. 1-10 and respectfully submit that those claims should be dismissed. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning John Does 1-10, and on that basis deny them. Defendants admit that they edited the October 24, 2023 article referenced in Paragraph 59. Defendants further state that whether they "published" the October 24, 2023 article referenced in Paragraph 59 is a question of law for which no response is required. Defendants deny the remaining allegations of Paragraph 59.

35

60.    On information and belief, John Doe Nos. 1–10 are unidentified employees of Check My Ads, Media Matters for America, and/or Dewey Square Group who also were directly involved in writing, editing and publishing the defamatory October 24, 2023 article.  Indeed, Media Matters published a similar article in October 2022, which claimed that Google Ads was responsible for nearly half of all display ads directing users to Rumble's website.  It did so based upon a non-public Dewey Square Group analysis.  Dewey Square Group itself is a hyper-partisan government and public affairs agency, who upon information and belief, was paid by Media Matters and others for this analysis as part of a broader public affairs attack on Rumble.

**ANSWER**: Defendants object to Rumble's claims against fictitious defendants, which are generally not permitted.  Defendants further object to Rumble's lack of diligence in identifying and naming John Does Nos. 1-10 and respectfully submit that those claims should be dismissed.  To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning John Does 1-10, and on that basis deny them.  Defendants respectfully refer the Court to the communications referenced in Paragraph 60 for their true content and meaning. To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants deny the remaining allegations in Paragraph 60.

***Defendants' Claims that Rumble is 90% Monetized by, and Economically Dependent
Upon, Google Ads are False and Defamatory Per Se.***

61.     Defendants' claims that Rumble is 90% monetized by and is
economically dependent upon Google Ads are false and defamatory.  At the time of
Defendants' claims in August through October 2023, Rumble's ad revenue generated
from Google AdSense was miniscule.  In October 2023, it was less than 1% percent of
the Company's total revenue.

**ANSWER**: Rumble's claim that it was false and defamatory to state that
"Rumble is 90% monetized by and is economically dependent on Google Ads" is a
conclusion of law to which no response is required.  To the extent that a response is
required, Defendants deny that it was false and defamatory to state that Rumble was
90% monetized by and is economically dependent upon Google Ads."  Defendants
lack Defendants lack knowledge or information sufficient to form a belief as to the
truth of the remaining allegations in Paragraph 61, and on that basis deny them.


62.     Defendants' false claims about Rumble's ad revenue imply—as
Defendants intended—that Rumble is susceptible to a material financial risk (i.e., the
risk that Google may decide to pull nearly all Rumble's ad revenue) that simply does
not exist.  As Rumble's public securities filings show, since 2021, the percentage of
revenue Rumble derived from Google Ads has fallen dramatically.  In the first three

quarters of 2021, revenue from Google Ads was about 86% of Rumble's total revenue. In October 2023, it was less than 1%.  That number continues to shrink as Rumble's own ad marketplace, the Rumble Advertising Center, expands.

**ANSWER**: Defendants deny the allegations in the first sentence of Paragraph 62. Defendants respectfully refer the Court to the public securities filings referenced in Paragraph 62 for their true content and meaning.  To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 62, and on that basis deny them.


63.    Google Ads now accounts for such a small percentage of Rumble's overall revenue that, even if Google Ads were to drop Rumble, Rumble's financial health would remain strong and its financial outlook bright.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63, and on that basis deny them.


64.    Defendants' claims about the size of Rumble's ad revenue derived from Google falsely suggest that Defendants' own attacks against the Company pose an existential financial threat that simply does not exist.  Although Defendants' mission is to destroy Rumble by pressuring Google to demonetize it, such a loss would account

38

for less than 1% of Rumble's gross revenue.

**ANSWER**: The first sentence of Paragraph 64 contains conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny those allegations.  Defendants deny the remaining allegations of Paragraph 64.

65.    Defendants' claims that Rumble is economically dependent on Google Ads and derives 90% of its ad revenue from Google are defamatory per se because they falsely impute to Rumble a characteristic and condition that is incompatible with the proper exercise of Rumble's business, trade, mission, and brand.  Since its inception, Rumble's publicly stated mission has been to free itself—and its users— from the shackles of Big Tech's censorship and dominance in the U.S. economy.  (To that end, Rumble filed an antitrust lawsuit against Google in January 2021; that lawsuit is ongoing.) And that distinction has been a significant factor in Rumble's economic success, including successfully going public in September 2022, because Rumble's users, shareholders, and investors share Rumble's commitment to independence from Big Tech.  Defendants' false claims have diminished Rumble's brand in the eyes of its users, shareholders, putative investors, and a substantial and respectable minority of Florida's citizenry.

**ANSWER**: The first and last sentences of Paragraph 65 contain conclusions of law to which no response is required.  To the extent that a response is required, Defendants deny those allegations.  Defendants admit that Rumble filed an antitrust

39

lawsuit against Google in January 2021 and that lawsuit is ongoing.  Defendants lack

knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 65, and on that basis deny them.


66.    Rumble reported in the Form 10-Q it filed publicly with the SEC in

November 2022 that revenue generated from Google AdSense and another external

advertising network was only about 19% of Rumble's total revenue—not 90% as Atkin

claimed.  In fact, the percentage of ad revenue derived solely from Google AdSense in

Q3 2022 was only 9%.  That percentage has fallen even further as Rumble has begun

rolling out the Rumble Advertising Center, a technologically advanced advertising

marketplace that will allow Rumble to scale advertising revenue through automation

and improve the experience for its advertisers.  Accordingly, Defendants' statements

are defamatory per se because they also accuse Rumble of criminal misconduct—

falsely implying that Rumble committed securities fraud by lying to investors and to

the SEC when it reported in public SEC filings at the end of 2022 that revenue from

Google AdSense and another external advertising network was only 19% of the

company's overall revenue and by failing to report revenue from Google AdSense

separately after that quarter.

**ANSWER**: The last sentence of Paragraph 66 contains conclusions of law to

which no response is required.  To the extent that a response is required, Defendants

deny those allegations.  Defendants respectfully refer to the Court to the November

2022 SEC filing and other communications referenced in Paragraph 65 for their true content and meaning.  To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66, and on that basis deny them.

### Jammi and Atkin Published Their Statements With Actual Malice: They Knew Rumble was not Largely Monetized by Google Ads—Because Rumble Told Them.

67.    Defendants claim to be dismantling disinformation.  But in reality, they are peddling false claims that support their agenda—taking down Rumble.  Rumble has told Jammi directly that revenue from Google Ads and another external advertising network represented less than 20% of the Company's overall ad revenue.  On December 26, 2022, Rumble replied to a tweet Jammi posted on X, informing her that "[t]he top two external ad networks Rumble uses, which includes Google, represent less than 20% of our revenue in Q3." Jammi responded: "Phew! Y'all are surprisingly into facts for a company that exists just to stream conspiracy theorists who've been kicked off YouTube.  But noted.  Thanks."[10] On information and belief, Jammi shared this information with Atkin, who follows Jammi's account on X, and Atkin independently saw Rumble and Nandini's exchange on X.

_____

[10] Nandini Jammi (@nandoodles), X (Dec. 26, 2022, 2:26 PM), https://twitter.com/nandoodles/status/1607457943569551366.

41

**ANSWER**: Defendants respectfully refer to the Court to the communications referenced in Paragraph 67 for their true content and meaning.  To the extent that such communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants deny the remaining allegations in Paragraph 67, and on that basis deny them.

68.    Jammi and Atkin also knew that their claims were false because, upon information and belief, they reviewed the similarly focused, October 2022 Media Matters article, Google's ad network is driving and monetizing traffic to the fringe video-sharing platform Rumble, which states expressly that "Google's ad network made up [only] 2% of total advertiser spending on Rumble.com in the last year."[11] Upon information and belief, Jammi and Atkin have been working directly with Media Matters and Dewey Square Group as part of a broader public affairs campaign to target Rumble, and, as a result, have reviewed this article and the non-public Dewey Square Group and Pathmatics analyses upon which it is based.

**ANSWER**: Defendants respectfully refer to the Court to the communications referenced in Paragraph 68 for their true content and meaning.  To the extent that such

---

[11] Kayla Gogarty and Natalie Mathes, *Google's ad network is driving and monetizing traffic to the fringe video-sharing platform Rumble*, Media Matters (October 20, 2022) (citing Pathmatics), https://www.mediamatters.org/google/googles-ad-network-driving-and-monetizing-traffic-fringe-video-sharing-platform-rumble (last visited Nov. 28, 2023).

communications are inconsistent with the allegations of this paragraph, Defendants

deny every inconsistent allegation. Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 68,

and on that basis deny them. Defendants deny the remaining allegations in Paragraph

68.

*Jammi and Atkin Published Their Statements With Actual Malice:*
*They Published Them With Ill Will, to Promote a Preconceived Narrative that Rumble is*
*"Toxic," With Purposeful Avoidance of Obvious Sources of Readily Available*
*Information, With a Financial Motive to Profit Off Their Defamation, and Without*
*Adhering to Journalistic Standards.*

69.    Since the December 2022 exchange, Defendants have continued their

disinformation campaign against Rumble, including by repeating the statements at

issue. The reason is obvious: Defendants have made clear that their goal is to destroy

Rumble regardless of the facts. Defendants knowingly or recklessly disregarded the

truth about Rumble because of their extreme ill will and contempt for Rumble.

Defendants' ill will is obvious on the face of their posts and other statements about the

Company, which they routinely refer to as "toxic." For example, Jammi has posted

the following:

**ANSWER**: Defendants respectfully refer to the Court to the communications

referenced in Paragraph 69 for their true content and meaning. To the extent that such

communications are inconsistent with the allegations of this paragraph, Defendants

deny every inconsistent allegation. The remaining allegations of Paragraph 69 contain

legal conclusions that do not require a response.    To the extent that a response is

required, Defendants deny the remaining allegations in Paragraph 69.


70.    Not only were Defendants motivated by ill will toward Rumble, but they

also purposefully ignored facts in obvious, reliable sources of information about the

Company.    Defendants recklessly disregarded information in Rumble's publicly

available SEC filings that contradicted their preconceived narrative that Rumble is

heavily dependent on Google Ads.  On information and belief, Defendants read these

filings, but they purposefully omitted from their statements material information that

contradicted the story they set out to tell—that Rumble is a "house of cards" built on

Google Ads and economically fragile to the interference Jammi and Atkin intended to

achieve in Rumble's relationship with Google.

**ANSWER**: Defendants respectfully refer to the Court to the SEC filings and

communications referenced in Paragraph 70 for their true content and meaning.  To

the extent that such SEC filings and communications are inconsistent with the

allegations of this paragraph, Defendants deny every inconsistent allegation.  The

remaining allegations of Paragraph 70 contain legal conclusions that do not require a

response.    To the extent that a response is required, Defendants deny the remaining

allegations in Paragraph 70.


71.    Over time, Rumble's SEC filings demonstrated an ever-decreasing

amount of revenue from Google Ads which became so de minimus (and thus not a
material financial risk) that it was excluded from Rumble's SEC filings after Q3 2022.
Prior to Defendants' statements, the most recent public information about Rumble's
advertising revenue was its November 2022 Form 10-Q, which states that revenue
generated from Google AdSense and another external advertising network was only
about 19% of Rumble's total revenue.[12]  The percentage attributable to Google
AdSense alone was only 9%.  On information and belief, Defendants were aware of
the information in Rumble's November 2022 Form 10-Q that contradicted their false
statement because they have reviewed this and other of Rumble's publicly available
SEC filings, such as Rumble's 2023 Q1 earnings report.  On information and belief,
Defendants were also aware of the decreasing trend of external advertising revenue
supporting Rumble's business prior to their false statements.  On May 21, 2023, Jammi
responded to a tweet from Dan Bongino noting that she "checked out Rumble's Q1
2023 earnings report."

    **ANSWER**: Defendants respectfully refer to the Court to the SEC filings and
communications referenced in Paragraph 71 for their true content and meaning.  To
the extent that such SEC filings and communications are inconsistent with the
allegations of this paragraph, Defendants deny every inconsistent allegation.

---

[12] Form 10-Q, Rumble Inc. (Nov. 14, 2022), available at
https://api.mziq.com/mzfilemanager/v2/d/2e1fc959-ad61-4cc5-9c93-6d71e81648f4/567c0117-
9ff3-9c18-1207-e6eda85ad284?origin=1.

Defendants admit that they were aware that advertisers were leaving Rumble upon discovering that their ads served through opaque exchanges such as Google Ads were appearing on Rumble. The remaining allegations of Paragraph 71 contain legal conclusions that do not require a response. To the extent that a response is required, Defendants deny the remaining allegations in Paragraph 71.

72. The same day, she also tweeted a screenshot from Rumble's Q1 2023 earnings report. And she falsely claimed that much of Rumble's year-over-year increase in revenue was from "GOOGLE ADS, which [Rumble] so deliciously claim[s] to have ditched."

**ANSWER**: Defendants respectfully refer to the Court to the communications referenced in Paragraph 72 for their true content and meaning. To the extent that such SEC filings and communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

73. In addition to their animus toward Rumble, Defendants had a financial motive to defame the Company. Check My Ads is a 501(c)(3) tax-exempt corporation that relies on soliciting donations to fund its operations. It is funded by grants, charitable foundations, and individual donors. Defendants' salacious and widespread disinformation campaigns against companies like Rumble are critical for attracting the donors necessary to sustain Check My Ads' existence.

**ANSWER**: Defendants admit the allegations that Check My Ads is a 501(c)(3) tax-exempt company funded by grants, charitable foundations, and individual donors. Defendants deny the remaining allegations in Paragraph 73.

74.     Finally, Defendants failed to abide by basic journalistic standards in researching, writing, and publishing the October 24, 2023 article, which Defendants describe as a "news article." Because this was a "news article," Defendants should have adhered to standards of ethical and professional journalism, which require journalists to, among other things, "[d]iligently seek subjects of news coverage to allow them to respond to criticism or allegations of wrongdoing," "[v]erify information before releasing it," "[n]ever deliberately distort facts or context," and "[a]cknowledge mistakes and correct them promptly and prominently."[13] Here, Defendants failed to contact Rumble for comment prior to publication of the October 24, 2023 article, omitted material facts provided to them by Rumble that were readily and publicly available including in Rumble's SEC filings, deliberately included information they knew to be false to bolster their preconceived take-down narrative, and refused to correct or acknowledge that their statements were false.

**ANSWER**: Defendants admit that the October 24, 2023 article is a news article,

---

[13] Soc'y of Pro. Journalists, SPJ Code of Ethics (Sept. 6, 2014), https://www.spj.org/ethicscode.asp.

that they did not contact Rumble for comment prior to publishing the October 24, 2023 article and they declined to update or correct the article in response to Rumble's retraction demand.  Except to the extent expressly admitted, Defendants deny the allegations of Paragraph 74.

### *Jammi and Atkin Acted With Actual Malice Because They Refused Rumble's Demand To Retract Their False Statements.*

75.    On October 26, 2023, Rumble's legal counsel sent Jammi and Atkin a letter informing them that their statements are false and defamatory.  Specifically, the letter explained that, as "Rumble reported in the Form 10-Q it filed publicly with the SEC in November 2022[,] ... revenue generated from Google AdSense was only about 19% of Rumble's total revenue," and "[t]hat percentage has fallen even further as Rumble has begun rolling out the Rumble Advertising Center."

**ANSWER**: Defendants respectfully refer to the Court to the letter referenced in Paragraph 75 for its true content and meaning.  To the extent that this letter is inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

76.    As such, Rumble's counsel demanded that Jammi and Atkin take down their September 26, 2023 tweets falsely claiming that Rumble is "largely monetized through Google Video Partners" and "90% funded by @GoogleAds." Rumble's

counsel also demanded that Jammi and Atkin retract the false claims in the October

24, 2023 article published on Check My Ads, including that "Rumble is heavily

monetized by Google Ads," and Rumble "appears to be heavily dependent on Google

Ads, by far its largest advertising partner."

**ANSWER**: Defendants respectfully refer to the Court to the letter referenced in

Paragraph 76 for its true content and meaning.   To the extent that this letter is

inconsistent with the allegations of this paragraph, Defendants deny every inconsistent

allegation.

77.    Defendants know how to correct the public record when they want to.

In August 2021, Rumble notified Jammi that she had posted inaccurate information

on Twitter.  She responded by sharing the correct information publicly:

**ANSWER**: Defendants respectfully refer to the Court to the communications

referenced in Paragraph 77 for its true content and meaning.  To the extent that those

communications are inconsistent with the allegations of this paragraph, Defendants

deny every inconsistent allegation.

78.    They have refused to do so here.  Rather, Atkin used the opportunity to

reemphasize the accuracy of her false statement.   On November 21, 2023, Atkin

doubled down, posting on X that "[t]o clarify, approximately 90% of Rumble's

programmatic display ad revenue comes from @GoogleAds." This statement was a

reply to Atkin's original September 26 tweet.  It came nearly a month after Atkin received Rumble's unambiguous retraction demand letter, in which Rumble informed Atkin that Google Ads did not make up a significant portion of its ad revenue.  Atkin's attempt to qualify her original statement as referring only to "programmatic display" ad revenue was not a correction, but rather an admission that she had the facts wrong. Google Ads does not make up 90% of Rumble's programmatic display ad revenue. Had Atkin engaged with Rumble, the Company would have told her this.  Indeed, Defendants have had ample opportunity to engage with Rumble and learn about the Rumble's own advertising system that now provides the Company with advertising revenue.  Instead, rather than meaningfully retracting or correcting her original statement and setting the record straight, Atkin chose to repeat her false claims, amplifying the harm to Rumble.  And Defendants' refusal to retract their statements is additional evidence of their malicious intent toward Rumble.

**ANSWER**: Defendants respectfully refer to the Court to the communications referenced in Paragraph 78 for their true content and meaning.  To the extent that those communications are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation. Defendants lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 78, and on that basis deny them.

*Defendants' False Statements Have Harmed Rumble's Business and Reputation.*

79.    Defendants' concerted and coordinated smear campaign is having its
desired effect.  Defendants' false assertions that Rumble is heavily dependent on and
90% monetized by Google Ads, and that it has lied to and misled stakeholders about
its sources of ad revenue and overall financial health have caused substantial harm to
Rumble's reputation and damaged its brand.  Defendants' false and defamatory
campaign has created uncertainty with Rumble's users and creators, as well as sowed
confusion with advertisers on the Rumble Advertising Center.

**ANSWER**: Defendants deny the allegations in Paragraph 79.


80.    Beyond this irreparable reputational harm, Rumble's business has
suffered economically.  As Defendants have boasted, major advertisers have dropped
Rumble.  And putative advertisers have avoided purchasing ads through the Rumble
Advertising Center because they are less willing to buy ads when they perceive risk of
Jammi, Atkin, and Media Matters publicly shaming and targeting them for their ads
appearing on Rumble's website.

**ANSWER**: Defendants respectfully refer to the Court to the communications
concerning Defendants "boast[s]" that "major advertisers have dropped Rumble" for
their true content and meaning.   To the extent that these communications are
inconsistent with the allegations of this paragraph, Defendants deny every inconsistent
allegation.  Defendants lack knowledge and information sufficient to form a belief as

to the truth of the remaining allegations in Paragraph 80, and on that basis deny them.

81.    Rumble's stock price also fell nearly 13% in the week following Defendants' publication of their defamatory October 24, 2023 article about Rumble on CheckMyAds.org.  On October 23, 2023, Rumble's stock price closed at $5.15. One week later, Rumble's stock price had fallen to $4.49.  As a result of the stock price decrease, Rumble's market capitalization fell by nearly $185 million (from $1.443 billion to $1.258 billion).

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81, and on that basis deny them.

82.    Rumble has also incurred special damages trying to mitigate, as best it can, the harm caused by Defendants' defamation.  These damages were a foreseeable and normal consequence of Defendants' tortious conduct, and that conduct was a substantial factor in bringing about these expenses.  For example, Rumble has spent more than $37,122.50 in legal fees to outside counsel in connection with its efforts to educate Defendants and request that Defendants retract their false and defamatory statements—a request that Defendants have refused.  Further, Rumble spent another $10,000 on a public relations consultant to mitigate damages directly connected to Defendants' false statements.  That work is ongoing.  These fees are separate from and in addition to the substantial sums Rumble has spent, and will have to spend, on this

litigation.

**ANSWER**: Paragraph 82 states legal conclusions that do not require a response. To the extent that a response is required, Defendants deny the allegations in Paragraph 82.

## COUNT I – DEFAMATION
## (AGAINST ALL DEFENDANTS)

83.     Plaintiff repeats and alleges paragraphs 1–82 as if set forth fully herein.

**ANSWER**: Defendants incorporate all prior paragraphs of this Answer to Rumble's Amended Complaint.

84.     Defendants made the following false and defamatory statements of fact about Rumble on X and CheckMyAds.org.

   a.     On August 16, 2023, Jammi wrote on X that "Rumble is all posturing, all the time.  They're not a Google Ads killer or even close to it – they depend on Google for their business.  We're talking a house of cards."[14]

   b.     On September 26, 2023, Jammi wrote on X that "@rumblevideo is largely monetized through Google Video Partners (GVP), a network of sites that Google forcibly opts YouTube advertisers into."[15]

---

[14] Nandini Jammi (@nandoodles), X (Aug. 16, 2023, 12:32 PM), https://twitter.com/nandoodles/status/1691850380315951463.

[15] Nandini Jammi (@nandoodles), X (Sept. 26, 2023, 7:36 PM), https://twitter.com/nandoodles/status/1706814986461311430.

c.    On September 26, 2023, Atkin wrote on X that "Rumble, the most toxic place on the internet, is 90% funded by @GoogleAds. But the advertisers using Google didn't know! Until now."[16]

d.    On October 3, 2023, Jammi wrote on X that "Without @GoogleAds, Rumble would not be viable. ... It's criminal behavior by Google, which has promised brand safety to its clients."[17]

e.    On October 24, 2023, Defendants published on CheckMyAds.org an article falsely claiming that: "Rumble is heavily monetized by Google Ads. Rumble loves to boast about being free from Big Tech. In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner — and advertisers often have no idea their ads are appearing there. Rumble is part of Google Video Partners, which means Google dumps inventory there that many advertisers assume is going to YouTube. And it seems to know brands wouldn't appreciate appearing next to some of Rumble's content: it has taken steps to minimize the risk of advertisers waking up to screenshots of their ads next to Alex Jones' face. Its two-tier system for ads monetizes the worst videos through Rumble Ads, its in-house ad platform, while featuring Google Ads on mainstream channels, such as Reuters."[18]

**ANSWER**: Paragraph 84 states legal conclusions that do not require a response.

To the extent that a response is required, Defendants respectfully refer the Court to the

statements referenced in Paragraph 84 for their true content and meaning. To the

extent that those statements are inconsistent with the allegations of this paragraph,

---

[16] Claire Atkin (@catthekin), X (Sept. 26, 2023, 7:43 PM), https://twitter.com/catthekin/status/1706816841061179478.

[17] Nandini Jammi (@nandoodles), X (Oct. 3, 2023, 1:02 PM),

https://twitter.com/nandoodles/status/1709252496466575691.

[18] Check My Ads, *8 Things To Know About Rumble, The Toxic Platform That Will Stream The GOP Debate* (Oct. 24, 2023), https://checkmyads.org/updates/rumble-gop-debate-explainer/.

Defendants deny every inconsistent allegation.

85.    Defendants' statements are reasonably understood to be statements of fact about Rumble, and those statements were understood by people who saw, heard, and read them to be statements of fact about Rumble.  Defendants and Check My Ads purport to be digital advertising watchdogs, suggesting to readers that their publications and pronouncements are researched, reliable, and based on facts.

**ANSWER**: Paragraph 85 states legal conclusions that do not require a response.  To the extent that a response is required, Defendants respectfully refer the Court to the statements referenced in Paragraph 85 for their true content and meaning.  To the extent that those statements are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

86.    Defendants' statements convey, and are reasonably understood to convey, that Rumble's business is largely dependent on Big Tech (i.e., Google Ads), that its heavy reliance on Google Ads exposes Rumble to a material financial risk, and that Rumble has misled investors and other stakeholders by reporting false information about its financial health and sources of ad revenue in public securities filings.

**ANSWER**: Paragraph 86 states legal conclusions that do not require a response. To the extent that a response is required, Defendants respectfully refer the Court to the statements referenced in Paragraph 86 for their true content and meaning.  To the

extent that those statements are inconsistent with the allegations of this paragraph,
Defendants deny every inconsistent allegation.

87.    Defendants' statements are false.  Rumble is not "largely" or "heavily"
monetized by Google.  Nor is it "90% funded" by Google Ads.  It is not reliant on
Google as a going concern.  As set forth above in detail, the fact that Rumble receives
only a small fraction of its revenue from Google Ads is widely and publicly known.
Rumble publicly reported in its SEC filings in November 2022, and Rumble told
Jammi directly in late 2022, that Rumble received less than 20% of its ad revenue from
Google and another external advertising network.  In fact, in October 2023, it was less
than 1%.  Rumble's business is not dependent on Google Ads.  Rumble is not
vulnerable to a material financial risk if it were to be dropped from Google Ads.  And
Rumble has never lied to or misled its investors.

**ANSWER**: Paragraph 87 states legal conclusions that do not require a response.
To the extent that a response is required, Defendants respectfully refer the Court to the
statements and SEC filings referenced in Paragraph 87 for their true content and
meaning.  To the extent that those documents are inconsistent with the allegations of
this paragraph, Defendants deny every inconsistent allegation.  Defendants lack
knowledge and information sufficient to form a belief as to the truth of the remaining
allegations in Paragraph 87, and on that basis deny them.

88.    Defendants' statements are defamatory—and at least a substantial and
respectable minority of the community understood them to be defamatory—because
they expose Rumble to hatred, ridicule, or contempt; tend to injure Rumble in its
business and reputation; and charge that Rumble committed a crime.  Any statement
that Rumble is largely dependent on Big Tech platforms like Google Ads harms
Rumble's business reputation and damages its brand, particularly with content
creators and users who seek out neutral social media platforms.  Likewise, any
statement that Rumble made false statements in securities filings, or otherwise misled
investors and other stakeholders, injures Rumble's business and reputation, and falsely
accuses Rumble of criminal conduct.

**ANSWER**: Paragraph 88 states legal conclusions that do not require a response.
To the extent that a response is required, Defendants respectfully refer the Court to the
statements referenced in Paragraph 88 for their true content and meaning.  To the
extent that those documents are inconsistent with the allegations of this paragraph,
Defendants deny every inconsistent allegation.


89.    Defendants' false statements that Rumble is susceptible to a material
financial risk because of its heavy reliance on Google Ads are defamatory per se
because they improperly call into question Rumble's financial soundness which tends
to injure Rumble in its business.

**ANSWER**: Paragraph 89 states legal conclusions that do not require a response.

To the extent that a response is required, Defendants respectfully refer the Court to the statements referenced in Paragraph 89 for their true content and meaning. To the extent that those documents are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

90.     Defendants' false statements accusing Rumble of lying to investors are defamatory per se because they impute to Rumble an infamous crime—specifically, securities fraud—and they impute to Rumble conduct incompatible with the proper execution of lawful business.

**ANSWER**: Paragraph 90 states legal conclusions that do not require a response. To the extent that a response is required, Defendants respectfully refer the Court to the statements referenced in Paragraph 90 for their true content and meaning. To the extent that those documents are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

91.     As a direct and foreseeable result of Defendants' false and defamatory statements, Rumble has suffered significant reputational and economic harm as detailed above. Defendants have bragged about causing this harm, noting that their disinformation campaign has spurred advertisers to drop Rumble. In addition, Rumble has been forced to expend more than $37,122.50 in legal fees and $10,000 to hire a public relations firm to try to mitigate the harm caused by Defendants' libelous

smear campaign.  And Rumble's market capitalization has decreased by nearly $185 million.  The overall monetary value of the harm caused by Defendants' defamation exceeds $75,000.

**ANSWER**: Paragraph 91 states legal conclusions that do not require a response. To the extent that a response is required, Defendants respectfully refer the Court to the "bragg[ing]" statements referenced in Paragraph 91 for their true content and meaning. To the extent that those documents are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.  Defendants deny the remaining allegations of Paragraph 91.

92.    Defendants had no applicable privilege or legal authorization to publish their defamatory statements or, if they did, abused that privilege.

**ANSWER**: Paragraph 92 states legal conclusions that do not require a response. To the extent that a response is required, Defendants deny the allegations in Paragraph 92.

93.    Defendants published their defamatory statements with actual malice. Defendants knew their statements were false when they made them, or recklessly disregarded the truth or falsity of their statements.  Specifically, Defendants acted with actual malice because: (1) Rumble informed Jammi directly more than a year before Defendants published their false and defamatory statements that revenue from Google

Ads, combined with revenue from a second external advertising network, was less than 20% of Rumble's overall ad revenue; (2) Defendants ignored obvious sources of information—including Rumble's publicly available securities filings— that contradicted the narrative they concocted to take down Rumble; (3) Defendants were motivated by hostility and ill will toward Rumble because Rumble allows content creators to express views on the platform contrary to Defendants' partisan political agenda; (4) Defendants had a financial motive to publish defamatory falsehoods about Rumble; (5) Defendants refused to retract or correct their false and defamatory statements; and (6) Defendants failed to adhere to journalistic standards in researching, writing, and publishing their October 24, 2023 "news article."

**ANSWER**: Defendants deny the allegations in Paragraph 93.


## COUNT II – DEFAMATION BY IMPLICATION (AGAINST ALL DEFENDANTS)

94.     Plaintiff repeats and alleges paragraphs 1–82 as if set forth fully herein.

**ANSWER**: Defendants incorporate all prior paragraphs of this Answer to Rumble's Amended Complaint.


95.     Defendants made a series of false statements of fact about Rumble on X and CheckMyAds.org that were reasonably capable of sustaining an incorrect and defamatory implication.  Specifically, Defendants juxtaposed the following statements

of fact to imply a defamatory connection between them or otherwise create a defamatory implication:

    a.    On August 16, 2023, Jammi wrote on X that "Rumble is all posturing, all the time. They're not a Google Ads killer or even close to it – they depend on Google for their business. We're talking a house of cards."[19]

    b.    On September 26, 2023, Jammi wrote on X that "@rumblevideo is largely monetized through Google Video Partners (GVP), a network of sites that Google forcibly opts YouTube advertisers into."[20]

    c.    On September 26, 2023, Atkin wrote on X that "Rumble, the most toxic place on the internet, is 90% funded by @GoogleAds. But the advertisers using Google didn't know! Until now."[21]

    d.    On October 3, 2023, Jammi wrote on X that "Without @GoogleAds, Rumble would not be viable. ... It's criminal behavior by Google, which has promised brand safety to its clients."[22]

    e.    On October 24, 2023, Defendants published on CheckMyAds.org an article falsely claiming that: "Rumble is heavily monetized by Google Ads. Rumble loves to boast about being free from Big Tech. In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner — and advertisers often have no idea their ads are appearing there. Rumble is part

---

[19] Nandini Jammi (@nandoodles), X (Aug. 16, 2023, 12:32 PM), https://twitter.com/nandoodles/status/1691850380315951463.

[20] Nandini Jammi (@nandoodles), X (Sept. 26, 2023, 7:36 PM), https://twitter.com/nandoodles/status/1706814986461311430.

[21] Claire Atkin (@catthekin), X (Sept. 26, 2023, 7:43 PM), https://twitter.com/catthekin/status/1706816841061179478.

[22] Nandini Jammi (@nandoodles), X (Oct. 3, 2023, 1:02 PM), https://twitter.com/nandoodles/status/1709252496466575691.

of Google Video Partners, which means Google dumps inventory there that many advertisers assume is going to YouTube.  And it seems to know brands wouldn't appreciate appearing next to some of Rumble's content: it has taken steps to minimize the risk of advertisers waking up to screenshots of their ads next to Alex Jones' face.  Its two-tier system for ads monetizes the worst videos through Rumble Ads, its in-house ad platform, while featuring Google Ads on mainstream channels, such as Reuters."[23]

**ANSWER**: Paragraph 95 states legal conclusions that do not require a response. To the extent that a response is required, Defendants respectfully refer the Court to the statements referenced in Paragraph 95 for their true content and meaning.  To the extent that those statements are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.


96.    Defendants juxtaposed these series of statements to imply—and their statements were reasonably understood to imply—(1) that Rumble's heavy reliance on Google Ads exposes Rumble to a material financial risk and (2) that Rumble has misled investors and other stakeholders by reporting false information about its financial health and sources of ad revenue in public securities filings.

**ANSWER**: Paragraph 96 states legal conclusions that do not require a response. To the extent that a response is required, Defendants respectfully refer the Court to the statements referenced in Paragraph 96 for their true content and meaning.  To the

---

[23] Check My Ads, *8 Things To Know About Rumble*, The Toxic Platform That Will Stream The GOP Debate (Oct. 24, 2023), https://checkmyads.org/updates/rumble-gop-debate-explainer/.

extent that those statements are inconsistent with the allegations of this paragraph,
Defendants deny every inconsistent allegation.

97.    Defendants' statements and their implications are false.  As set forth
above in detail, more than a year ago, Google Ads and another external advertising
network accounted for 19% of Rumble's revenue, and Rumble received less than 1%
of its revenue from Google Ads in October 2023.  The fact that Rumble receives a
small percentage of its revenue from Google Ads has been publicly reported in
Rumble's SEC filings, and Rumble told Jammi directly in late 2022 that it receives less
than 20% of its ad revenue from Google and a second external advertising network.
As such, Rumble is not vulnerable to a material financial risk were Google Ads to drop
it.  And Rumble has never lied to or misled its investors.

**ANSWER**: Paragraph 97 states legal conclusions that do not require a response.
To the extent that a response is required, Defendants respectfully refer the Court to the
statements and SEC filings referenced in Paragraph 97 for their true content and
meaning.  To the extent that those documents are inconsistent with the allegations of
this paragraph, Defendants deny every inconsistent allegation.  Defendants lack
knowledge and information sufficient to form a belief as to the truth of the remaining
allegations in Paragraph 97, and on that basis deny them.

98.    Defendants' statements and their implications are defamatory—and at

least a substantial and respectable minority of the community understood them to be

defamatory—because they expose Rumble to hatred, ridicule, or contempt; tend to

injure Rumble in its business and reputation; and charge that Rumble committed a

crime.

**ANSWER**: Paragraph 98 states legal conclusions that do not require a response.

To the extent that a response is required, Defendants respectfully refer the Court to the

statements referenced in Paragraph 98 for their true content and meaning.  To the

extent that those documents are inconsistent with the allegations of this paragraph,

Defendants deny every inconsistent allegation.


99.    Defendants' false implications that Rumble is susceptible to a material

financial risk because of its heavy reliance on Google Ads are defamatory per se

because they improperly call into question Rumble's financial soundness, which tends

to injure Rumble in its business.

**ANSWER**: Paragraph 99 states legal conclusions that do not require a response.

To the extent that a response is required, Defendants respectfully refer the Court to the

statements referenced in Paragraph 99 for their true content and meaning.  To the

extent that those documents are inconsistent with the allegations of this paragraph,

Defendants deny every inconsistent allegation.


100.   Defendants' false implications accusing Rumble of lying to investors are

defamatory per se because they impute to Rumble an infamous crime– specifically, securities fraud—and they impute to Rumble conduct incompatible with the proper execution of lawful business.

**ANSWER**: Paragraph 100 states legal conclusions that do not require a response. To the extent that a response is required, Defendants respectfully refer the Court to the statements referenced in Paragraph 100 for their true content and meaning. To the extent that those documents are inconsistent with the allegations of this paragraph, Defendants deny every inconsistent allegation.

101.    As a direct and foreseeable result of Defendants' false and defamatory statements and their implications, Rumble has suffered significant reputational and economic harm as detailed above. Defendants have bragged about causing this harm, noting that their disinformation campaign has spurred advertisers to drop Rumble. In addition, Rumble has been forced to expend more than $37,122.50 in legal fees and $10,000 to hire a public relations firm to try to mitigate the harm caused by Defendants' libelous smear campaign. And Rumble's market capitalization has decreased by nearly $185 million. The overall monetary value of the harm caused by Defendants' defamation exceeds $75,000.

**ANSWER**: Paragraph 101 states legal conclusions that do not require a response. To the extent that a response is required, Defendants respectfully refer the Court to the "bragg[ing]" statements referenced in Paragraph 101 for their true content

and meaning.  To the extent that those documents are inconsistent with the allegations

of this paragraph, Defendants deny every inconsistent allegation.  Defendants deny

the remaining allegations of Paragraph 101.

102.   Defendants had no applicable privilege or legal authorization to publish

their defamatory statements or implications or, if they did, abused that privilege.

**ANSWER**: Paragraph 102 states legal conclusions that do not require a

response.  To the extent that a response is required, Defendants deny the allegations

in Paragraph 102.

103.   Defendants published their defamatory statements and implications with

actual malice.  Defendants knew their statements and implications were false when

they made them, or recklessly disregarded the truth or falsity of their statements.

Specifically, Defendants acted with actual malice because: (1) Rumble informed

Jammi directly more than a year before Defendants published their false and

defamatory statements that revenue from Google Ads and another external advertising

network was less than 20% of Rumble's overall ad revenue; (2) Defendants ignored

obvious sources of information—including Rumble's publicly available securities

filings—that contradicted the narrative they concocted to take down Rumble; (3)

Defendants were motivated by hostility and ill will toward Rumble because Rumble

allows content creators to express views on the platform contrary to Defendants'

66

partisan political agenda; (4) Defendants had a financial motive to publish defamatory falsehoods about Rumble; (5) Defendants refused to retract or correct their false and defamatory statements; and (6) Defendants failed to adhere to journalistic standards in researching, writing, and publishing their October 24, 2023 "news article."

**ANSWER**: Defendants deny the allegations in Paragraph 103.

## GENERAL DENIAL

Each numbered paragraph in this Answer responds to the identically numbered paragraph in the Complaint. Defendants deny all allegations, declarations, claims, or assertions in the Complaint that are not specifically admitted in this Answer. To the extent the headings contained in the Complaint constitute allegations, such allegations are denied.

## AFFIRMATIVE DEFENSES

By alleging the Defenses set forth below, Defendants are not in any way acknowledging or conceding that it has the burden of proof on any issue or defense as to which applicable law places the burden on Rumble. The defenses are pleaded in the alternative, are raised to preserve Defendants' right to assert such defenses and are raised without prejudice to Defendants' ability to raise other and further defenses. Defendants reserve the right to amend their Answer and Defenses, including without limitation the right to assert such additional defenses as may later become known to it through discovery or otherwise.

## FIRST AFFIRMATIVE DEFENSE

The Amended Complaint, and each of its claims for relief, is barred because it fails to state a claim upon which relief can be granted against Defendants.  *See* Dkts. 44; 63.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because the statements about which Plaintiff complains are privileged and protected by the First Amendment to the United States Constitution, Article 1, Section 4 of the Florida Constitution, and common law.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because the statements about which Plaintiff complains partially or wholly constitute expressions of opinion, statements that cannot demonstrably be proven true or false, and/or rhetorical hyperbole.  *See* Dkt. 90, pp. 17-20.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because the challenged statements are true or substantially true and thus cannot be the basis for a defamation action.  *See* Dkt. 90, pp. 17-20.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff does not dispute that it is a public figure.  As a public figure, Plaintiff cannot establish, by clear and convincing evidence, that Defendants acted with actual

68

malice as to the publication of the challenged statements.  Dkt. 44, pp. 20-24; 90, pp.

23-25.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because the statements about which Plaintiff

complains, when considered in their entirety as required by applicable law, are not

reasonably capable of the false and defamatory interpretations and effects set forth by

Plaintiff and did not defame Plaintiff.  *See* Dkt. 44, pp. 8-13; 63, pp. 2-6; 90, p. 10-11.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because the alleged implications do not arise from

the challenged statements and because Plaintiff does not plead that Defendants

intended the alleged implications.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's defamation by implication claim fails because it failed to allege or

identify true statements as the basis for that claim.  *See* Dkt. 44, pp. 24-25.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because the publication was not made with

common law malice, and Defendants did not commit any outrageous conduct that

was malicious, wanton, reckless, or in willful disregard of Plaintiff's rights.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Plaintiff has not suffered any actual harm

or damages proximately caused by the publication, including special damages, and

any claimed damages are vague, uncertain, imaginary, and speculative.  Dkt. 90, pp. 11-15.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because it has not suffered any reputational harm proximately caused by the publication.  *See* Dkt. 90, pp. 15-16.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because any loss or damage it suffered was caused by the Plaintiff or third parties over whom Defendants have no authority or control.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its failure to mitigate and/or prevent the damages about which it complains.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claim for punitive damages is barred because it would violate Defendants' right to procedural and substantive due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Florida Constitution because, among other things, the alleged conduct here is not sufficiently reprehensible to warrant any punitive damages recovery and Plaintiff cannot establish actual malice.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of equitable estoppel. Rumble's own SEC filings and communications on social media establish

that Rumble was materially reliant on Google in multiple respects and, having made

those public assertions, the law does not permit it to now argue otherwise.  *See* Dkt.

90, pp. 23-25.

DATED: March 19, 2025

| | |
|---|---|
| SHULLMAN FUGATE PLLC | DAVIS WRIGHT TREMAINE LLP |
| By: */s/ Sarah M. Papadelias* | John M. Browning* |
| Deanna K. Shullman (SBN 514462) | Katherine M. Bolger* |
| Sarah M. Papadelias (SBN 0125098) | |
| 2101 Vista Parkway, Ste. 4006 | 1251 Avenue of the Americas |
| West Palm Beach, Florida 33411 | New York, New York 10020 |
| Telephone: (561) 429-3619 | Telephone: (212) 489-8230 |
| dshullman@shullmanfugate.com | jackbrowning@dwt.com |
| spapadelias@shullmanfugate.com | katebolger@dwt.com |
| | |
| *Counsel for Defendants Nandini Jammi and Claire Atkin* | *Admitted Pro Hac Vice* |