# EXHIBIT A

1
2
3

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

4    RUMBLE, INC.,                        )
                                          )
5                        Plaintiff,       )
                                          )
6            vs.                          ) Case No.
                                          )
7    NANDINI JAMMI, CLAIRE ATKIN, and     ) 8:23-cv-2718-CEH-LSG
     JONN DOE NOS. 1-10,                  )
8                                         )
                         Defendant.       )
9

10

11

12            **MOTION HEARING**
          (Held via Zoom videoconference)
13     Sam M. Gibbons United States Courthouse
              801 North Florida Avenue
14             Tampa, Florida  33602
                November 8, 2024
15                 11:30 a.m.

16     BEFORE THE HONORABLE CHARLENE EDWARDS HONEYWELL

17            UNITED STATES DISTRICT JUDGE

18

19        SHARON A. MILLER, CSR, RPR, CRR, RMR
             Federal Official Court Reporter
20     Sam M. Gibbons United States Courthouse
          801 North Florida Avenue, Room 13A
21             Tampa, Florida  33602
            sharon_miller@flmd.uscourts.gov
22                 813.301.5041

23

24

25        Proceedings recorded by machine shorthand
       Transcript produced by computer-assisted transcription

1                          **APPEARANCES**

2   PRESENT ON BEHALF OF THE PLAINTIFF:

3
                          MS. ELIZABETH M. LOCKE, ESQ.
4                         MR. NICHOLAS J. BRECHBILL, ESQ.
                          Clare Locke, LLP
5                         10 Prince Street
                          Alexandria,  va 22314
6                         (202)682-7400

7   PRESENT ON BEHALF OF THE DEFENDANTS:

8
                          MR. JOHN BROWNING, ESQ.
9                         DAVIS WRIGHT TREMAINE, LLP
                          1251 Avenue of the Americas
10                        21st Floor
                          New York, NY 10020
11                        (212)489-8230

12

13                        MS. SARAH M. PAPADELIAS, ESQ.
                          SHULLMAN FUGATE, PLLC
14                        100 S. Ashley Drive, Suite 600
                          Tampa, Florida 33602
15                        (813)435-1615

16

17

18

19

20

21

22

23

24

25

    UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

```
 1   (Court in session at 11:30 a.m.)

 2             THE COURT:  All right.  Good morning.

 3             MR. BROWNING:  Good morning, Your Honor.

 4             MS. LOCKE:  Good morning.

 5             THE COURT:  We are here in the matter of Rumble

 6   versus Jammi, case 8:23-cv-2718 for a continuation of the

 7   hearing we started yesterday on the defendant's motion to

 8   dismiss the amended complaint.  My recollection is that we had

 9   concluded the argument with regard to special damages and we

10   were moving to the actual malice, or was there some additional

11   argument regarding special damages?  I know I'd ask asked the

12   question, so I'll go to you first, Mr. Browning.

13             MR. BROWNING:  Thank you, Your Honor.  If it would

14   be all right, I can't remember exactly where we left it but I

15   would like to clarify a point on special damages if I may, and

16   I'm happy to let Ms. Locke respond --

17             THE COURT:  Okay.

18             MR. BROWNING:  -- without proceeding back to malice.

19             THE COURT:  You may.

20             MR. BROWNING:  So, Your Honor, yesterday, one of the

21   things we were discussing and debating was the correct

22   applicable pleading standard for special damages.  I think the

23   best articulation of that standard is in a case we cited in

24   our reply brief called First Insurance Funding versus

25   Stonemark, Inc. That's 2022 Westlaw 17551748.  And at star
```

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    eight of that case, the Court explains that Florida law

2    requires a plaintiff to plead special damages proximally

3    caused by the making of false statements.  It continues

4    pursuant to Rule 9(g), a party must specifically state special

5    damages.  In merely alleging that it has experienced

6    significant financial harms and reputational damages, that

7    does not satisfy that standard.

8          The key things I'd like to focus on, Your Honor, for

9    just a moment is, one, specificity in the specific pleading

10   and, two, proximate cause, the defamatory statements needs to

11   have proximally caused the damage.

12         We discussed the three buckets of special damages at

13   length yesterday, but the standard is particularly applicable

14   and particularly important for the lost advertisers strand,

15   and, you know, our primary argument is that the way that

16   Rumble has failed to specifically identify advertisers who

17   decline to do business with them because of the defamatory

18   statements in suit, but another equally important aspect of

19   our argument and we sort of discussed this under the rubric of

20   plausibility, but I think it's actually more helpful to think

21   of it in terms of proximate cause is the advertisers special

22   damages claim fails because Rumble has failed to plead that

23   the statements in suit, i.e., that Rumble was materially

24   reliant on Google Ads caused advertisers to leave Rumble.  And

25   this is clear from the Complaint itself.

```
 1              If you look the Paragraph 80 of the Complaint, it

 2    alleges that Rumble's business has suffered economically

 3    because major advertisers have dropped Rumble.  What's missing

 4    there, Your Honor, and what is fundamentally important to

 5    pleading special damages is at least an allegation that these

 6    advertisers left because of the statements in suit, i.e.,

 7    because our clients reported that Rumble was materially

 8    reliant on Google.

 9              And the Complaint actually contradicts that.  The

10    Complaint confirms that to the extent that advertisers left

11    Rumble as a result of my client's activities or Check My Ads

12    activities, this was because of something entirely unrelated

13    to exposure to Google.  So if you look at Paragraph 2 of the

14    Complaint, for example, it discusses a playbook to cut off ad

15    revenue to platforms like Rumble, by spreading malicious

16    falsehoods about how large corporate advertisers products were

17    being featured with and, therefore, suggesting an endorsement

18    of politically charged or otherwise controversial content.

19              Now, that's an entire separate issue from the

20    defamatory statements here.  That is a concession that the

21    reason that advertisers left was because they didn't like

22    their advertisements appearing next to individuals,

23    controversial individuals on Rumble like Alex Jones' or Nick

24    Fuentes of the world, and that's why advertisers dropped

25    Rumble.  That has nothing to do with the statements in suit
```

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    which were about how much revenue Rumble relatively takes from

2    Google, and for that reason because there's no proximate cause

3    alleged the Complaint fails on this point.

4            One other thing to note here, this extrapolates into

5    a bigger picture issue with the Complaint.  We saw this

6    yesterday with the PowerPoint slide that sort of zoomed out in

7    the statements in suit to take into account a whole bunch of

8    other things and a whole bunch of activities by Check My Ads

9    that had nothing to do with the statements in suit, but this

10   big picture thinking is quite dangerous because what is

11   happening here is Rumble is using a very narrow allegation of

12   defamation which arises from statements to do with how much

13   they do or do not rely on Google to bring in all the Check My

14   Ads activities, even though those statements in that reporting

15   is none in suit, so this complaint does not allege that Rumble

16   was defamed because Check My Ads said the content is toxic,

17   nor does it allege that Check My Ads defamed Rumble because,

18   you know, it falsely engineered ads or ways for ads to appear

19   next to controversial content.  That's not at issue here.

20           But what Rumble is trying to do is bring all of that

21   in through allegations that really have nothing to do with

22   the, quote unquote, toxic content on Rumble.

23           Like I said yesterday about the dangerous precedent

24   set that would be set by saying any statement that runs

25   contrary to a company's brand is defamatory, this would set an

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    extremely dangerous precedent that any minor false statement

2    and news article would open up the entirety of the rest of

3    what the publisher was doing to scrutiny, to discovery, to

4    potentially triggering damages even if that conduct itself was

5    not actionable and not even in the Complaint.

6            So, Your Honor, sort of as a general theme here, I'd

7    urge you to focus your review on the statements, on the

8    alleged interpretations and the specific pleadings of special

9    damages rather than letting this case go so far afield, and

10   that's all I have on special damages, Your Honor.  And I can

11   pause to let Ms. Locke respond, and we can do --

12           THE COURT:  Ms. Locke, you may respond.

13           MS. LOCKE:  Thank you, Your Honor.  So, special

14   damages I'm very pleased to hear that Mr. Browning and I agree

15   on at least one thing today, and that is that Rule 9(g) is the

16   applicable standard under which we are pleading here, and so I

17   want to make sure that the Court understands, it seems like

18   Your Honor did understand yesterday by one of your questions,

19   but I just want to make sure that the Court understands what

20   our position is and the reason for which we cited certain

21   cases.

22           We are not arguing that Rule 8, the notice pleading

23   standard, applies here, even though as Mr. Browning conceded

24   yesterday, there is a significant split of authority over

25   whether Rule 8 or Rule 9(g) applied in defamation per quod

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    cases within this very district.  We have plead to Rule 9(g)

2    standards as courts in Florida have set out that standard.

3            Now, it appeared that Mr. Browning was arguing

4    yesterday that Rule 9(b)'s standard for fraud applied.  I'm

5    glad to hear today that he is agreeing that it does not.

6            So while Rule 9(g) may be more demanding than Rule

7    8, it does not require the level of specificity that Rule 9(b)

8    for fraud does.  I think we're all on the same page on that.

9            But with respect to the Leavitt and the ThermoLife

10   cases, we cited Leavitt in our briefing.  That case ultimately

11   did hold that Rule 8 notice pleading standard applied.  That's

12   not the reason we were citing Leavitt.  Leavitt has a very

13   helpful discussion even though it came out the opposite way on

14   Rule 8.  It had a very helpful discussion within it about the

15   purpose and reading of Rule 9(g).

16           I'd commend the Court to reading that analysis.  It

17   instructs and talks about how Rule 9(g) is more focused on the

18   remedy sought and requiring parties to special damages with

19   respect to remedy, and it does not impose a particularity

20   requirement like Rule 9(b) for fraud does.

21           So really we were citing Leavitt for the proposition

22   that Rule 9(g), it's not the same as Rule 9(b).  It is sort of

23   a middle between Rule 8, Rule 9(b) standard.

24           In the subsequent case, ThermoLife, which is a 2020

25   case out of the Southern District of Florida, it applied the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    same logic from Leavitt about what 9(g) requires, and so it

2    said that Rule 9(g) requires no more than a specific statement

3    that allows the defendant to prepare a responsive pleading and

4    begin its defense.

5         And Your Honor knows there's going to be -- there's

6    going to be initial disclosures.  There's going to be

7    interrogatories.  We're going to engage in discovery, back and

8    forth, and we will get that specificity about the who, what,

9    when, where and why and the causation points.

10        But in ThermoLife, the Court was very clear that the

11   counterclaim plaintiff in that case VPX explicitly state that

12   it sought lost profits and counter-promotion costs, and

13   federal pleading standards do not require more.  That's at

14   page two of that decision.

15        And so here in our Complaint, we have more than

16   satisfied that standard pleading with, like, heightened

17   specificity the attorney's fees that were pre-litigation that

18   were incurred -- and I'll come back to that in just a

19   moment -- lost advertisers, and the drop in the stock price.

20        Now, I'm hearing new argument for the very first

21   time this morning by Mr. Browning saying this causation

22   argument, this was not argued in their briefing, that somehow

23   we have to plead proximate causation to the specific

24   myopically looking portion of the statement.

25        And I kind of go back to where I started with my

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  argument yesterday morning, Your Honor, is that that is the

2  crux of the problem of defendants' position that asking this

3  Court to look at statements out of context.

4          The Court is obligated under the law to look at the

5  statements in context.  And, so, Mr. Browning's concern about

6  big picture thinking, this is not big picture thinking.  This

7  is following the law and looking at the statements in the

8  context in which they remain.

9          And he says, well, you can't consider the fact that

10  we said that Rumble is toxic because they're not suing on

11  toxic.  Well, that's not exactly right, and I think that's a

12  too myopic and narrowly focused view of our Complaint.

13          If it were toxic is that it appears all over our

14  Complaint.  It informs the statements that, and the request,

15  to defund Rumble, and it informs the hypocrisy point and the

16  financial reliance on Google's point that we have sued upon.

17          And so it absolutely is at issue in this case, and

18  it is all over our Complaint, and to suggest that because it's

19  in our Complaint somehow it is problematic to pleading damages

20  strikes me as an odd argument and logically inconsistent.

21          And so I think it's important for the Court -- and

22  Mr. Browning does not seem to dispute or argue against the

23  concession that was already made in footnote one of their

24  brief -- that the Court has to look at these statements and

25  the hyperlink that are in those statements which we showed the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Court yesterday because that is the context that a reasonable

2    reader would view the statements and how they would be seen.

3    And there's extensive case law in Florida and beyond that

4    those hyperlinked sources that Defendants relied upon are

5    incorporated into the statements and are part -- incorporated

6    by reference just as though when you look at a contract, if

7    there's a hyperlink in a contract for defamation cases, the

8    defamatory statement, if there is a hyperlink within that

9    statement, those hyperlinks are incorporated by reference into

10   the defamatory statements and they have to be considered for

11   the full context analysis.  That is the Gubarev versus

12   Buzzfeed case.  That's 340 F.Supp 1304.  That's at 2018 case

13   out of the Southern District of Florida.  There's also Boley

14   versus Atlantic Monthly Group, 950 F.Supp 249 out of the DCC

15   in 2013 and then a similar case relating to incorporation by

16   reference for contracts where there's a link within a contract

17   a similar scenario.  Zamber versus American Airlines.  That's

18   a 2020 case out of the Southern District of Florida, and the

19   cite is 2020 Westlaw 1445479.  And so, you know, this myopic

20   focus on bits and pieces and parsing out this word is not the

21   appropriate standard.

22        Now, going back to special damages specifically, it

23   was also a discussion about Robertson versus Doe yesterday,

24   the New York case, and that's how this was kind of a confusion

25   came up over the pleading standard.  That's where the court

1    held that litigation of attorney's fees only qualify as

2    special damages if they are incurred in connection with a

3    separate litigation.  That's what Mr. Browning was arguing.

4          But in Robertson, I think it's important to point

5    out that the Court clearly distinguished it and separately

6    analyzed the non-litigation attorney's fees as part of that

7    case.  There the plaintiff incurred legal fees to mitigate

8    damage and avoid litigation.

9          And those non-litigation attorney's fees included

10   money spent by the plaintiff's counsel to identify websites

11   that were publishing the defamatory statements and to send

12   cease and desist letters to get those statements removed from

13   the Internet and from other publishers.

14         That's exactly the type of special damage that

15   Rumble has claimed as attorney's fees here.  Rumble expressly

16   omitted any claim as special damages to the cost associated

17   with litigating this case.  They were both separately.  They

18   don't inform the Complaint drafting.  Those were billed

19   separately and are not part of that monetary allegation for

20   special damages.

21         I think that is all I have for special damages, Your

22   Honor.

23         THE COURT:  Let me ask you.  With regard to that,

24   I'll hear from you both, you refer to a New York, to New York

25   cases.  Is there any issue in this case with regard to

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    conflict of law?  I think I recall seeing in a footnote as it

2    relates to the laws here that Florida and Maryland's laws

3    are -- maybe that was in defendant's motion and maybe there

4    isn't a choice of law question.  And, again, with regard to

5    this issue, there's discussion of new fraud law.  I'm assuming

6    because you did not find any Florida law or Eleventh Circuit

7    law regarding that point?

8              MS. LOCKE:  Sorry.  Mr. Browning, go ahead.

9              MR. BROWNING:  Speaking for defendants, you know,

10   while I can't remember exhaustively every case we considered

11   or did consider, my firm understanding is, yes, we didn't find

12   cases on point on Florida law.  I know we looked around.  I

13   cannot recall any at this time.

14             THE COURT:  Okay.

15             MS. LOCKE:  Your Honor, with the question about

16   choice of law, my understanding is that Florida law looks to

17   see if there's a conflict between states whose law might

18   apply --

19             THE COURT:  Right.

20             MS. LOCKE:  -- and then will make a determination.

21   On the issues that we are arguing here, I am a not aware of a

22   conflict of law.  This special damages point arises from the

23   Second Restatement of Torts, which my understanding Florida

24   does follow, and so the Robertson case was analogous.  I think

25   the only distinction between Robertson in terms of the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    substantive law is that there's a heightened pleading standard

2    in New York that is different here.  That's factually with

3    respect to special damages in terms of what can be claimed as

4    special damages and attorney fees.  I don't understand there

5    to be a conflict between New York and Florida law.  I think

6    they both flow from the Second Restatement of Torts.

7              THE COURT:  And the footnote I was looking at is

8    actually footnote 6 in the defendant's motion which indicates

9    that Maryland law would apply to this action in the event of a

10   true conflict of laws, but that no choice of law analysis is

11   necessary because the laws of Florida and Maryland are

12   substantively identical on the relevant points raised before

13   the Court.

14             MS. LOCKE:  Your Honor, I can't comment on

15   whether -- we believe Maryland laws applies at this point.  I

16   think that requires a little bit of fact inquiry and a little

17   bit of discovery into, one, well, whether on any of the points

18   whether there's a true conflict between the two --

19   Mr. Browning says there isn't -- but separately where the harm

20   occurred and where the tort, that is not clear to me.

21             My understanding is that Defendant Jammi and

22   Defendant Atkin had moved; that Maryland may not be the situs

23   of where they are.  There's I think discovery that needs to

24   take place before I could say with confidence that Maryland

25   applies.  We do know that Rumble is headquartered in Long Boat

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Key.  They have their offices in Long Boat Key and the damage

2    would have been felt in Long Boat Key, and so we have been

3    largely looking at Florida law here, but for purposes of

4    today, I'm not aware of a conflict that would cause us to

5    argue the case in a different way.

6            THE COURT:  Mr. Browning.

7            MR. BROWNING:  Yes.  I think I can cut the Gordian

8    knot, Your Honor.  For purposes of this motion, I'm not aware

9    of any material conflict between Maryland law and Florida law,

10   so choice of law is necessary right now.  I would like to

11   preserve my right to argue choice of law further down the line

12   if there were to be, you know, material differences, but for

13   today we are not asserting that there's a need.

14           THE COURT:  All right.  Then we will now go on to

15   the argument pertaining to actual malice.

16           MR. BROWNING:  As Libby did at the beginning of her

17   last remarks, I'll start with something the parties agree on.

18   There is no dispute here that for actual malice purposes

19   Rumble is a public figure, that it is required to plead and

20   ultimately to prove by clear and convincing evidence that my

21   clients published the statements at issue with actual malice,

22   which is either knowledge of falsity or reckless disregard for

23   the truth, which means a high subjective awareness of probable

24   falsity.

25           And, here, our argument at the motion to dismiss

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    stage is that the Complaint rules out actual malice because of

2    the implications of the primary argument Rumble has made.

3    Rumble's primary argument on actual malice is you published

4    these statements with knowledge of falsity or at least

5    reckless disregard for the truth because we, Rumble, told you

6    that we were not materially reliant on revenue from Google in

7    December 2022 and in our SEC filings.

8         At that -- those pleadings cut the other way,

9    because as we explain in our briefing, they are consistent

10   with and not contradictory to the gist of the allegedly

11   defamatory statements.

12        I need to pause for another moment to emphasize that

13   for actual malice purposes, what -- the gist is important.

14   The gist plead in the Complaint is that Rumble was materially

15   reliant on Google revenue as of the fall of 2023, and that is

16   the belief, that is the fact against which actual malice must

17   be tested.

18        And so if you look back at Rumble's affirmative

19   statements to Ms. Jammi which are alleged to have been relayed

20   to Ms. Atkin, those state that up to 20 percent of ad revenue

21   was attributable to Google ads and another company.

22        A couple of important things to note.  First, Rumble

23   did not break down those numbers.  It does not say while

24   1 percent is Google and 19 percent is attributable to another

25   company, so given Rumble's historical reliance on Google,

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    again, they were about 90 percent reliant on them until the

2    end of 2021, it would be a fair reading of that statement that

3    Google was at least or close to 20 percent reliant on revenue

4    from Google ads.

5           That is a material share of their revenue.  That is

6    consistent with the statements or the gist of the statements

7    that Rumble was materially reliant on Google.  How do we know

8    this?  Well, we know this because Rumble filed SEC filings

9    until -- a series of SEC filings stating that essentially a

10   similar amount of exposure to Google Ads.  Again, it's -- I

11   think it's 19 percent collectively with another agency was a

12   material portion of their revenue for loss of which might

13   significantly affect its business.

14          Now, again, the fair reading of these statements

15   given Rumble's own admissions and SEC filings is that

16   20 percent, which is what Ms. Jammi and Atkin were led to

17   believe by Rumble, is a material share of their revenue.  Even

18   less than 20 percent could be a material share of their

19   revenue because of the way that they bounded together Rumble

20   and this other organization.

21          And given that that's the last thing that Rumble

22   affirmatively told my clients, they were entitled -- and as

23   pled in the Complaint, they were entitled to rely on that, and

24   given that reliance there can be no actual malice.  That's the

25   baseline we argue, Your Honor.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          The remaining allegations of actual malice, as we

2     say in our Complaint, you know, against that backdrop are not

3     sufficient.  Things like ill-will or profit motive are not --

4     I don't think there's any dispute that on their own are not

5     evidence of actual malice.  You can't see the actual malice

6     based on any one of those things, and Rumble's aggregation

7     argument, which is put everything together and you get actual

8     malice, really fails in light of the fact that the last thing

9     Rumble told Ms. Jammi and Ms. Atkin was the gist and sting of

10    what they conveyed was up to 20 percent of our revenue comes

11    from Rumble.  And it was a fair conclusion to draw that that

12    was the material share.

13         One final note is the Complaint also references

14    other sources of information, that they allege Ms. Jammi and

15    Ms. Atkin should have consulted and should have caused them to

16    doubt that the gist of their reporting that Rumble was

17    materially reliant on Google and those sources include a Media

18    Matters article and reading between the lines of I believe the

19    last SEC filing before these statements were made which made

20    no mention of material reliance on Google.

21         The Complaint alleges that they should have read

22    this and understood it to mean that Rumble is no longer

23    materially reliable upon Google.

24         Your Honor, our position is those statements

25    implied, or at least implied statements, do not counteract the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  very express statement that Rumble made in its December 2022

2  tweet up to 20 percent was attributable to Google and

3  subsequent SEC filings stating that Rumble, you know, until a

4  very recent time or until a time very soon before the textbook

5  statements were published was materially reliant on Google

6  revenue.

7          And for that reason, again, my clients were entitled

8  to take Rumble at its word and to take these statements direct

9  straight from the horse's mouth and were not required to or

10 were not plausibly caused to doubt this by third-party

11 reporting or by sort of reading between the lines of the last

12 SEC statement.  On actual malice, that is our argument.  I can

13 pause there.

14         THE COURT:  Okay.  Thank you.  Ms. Locke.

15         MS. LOCKE:  Thank you, Your Honor.  So actual malice

16 is a fact intensive inquiry.  It is a subjective inquiry.

17 What was in the defendant's mind, Defendant Jammi and

18 Defendant Atkin's mind at the time of publication?  There's no

19 doubt that proving actual malice requires a high standard, but

20 at the pleading stage and the Eleventh Circuit just said this

21 yesterday, Your Honor, and it came --

22         THE COURT:  Yes.

23         MS. LOCKE:  -- in a case that was Project Veritas

24 versus CNN and had reiterated at the pleading stage plaintiffs

25 need only allege sufficient facts to commit the inference that

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    defendants published their statements with actual malice.

2            And the Supreme Court has said in Herbert versus

3    Lando, which we cited in our brief, that both direct and

4    circumstantial evidence is appropriate, and I think it would

5    be helpful to highlight what the Supreme Court has said.

6            The existence of actual malice may be shown in many

7    ways.  As a general rule, any competent evidence, either

8    direct or circumstantial, can be resorted to and all the

9    relevant circumstances surrounding the transaction may be

10    shown provided they're not too remote including threats, prior

11    or subsequent defamations, subsequent statements of the

12    defendant, circumstances indicating the existence of rivalry,

13    ill-will or hostility between the parties, facts tending to

14    show a reckless disregard of the plaintiff's rights and in an

15    action against a newspaper, a media outlet, custom and usage

16    with respect to the treatment of news items of the nature of

17    the one under consideration.

18            For example, plaintiffs may show that the defendant

19    had drawn a pistol at the time he uttered the words complained

20    of or that the defendant had tried to kiss and embrace a

21    plaintiff just prior to the defamatory publication or that the

22    defendant had failed to make a proper investigation before

23    publication of the statements in question.

24            Now, no drawing of pistols or kissing in this case,

25    but a proper investigation is something that I think we should

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    spend a little bit of time on.

2          Now, all of that is a long way of saying that the

3    actual malice standard does not lend itself to summary

4    disposition on a motion to dismiss easily.

5          And here Rumble alleges both direct and

6    circumstantial evidence of actual malice.  It's exceedingly

7    rare.  I litigate these cases for a living, and it is

8    exceedingly rare to have direct evidence of actual malicious,

9    and we have it here in spades, Your Honor.

10          With Your Honor's permission, I'd like to show my

11    screen again.

12          THE COURT:  Okay.  You may.

13          MS. LOCKE:  Back in December of 2022, Defendant

14    Jammi made nearly identical statements that the ones that we

15    are suing on.  "Your entire business model," in responding to

16    Rumble on Twitter, "your entire business model depends on

17    Google Ads and that could crumble at any moment."  That is the

18    financial insecurity and failure to disclose predicate that we

19    have sued upon and these other statements.  And the two

20    similar statements, and Rumble responds directly to Ms. Jammi

21    and says "your statement is false."  The top two, not just

22    Google, but the top two external ad networks Rumble uses which

23    includes Google represents less than 20 percent of our revenue

24    in Q3.  And I think that this is what is important that

25    Mr. Browning is omitting.  They go on to say it's down

1    45 percent in Q2, in other words, in three months, what Rumble

2    is telling Ms. Jammi is in three months, the revenue has

3    precipitously dropped by more than half, by 55 percent from Q2

4    in 2023 to Q3 -- I'm sorry -- 2022.  I'm getting my years

5    wrong.  Q2 2022, to Q3 2022, the amount of revenue that Rumble

6    is receiving from Google Ads has gone from 45 percent to

7    20 percent.  So it's not just telling Ms. Jammi that we're at

8    20 percent or that two advertiser partners are at 20 percent,

9    but that it has gone down by 55 percent in that three-month

10   period.

11          Now, defendants argue that this statements and the

12   Q -- the Q3 2022 SEC filing demonstrate that they couldn't

13   possibly have acted with actual malice because they were

14   entitled to rely on this statement that Rumble gave them.

15          Now, there's multiple -- before I get to the

16   problems with that, I want to make sure that the Court

17   understands that Ms. Jammi acknowledged reading this and she

18   said, "phew, y'all are surprisingly into facts for a company

19   that exists just to stream" -- I'm sorry -- sorry about that.

20   I hit the wrong button.  "Phew, y'all are surprisingly into

21   facts for a company that exists just to stream conspiracy

22   theorists who have been kicked off of YouTube, but noted.

23   Thanks."

24          Now, it's a little snarky, but what she is saying is

25   I've seen these numbers and I understand these facts.  And so

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

 1    now they say defendants argue that they believed they're

 2    entitled to rely on this and believe these statements to be

 3    true, but there are four problems with that argument.

 4         Number one, the Defendants misrepresent and

 5    mischaracterize what Rumble told them.  They said that

 6    defendants say, well, we were entitled to believe that Google

 7    was 20 percent or up to 20 percent of Rumble's entire revenue,

 8    but it's clear that Google was only one of two and that was

 9    said expressly.

10         That, of course, means that they're not entitled to

11    rely and think that it's an entire 20 percent.  Of course they

12    never reached out.  They never asked.  They never said, hey,

13    break it down for us.

14         Also, as I just said, it ignores the precipitous

15    drop that Rumble shared with defendants, that 55 percent

16    decline in a three-month period.  That put the defendants on

17    notice of this decline.

18         And the third problem is that Rumble told the

19    defendants about that decline a year, a full year before their

20    defamatory statements.  When defendants had made the

21    defamatory statements that we're suing on here in this case a

22    year later, they knew -- and all of the documents and

23    especially the October 23rd, 2023 article demonstrate that

24    they knew that Rumble had developed and rolled out its own

25    competing ad platform which would have provided substantial

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   revenue and eliminating the risk associated with losing Google

2   ad revenue.

3          They also knew and it's stated expressly in their

4   October 2023 article that Rumble had gone through an IPO, and

5   that they had achieved significant funding and financing as a

6   result of that IPO, thus, also lessening any kind of reliance

7   or need for Google ad revenue, and so they can't say that they

8   didn't know those facts to be true.

9          Now, this engagement that Rumble had with the

10  defendant in December of 2022 should have caused them to

11  inquire either to Rumble or to the SEC filings before

12  repeating these defamatory statements.

13         And it certainly is inconsistent with Ms. Atkin's

14  statements that 90 percent of ad revenue came from Google.

15  That as one of the basis for the statements that we have sued

16  on.  She says 90 percent.  Even if you were to take all the

17  inferences and all the facts as Mr. Browning alleges, which

18  again the Court can't do at this stage, and 90 and 20 are

19  materially different, if you take the inferences and facts in

20  favor of Rumble to at 20 percent, maybe at 10 percent each, 10

21  and 90 is even more materially different.

22         Now, they also -- defendants also argue that, well,

23  this statement, this 20 percent that you told us about in the

24  precipitous decline in revenue, that outreach doesn't directly

25  contradict what the Defendant said.  That is precisely the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  same argument that the Eleventh Circuit rejected yesterday in

2  the Project Veritas case.  I'd like to take a moment just to

3  describe briefly the facts of that case.

4         There Project Veritas is a media organization that

5  calls out what they view as hypocrisy in other media outlets

6  in other big institutions.  They were suspended from Twitter

7  back in 2021, I believe it was for showing a house number.

8  They were doing an interview and a house number, an address

9  house number was shown on the screen and so Twitter suspended

10 them under Twitter's doxing policy.

11        Now, CNN first reported that truthfully, accurately

12 that they were suspended for doxing or that's what Twitter

13 said they were suspended for, for showing personally

14 identifying information.  Four days later, the CNN, the same

15 reporter then reported that Veritas was swept up in a broader

16 crackdown by Twitter for reporting misinformation or reporting

17 false information.

18        Now, Veritas argued the fact that the CNN journalist

19 just four days before had reported accurately about why it was

20 suspended demonstrated that CNN had acted with actual malice;

21 that CNN subjectively entertained serious doubts about its

22 reporting that Veritas was suspended for spreading false

23 information as opposed to sharing true information but private

24 information.

25        Now, CNN argued to the Court with respect to actual

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    malice that Project Veritas had to allege more in the

2    Complaint that Project Veritas had to show that the CNN

3    statements directly contradicted this language in the Eleventh

4    Circuit decision, directly contradicted the journalist's

5    second statements.  And they didn't demonstrate that the CNN

6    journalist subjectively doubted the accuracy of the statements

7    where there was -- without this direct on-point contradiction.

8         The Eleventh Circuit expressly rejected that

9    argument based on the pleading standard for actual malice, and

10   the Court held at the pleading stage Veritas must merely

11   allege sufficient facts to commit the inference that the CNN

12   journalist published the statement with knowledge or reckless

13   disregard of the truth.

14        Now, what does reckless disregard for the truth

15   mean?  That means that the Defendant entertained an awareness

16   of probable falsity.  You don't have to know actual falsity.

17   It's just could it probably be false?  And where you put a

18   Defendant on notice that their statements are false, it

19   requires them to do some research.  It's an inquiry notice.

20        There is extensive case law, Curtis versus Buts,

21   Herbert versus Lando.  Those are the Supreme Court cases.

22   There are additional cases arriving out of the Fifth Circuit,

23   Zerangue versus TSP Newspapers, 814 F.2d 1066, and this is at

24   1071.

25        Courts have upheld findings of actual malice where

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  defendants failed to investigate a story weakened by inherent

2  probability, internal consistencies or apparently reliable

3  contradictory information.

4      Now, that's exactly what the notice that Rumble put

5  defendants on required them to do.  They had an obligation to

6  go and check to see given the precipitous drop that Rumble

7  told them about whether that drop was continuing, whether it

8  was steady, whether it went up.

9      And had they inquired, they would have known that

10  Rumble omitted -- they would have known both its Q3 statements

11  that Google was only one of two of the ad partners that made

12  up less than 20 percent, but they also would have known that

13  after Q3 2022 Rumble omitted from its statement of what was a

14  material risk any reference to Google whatsoever.  They would

15  have had an obligation to include that if there was a material

16  financial risk.

17      Now, I also want to make the point, material, what

18  does material mean?  It does not mean -- it's a term of art

19  with respect to securities filings.  This is Rumble's Q3 2022

20  SEC report.  It does not mean that the company is no longer

21  going to be a going concern if this event happens.  All it

22  means is that if this event happens, it could negatively

23  impact revenues and profitability, and that's exactly what

24  this SEC report said.  It could have a negative impact.  It

25  doesn't mean that they're wholly relying upon, that they are a

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   house of cards, that the entire business is going to collapse

2   if Google were to no longer be a source of revenue for them.

3        So, now, they're not only on inquiry notice.  The

4   Complaint alleges that they -- and alleges direct evidence

5   that defendants, and it sounds like Mr. Browning is conceding

6   today, that defendants were aware of and were looking at these

7   SEC filings.

8        Here is from our Complaint screen captures of tweets

9   that defendant Jammi sent talking about how she has gone in

10  and looked at Rumble's earnings reports.  Now, this is Q1 2023

11  so it's three months earlier, but it is around the same time

12  where she is saying to Mr. Bongino who is a part of Rumble,

13  he's on the board of Rumble, she says, "I'm glad you're

14  bringing this up because I checked out Rumble's Q1 2023

15  earnings report and it brought in just about $14.3 million

16  last quarter."  And then she is complaining that they're lying

17  about their SEC filings.

18       And then the following paragraph in the Complaint in

19  paragraph 72 -- sorry.  I keep doing that.  In paragraph 72,

20  revenue is up from 4 million this time last year, and if my

21  research is correct much of that money comes from Google ads

22  which you so deliciously claim to have ditched.

23       Again, Defendants are looking at Rumble's financial

24  filings and financial statements to prove, to make their claim

25  that we are reliant on Google, and so this is direct evidence

1   of malice.

2         We also allege to address the Media Matters article,

3   we also allege in the Complaint that defendants had seen and

4   reviewed a Media Matters article from around the same time,

5   October 20th, 2022.

6         Now, that Media Matters article makes -- says

7   expressly that Google ads network makes up only 2 percent of

8   total advertiser spending on Rumble.com in the last year,

9   materially different, again, from even the 20 percent number

10  in the SEC filings for the two -- for the true ad partners.

11        Now, we allege in the Complaint that defendants are

12  working with Media Matters to target Rumble just as Defendant

13  Jammi had done with Media Matters in the past when she was at

14  Sleeping Giant when she targeted Fox News and Bright Bart

15  News, and this reporting is remarkably similar to the

16  reporting that Rumble -- that defendants had -- the Media

17  Matters reporting is remarkably similar to the reportings that

18  defendants had produced on Rumble itself, and so there are a

19  lot of similarities.

20        And defendants cite to other Media Matters articles

21  in their October 2023 article, so it's plausible to infer and

22  we allege in the Complaint that they saw this number and they

23  were on notice of the 2 percent number.

24        Now, Your Honor, those are the allegations of direct

25  evidence of actual malice, but as Herbert verus Lando

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   explains, the Supreme Court has said that the Defendant is --

2   that you're also allowed to look at circumstantial evidence of

3   malice.  And the Supreme Court has recognized that a

4   defamation Defendant is highly unlikely to admit and get

5   called to the stand, yes, I knew what I was writing was false

6   at the time I wrote it, and so, therefore, you're allowed to

7   look at these buckets of circumstantial evidence that can be

8   used.  And you can, in fact, accumulate that circumstantial

9   evidence taken together.  If it is -- while a particular

10  bucket may not be sufficient standing alone, together may be

11  supporting and pleading enough to prove actual malice.

12          And so -- and that's the Shapiro case, also the

13  Eramo versus Rolling Stone case.  The Amended Complaint pleads

14  each and every kind of these buckets of circumstantial

15  evidence that courts have recognized support a finding of

16  actual malice.  And when considered in accumulation, the

17  evidence is well more than enough to satisfy our pleading

18  standard.  We plead -- and I showed the Court earlier, we

19  plead hostility and ill-will.  All of those statements that

20  defendants have previously posted on Twitter about their

21  intent to take down Rumble, their intent to harm Rumble, that

22  shows hostility and intent to destroy Rumble's business.

23          They have, as we looked at yesterday, they have

24  given a "how to" manual on how to demonetize and block Rumble

25  and they acknowledge that their statements are intended to

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   harm Rumble, and so the Supreme Court has acknowledged in

2   Curtis Publishing versus Sykes that this is evidence in

3   support of actual malice.

4        We've also alleged that defendants engaged in a

5   preconceived notice and that they intentionally ignored facts

6   and sources of information.  For a year, for more than a year

7   they clung to that narrative that Rumble was dependent on

8   Google Ads after Rumble shared evidence of this precipitous

9   decline.  They continued to spread lies about Rumble's revenue

10  sources, their valuations and undisclosed financial risk.

11  They called Rumble a garden variety of grift.  They knew

12  Rumble was publicly traded.  They ignored these SEC filings

13  which they could have easily gone and looked up or they looked

14  at them in which case it's direct evidence of actual malice,

15  and they also ignored the Media Matters article from

16  October 2022.

17       But most importantly, Rumble reached out to these

18  defendants and said this is false.  Defendants knew that

19  Rumble was willing to have a conversation and willing to share

20  accurate information and accurate facts.  Nevertheless,

21  defendants failed to engage in that dialogue.  They failed to

22  reach out about the obvious utmost information Rumble itself,

23  and the Harte-Hanks case, the United States Supreme Court case

24  at 491 U.S. 657 says that a failure to interview key sources

25  is evidence of a purposeful avoidance of the truth.

1          We also allege that defendants had a financial

2    notice to defame Rumble, and the very article that -- the

3    October 24, 2023 article just below the very statements that

4    Rumble is heavily monetized by Google Ads that we are suing

5    upon, they are asking for funding for donors, and at the very

6    top of their website, that's also a part of this article

7    they're asking for donations.  That is pled at paragraph 73 of

8    the Amended Complaint.

9          We also allege that Rumble sent a retraction demand

10   letter in October of 2023 and that the Defendants refused to

11   retract.  We sent this letter and Rumble -- I am sorry.  And

12   the defendants waited nearly a month, nearly a month to do

13   anything.  And then once they did, they did a one reply --

14   rather than taking down the tweet, they did a one reply

15   doubling down on the false statement.

16         Ms. Atkin says "to clarify, approximately 90 percent

17   of Rumble's programmatic display ad revenue comes from Google

18   Ads."  This isn't a draft of the article or any of the other

19   three statements.  This is one reply in a tweet to the

20   90 percent number.

21         The problem with it is -- there are multiple

22   problems with it.  Number one it's wrong.  90 percent of

23   Rumble's programmatic display ad revenue does not come from

24   Google.  Two, Ms. Atkin and Defendant Jammi did not reach out

25   to Rumble to say, hey, is this accurate, is this -- and engage

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    in a dialogue about whether this was accurate.  They just

2    posted it, and they did to reconfirm their view, their

3    statement that Rumble is dependent on Google Ads.

4           And, three, as they say, the lie goes around the

5    world before the truth gets out of bed.  You see here that the

6    original post has 365,000 views, but the, quote unquote,

7    retraction and correction only has 905.  It was a materially

8    ineffective retraction and correction.

9           Finally, we allege that they engaged in a departure

10   from journalistic standards.  Curtis versus Buts talks about

11   that as well as Herbert versus Lando, that they failed to

12   reach out for a request for comment and they failed to do any

13   appropriate investigation and failed to retract when

14   appropriate, which, you know, are all part of journalistic

15   standards.  And, finally, we allege that there's collusion

16   with Media Matters and a group dually squared.

17          These are additional allegations where there's

18   collusion support, circumstantial evidence of malice where

19   groups come together in an effort to target and defame and

20   that's the Ray versus Edwards case out of the Eleventh

21   Circuit.  And with that, I'll be quiet.

22          THE COURT:  Thank you.

23          MR. BROWNING:  I'm going to do a brief rebuttal, if

24   I may.  So, again, you know, the core point here is that the

25   December 2022 statement from Rumble can be fairly read to say

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  that Google provided up to 20 percent of their revenue.  The

2  subsequent SEC filings can be fairly read to say that that

3  portion of revenue was a material part of Rumble's business,

4  and Ms. Locke, you know, faulted my clients for not reaching

5  out or not engaging, to which I'd make two points.  One is

6  they already had the statement from Rumble.  They had an

7  affirmative statement on this issue and they interpreted it in

8  a fair and non-actual malice way.

9          And actually another point there is that the Media

10  Matters article was from October 2022, so that was the one

11  that said Rumble contributed 2 percent.  That was before

12  Rumble published its tweet to Jammi in December.  And so my

13  clients were not required to rely on that 2 percent number

14  three months prior if when Rumble itself published a statement

15  to them suggesting more than 20 percent -- I'm sorry, less

16  than 20 percent, up to 20 percent.

17          The final issue here -- and that statement, the

18  affect of that statement on their state of mind effectively

19  nullifies the circumstantial evidence.  The final thing I will

20  say here is Ms. Locke talked in a fair amount of length about

21  attempts to make retraction demands and to get my clients to

22  correct their statements.

23          The law is clear on this point that post-publication

24  retraction demands are not relevant to actual malice.  Actual

25  malice must be judged at the time of publication.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1           With respect to Atkin -- Ms. Atkin's repost, it

2    might be arguable that that was a subsequent publication but

3    certainly with respect to the other four, so that's the

4    article and Ms. Jammi's tweets.

5           Rumble's retraction request and everything that it

6    did after the time of publication are categorically not

7    relevant because they cannot possibly affect defendants' state

8    of mind at the time of publication.  By definition they can't.

9    It happened after.

10          So all of that should be disregarded.  And I'm not

11   even sure it appears in the Complaint.  So that's all I have

12   on actual malice, Your Honor, and I can go to defamation by I

13   implication if you'd like.

14          THE COURT:  Yes.

15          MR. BROWNING:  Defamation by implication is a fairly

16   simple argument here.  Our primary argument is that the

17   statements do not qualify for defamation by implication

18   because Rumble has failed to allege a necessary and basic

19   element of that claim and that is the existence of a true

20   fact.

21          Rumble's entire Complaint is geared towards arguing

22   that it was false for defendants to claims that they were

23   materially reliant on Google Ads' revenue as of the fall of

24   2023.

25          Having stated that these statements are false, they

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  cannot turn around and plead that they are also true for the

2  purposes of a defamation by implication.  This is a pretty

3  basic hurdle that they cannot clear, and Your Honor applied

4  essentially identical analysis to dismiss defamation by

5  implication claims in Markle versus Markle.

6        THE COURT:  I did, yes.

7        MR. BROWNING:  There really is no difference here.

8  Rumble cites some case law that it claims suggests that

9  true -- sorry -- that false statements can serve as the basis

10 for defamation by implication claim.

11       Your Honor, if you go through those cases and the

12 theme of our argument, if you really dig in, they don't

13 actually say that.  They certainly do not rebut or contradict

14 the explicit language that Your Honor relied on in Markle and

15 the authority that what is required is a true statement of a

16 fact off of which the false implication is made.  For that

17 reason the claim must be dismissed.

18       The second reason the defamation by implication

19 should be dismissed, which brings us full circle back to the

20 beginning, is that it rises and falls with the straight

21 defamation claims.  By that I mean if the three allegedly

22 defamatory interpretations advanced by Rumble are not held to

23 be defamatory and if Rumble is deemed to have not pled special

24 damages, the defamation by implication claim must fail.  It

25 must be dismissed.  And, you know, I mentioned that this

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    brought us back to the beginning, so I'll take the opportunity

2    to just very quickly wrap up.

3         As I said earlier this morning, Rumble would like to

4    make this case big and sprawling and about not only what Check

5    My Ads does but what other media monitoring groups do in the

6    abstract and to pull all of that in to this case, but in

7    reality, the Complaint is much smaller and the alleged

8    defamation is much smaller and that's where the Court should

9    focus its attention.

10        Really what is at issue here is whether the three

11   defamatory interpretations of the statements advanced by

12   Rumble are, in fact, defamatory.  I invite Your Honor to read

13   the statements in context, but the core of what they are

14   alleging to be defamatory is simply not.

15        For the reasons I discussed yesterday, the case law

16   is clear in Florida that to injure a business in the

17   defamation sense requires more than what Rumble has plead

18   here.  It requires malfeasance of some sort, fraud, unethical

19   dealings or actual default on a financial obligation.  We have

20   none of that here.

21        If you look at the statements at issue, the

22   statements that they are suing on without all the noise and

23   other stuff around it, what the gist and sting of those

24   statements is that Rumble was materially reliant on Google,

25   and that does not qualify as an actionable defamatory

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    statement.  It certainly does not qualify as a defamatory per

2    se statement.

3          The amount of time and PowerPoint slides we have

4    been through to try and figure out what these statements mean

5    it's pretty clear proof that they're not defamatory per se

6    which means defamatory on their face.  And, again, there is no

7    implication of fraud, malfeasance, actually defaulting on

8    debts, and for that reason, you know, the interpretation that

9    this connotes a financial risk, this entirely legal

10   partnership connotes a financial risk, it's not defamatory per

11   se.  It's not defamatory at all.

12         Similarly, the fact that these statements run

13   counter to Rumble's brand, it's not defamatory.  It's not

14   fraud.  That's not unethical dealings, and it's far too loose

15   a standard to simply say that any statement that runs counter

16   to a company's brand is defamatory.  That's not backed up by

17   the law and for that reason that fails too.

18         In addition, the fact that Rumble still takes money

19   from Google, still partners with it even though it alleges

20   that it has no financial need to do that proves that this

21   relationship does not actually harm its business reputation.

22   If it did, it wouldn't be partners with Google, but it is.

23         Finally, the statements cannot be fairly read to

24   impute fraud.  I just don't say that.

25         And, Your Honor, the Mercola versus New York Times

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    case makes clear that the Court cannot read in that meaning

2    because it's unreasonable.

3            For all those reasons, the defamation and defamation

4    by implication claims fails, and on special damages, you know,

5    even assuming there was some defamatory could be eked out, we

6    don't think there is.  Again, all of those suffer from

7    material problems.  It's clear, you know, that there's no real

8    dispute that fluctuation of stock price that has not been

9    realized through the sale of stock, it's not actionable, so

10   the $187 million claim needs to go.

11           The pleading standard for advertisers has also not

12   been met.  They haven't been identified specifically nor has

13   there been the necessary allegation of proximate cause.  To

14   the contrary, Rumble admits to the extent that advertisers

15   left, it was because they did not like their content, not

16   because -- not for any reason that has anything to do with how

17   much money they took from Google.

18           And, finally, again, the Robinson versus Doe case we

19   discussed, if Your Honor reads it, it's very clear that

20   pre-action -- pre-action claim letters, the like, in the

21   defamation action before the Court cannot be grounds for

22   special damages, so that fails too.

23           And for all those reasons, there is no claim for

24   defamation here, Your Honor, or defamation by implication and

25   the Complaint should be dismissed.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          THE COURT:  Okay.  Thank you.  Ms. Locke?

2          MS. LOCKE:  Thank you, Your Honor.  Regarding

3    Rumble's claim for defamation by implication, defendant's

4    argument is that the claim fails because -- primarily because

5    we have not identified any true statements that give rise to

6    the false implication.

7          Now, to be clear, we have pled this claim in the

8    alternative just as the pleading standard allow us to do so.

9    Defendants accuse Rumble of receiving substantial revenue from

10   Google.  At one point Rumble did receive a more significant

11   portion of its revenue from Google.  That is true.  As we

12   allege in the Complaint, by October 2023, Rumble received less

13   than 1 percent of its revenue from Google Ads.

14         So if the Court or the jury were to conclude that

15   the predicate statement is true, that Rumble still received

16   some considerable amount of revenue from Google, defendant's

17   statement still gives the false impression that Rumble is

18   financially vulnerable and not viable without Google Ads.

19   That is the false impression.

20         Similarly, defendants have said that Google is

21   Rumble's largest advertising partner, and that Rumble still

22   partners with Google.  If the Court or the jury were to

23   conclude that those predicate facts are true, defendants'

24   statements still give the false impression that Rumble cannot

25   operate without Google's ad revenue which is false, so there

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    are true statements.  It's a matter of timing and it's a

2    matter of which predicate, which predicate fact the Court is

3    looking at for truth and falsity.

4           The Jews for Jesus case, a Florida Supreme Court

5    case, says that defamation by implication, there's a claim for

6    defamation by implication where the matter charged is

7    defamatory is not the literally true statement but the false

8    impression given either by the juxtaposition of true facts

9    or -- and this is critical -- the omission of material facts.

10          We have also alleged that there's a defamation --

11   defamation by implication claim based on the omission of

12   material facts here.  There's no dispute that Defendants

13   failed to disclose specificity as they were told in December

14   of 2022 that Rumble's Google revenue was shrinking

15   precipitously.  They left the false impression that Rumble had

16   remained fully reliant on Google notwithstanding that

17   according to defendants they boast about being free from

18   Google.

19          That goes directly to the hypocrisy and dishonesty

20   implication and it goes directly to the financial viability of

21   the company, that implication.

22          Now, that brings me back, and I will conclude -- I

23   will conclude briefly here -- to where we began.

24          Mr. Browning says that there has to be some fraud in

25   order for the Court to conclude that these statements are

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    defamatory per se.  There has to be some heightened standard.

2    That is simply not the law.

3           If there is an injury to business and it imputes

4    dishonesty in their business dealings, it does not have to

5    rise to criminal fraud.

6           And as the Diplomat case says, there is no single

7    rule about what is defamatory to plaintiff A versus plaintiff

8    B.  And statements imputing that did arise to the implication

9    that the company is dishonest in their dealings, dishonest in

10   their statements to investors, dishonest in their public

11   statements about what their mission and what their work is,

12   and the confidence for their position give rise to a per se

13   claim for defamation as well as statements -- this is the

14   Visant case, and the other cases we've cited -- imputing that

15   it is bad and it would be undesirable to have a commercial

16   relationship with that plaintiff.  That is precisely what

17   these statements do.

18          Mr. Browning talks about noise and the number of

19   slides that we have shown the courts.  The number of slides

20   reflect the sheer breadth of the defamation here.  And the

21   noise is nothing -- nothing of the sort.  It is the context,

22   again, the context that the Court must have in order to

23   evaluate these claims that comes from the four corners of the

24   defendants' very own statements that they've made about Rumble

25   and they show the intent and the harm, the intent of the harm

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    and the damage that was done to Rumble and its brand.

2            If there is any deficiency with -- I think we had

3    said -- I would toot my own horn, I think we have done a good

4    job here pleading this claim, but if there's any deficiency

5    that Your Honor sees, we are more than happy to amend our

6    Complaint and we would ask for the opportunity to do so.  But

7    with that, we would ask that the Court deny defendants' motion

8    to dismiss.

9            THE COURT:  Okay.  I'm going to ask you all a few

10   questions that I don't think will become repetitive.

11           Ms. Locke, you talked about the Jones case, Jones v.

12   Greeley and the accusation of hypocrisy as constituting

13   defamation per se.

14           MS. LOCKE:  Yes.

15           THE COURT:  That's a very old case, 1889.

16           MS. LOCKE:  Yes, ma'am.

17           THE COURT:  Is it your belief that it's still

18   binding in light of the fact that it's from over a hundred

19   years ago?

20           MS. LOCKE:  Yes, Your Honor.

21           THE COURT:  The court there did not apply the law,

22   the elements of defamation that Florida recognizes today.

23           MS. LOCKE:  Yes, Your Honor.  It is still binding.

24   It's a Florida Supreme Court case.  It has never been

25   overruled and there I think it demonstrates precisely why the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   hypocrisy on its face is relevant.  There it was an individual

2   who was proclaiming to be a philanthropist when in actuality

3   he had mistreated a widow and/or fans and had taken advantage

4   of them.  No allegations of criminal misconduct there, but I

5   think it's just goes to show -- and it's not just Florida who

6   recognizes -- not just Florida that recognizes a claim of

7   hypocrisy being capable of a defamatory meaning and defamatory

8   per se, it's other jurisdictions.  And we've cited those, but

9   I think it just goes to show that this is a long standing and

10  inherent function and feature of defamation per se.

11          It is one of the seminal cases in Florida on this

12  point.  And so, yes, I do think it's binding.  I think it's

13  still controlling law and the Florida Supreme Court has not

14  overruled it.

15          THE COURT:  Okay.  Mr. Browning, would you like to

16  address that?

17          MR. BROWNING:  I would, Your Honor.  You know, I

18  think the claim that this is seminal law is belied somewhat by

19  the fact that Ms. Locke doesn't cite any newer case citing it.

20          I think Your Honor is right to inquire whether this

21  is still controlling given that it's decided 140 years ago

22  before New York Times versus Sullivan, before major advances

23  in first amendment jurisprudence, and so I would query the

24  premise this is still an accurate statement of the law, but

25  even if it is, Your Honor, it supports our argument more than

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Ms. Locke and Rumble's.

2            If you dig into this case, what it shows are a

3    couple of things.  The first is that this hypocrisy in this

4    context is very binary.  The allegations were essentially that

5    one, that, you know, a banker, a person, an individual held

6    himself out to be a philanthropist and a friend of the poor,

7    but also at the same time made extortionist loans to them so

8    impoverished widows and poor people.

9            And so there's kind of two issues there.  One, this

10   is my theme, you know.  This is a case that involves

11   malfeasance of a sort that is not present in our statements.

12   Impoverishing widows and orphans is pretty bad, and there's

13   nothing close to that level of, you know, unethical behavior

14   accused in our statements.

15           The second point is it's much more binary, so the

16   hypocrisy, this illustrates well what a claim of hypocrisy

17   would be which is, you know, I do -- I say one thing and I do

18   the exact opposite.

19           Here, Rumble's, you know, hypocrisy claim is based

20   on very dissimilar facts.  What it means to an anti-Big Tech

21   company is very squishy, and it's not well-defined.  It's not

22   binary like the examples Ms. Locke had yesterday with a

23   company saying we don't make anything in China and we do, or

24   Wendy's, we don't use frozen food but we do, and the

25   squishiness of Rumble's anti-Big Tech ethos is exposed by its

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    own complaint where it admits that it still takes money from

2    Google and still partners with Google even though it claims

3    that there's no financial need for it to do so.

4          And so our facts are different.  This isn't a case

5    of hypocrisy.  This is a case of defendants making a statement

6    that runs counter to Rumble's preferred brand ethos about

7    being anti-Big Tech and, again, as I said yesterday, there's

8    no authority stating that there's anything defamatory about

9    that.  And it would be very dangerous to hold that there was,

10   because then essentially any mistake and any news article

11   could form the basis for a claim based on a sort of abstract

12   allegation that it imputed some degree of hypocrisy to the

13   company because it suggested violated its own ethics and I

14   think that's too broad.

15         Another reason not to apply this case, Your Honor,

16   all of the hypocrisy cases cited by Ms. Locke involve

17   individuals.  She hasn't cited a single case involving a

18   corporation.  I think that's an important distinction for two

19   reasons.

20         Firstly, as we cite in our brief, there's authority

21   that says defamation law treats businesses and individuals

22   differently.  You can't defame a business for moral failings.

23   You can only defame it for hurting its or injuring its

24   business reputation which, as we have said, requires some kind

25   of malfeasance or default, and so this just simply isn't the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   kind of these statements, or Rumble doesn't have the kind of

2   reputation where this kind of moral failing would be

3   actionable.

4          And this leads to the second point, which is I don't

5   even really know what it means for a large publicly trade

6   corporation like Rumble to be hypocritical.  I mean these

7   companies are made up of lots of employees.  They do

8   complicated things.  It's a conglomeration of people acting

9   with slightly different interests and under different

10  obligations to maximize profit, and given that reality, I

11  don't think you can set fairly say that a business can be

12  hypocritical in the sense that hypocrisy is used in this Jones

13  case and others.

14         Finally, in Jones, Your Honor, it cites some

15  authority that actually helps our position about the standard

16  for business disputes and defamatory meaning, and it cites

17  this case called Stone versus Cooper which is in 2 Denio 300.

18  I don't know what Denio is.  It's a very ancient report, but

19  it said it makes a reference to something called shaving.  The

20  plaintiff was accused of shaving.  I tried to figure out what

21  that was.  It was some kind of business practice that was

22  legal.  I think it involved arbitrage, but some people thought

23  it was unethical.

24         And in Stone versus Cooper, the Court held that

25  saying the plaintiff had been involved in shaving was not

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    actionable because that activity might be done in a legitimate

2    and innocent way.

3            That feeds directly into the Bongino case I was

4    talking about yesterday, Your Honor, where it was held not

5    actionable to say that somebody got fired because this is a

6    normal business function and because it didn't necessarily

7    impute wrong-doing.

8            That's the same principle that should apply here,

9    and for that reason because the statements relate to a normal

10   business function, i.e., an entirely legal relationship with

11   Google and do not impute wrong-doing, they're not defamatory

12   as a matter of law.

13           THE COURT:  Okay.

14           MS. LOCKE:  Your Honor, may I respond on just a

15   couple of points?

16           THE COURT:  You may.

17           MS. LOCKE:  Thank you, Your Honor.  So, one of the

18   things that I think may have been implicit in your question

19   about the change of law over time, the biggest change of law

20   with respect to defamation is that adding of the malice

21   standard, New York Times versus Sullivan.  But, New York Times

22   versus Sullivan wasn't about defamatory meaning and the

23   defendants have cited no case law whatsoever to suggest that

24   the Jones case is not longstanding and good law or that it has

25   been overruled.  And also longstanding case law, Diplomat

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    versus Westinghouse says that corporations and individuals are

2    treated identically, are treated the same for purposes of

3    slander and libel analysis.

4          And so Mr. Browning's distinction about moral

5    failings can't be attributed to a company, I think that is

6    belied by the Jones case in and of itself talking about a

7    philanthropist giving loans.  He was giving loans through a

8    company, through an institution.  And so certainly companies

9    can have moral failings and we see that that can cause damage

10   to the company's reputation and brand.  It happens.  It

11   happens every day.

12         Then finally, I would say that in response to the

13   squishiness point, squishiness sounds like another way of

14   saying it sounds like a question for the jury, that there are

15   fact questions here that a jury needs to resolve.

16         So, as to hypocrisy, the meaning of Ms. Atkin's and

17   Ms. Jammi's statements had the intended impact on a reasonable

18   reader.  All that is needed here for defamatory meaning, Your

19   Honor, is that it gives rise to this inference, whether we

20   pled that there is an inference here, and if so, then you have

21   satisfied your duty as a question of law and the question then

22   goes to the jury as to whether it did, in fact, have that

23   impact on a reasonable reader.

24         THE COURT:  Okay.  My next, I'm looking at Turner v.

25   Wells which was out of the Southern District of Florida, but

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   it was affirmed by the Eleventh Circuit in 2018.  I'm looking

2   at statement one and statement four.  It's about statement

3   one.  I'm referring to the August 16, 2023 statement that

4   Jammi wrote and the October 3rd, 2023 statement that Jammi

5   wrote on X.

6           Are either of these statements subject to empirical

7   proof or objectively verifiable event as that is discussed in

8   Turner v. Wells?  I'll start with you, Ms. Locke.

9           MS. LOCKE:  I apologize.  I'm just getting those

10  statements up.

11          THE COURT:  Okay.  Sure.

12          MS. LOCKE:  I apologize.  I want to make sure I'm

13  responsive to your question.  Which statements were you --

14          THE COURT:  The first one.  I have them labeled one

15  through five.

16          MS. LOCKE:  Sure.

17          THE COURT:  The August 16th statement that "Rumble

18  is all posturing all the time.  They are not a Google Ads

19  killer or even close to it.  They depend on Google for their

20  business.  We're talking a house of cards."  That first one.

21          And then the fourth one is the October 3rd, 2023,

22  Jammi wrote on X that "without Google Ads Rumble would not be

23  viable.  Its criminal behavior by Google which has promised

24  brand safety to its clients."

25          MS. LOCKE:  Yes.  So let me answer each of those in

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    turn.  So the law requires a definitive enough statement to be

2    capable of being proven true or false, and that is the Turner

3    versus Wells, that the gist of what Turner versus Wells was

4    talking about.

5         Here, as we have cited case law, house of cards has

6    a definitive meaning.  It means exactly what -- and it was

7    intended to mean it's going to collapse.  It's going to fall

8    down and that is the same, it is the same meaning that the

9    fourth statement that Your Honor is looking at, would not be

10   viable, would no longer be a going concern.  It's a house of

11   cards.  The company is going to collapse.  It's no longer

12   going to be financially viable.  That is capable of being

13   proven true or false.

14        And I think -- I think going back to malice, the

15   October 2023 SEC filing demonstrates that that is wrong, that

16   materiality for purposes of what is a material risk doesn't

17   mean that is going to collapse and be a house of cards or no

18   longer viable.  It may have a negative impact, but these on

19   their face suggests something that is boolean; that the

20   company is no longer going to survive if Google pulls its ad

21   revenue from it, or they are no longer have access to that ad

22   revenue.

23        That is precisely the falsity that we are claiming,

24   both with respect to the per se and the implication claim.

25   And how would that be proven?  Certainly discovery into it,

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   what are the sources of revenue and perhaps expert testimony

2   related to the viability of the company.  We would have direct

3   evidence put on, testimony from Rumble itself about the

4   viability of the company at this point in time when these

5   defamatory statements were made as to whether the company

6   would be viable or clams would be a going concern or not a

7   going concern.

8          So we have cited case law specifically about house

9   of cards.  No doubt.  No doubt that that.  Language is

10  colorful, but colorful language does not mean that it is not

11  capable of a precise meaning.  And we know exactly what

12  Ms. Jammi intended to convey because she repeated it on

13  October 3rd; right?  It's no longer viable.  It's going to

14  collapse.  It's a house of cards.  It's not going to be a

15  going concern any longer.

16         THE COURT:  Okay.  Thank you.  And I'll hear now

17  from Mr. Browning.

18         MR. BROWNING:  Yes, Your Honor.  I think you raise a

19  very astute point here about opinion which we raised

20  admittedly and briefly, for space reasons, which is these

21  statements that you pointed out are subjective opinions.

22  They're incapable of being proven true or false.

23         Everything I just heard Ms. Locke say relates to an

24  untested hypothetical which is what would happen if Google ads

25  were to pull its money or if this partnership was to end.  The

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    partnership hasn't ended.  It hasn't been tested.  It was

2    still alive when these statements were made, and for that

3    reason the statements are simply not capable of being proven

4    true or false.  And the Turner v. Wells case illustrates this

5    principle quite nicely, Your Honor.

6         There I think the issue was whether it was

7    homophobic for a coach to give a player a male blowup doll or

8    words to that affect.  And the Court held that such statements

9    couldn't be proven true or false because it was subjective as

10   to whether, you know, this deed was homophobic because

11   homophobic is not capable of a readily discernible meaning.

12        It cannot be proven true or false in an absolute

13   sense.  That same principal extrapolated here means that a

14   prediction about what might happen is also subjective.  It

15   can't be proven true or false, and Ms. Locke suggested we take

16   discovery.  I don't know how we would, short of seeing what

17   happened, you know, if Google -- if Rumble did, you know, pull

18   Google out, but even then, these statements have to be geared

19   to the time of publication, and at that time this was a

20   prediction of something that might happen in the future but

21   there's no way of proving whether it's true or false.

22        This also ties into meaning, meaning that these are

23   inextricably intertwined here, so this is the strand where

24   they say it's defamatory to say that Rumble faces a

25   hypothetical financial risk, and this is why, Your Honor, I

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    think that the case law only binds statements to be defamatory

2    when companies actually default, not when somebody predicts

3    they might.

4          And I think the fact that such a prediction would be

5    a subjective opinion reinforces and undergirds our argument

6    that simply pointing out a hypothetical financial risk is not

7    defamatory meaning-wise.

8          If Your Honor would allow me just a second to

9    address the squishy point.

10          THE COURT:  Okay.

11          MR. BROWNING:  Just to make clear what I was saying,

12    because this is very important.  The point that I was trying

13    to make was not that a jury should decide whether or not the

14    statement accuses Rumble of hypocrisy.  The point that I was

15    trying to make is that the interpretation that these

16    statements when counter to Rumble's, a valid brand, are not

17    binary.  They're not clear.  They're not clearly oppositional,

18    or like the opposite of what Rumble said.

19          So Rumble says it has an anti-Big Tech brand, but

20    that is using squishy to describe what that brand is.  So it's

21    not like Rumble said made statements or made part of its brand

22    that it will never take money from Google.  That would be a

23    binary, but that's not what's at issue here.

24          Rumble does take money from Google.  It still does.

25    It always has and has been materially reliant, and so that's

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    what I meant by squishy was that its brand is not necessarily

2    antithetical to the statement, and so for that reason the

3    hypocrisy interpretation just doesn't work.

4            MS. LOCKE:  Your Honor, if I may respond on just a

5    couple of points with your permission.

6            THE COURT:  You may.

7            MS. LOCKE:  Number one, I do object to the argument

8    based on opinion.  That was not argued in the motion to

9    dismiss at all.  There's no argument about opinion.  It was

10   raised for the first time in the reply brief to which we did

11   not have an opportunity on briefing on that, so I do object to

12   Mr. Browning's argument about opinion.

13           Number two, we pled in the Complaint as of the time

14   of these statements that Rumble had a 1 percent revenue from

15   Google ads.  That is not anywhere near collapse and that is so

16   far afield from, like 1 percent decline in revenue is so far

17   afield from whether the company would be viable or a house of

18   cards without it.  It is a boolean consideration as to what

19   Ms. Atkin and what Ms. Jammi said, whether it's a house of

20   cards or viable, whether the company would maintain its status

21   as a company and as a going concern.

22           And then finally, this point about, you know, we

23   wouldn't know if hypothetical house of cards is predictive and

24   therefore it's not -- therefore, it's not actionable, how

25   would we test it?  That's exactly what the Visant case was

1    about.  They were on the verge of bankruptcy or being close to

2    default is predictive, and nevertheless, the Court says that

3    that is defamatory per se.  And that is exactly what -- it's

4    analogous to the statements here, predictive that the company

5    is going to collapse if they lose this Google Ad revenue.

6              MR. BROWNING:  Sorry to do this.  Could I have just

7    a second?

8              THE COURT:  You know, and I will tell you all, this

9    is, as you may have guessed or found from your research, this

10   is not the first defamation case over which I've presided.

11   I've had several.  But I must admit you all are both very good

12   and that's a pleasure so I don't mind hearing from you,

13   because I can tell that you are experienced litigators in the

14   defamation field, contrary to some attorneys I've had with

15   some other defamation cases.

16             I will allow you, the moving party, Mr. Browning, I

17   will allow you to make an additional comment and then I have

18   just a couple more questions.

19             MR. BROWNING:  Sure, Your Honor.  You know, two very

20   quick points.  One, contrary to what Ms. Locke said, if you

21   look at footnote 10 on page 12 of our moving brief, we did

22   raise opinion, so I believe we preserved it.  And also, again,

23   you know, to return to a theme, Visant doesn't actually stand

24   for the proposition that a hypothetical risk of imminent

25   default or collapse is actionable.  That case actually

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    involved a statement that said, you know, that the company has

2    defaulted on its debts.  And also, you know, if we look at the

3    statements going back to looking at these statements in

4    context, house of cards or, you know, these statements that we

5    were looking at involve viability or house of cards, they

6    don't have the same immediacy.  They don't say, well, Google

7    is going to pull out or it doesn't say they are on the verge

8    of bankruptcy.  There's a distance there, Your Honor, that I

9    think is significant.

10          I think I had something else, but I have forgotten

11    so I'll leave it there.

12          THE COURT:  Okay.

13          MR. BROWNING:  I just remembered.  The house of card

14    cases, again, those involve accusations that the company was a

15    Ponzi scheme, so there was a predicate of allegations of fraud

16    and precariousness that are just not visible here.

17          The statements here, you know, speculate about what

18    might happen if this legal partnership went away, but it's not

19    the same as saying, you know, it's a house of cards because

20    the whole business is a Ponzi scheme.

21          THE COURT:  Okay.  And then with regard to the

22    declarations that you all have attached, the defendants to the

23    motion, it's the declaration of John Browning, and then the

24    plaintiff attached a declaration of Nicholas Brechbill, and

25    as, you know, the Court typically considers the four corners

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    of the Complaint and the attachments.  And I can consider

2    other matters that are central to the litigation referenced in

3    the Complaint about which there is no dispute.  I just want to

4    make sure I didn't see any objection raised with regard to

5    Mr. Browning's declaration and the attachments.  I just want

6    to confirm that while I have you all on the phone.  Is there

7    any objection, Ms. Locke?

8         MS. LOCKE:  Your Honor, no objection for the

9    purposes for which they were relied upon, and let me make

10   clear as to why I'm caveating that.

11        As footnote 1 in their motion to dismiss says, the

12   defamatory statements that we are suing on are -- we did not

13   attach them to the Complaint, but they did in their -- in this

14   declaration.  We agree that the Court can, in fact, consider

15   the defamatory statements as well as the hyperlinks within.

16        The one thing I will say is that some of in

17   particular to Exhibit B, it does not appear Exhibit B is --

18   there are multiple forms of Exhibit B is what I will say, and

19   that there is not for purposes of this argument, but I think

20   for purposes later in the case, a form of Exhibit B that is

21   going to become relevant.  I just don't want my non-objection

22   to be construed as anything other -- I think the content of

23   Exhibit B, the content of the article we agree is the article

24   itself, but there are a different form of it that I think may

25   become relevant down the line, but for purposes of the Court's

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    review of the content and the hyperlinks within, we agree it's

2    accurate.

3              THE COURT:  Okay.  And then with regard to the

4    declaration of Nicholas Brechbill which is doc 59 on CM/ECF,

5    Mr. Locke, is there any objection to the Court's consideration

6    of the counter-defendants' motion to dismiss in ThermoLife?

7              MR. BROWNING:  Yes, Your Honor.  We have no

8    objection.  I mean it's a memorandum of law that was filed in

9    another lawsuit, but, you know, if a memorandum of law is

10   obviously not controlling to Your Honor's analysis, you know,

11   the actual decision in ThermoLife is superseding, and it

12   doesn't apply and doesn't require a denial of our motion to

13   dismiss for all the reasons we've discussed for the last

14   several hours.  To answer your question, no objection, Your

15   Honor.

16             THE COURT:  All right.  And then I'm going to now

17   put on my case management hat.  A couple of things I've noted.

18   There is a motion pending filed by the defendant that's not

19   quite ripe yet.  It's the motion at doc 74.  The defendants'

20   motion to extend the deadline for motions to add parties or to

21   amend pleadings.  The motion does indicate, as is required,

22   that the plaintiff opposes the motion under the -- although

23   the plaintiff hasn't had an opportunity yet to file a response

24   to it, so I'm not going to hear any argument on it, but let me

25   just tell you and share with you my thoughts with regard to

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   this.

2          I will tell you now that I agree with the defendant

3   with regard to the defamation by implication argument.  I

4   understand that the plaintiff requests leave to amend, and so

5   I most likely will, regardless of how I ruled with regard to

6   the five defamatory statements, going to give plaintiff an

7   opportunity to amend.  I recognize that the plaintiff has

8   already filed an Amended Complaint, but that Amended Complaint

9   was not filed with the benefit of an order from the Court

10  having analyzed the amended -- the Complaint based upon a

11  motion to dismiss.

12         The plaintiff voluntarily amended the Complaint, and

13  that's why we're working on the Amended Complaint now.  But I

14  will typically give parties an opportunity to also amend one

15  additional time after I issue an order on a motion to dismiss

16  because they then have the benefit of the Court's ruling as

17  the party proceeds to amend.

18         When I do that, then, of course, depending upon how

19  far we go or how long that takes, the defendant will have an

20  opportunity to respond to what would then be the second

21  amended complaint.  And so I raise that just to make you all

22  aware of how I proceed with regard to these cases, and if we

23  look at in Markle, I did it in that case.  I did it in the

24  Pete Buttigieg case.  I did it in most other cases, defamation

25  cases that I've had where I wanted the parties to have an

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    opportunity to consider the Court's order.

2         The one thing that the Defendant requests, and I'm

3    not likely to grant, is making any new deadlines 60 days of

4    defendant's certification, that their document production to

5    Rumble's first set of requests for production is complete.  I

6    don't know where you all are with regard to discovery.

7         As I mentioned yesterday, I've not stayed discovery

8    in this case.  Our local rules don't contemplate a stay of

9    discovery and one of the reasons that I don't stay discovery

10   is because rarely will I dismiss a case with prejudice the

11   first time it comes before me on a motion to dismiss.  It does

12   happen on occasion, particularly when I'm dealing with unity

13   arguments and a few other arguments that are not germaine to

14   the issues raised in this case.

15        And I raise the discovery issue because the other

16   issue I see, Ms. Locke, is that you have a fictitious pleading

17   here with, what, John Does 1 through 10, and that no doubt you

18   are aware of that in federal court we don't allow fictitious

19   pleadings, and I just want to bring that to your attention

20   because at some point you're going to need to rectify the

21   fictitious pleading.  And I don't know if that's because you

22   all haven't done adequate discovery for them to be identified,

23   but the plaintiff must move to amend the pleading when the

24   identification of the unknown defendant is obtained through

25   the discovery process.  So, Ms. Locke, would you like to

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    respond?

2        MS. LOCKE:  Yes, Your Honor.  Thank you very much.

3    We understand that we have started the process of discovery

4    including issuing third-party subpoenas.  Those third parties

5    we've alleged in the Complaint that we believe that these are

6    individuals at Media Matters and dually squared.  We have

7    issued subpoenas to those parties.  Those entities are not

8    located in Florida so those -- they are, as you are probably

9    not surprised to hear, refusing to turn over documents, and so

10   there is likely to be another practice in a different court,

11   so this was part of why we asked for -- we didn't know when to

12   say and we didn't want to put the Court in a position of

13   again, but we have to withdraw our motion because it's taken

14   longer than 60 days to get briefing in a different court

15   handled.

16       And so what we came up with, and perhaps it was

17   inartful, was the 60 days after we get the documents from the

18   defendant in this case.  The parties have exchanged discovery

19   in this case, Your Honor, but documents have not been

20   exchanged yet.

21       And I do think that there may be some briefing and

22   some motions practice that will need to happen before Your

23   Honor before those documents are exchanged, particularly as it

24   relates to this issue.  My understanding is that -- and I

25   don't want to put words in Browning's mouth at all, but my

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  understanding is that there are privileged assertions that

2  they are going to be raising and standing on and not producing

3  certain documents with respect to those privilege issues

4  related to the journalist privilege, and so we are -- I think

5  that there may be some motions practice before we're able to

6  get those documents and be able to amend that Complaint, but

7  we were trying to preserve our right.

8          We're not sitting on our hands here.  We are

9  attempting in good faith to get those documents so that we can

10 properly under the relevant standards identify those

11 individuals, if any, to add to the Complaint.

12         THE COURT:  I think I may have misspoken.  I think

13 factually you're correct, it's plaintiff's motion.  I may have

14 identified that as defendants' motion, I'm not sure, but

15 you're correct, it is the plaintiff's motion at docket entry

16 74.  And the certification reflect that the defendant objects,

17 although the defendant has not had adequate opportunity or the

18 14 days that our local rules allow to file a response to the

19 motion.

20         And I raise it because, again, as I've already said,

21 as I will go through each of these statements in the order

22 that I enter and most likely I'm going to allow the plaintiff

23 an opportunity to amend, but even with regard to the John Doe

24 defendants where they cannot be identified by name, they're

25 supposed to be described in such detail that it is possible to

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    identify them.  And in your Amended Complaint I don't think

2    you list any specific actions the individuals allegedly

3    undertook.  I just don't recall.

4            MS. LOCKE:  Yes, your Honor.  If we need -- if we

5    need to amend to state more specifically, I think we can

6    attempt to do that, but right now the allegation is based upon

7    Ms. Jammi and Ms. Atkin's working with a different entity.

8    And not knowing who within that entity they work with, and we

9    don't have those documents and they're objecting on producing

10   those documents based on a journalist privilege, and so it's a

11   little bit of a Gordian knot there with respect to the

12   privilege, and once we are able to unwind that Gordian knot

13   and those entities are located outside of Your Honor's purview

14   outside of this district, so there is motions practice and

15   there is lots of preview, and not to get too far into the

16   merits there, there is motion practice that probably needs to

17   happen in one or both of those courts to undo that Gordian

18   knot.  So all we would do is respectfully request that we be

19   allowed to plead and amend with respect to those fictitious

20   individuals once we have the opportunity to do that discovery.

21   We don't want to be sitting on our hands.  We're trying to do

22   it but also are mindful of our pleading obligations.

23           THE COURT:  Okay.  And so I wanted to make you aware

24   since I had you before the Court this afternoon that we did

25   notice that.  There didn't really appear to be a lot in the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  Amended Complaint pertaining to the John Doe defendants, so.

2         MR. BROWNING:  Your Honor, if I may just make a

3  couple of brief points on this, just to explain our

4  perspective and without prejudice the opposition we're going

5  to file.

6         There are a couple of pertinent issues.  I agree

7  with Ms. Locke's summary of discovery.  That's a fair

8  statement -- summary of the statement of affairs with one, I

9  think, important exception.  We have produced interrogatory

10 responses identifying the individuals who were involved in

11 drafting and publishing the statements at issue and those

12 involve some employees or former employees of Check My Ads,

13 but conspicuously there's no one from Media Matters.  There's

14 no one from Dewey Square Group involved there, so we have made

15 a sworn statement that they were not involved in the editing

16 or publication of these materials.

17        And to Your Honor's point about how Media Matters

18 and how Dewey Square Group gets in here, we're equally

19 confused, and this raises an issue for us because we don't

20 understand how they can be joined to this defamation action if

21 they didn't publish the statements.

22        If Rumble has in mind this sort of conspiracy theory

23 or something else that's not reflected in the Complaint, this

24 makes it a completely different case.  And so that is why we

25 are wary of giving Rumble an automatic right to add parties.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    It's why we would vehemently oppose the amendment of a

2    Complaint while this motion to dismiss is pending.  And what

3    we're very concerned about is that somewhere down the line,

4    and we will producing documents soon, Your Honor, what we

5    produced and Rumble can attest our assertions, but what we're

6    concerned with about is down the line, the complexion of this

7    case changes completely.  So, you know, an Amended Complaint

8    is pled that involves Media Matters and Dewey Square Group and

9    things that have either nothing to do with the statements in

10   suit or broaden it.  And so that informs our reticence to

11   agree to sort of an amendment and has implications down the

12   line as to how discovery is going to run, Your Honor.

13           Because if in three months the complexion of the

14   case changes, we think there could be significant prejudice to

15   our clients because we just don't know what the claim is going

16   to be.

17           THE COURT:  Right.  Well, and as he said, when I

18   enter the order on the pending motion to dismiss, you

19   obviously should rely upon the written order, but I do expect

20   that I will give the plaintiff an opportunity to amend based

21   upon the order.  I usually give 21 days, 14 or 21 days after

22   I've entered the order, and in this case it would be a Second

23   Amended Complaint to be filed.  And after that's done, then

24   you know, the defendants will respond according based upon the

25   filing of the Second Amended Complaint.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          When are you all scheduled for mediation?

2          MS. LOCKE:  We have that scheduled, Your Honor.  I

3    know that we have it on the calendar, and we've actually

4    scheduled it, but if I may.

5          MR. BRECHBILL:  If I may.

6          MS. LOCKE:  I think it's next year, but I don't have

7    any date.

8          THE COURT:  Okay.

9          MR. BRECHBILL:  If I may, Your Honor.  Nick

10   Brechbill, Counsel for the plaintiffs along with Ms. Locke.

11   It's April 30th, 2025 we have a date scheduled.

12         THE COURT:  Okay.  All right.  Great.  Thank you.

13   All right.  Those are all of the questions I have.  Is there

14   anything else, Counsel?

15         MS. LOCKE:  Not from plaintiffs, Your Honor.

16         MR. BROWNING:  Not from defendants either.

17         THE COURT:  All right.  There being nothing further,

18   then that concludes this proceeding.  The Court is going to

19   take the matter under advisement, and as I've indicated and

20   I've already stated, I agree with the defamation by

21   implication.  I think that the law does require there be some

22   true statements, and so I think the defendants' argument is

23   well taken with regard to that, and as to the remaining five

24   statements, the Court will go through and look at each of the

25   statements.  And I've looked at the statements, I have not

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    looked at the hyperlinked material yet either, which, of

2    course, I will do before entering an order on this matter.

3            So there being nothing further, that concludes this

4    proceeding.  You all are free to leave the meeting.  We are

5    adjourned.

6    (Court adjourned at 1:24 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1

2    UNITED STATES DISTRICT COURT  )

3                                  )

4    MIDDLE DISTRICT OF FLORIDA    )

5

6            I, SHARON A. MILLER, Official Court Reporter for the

7    United States District Court, Middle District of Florida, do

8    hereby certify that pursuant to Section 753, Title 28, United

9    States Code that the foregoing is a true and correct

10   transcript of the stenographic notes taken by computer-aided

11   transcription taken in the above-entitled cause by the

12   undersigned and that the transcript format is in conformance

13   with the regulations of the Judicial conference of the United

14   States.

15   /S/Sharon A. Miller, CSR, RPR, CRR, RMR

16   Official Court Reporter

17

18

19

20

21

22

23

24

25

     UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION