# EXHIBIT M



# C L A R E   L O C K E
L  L  P

**ELIZABETH M. LOCKE, P.C.**
libby@clarelocke.com

10 Prince Street
Alexandria, Virginia 22314

(202) 628-7400

www.clarelocke.com

**NICHOLAS J. BRECHBILL**
nick@clarelocke.com

July 25, 2024

Via Personal Service

Dewey Square Group, LLC
c/o Corporate Creations Network Inc.
1629 K Street, NW #300
Washington, DC 20006

> **Re:**    *Rumble v. Jammi, et al., Case No. 8:23-CV-2118*

To Whom It May Concern:

We write on behalf of Plaintiff Rumble Inc. in the above-referenced litigation pending in the U.S. District Court for the Middle District of Florida. We have issued the enclosed subpoena seeking copies of relevant documents in your possession.

Please examine the subpoena for the applicable date and location required for your compliance. If you are represented by a lawyer, please have them contact me about the enclosed subpoena. If you are not represented by a lawyer, you may seek the assistance of counsel if you believe that to be necessary.

While the subpoena technically calls for the production of documents at a physical address in Virginia, you can also comply with the document subpoena by emailing any responsive documents to libby@clarelocke.com and nick@clarelocke.com.

Please do not hesitate to contact us with any questions regarding this request.



Very truly yours,

CLARE LOCKE LLP

Elizabeth M. Locke, P.C.

Nicholas J. Brechbill

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| Rumble Inc. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No.  8:23-cv-02718-CEH |
| Nandini Jammi, Claire Atkin, and John Does No. 1-10 | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Dewey Square Group, LLC, c/o Registered Agent, Corporate Creations Network Inc.
1629 K Street, NW #300, Washington, DC 20006

*(Name of person to whom this subpoena is directed)*

☙ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: 10 Prince Street, Alexandria, VA 22314 or by email to libby@clarelocke.com and nick@clarelocke.com | Date and Time: 08/16/2024 12:00 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    07/25/2024

| _CLERK OF COURT_ | OR | /s/ Jered Ede |
|---|---|---|
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  _____
Rumble Inc. _____ , who issues or requests this subpoena, are:

Jered Ede, Clare Locke LLP, 10 Prince Street, Alexandria, VA 22314, jered@clarelocke.com, (202) 628-7409

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  8:23-cv-02718-CEH

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
       **(i)** is a party or a party's officer; or
       **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) For Other Discovery.** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) Command to Produce Materials or Permit Inspection.**
   **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
       **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
       **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) Quashing or Modifying a Subpoena.**
   **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
       **(i)** fails to allow a reasonable time to comply;
       **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
       **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
       **(iv)** subjects a person to undue burden.
   **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
       **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

       **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
       **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
       **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
   **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
   **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2) Claiming Privilege or Protection.**
   **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
       **(i)** expressly make the claim; and
       **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## **ATTACHMENT A**

## **INSTRUCTIONS**

1.      Unless otherwise noted, these requests require You to produce all responsive Documents, Communications, and things requested from October 2022 through the present.

2.      You shall produce all Documents, Communications, and things requested that are responsive to the requests set forth below in their original form or in copies that are exact duplicates of the originals.

3.      All Electronically Stored Information shall be produced according to the Federal Rules of Civil Procedure, unless You and the parties agree otherwise.

4.      Produce all responsive Documents, Communications, and things requested in Your possession, custody, or control, regardless of whether responsive Documents, Communications, and things requested are currently in Your immediate possession, including Documents and Communications obtained by Your counsel, employees, agents, or any other persons acting on Your behalf.

5.      If You object to any portion of any request, identify the portion to which You object and respond to the remainder.  All objections to the requests herein shall be made in writing and delivered via email to the undersigned counsel on or before the date set for production.

6.     If any Document or Communication, or any portion of any Document or Communication, within the scope of a request is withheld or redacted from production upon any claim of privilege, You shall provide a list identifying each Document or Communication so withheld, as follows:

        a.     a brief description of the document;

        b.     the type of document, e.g., letter or memorandum;

        c.     the general subject matter of the document;

        d.     the date of the document;

        e.     the author of the document;

        f.     the addressees of the document;

        g.     any other recipients of the document;

        h.     the relationship of the author, addressees and recipients to each other; and

        i.     the specific privilege(s) claimed for that Document or Communication.

7.     The use of the singular form of any word includes the plural and vice versa.  The past tense of any verb used herein includes the present tense, and the present tense includes the past tense.  Each request and subparagraph or subdivision thereof shall be construed independently, and no other request or subparagraph or subdivision thereof shall be referred to or relied on to limit its scope except insofar as the request or subparagraph or subdivision construed expressly refers to another request or subparagraph or subdivision thereof.

8.      Produce all Documents, Communications, and things requested (1) as
they are kept in the usual course of business, including any labels, file markings, or
similar identifying features, or (2) organized and labeled to correspond to the
categories requested herein.

## **DEFINITIONS**

1.      "Action" refers to the above-captioned case, *Rumble, Inc. v. Jammi, et
al.*, 23-cv-02718-CEH (M.D. Fla.).

2.      "All," "any," "each," and "every" encompass any and all of the matter
discussed.

3.      "Amended Complaint" refers to the Amended Complaint in the Action
filed on April 26, 2024 (ECF No. 42), attached as Exhibit 1.

4.      "And" and "or" are terms of inclusion, not exclusion, and shall be
construed either disjunctively or conjunctively as necessary to bring within the scope
of a document request any Documents, Communications, or things that might
otherwise be construed to be outside of its scope.

5.      "Atkin" refers to Defendant Claire Atkin.

6.      "Communication" or "Communications" means a communication in
any form, including, without limitation, notes, complaints, diaries, journals,
datebooks, reports, calendars, telephone messages, letters, email messages, LinkedIn
messages, cell phone text messages (SMS messages and MMS messages), voicemail

messages, social media communications or posting on sites including but not limited to Facebook, X (f/k/a Twitter), and Instagram (including any direct messages), website postings, internet chat-room postings, lists, correspondence, drawings, designs, telegrams, manuals, summaries or records of personal conversations, logs, minutes or records of meetings, minutes of any other type, transcripts of oral testimony or statements, affidavits, or summaries of investigations. For avoidance of doubt, the term "Communications" includes internal communications and communications with third parties.

7.     "Concerning" means relating to, referring to, describing, evidencing, or constituting.

8.     "Jammi" refers to Defendant Nandini Jammi.

9.     "Document" means any printed, written, typed, recorded, transcribed, taped, photographic, or graphic matter, however produced or reproduced, including, but not limited to: any letter, correspondence, or communication of any sort; email, either sent or received; file, print, negative, or photograph; sound or video recording; note, notebook, diary, calendar, minutes, memorandum, contract, agreement, or any amendment thereto; telex, telegram, or cable; summary, report, or record of any telephone conversation, personal conversation, discussion, interview, meeting, conference, investigation, negotiation, act, or activity; projection, work paper, or draft; computer output or input; data processing card; opinion or report of any

4

consultant; request, order, invoice, or bill of lading; analysis, diagram, map, index, sketch, drawing, plan, chart, manual, brochure, pamphlet, advertisement, circular, newspaper or magazine clipping; press release; receipt, journal, ledger, schedule, bill, or voucher; financial statement, statement of account, bank statement, checkbook, check stubs or register, canceled check, deposit slip, charge slip, tax return, or requisition; file, study, graph, or tabulation; and all other writings and recordings of whatever nature, whether signed, unsigned, or transcribed, and any other data compilation from which information can be obtained or translated. The term "document" also shall mean: the original and/or any non-identical original or copy, including those with any marginal note or comment or showing additions, deletions, or substitutions; drafts; attachments to or enclosures with any document; and any other documents referred to or incorporated by reference in the document. The term "document" also specifically includes all electronic documents and other "electronically stored information" (whether stored electronically or in the form of a hard-copy, print-out, or otherwise) and all attachments thereto.

10.    "Electronically stored information" or "ESI" refers to any portion of data available on a computer or other device capable of storing electronic data. "Electronically stored information" includes, but is not limited to, email, spreadsheets, databases, word processing documents, images, presentations, application files, executable files, log files, and all other files present on any type of

5

device capable of storing electronic data.  Devices capable of storing electronically stored information include, but are not limited, to servers, desktop computers, portable computers, handheld computers, flash memory devices, wireless communication devices, pagers, workstations, minicomputers, mainframes, and any other forms of online or offline storage.  ESI includes cell phone text messages (SMS messages and MMS messages), voicemail messages, and similar types of messages.  ESI includes any records of such communications or messages, including phone records.  ESI includes any social media communication (such as but not limited to X (f/k/a Twitter), Facebook, and Instagram), including any direct messages.  For any document kept in electronic form, the term "Document" includes any metadata associated with the document.

11.    "Person" is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

12.    "Plaintiff" or "Rumble" refers to Rumble, Inc., the plaintiff in the Action.

13.    "Relating to," "Relate to," "Reflecting," and/or "Concerning" mean relating to, reflecting, concerning, referring to, constituting, embodying, connected to, in connection with, comprising, regarding, evidencing, describing, identifying, stating, analyzing, containing information concerning, and/or in any way pertaining to the subject matter of this Action.

6

14.    "Jammi's August 16, 2023 Post" refers to the post Jammi made on X about Rumble on August 16, 2023, which is available at https://twitter.com/nandoodles/status/1691850380315951463 and identified in paragraphs 10, 53, 84, and 95 of the Amended Complaint.

15.    "Atkin's September 26, 2023 Post" refers to the post Atkin made on X about Rumble on September 26, 2023, which is available at https://twitter.com/catthekin/status/1706816841061179478 and identified in paragraphs 11, 57, 84, and 95 of the Amended Complaint.

16.    "Jammi's September 26, 2023 Post" refers to the post Jammi made on X about Rumble on September 26, 2023, which is available at https://twitter.com/nandoodles/status/1706814986461311430 and identified in paragraphs 11, 54, 84, and 95 of the Amended Complaint.

17.    "Jammi's October 3, 2023 Post" refers to the post Jammi made on X about Rumble on October 3, 2023, which is available at https://twitter.com/nandoodles/status/1709252496466575691 and identified in paragraphs 12, 56, 84, and 95 of the Amended Complaint.

18.    "October 24, 2023 Article" refers to the article about Rumble published on CheckMyAds.org on October 24, 2023, which is available at https://checkmyads.org/updates/rumble-gop-debate-explainer/ and identified in paragraphs 13, 58, 84, and 95 of the Amended Complaint.

19.    "Publications" refer to Jammi's August 16, 2023 Post, Atkin's September 26, 2023 Post, Jammi's September 26, 2023 Post, Jammi's October 3, 2023 Post, and the October 24, 2023 Article, collectively.

20.    "You" and "Your" refer to Dewey Square Group, and its current and former officers, directors, employees, contractors, and other agents.

## <u>DOCUMENT REQUESTS</u>

### <u>REQUEST NO. 1.</u>

All Documents and Communications Concerning Rumble's advertising revenue.

### <u>REQUEST NO. 2.</u>

All Documents and Communications Concerning Rumble's use of Google Ads.

### <u>REQUEST NO. 3.</u>

All Documents and Communications Concerning the Rumble Advertising Center.

### <u>REQUEST NO. 4.</u>

All Documents Reflecting or Concerning Communications between You and Atkin Relating to Rumble.

### <u>REQUEST NO. 5.</u>

All Documents Reflecting or Concerning Communications between You and Jammi Relating to Rumble.

### <u>REQUEST NO. 6.</u>

All Documents Reflecting or Concerning Communications between You and Rachel Gilmore, a reporter for Check My Ads, Relating to Rumble.

**REQUEST NO. 7.**

All Documents Reflecting or Concerning Communications between You and Brandon Hardin, an editor for Check My Ads, Relating to Rumble.

**REQUEST NO. 8.**

All Documents Reflecting or Concerning Communications between You and Alec D'Angelo, a researcher for Check My Ads, Relating to Rumble.

**REQUEST NO. 9.**

All Documents Reflecting or Concerning Communications between You and Check My Ads Relating to Rumble.

**REQUEST NO. 10.**

All Documents Reflecting or Concerning Communications between You and Dewey Square Group Relating to Rumble.

**REQUEST NO. 11.**

All Documents and Communications Concerning Jammi's August 16, 2023 Post.

**REQUEST NO. 12.**

All Documents and Communications Concerning Jammi's September 26, 2023 Post.

**REQUEST NO. 13.**

All Documents and Communications Concerning Atkin's September 26, 2023 Post.

**REQUEST NO. 14.**

All Documents and Communications Concerning Jammi's October 3, 2023

Post.

**REQUEST NO. 15.**

All Documents and Communications Concerning the October 24, 2023

Article.

**REQUEST NO. 16.**

All Documents and Communications Concerning Rumble's December 26,

2022 tweet referenced in the Amended Complaint at ¶ 67.

**REQUEST NO. 17.**

Any joint defense or similar agreement between You and any Person Relating

To the Action.

11

# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RUMBLE INC.,

                    Plaintiff,

            v.

NANDINI JAMMI, CLAIRE ATKIN, and
JOHN DOE NOS. 1–10,

                    Defendants.

**Case No. 8:23-cv-02718-CEH**

DEMAND FOR A JURY TRIAL

## AMENDED COMPLAINT

Plaintiff Rumble Inc. ("Rumble"), by and through its undersigned counsel, hereby files the following Amended Complaint against Defendants Nandini Jammi, Claire Atkin, and John Doe Nos. 1–10, and in support of its Amended Complaint, states as follows:

## NATURE OF THE ACTION

1.  Nandini Jammi and Claire Atkin, the co-founders of Check My Ads, together with Media Matters for America, purport to be digital advertising crusaders dedicated to fighting the "global disinformation epidemic." Yet, for years, they have engaged in their own hypocritical disinformation campaign to censor, silence, and cancel speech by spreading false, materially misleading, and defamatory statements and engaging in tortious conduct to convince advertisers to withdraw ad spends from platforms like Rumble that host content creators who espouse views contrary to

Defendants' hyper-partisan sensibilities. In the 2010s, their targets were Bill O'Reilly, Breitbart News, and Tucker Carlson. Today, their targets are Elon Musk, X, and Rumble.

2. Before starting Check My Ads, Jammi helped launch an anonymous Twitter campaign using the Twitter account Sleeping Giants (@slpng_giants) to publicly pressure companies to stop advertising on Breitbart. Sleeping Giants later teamed up with Media Matters to boycott certain Fox News hosts, including Tucker Carlson. Together, Sleeping Giants and Media Matters identified a pressure point to cripple media (and social media) platforms that broadcast content contrary to their progressive world views: advertising dollars. They developed the playbook to cut off ad revenue to these platforms by spreading malicious falsehoods about how large corporate advertisers' products were being featured with—and therefore suggesting an endorsement of—politically-charged or otherwise controversial content.

3. Big Tech was quick to catch on. Not wanting to draw the ire of self-proclaimed advertising watchdogs and realizing that they too could fall victim to the Sleeping Giants-Media Matters playbook, Big Tech platforms such as Google, YouTube, Amazon Web Services, Facebook, and others began increasingly to censor content creators based on what they perceived to be the partisan political hot-button issues of the day.

4. For its part, Rumble has refused to cave to this pressure. Rumble was

created as, and it remains, a proudly content-neutral video platform dedicated to protecting a free and open internet by providing a safe space for open discourse. Rumble's steadfast commitment to free speech is what sets it apart from competing platforms. Rumble was born of a need to protect small content creators who were being squeezed out by incumbent Big Tech platforms in favor of large creators, influencers, and brands. And as Big Tech platforms have increasingly shifted toward preferencing and censorship based on content, not size, Rumble has stayed true to its mission. Rumble supports small content creators, and unlike its competitors, Rumble is a neutral video platform. As a result, Rumble hosts a broad spectrum of creators with varying political viewpoints, allowing users to decide for themselves what content to view.

5.     Rumble has also built its platform from the ground up, creating its own technical infrastructure to avoid dependencies on third parties for critical services whenever possible. And, rather than relying on Google for its advertising revenue, in August 2022 Rumble launched its own platform for advertisers, the Rumble Advertising Center, to further insulate itself and its shareholders from Big Tech.

6.     Rumble has been highly vocal and public about its mission—from its creation, through its 2022 initial public offering, to today, Rumble has been outspoken in its press releases, through its CEO's public statements, and in its U.S. Securities and Exchange Commission ("SEC") filings about its commitment to free

speech, its mission to protect a free and open internet, and its development of its own technical infrastructure and ad platform. Investors have taken note, and as of October 23, 2023, Rumble's market capitalization was $1.44 billion.

7.    Defendants hate Rumble's content-neutral philosophy—and its progress towards economic independence. Rather than entrusting consumers to make their own choices about what to watch, Defendants believe consumers should only be allowed to have access to content that aligns with Defendants' hyper-partisan political views. And Defendants loathe that Rumble has been so successful raising capital and developing a strong foothold in the market. So, Defendants launched a disinformation campaign to demonetize Rumble, and they have bragged about it publicly:



4





8.     In their campaign against Rumble, Defendants are using the same recycled playbook that Jammi used at Sleeping Giants.  Step one: manufacture and spread knowingly false statements about Rumble's business practices, ad placements, revenue streams, and overall financial health.  Step two: publicly pressure large advertisers to "drop" Rumble, thereby reducing revenue to the Company, and amplifying the economic risk they pose to their targets to further discourage investors from purchasing or holding Rumble stock.

9.     As relevant to this action, Defendants falsely accused Rumble— expressly and by implication—of lying to its shareholders and the SEC in its securities filings about the Company's financial health and its sources of ad revenue. Specifically, Defendants have repeatedly peddled the false narrative that Rumble is primarily monetized by and wholly dependent upon revenue from Google Ads, when in reality, Google Ads now represents less than 1% of the Company's revenue.  This narrative is particularly damaging to Rumble.  The notion that Rumble is heavily

dependent on ad revenue from Google is wholly inconsistent with Rumble's publicly

stated mission to be free from the political and economic pressures of Big Tech. And

it is equally damaging to Rumble because it falsely attributes a material and

existential financial risk to the Company that Defendants' stated mission to eliminate

Rumble's Google Ad revenue will cause Rumble's financial collapse.

10.     Defendants have peddled this false narrative repeatedly on X, formerly

known as Twitter, and in an article published on CheckMyAds.org. For example,

on August 16, 2023, Jammi posted on X: "Rumble is all posturing, all the time.

They're not a Google Ads killer or even close to it – they depend on Google for their

business. We're talking a house of cards."



11.     On September 26, 2023, Atkin posted on X: "Rumble, the most toxic

place on the internet, is 90% funded by @GoogleAds," and she included a link to a

Check My Ads article with instructions for advertisers to block Rumble from their ad campaigns. The same day, Jammi posted on X: "A little known fact: @rumblevideo is largely monetized through Google Video Partners."

 

12. On October 3, 2023, Jammi posted on X: "Without @GoogleAds, Rumble would not be viable. … It's criminal behavior by Google, which has promised brand safety to its clients."



13.    Defendants repeated similar claims in an article published on CheckMyAds.org on October 24, 2023.  The article claimed: "Rumble loves to boast about being free from Big Tech.  In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner."

14.    Defendants' clear intent in manufacturing and publishing this false narrative is to harm Rumble's reputation with advertisers, shareholders, investors, creators, and users by suggesting that Rumble is lying to its stakeholders and the market about a material financial risk to the Company—the risk that Rumble's business would be devastated if Google Ads were to drop Rumble.  This is precisely the result that Defendants' false statements are meant to bring about.  But the notion that Rumble's revenue is incompatible with the brand Rumble has worked hard to

build—as an alternative to Big Tech that rejects the cancel culture and censorship that pervade other large social video platforms—is entirely false. And even if Google Ads were to drop Rumble, Rumble's business would not materially suffer.

15.     As Rumble truthfully disclosed in its securities filings, ad revenue Rumble generated from Google Ads has declined quickly in the last two years. Rumble reported in its amended Form S-4 filed on May 12, 2022 that 86% of Rumble's total revenue in the first three quarters of 2021 was derived from Google Ads. In its amended Form S-4 filed on August 9, 2022, Rumble disclosed that, in Q1 2022, Rumble derived 56% of its total revenue from Google Ads and one other external advertising network. By Q2 2022, that percentage had fallen to 45%—a fact that Rumble disclosed in its Form S-1 filed on November 4, 2022. In its Q3 2022 Quarterly Report publicly filed with the SEC, Rumble stated that its revenue from Google Ads and another external advertising network represented 19% of Rumble's overall revenue in the quarter. Although not reported in the Q3 2022 Quarterly Report, the amount of revenue Rumble derived from Google Ads alone was only 9%.

16.     Since then, the percentage of revenue Rumble derived from Google Ads has continued to decline precipitously. That percentage is now so small that Rumble stopped reporting it in its securities filings because its possible loss no longer represents a material risk to the Company. ***In October 2023, Rumble derived less***

9

*than 1% of its revenue from Google Ads*.  This rapid decline was due in large part to the roll out of Rumble's own advertising platform, the Rumble Advertising Center.  Thus, Rumble is not "largely" monetized by Google, Rumble is not reliant on Google Ads, Rumble's financials are not a house of cards built on Google Ads, and Rumble is not "90% funded" by Google Ads as Defendants' claimed.

17.     Defendants recklessly disregarded the truth and published these claims with actual malice when they manufactured this false narrative.  In fact, Defendants knew their statements about Rumble were false when they made them.  The true facts about Rumble's ad revenue were not only publicly available in the Company's SEC filings, but Rumble responded directly to Jammi on X in late 2022 informing her that revenue from two external ad networks, one of which was Google Ads, was less than 20% of Rumble's overall ad revenue in the prior quarter.  Jammi acknowledged both receiving this message and the accuracy of it.  Indeed, she snarked back: "Phew!  Y'all are surprisingly into facts for a company that exists just to stream conspiracy theorists who've been kicked off YouTube.  But noted.  Thanks."

18.     Defendants' concerted disinformation campaign has had precisely the effect they intended—it has harmed Rumble's brand in the eyes of Rumble's stakeholders, including with investors and partners who share Rumble's mission of restoring the internet to its roots by making it free and open and rejecting Big Tech

cancel culture. Following Defendants' false statements imputing to Rumble in the marketplace a material financial risk that does not exist, Rumble lost significant market value. In the week following the defamatory article Jammi and Atkin published on CheckMyAds.org, investors divested their stock in the Company, and Rumble lost nearly $185 million in market capitalization. As a result of Defendants' defamatory falsehoods, Rumble has also been forced to expend tens of thousands of dollars on outside legal counsel and public relations firms to try to mitigate the damage Defendants have caused and continue to cause.

19. While Defendants are free to disagree with Rumble's policy of content neutrality and the views expressed on the platform by third-party content creators, they are not free to knowingly fabricate and publish false statements about the Company to their 150,000 X followers and to a global internet audience in an effort to harm Rumble's business. As individuals supposedly dedicated to combating disinformation should appreciate, the truth matters. Rumble brings this lawsuit to set the record straight, vindicate its rights, and recover damages for the harm Defendants' lies have caused to Rumble's business and reputation.

## PARTIES AND RELEVANT NON-PARTIES

20. Plaintiff Rumble is incorporated under the laws of Delaware, and its headquarters and principal place of business is located at 444 Gulf of Mexico Drive, Longboat Key, Florida. Many of Rumble's corporate documents and potentially

relevant witnesses are in Florida.  The location of Rumble's headquarters is publicly available and widely known, including by Defendants.  Rumble's X profile (@rumblevideo), which Defendants regularly visit and which Jammi and Check My Ads follow, lists Rumble's location as Longboat Key, Florida.  In addition, many of Rumble's public SEC filings, which Defendants have admitted to reviewing, state that Rumble's registered office is in Longboat Key, Florida.  Rumble's press releases, which Defendants have cited, also note its location in Longboat Key, Florida.  And several of Rumble's tweets mention its Florida offices.  Defendants have cited to these press releases and securities filings in articles they published on CheckMyAds.org, and they have tagged and retweeted posts by Rumble, demonstrating that Defendants knew that Rumble is a Florida-based company.

21.     Defendant Nandini Jammi is a co-founder of Check My Ads.  Jammi is domiciled in, resides in, and is a citizen of Maryland.  Jammi's X account (@nandoodles) has nearly 100,000 followers.

22.     Defendant Claire Atkin is a co-founder of Check My Ads.  Atkin is domiciled in and is a citizen of British Columbia, Canada.[1]  She currently resides in New York, New York.  Atkin's X account (@catthekin) has nearly 20,000 followers.

---

[1] Cheryl Chan, *Vancouver co-founder of Check My Ads takes on Fox News*, Vancouver Sun (June 9, 2022), https://vancouversun.com/news/local-news/check-my-ads-vancouver-cofounder-fox-news.

(Continued…)

23.     Check My Ads is a 501(c)(3) tax-exempt corporation organized under the laws of Delaware and purports to be "an independent watchdog reshaping the digital advertising industry."[2]  Defendants Jammi and Atkin reached into Florida and purposefully availed themselves of the privileges of doing business in the State by registering Check My Ads in Florida in October 2023.  Upon information and belief, Defendants Jammi and Atkin have solicited financial donations within Florida and from Florida residents for Check My Ads, benefitting them personally.  Check My Ads' X account (@CheckMyAdsHQ) has nearly 29,000 followers.

24.     Media Matters for America is a nonprofit organization organized under the laws of the District of Columbia with its principal place of business in Washington, D.C.  Media Matters claims to be a "progressive research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in the U.S. media."[3]  On information and belief, Media Matters has worked directly with Defendants in their concerted disinformation campaign aimed at destroying Rumble's business by making false claims to pressure advertisers to stop advertising on Rumble, including by reviewing, editing, and publishing the October 24, 2023 article on CheckMyAds.org,

---

[2] Check My Ads, *About*, https://checkmyads.org/about/ (last visited Nov. 28, 2023).
[3] Media Matters for Am., *About Us*, https://www.mediamatters.org/about-us (last visited Nov. 28, 2023).

13

upon which this action is partially based.  Indeed, in October 2022, Media Matters published an article similarly focused on how Google Ads ostensibly represented almost half of display ad traffic directing viewers to Rumble's website—basing that claim purportedly upon a non-public report published by Dewey Square, a hyper-partisan public affairs agency itself.[4]

25.     Defendants John Doe Nos. 1–10 are individuals who authored, edited, and published—together with Jammi and Atkin—the defamatory October 24, 2023 article about Rumble on CheckMyAds.org, upon which this action is partially based. Rumble is currently unaware of the names or identities of John Doe Nos. 1–10, and it intends to identify John Doe Nos. 1–10 through discovery in this action.  Upon information and belief, John Does 1–10 are Check My Ads, Media Matters, and/or Dewey Square Group employees.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there exists (and at all times since the commencement of this case has existed) complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest

---

[4] Kayla Gogarty and Natalie Mathes, *Google's ad network is driving and monetizing traffic to the fringe video-sharing platform Rumble*, Media Matters (October 20, 2022), https://www.mediamatters.org/google/googles-ad-network-driving-and-monetizing-traffic-fringe-video-sharing-platform-rumble (last visited Nov. 28, 2023).

and costs. Specifically, as pleaded above, Plaintiff Rumble is a citizen of Florida, where it maintains its headquarters and principal place of business, and Delaware, where it is incorporated; Jammi is a citizen of Maryland; and Atkin is a citizen of British Columbia, Canada.

27.    This Court has personal jurisdiction over Defendants pursuant to the U.S. Constitution and Florida's long-arm statute, Fla. Stat. § 48.193. Defendants committed tortious acts within Florida by publishing false and defamatory statements about a Florida-based company that were made accessible to residents of Florida and were in fact accessed and read by Florida residents in Florida.

28.    For example, while located in Florida, X user @thelumpypotato accessed and viewed the four false and defamatory X posts made by Jammi and Atkin about Rumble at or around the time Defendants published those posts.

29.    While located in Florida, Jim Hoft read and accessed the four false and defamatory X posts made by Jammi and Atkin about Rumble at or around the time Defendants published those posts.

30.    While located in Florida, Joe Hoft read and accessed the four false and defamatory X posts made by Jammi and Atkin about Rumble at or around the time Defendants published those posts.

31.    On information and belief, an individual with the X username @TheKeeper2016 accessed, viewed, and "liked" Jammi's defamatory August 16,

2023 post on X from Florida, which @TheKeeper2016 lists as his location on his X account.

32.  On information and belief, individuals with the X usernames @pjitsjustpj, @TheKeeper2016, @_free61, @MIAAgainstFash, @Vollrathian, and @SoFloBri accessed, viewed, and "liked" Jammi's defamatory September 26, 2023 post on X from Florida, which @pjitsjustpj, @TheKeeper2016, @_free61, @MIAAgainstFash, @Vollrathian, and @SoFloBri list as their locations on their X profiles.

33.  On information and belief, individuals with the X usernames @corycandfcp and @hildebran accessed, viewed, reposted, and "liked" Jammi's October 3, 2023 post on X from Florida, which @corycandfcp and @hildebran list as their locations on their X profiles.

34.  On information and belief, individuals with the X usernames @Joanne90364717 and @ScoutsVue accessed, viewed, and reposted Atkin's September 26, 2023 post on X from Florida, which @Joanne90364717 and @ScoutsVue list as their locations on their X profiles.

35.  On information and belief, an individual named Max Francisco who, according to his LinkedIn profile, lives in Fort Lauderdale, Florida accessed and viewed the October 24, 2023 article published by Check My Ads.  Francisco accessed and "liked" Check My Ads' LinkedIn post, which contained a hyperlink to

the article.

36.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in the Middle District of Florida, and all Defendants are subject to personal jurisdiction in Florida. Rumble's headquarters and principal place of business is in the Middle District of Florida, where it has suffered the brunt of the harm to its reputation and economic injury from Defendants' defamatory statements.     In addition, Defendants' defamatory statements were published and accessed in the Middle District of Florida.

## FACTUAL ALLEGATIONS

### *Rumble Launches a Content-Neutral Video-Sharing Platform as an Alternative to Big Tech.*

37.     Rumble is an online video platform, web hosting, and cloud services business.  From day one, Rumble has publicly sought to differentiate itself from Big Tech.   When Rumble was founded in 2013, incumbent Big Tech platforms deprioritized small content creators in favor of influencers, corporations, and large brands.  Rumble sought to provide an alternative platform to empower those small content creators where they could express themselves freely.

38.     Over time, preferencing on social media and video platforms continued to expand and evolve.  Big Tech incumbents increasingly employed sophisticated algorithms to amplify certain content creators and censor others.   Rumble, by

17

contrast, never took that approach.  Unlike incumbent Big Tech platforms, Rumble has never employed black-box algorithms to drive profit or restrict content.  Its content policies have always remained consistent and transparent.

39.    As Big Tech social platforms have continued to expand censorship policies on user-generated content, Rumble has remained steadfastly and publicly committed to content neutrality.  It has created an open platform that welcomes content of all genres.

40.    Rumble's public commitment to restoring the internet to its roots by making it free and open once again has resonated with users who are fed up with the "cancel culture" running rampant throughout Big Tech, who support diverse opinions and authentic expression, and who recognize the value of and need for open dialogue.  In one year, from the third quarter of 2020 to the third quarter of 2021, the number of monthly active users on Rumble increased more than twentyfold, from about 1.6 million to over 36 million.

### *Rumble Goes Public and Establishes U.S. Headquarters in Florida.*

41.    In December 2021, Rumble announced a business combination with a special purpose acquisition company to take Rumble public.  The combination was successfully completed in September 2022, and Rumble began trading publicly on the Nasdaq Global Market.  The deal provided Rumble with gross proceeds of about $400 million, which has helped Rumble continue to grow and remain competitive

with its Big Tech rivals, while remaining true to its core values of content neutrality. As of the third quarter of 2023, Rumble had an average of approximately 58 million monthly active users.[5]

42.     In November 2021, Rumble publicly announced that it had signed a lease and would establish its U.S. headquarters in Longboat Key, Florida.  It also announced that it would immediately hire 20 to 25 employees for its U.S. headquarters, with rapid growth planned for the future.  Rumble officially opened its new office in Longboat Key in March 2023.

### *Jammi Partners With Media Matters to Take Down Media Networks and Personalities With Whom They Disagree Politically.*

43.     In November 2016, Jammi helped launch an anonymous Twitter campaign using the Twitter account Sleeping Giants to pressure advertisers to drop networks and personalities with which Jammi disagreed politically.  For example, Sleeping Giants went after Breitbart News Network, urging followers to collect screenshots of ads appearing on Breitbart's website and bombarding advertisers with tweets about where their ads were appearing.

44.     Eventually, Sleeping Giants teamed up with Media Matters, and together, they set their sights on Fox News—another media outlet whose views they

---

[5] Rumble, *Rumble Reports Third Quarter 2023 Results* (Nov. 13, 2023), https://api.mziq.com/mzfilemanager/v2/d/2e1fc959-ad61-4cc5-9c93-6d71e81648f4/bef8dd3c-7c42-fd7d-a08a-94f17d4d565c?origin=1.

did not share.  They followed the same playbook that Sleeping Giants had used against Breitbart.

45.    Over time, they refined their methods.  Not only were they capturing ads that appeared organically on the sites they sought to take down, but they also manufactured ad placements they knew advertisers would find problematic—a tactic that Defendants and Media Matters still employ today.  They create fake X profiles and visit sites of particularly controversial content creators, continually refreshing those pages until ads for large brands appear.

46.    For example, in March 2023, Netflix stopped advertising on Rumble after Media Matters engineered it so that Netflix ads would appear on a user-generated video on Rumble expressing antisemitic views.  Media Matters staff repeatedly refreshed the user-generated video—in some cases, more than 70 times—causing Rumble's advertising system to serve different advertisements until Media Matters found one that it could use as fodder for its public pressure campaign.  As it turned out, the Media Matters employee engaging in this tactic was the only one to actually view the Netflix ad on the video.  And once Rumble learned about this antisemitic content on its platform—a clear violation of Rumble's content moderation policies—it immediately removed the video.

### *Using the Same Media Matters and Sleeping Giants Playbook, Defendants Launch a New Online Smear Campaign to Take Down Rumble.*

47.    Jammi and Atkin co-founded the Check My Ads Institute in October

20

2021, purportedly to serve as a non-profit digital advertising watchdog.  Jammi and Atkin have promised to "rip the beating heart out of the disinformation economy."[6] However, Jammi and Atkin—individually and through Check My Ads—have waged their own disinformation campaign to take down Rumble by spreading lies about Rumble's financial health and its sources of ad revenue—all because Jammi and Atkin disagree with the views of some content creators on Rumble.

48.     To achieve their objective, Defendants have tried to put public pressure on advertisers to stop doing business with Rumble.  They have encouraged advertisers to "block Rumble from [their] ad campaigns," providing detailed instructions on how to do so.[7]  And they have urged Google to "drop Rumble[]."[8]

49.     In an effort to convince Rumble's key stakeholders, including shareholders, putative investors, and advertisers, to "drop Rumble," Defendants have also concocted the false and defamatory narrative that Rumble has lied to investors and stakeholders about its valuation, sources of revenue, and purportedly undisclosed financial risks.

50.     Specifically, on May 21, 2023, Jammi posted on X (in response to a

---

[6] Check My Ads, *Hey, Check My Ads is 2 years old!* (Oct. 27, 2023), https://checkmyads.org/updates/check-my-ads-is-2/.
[7] Check My Ads, *How to block Rumble from your ad campaigns* (Sept. 26, 2023), https://checkmyads.org/branded/how-to-block-rumble-from-your-ad-campaigns/.
[8] Check My Ads, *It's not just Russell Brand.  Here are other toxic people Rumble is monetizing.* (Sept. 28, 2023), https://checkmyads.org/updates/rumble-toxic-influencers-bongino-brand/.

tweet from Dan Bongino, a content creator on Rumble) that Rumble's multi-billion-dollar valuation was "just a garden variety grift."



51.     Not only is Jammi's claim false, but it also shows her clear intent to disseminate misleading information about Rumble. In support of her false claim that "there's no multi-billion dollar [sic] valuation" and Rumble is just a "garden variety grift," Jammi cites to quarterly revenue figures in Rumble's Q1 2023 earnings report. That is a completely different financial metric than valuation. Rumble went public through a business combination agreement with a special purpose acquisition company sponsored by Cantor Fitzgerald, a respected Wall Street investment bank. That transaction determined Rumble's enterprise value to be $2.1 billion, with a potential increase to $3.1 billion if stock price targets are satisfied in the coming years.

52.     Now that Rumble is publicly traded, its value is easier to determine. It is simply Rumble's share price multiplied by the number of shares. On October 23, 2023—the day before Defendants published their defamatory article on CheckMyAds.org—Rumble's stock closed at $5.15 per share, giving the Company

22

a market capitalization of about $1.44 billion.

53.     On August 16, 2023, Jammi tweeted that Rumble is "not a Google Ads killer … they depend on Google for their business.  We're talking a house of cards."



54.     On September 26, 2023, she made similar claims, posting on X that Rumble "is largely monetized through Google Video Partners."



55. Later the same day, Rumble's product manager posted on X that Rumble is "fearless" in "pursuit of [its] mission" to "protect a free and open internet." Jammi responded: "I'm pretty sure you're shit scared of losing your Google seller account," underscoring her intent to harm Rumble's business.



56. A few days later, on October 3, Jammi posted that "[w]ithout @GoogleAds, Rumble would not be viable. … It's criminal behavior by Google, which has promised brand safety to its clients."



57.     On September 26, Atkin posted that "Rumble, the most toxic place on the internet, is 90% funded by @GoogleAds." This post also tagged Jammi, an action that would lead to her receiving an alert to her account on X.



58.     Upon information and belief, Jammi, Atkin, and John Does 1–10 made the same claim in an article published by Check My Ads on October 24, 2023. The article said:

> Rumble is heavily monetized by Google Ads. Rumble loves to boast about being free from Big Tech. In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner — and advertisers often have no idea their ads are appearing there. Rumble is part of Google Video Partners, which means Google dumps inventory there that many advertisers assume is going to YouTube. And it seems to know brands wouldn't appreciate appearing next to some

of Rumble's content: it has taken steps to minimize the risk of advertisers waking up to screenshots of their ads next to Alex Jones' face. Its two-tier system for ads monetizes the worst videos through Rumble Ads, its in-house ad platform, while featuring Google Ads on mainstream channels, such as Reuters.[9]

59. On information and belief, Jammi and Atkin co-wrote, edited, and published this defamatory article on Check My Ads, along with John Doe Nos. 1–10.

60. On information and belief, John Doe Nos. 1–10 are unidentified employees of Check My Ads, Media Matters for America, and/or Dewey Square Group who also were directly involved in writing, editing and publishing the defamatory October 24, 2023 article. Indeed, Media Matters published a similar article in October 2022, which claimed that Google Ads was responsible for nearly half of all display ads directing users to Rumble's website. It did so based upon a non-public Dewey Square Group analysis. Dewey Square Group itself is a hyper-partisan government and public affairs agency, who upon information and belief, was paid by Media Matters and others for this analysis as part of a broader public affairs attack on Rumble.

### *Defendants' Claims that Rumble is 90% Monetized by, and Economically Dependent Upon, Google Ads are False and Defamatory Per Se.*

61. Defendants' claims that Rumble is 90% monetized by and is

---

[9] Check My Ads, *8 Things To Know About Rumble, The Toxic Platform That Will Stream The GOP Debate* (Oct. 24, 2023), https://checkmyads.org/updates/rumble-gop-debate-explainer/.

economically dependent upon Google Ads are false and defamatory. At the time of Defendants' claims in August through October 2023, Rumble's ad revenue generated from Google AdSense was miniscule. In October 2023, it was less than 1% percent of the Company's total revenue.

62. Defendants' false claims about Rumble's ad revenue imply—as Defendants intended—that Rumble is susceptible to a material financial risk (i.e., the risk that Google may decide to pull nearly all Rumble's ad revenue) that simply does not exist. As Rumble's public securities filings show, since 2021, the percentage of revenue Rumble derived from Google Ads has fallen dramatically. In the first three quarters of 2021, revenue from Google Ads was about 86% of Rumble's total revenue. In October 2023, it was less than 1%. That number continues to shrink as Rumble's own ad marketplace, the Rumble Advertising Center, expands.

63. Google Ads now accounts for such a small percentage of Rumble's overall revenue that, even if Google Ads were to drop Rumble, Rumble's financial health would remain strong and its financial outlook bright.

64. Defendants' claims about the size of Rumble's ad revenue derived from Google falsely suggest that Defendants' own attacks against the Company pose an existential financial threat that simply does not exist. Although Defendants' mission is to destroy Rumble by pressuring Google to demonetize it, such a loss would

account for less than 1% of Rumble's gross revenue.

65.     Defendants' claims that Rumble is economically dependent on Google Ads and derives 90% of its ad revenue from Google are defamatory per se because they falsely impute to Rumble a characteristic and condition that is incompatible with the proper exercise of Rumble's business, trade, mission, and brand.  Since its inception, Rumble's publicly stated mission has been to free itself—and its users— from the shackles of Big Tech's censorship and dominance in the U.S. economy. (To that end, Rumble filed an antitrust lawsuit against Google in January 2021; that lawsuit is ongoing.)  And that distinction has been a significant factor in Rumble's economic success, including successfully going public in September 2022, because Rumble's users, shareholders, and investors share Rumble's commitment to independence from Big Tech.  Defendants' false claims have diminished Rumble's brand in the eyes of its users, shareholders, putative investors, and a substantial and respectable minority of Florida's citizenry.

66.     Rumble reported in the Form 10-Q it filed publicly with the SEC in November 2022 that revenue generated from Google AdSense and another external advertising network was only about 19% of Rumble's total revenue—not 90% as Atkin claimed.  In fact, the percentage of ad revenue derived solely from Google AdSense in Q3 2022 was only 9%.  That percentage has fallen even further as Rumble has begun rolling out the Rumble Advertising Center, a technologically

advanced advertising marketplace that will allow Rumble to scale advertising revenue through automation and improve the experience for its advertisers. Accordingly, Defendants' statements are defamatory per se because they also accuse Rumble of criminal misconduct—falsely implying that Rumble committed securities fraud by lying to investors and to the SEC when it reported in public SEC filings at the end of 2022 that revenue from Google AdSense and another external advertising network was only 19% of the company's overall revenue and by failing to report revenue from Google AdSense separately after that quarter.

### *Jammi and Atkin Published Their Statements With Actual Malice: They Knew Rumble was not Largely Monetized by Google Ads—Because Rumble Told Them.*

67. Defendants claim to be dismantling disinformation. But in reality, they are peddling false claims that support their agenda—taking down Rumble. Rumble has told Jammi directly that revenue from Google Ads and another external advertising network represented less than 20% of the Company's overall ad revenue. On December 26, 2022, Rumble replied to a tweet Jammi posted on X, informing her that "[t]he top two external ad networks Rumble uses, which includes Google, represent less than 20% of our revenue in Q3." Jammi responded: "Phew! Y'all are surprisingly into facts for a company that exists just to stream conspiracy theorists

who've been kicked off YouTube. But noted. Thanks."[10] On information and belief, Jammi shared this information with Atkin, who follows Jammi's account on X, and Atkin independently saw Rumble and Nandini's exchange on X.



68. Jammi and Atkin also knew that their claims were false because, upon information and belief, they reviewed the similarly focused, October 2022 Media Matters article, *Google's ad network is driving and monetizing traffic to the fringe video-sharing platform Rumble*, which states expressly that "Google's ad network made up [only] 2% of total advertiser spending on Rumble.com in the last year."[11] Upon information and belief, Jammi and Atkin have been working directly with

---

[10] Nandini Jammi (@nandoodles), X (Dec. 26, 2022, 2:26 PM), https://twitter.com/nandoodles/status/1607457943569551366.
[11] Kayla Gogarty and Natalie Mathes, *Google's ad network is driving and monetizing traffic to the fringe video-sharing platform Rumble*, Media Matters (October 20, 2022) (citing Pathmatics), https://www.mediamatters.org/google/googles-ad-network-driving-and-monetizing-traffic-fringe-video-sharing-platform-rumble (last visited Nov. 28, 2023).

Media Matters and Dewey Square Group as part of a broader public affairs campaign to target Rumble, and, as a result, have reviewed this article and the non-public Dewey Square Group and Pathmatics analyses upon which it is based.

### *Jammi and Atkin Published Their Statements With Actual Malice: They Published Them With Ill Will, to Promote a Preconceived Narrative that Rumble is "Toxic," With Purposeful Avoidance of Obvious Sources of Readily Available Information, With a Financial Motive to Profit Off Their Defamation, and Without Adhering to Journalistic Standards.*

69.     Since the December 2022 exchange, Defendants have continued their disinformation campaign against Rumble, including by repeating the statements at issue. The reason is obvious: Defendants have made clear that their goal is to destroy Rumble regardless of the facts. Defendants knowingly or recklessly disregarded the truth about Rumble because of their extreme ill will and contempt for Rumble. Defendants' ill will is obvious on the face of their posts and other statements about the Company, which they routinely refer to as "toxic." For example, Jammi has posted the following:



**Nandini Jammi**
@nandoodles

I think a lot about how once we take down Rumble, this guy goes away forever



**Nandini Jammi**
@nandoodles

You need both and unfortunately, Rumble is DOA. Just watch :)

2:30 PM · Dec 17, 2021



**Nandini Jammi**
@nandoodles

It happened last week! Guess I was too busy demonetizing Rumble to notice.

5:57 PM · Oct 2, 2023 · **4,751** Views

70.     Not only were Defendants motivated by ill will toward Rumble, but they also purposefully ignored facts in obvious, reliable sources of information about the Company.  Defendants recklessly disregarded information in Rumble's publicly available SEC filings that contradicted their preconceived narrative that Rumble is heavily dependent on Google Ads.  On information and belief, Defendants read these filings, but they purposefully omitted from their statements material information that contradicted the story they set out to tell—that Rumble is a "house of cards" built on Google Ads and economically fragile to the interference Jammi and Atkin intended to achieve in Rumble's relationship with Google.

71.     Over time, Rumble's SEC filings demonstrated an ever-decreasing amount of revenue from Google Ads which became so de minimus (and thus not a material financial risk) that it was excluded from Rumble's SEC filings after Q3

2022.  Prior to Defendants' statements, the most recent public information about Rumble's advertising revenue was its November 2022 Form 10-Q, which states that revenue generated from Google AdSense and another external advertising network was only about 19% of Rumble's total revenue.[12]  The percentage attributable to Google AdSense alone was only 9%.  On information and belief, Defendants were aware of the information in Rumble's November 2022 Form 10-Q that contradicted their false statement because they have reviewed this and other of Rumble's publicly available SEC filings, such as Rumble's 2023 Q1 earnings report.  On information and belief, Defendants were also aware of the decreasing trend of external advertising revenue supporting Rumble's business prior to their false statements.  On May 21, 2023, Jammi responded to a tweet from Dan Bongino noting that she "checked out Rumble's Q1 2023 earnings report."

---

[12] Form 10-Q, Rumble Inc. (Nov. 14, 2022), available at
https://api.mziq.com/mzfilemanager/v2/d/2e1fc959-ad61-
4cc5-9c93-6d71e81648f4/567c0117-9ff3-9c18-1207-e6eda85ad284?origin=1.

33



72. The same day, she also tweeted a screenshot from Rumble's Q1 2023 earnings report. And she falsely claimed that much of Rumble's year-over-year increase in revenue was from "GOOGLE ADS, which [Rumble] so deliciously claim[s] to have ditched."



34

73.     In addition to their animus toward Rumble, Defendants had a financial motive to defame the Company.  Check My Ads is a 501(c)(3) tax-exempt corporation that relies on soliciting donations to fund its operations.  It is funded by grants, charitable foundations, and individual donors.  Defendants' salacious and widespread disinformation campaigns against companies like Rumble are critical for attracting the donors necessary to sustain Check My Ads' existence.

74.     Finally, Defendants failed to abide by basic journalistic standards in researching, writing, and publishing the October 24, 2023 article, which Defendants describe as a "news article."  Because this was a "news article," Defendants should have adhered to standards of ethical and professional journalism, which require journalists to, among other things, "[d]iligently seek subjects of news coverage to allow them to respond to criticism or allegations of wrongdoing," "[v]erify information before releasing it," "[n]ever deliberately distort facts or context," and "[a]cknowledge mistakes and correct them promptly and prominently."[13]  Here, Defendants failed to contact Rumble for comment prior to publication of the October 24, 2023 article, omitted material facts provided to them by Rumble that were readily and publicly available including in Rumble's SEC filings, deliberately included information they knew to be false to bolster their preconceived take-down narrative,

---

[13]     Soc'y of Pro. Journalists, *SPJ Code of Ethics* (Sept. 6, 2014), https://www.spj.org/ethicscode.asp.

and refused to correct or acknowledge that their statements were false.

*__Jammi and Atkin Acted With Actual Malice Because They Refused Rumble's Demand To Retract Their False Statements.__*

75. On October 26, 2023, Rumble's legal counsel sent Jammi and Atkin a letter informing them that their statements are false and defamatory. Specifically, the letter explained that, as "Rumble reported in the Form 10-Q it filed publicly with the SEC in November 2022[,] … revenue generated from Google AdSense was only about 19% of Rumble's total revenue," and "[t]hat percentage has fallen even further as Rumble has begun rolling out the Rumble Advertising Center."

76. As such, Rumble's counsel demanded that Jammi and Atkin take down their September 26, 2023 tweets falsely claiming that Rumble is "largely monetized through Google Video Partners" and "90% funded by @GoogleAds." Rumble's counsel also demanded that Jammi and Atkin retract the false claims in the October 24, 2023 article published on Check My Ads, including that "Rumble is heavily monetized by Google Ads," and Rumble "appears to be heavily dependent on Google Ads, by far its largest advertising partner."

77. Defendants know how to correct the public record when they want to. In August 2021, Rumble notified Jammi that she had posted inaccurate information on Twitter. She responded by sharing the correct information publicly:



78.     They have refused to do so here.  Rather, Atkin used the opportunity to reemphasize the accuracy of her false statement.  On November 21, 2023, Atkin doubled down, posting on X that "[t]o clarify, approximately 90% of Rumble's programmatic display ad revenue comes from @GoogleAds."  This statement was a reply to Atkin's original September 26 tweet.  It came nearly a month after Atkin received Rumble's unambiguous retraction demand letter, in which Rumble informed Atkin that Google Ads did not make up a significant portion of its ad revenue.  Atkin's attempt to qualify her original statement as referring only to "programmatic display" ad revenue was not a correction, but rather an admission that she had the facts wrong.  Google Ads does not make up 90% of Rumble's programmatic display ad revenue.  Had Atkin engaged with Rumble, the Company would have told her this.  Indeed, Defendants have had ample opportunity to engage

with Rumble and learn about the Rumble's own advertising system that now provides the Company with advertising revenue. Instead, rather than meaningfully retracting or correcting her original statement and setting the record straight, Atkin chose to repeat her false claims, amplifying the harm to Rumble. And Defendants' refusal to retract their statements is additional evidence of their malicious intent toward Rumble.

***Defendants' False Statements Have Harmed Rumble's Business and Reputation.***

79. Defendants' concerted and coordinated smear campaign is having its desired effect. Defendants' false assertions that Rumble is heavily dependent on and 90% monetized by Google Ads, and that it has lied to and misled stakeholders about its sources of ad revenue and overall financial health have caused substantial harm to Rumble's reputation and damaged its brand. Defendants' false and defamatory campaign has created uncertainty with Rumble's users and creators, as well as sowed confusion with advertisers on the Rumble Advertising Center.

80. Beyond this irreparable reputational harm, Rumble's business has suffered economically. As Defendants have boasted, major advertisers have dropped Rumble. And putative advertisers have avoided purchasing ads through the Rumble Advertising Center because they are less willing to buy ads when they perceive risk of Jammi, Atkin, and Media Matters publicly shaming and targeting them for their ads appearing on Rumble's website.

81.     Rumble's stock price also fell nearly 13% in the week following Defendants' publication of their defamatory October 24, 2023 article about Rumble on CheckMyAds.org.  On October 23, 2023, Rumble's stock price closed at $5.15. One week later, Rumble's stock price had fallen to $4.49.  As a result of the stock price decrease, Rumble's market capitalization fell by nearly $185 million (from $1.443 billion to $1.258 billion).

82.     Rumble has also incurred special damages trying to mitigate, as best it can, the harm caused by Defendants' defamation.  These damages were a foreseeable and normal consequence of Defendants' tortious conduct, and that conduct was a substantial factor in bringing about these expenses.  For example, Rumble has spent more than $37,122.50 in legal fees to outside counsel in connection with its efforts to educate Defendants and request that Defendants retract their false and defamatory statements—a request that Defendants have refused.  Further, Rumble spent another $10,000 on a public relations consultant to mitigate damages directly connected to Defendants' false statements.  That work is ongoing.  These fees are separate from and in addition to the substantial sums Rumble has spent, and will have to spend, on this litigation.

## COUNT I – DEFAMATION
## (AGAINST ALL DEFENDANTS)

83.     Plaintiff repeats and alleges paragraphs 1–82 as if set forth fully herein.

84.     Defendants made the following false and defamatory statements of fact

about Rumble on X and CheckMyAds.org.

    a.    On August 16, 2023, Jammi wrote on X that "Rumble is all posturing, all the time.  They're not a Google Ads killer or even close to it – they depend on Google for their business.  We're talking a house of cards."[14]

    b.    On September 26, 2023, Jammi wrote on X that "@rumblevideo is largely monetized through Google Video Partners (GVP), a network of sites that Google forcibly opts YouTube advertisers into."[15]

    c.    On September 26, 2023, Atkin wrote on X that "Rumble, the most toxic place on the internet, is 90% funded by @GoogleAds.  But the advertisers using Google didn't know!  Until now."[16]

    d.    On October 3, 2023, Jammi wrote on X that "Without @GoogleAds, Rumble would not be viable. … It's criminal behavior by Google, which has promised brand safety to its clients."[17]

    e.    On October 24, 2023, Defendants published on CheckMyAds.org an article falsely claiming that: "Rumble is heavily monetized by Google Ads.  Rumble loves to boast about being free from Big Tech.  In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner — and advertisers often have no idea their ads are appearing there.  Rumble is part of Google Video Partners, which means Google dumps inventory there that many advertisers

---

[14] Nandini Jammi (@nandoodles), X (Aug. 16, 2023, 12:32 PM), https://twitter.com/nandoodles/status/1691850380315951463.
[15] Nandini Jammi (@nandoodles), X (Sept. 26, 2023, 7:36 PM), https://twitter.com/nandoodles/status/1706814986461311430.
[16] Claire Atkin (@catthekin), X (Sept. 26, 2023, 7:43 PM), https://twitter.com/catthekin/status/1706816841061179478.
[17] Nandini Jammi (@nandoodles), X (Oct. 3, 2023, 1:02 PM), https://twitter.com/nandoodles/status/1709252496466575691.

(Continued…)

assume is going to YouTube. And it seems to know brands wouldn't appreciate appearing next to some of Rumble's content: it has taken steps to minimize the risk of advertisers waking up to screenshots of their ads next to Alex Jones' face. Its two-tier system for ads monetizes the worst videos through Rumble Ads, its in-house ad platform, while featuring Google Ads on mainstream channels, such as Reuters."[18]

85. Defendants' statements are reasonably understood to be statements of fact about Rumble, and those statements were understood by people who saw, heard, and read them to be statements of fact about Rumble. Defendants and Check My Ads purport to be digital advertising watchdogs, suggesting to readers that their publications and pronouncements are researched, reliable, and based on facts.

86. Defendants' statements convey, and are reasonably understood to convey, that Rumble's business is largely dependent on Big Tech (i.e., Google Ads), that its heavy reliance on Google Ads exposes Rumble to a material financial risk, and that Rumble has misled investors and other stakeholders by reporting false information about its financial health and sources of ad revenue in public securities filings.

87. Defendants' statements are false. Rumble is not "largely" or "heavily" monetized by Google. Nor is it "90% funded" by Google Ads. It is not reliant on Google as a going concern. As set forth above in detail, the fact that Rumble receives

---

[18] Check My Ads, *8 Things To Know About Rumble, The Toxic Platform That Will Stream The GOP Debate* (Oct. 24, 2023), https://checkmyads.org/updates/rumble-gop-debate-explainer/.

only a small fraction of its revenue from Google Ads is widely and publicly known. Rumble publicly reported in its SEC filings in November 2022, and Rumble told Jammi directly in late 2022, that Rumble received less than 20% of its ad revenue from Google and another external advertising network. In fact, in October 2023, it was less than 1%. Rumble's business is not dependent on Google Ads. Rumble is not vulnerable to a material financial risk if it were to be dropped from Google Ads. And Rumble has never lied to or misled its investors.

88. Defendants' statements are defamatory—and at least a substantial and respectable minority of the community understood them to be defamatory—because they expose Rumble to hatred, ridicule, or contempt; tend to injure Rumble in its business and reputation; and charge that Rumble committed a crime. Any statement that Rumble is largely dependent on Big Tech platforms like Google Ads harms Rumble's business reputation and damages its brand, particularly with content creators and users who seek out neutral social media platforms. Likewise, any statement that Rumble made false statements in securities filings, or otherwise misled investors and other stakeholders, injures Rumble's business and reputation, and falsely accuses Rumble of criminal conduct.

89. Defendants' false statements that Rumble is susceptible to a material financial risk because of its heavy reliance on Google Ads are defamatory per se because they improperly call into question Rumble's financial soundness which

tends to injure Rumble in its business.

90.     Defendants' false statements accusing Rumble of lying to investors are defamatory per se because they impute to Rumble an infamous crime—specifically, securities fraud—and they impute to Rumble conduct incompatible with the proper execution of lawful business.

91.     As a direct and foreseeable result of Defendants' false and defamatory statements, Rumble has suffered significant reputational and economic harm as detailed above.  Defendants have bragged about causing this harm, noting that their disinformation campaign has spurred advertisers to drop Rumble.   In addition, Rumble has been forced to expend more than $37,122.50 in legal fees and $10,000 to hire a public relations firm to try to mitigate the harm caused by Defendants' libelous smear campaign.  And Rumble's market capitalization has decreased by nearly $185 million.  The overall monetary value of the harm caused by Defendants' defamation exceeds $75,000.

92.     Defendants had no applicable privilege or legal authorization to publish their defamatory statements or, if they did, abused that privilege.

93.     Defendants published their defamatory statements with actual malice. Defendants knew their statements were false when they made them, or recklessly disregarded the truth or falsity of their statements.  Specifically, Defendants acted with actual malice because: (1) Rumble informed Jammi directly more than a year

before Defendants published their false and defamatory statements that revenue from Google Ads, combined with revenue from a second external advertising network, was less than 20% of Rumble's overall ad revenue; (2) Defendants ignored obvious sources of information—including Rumble's publicly available securities filings—that contradicted the narrative they concocted to take down Rumble; (3) Defendants were motivated by hostility and ill will toward Rumble because Rumble allows content creators to express views on the platform contrary to Defendants' partisan political agenda; (4) Defendants had a financial motive to publish defamatory falsehoods about Rumble; (5) Defendants refused to retract or correct their false and defamatory statements; and (6) Defendants failed to adhere to journalistic standards in researching, writing, and publishing their October 24, 2023 "news article."

## COUNT II – DEFAMATION BY IMPLICATION
## (AGAINST ALL DEFENDANTS)

94.     Plaintiff repeats and alleges paragraphs 1–82 as if set forth fully herein.

95.     Defendants made a series of false statements of fact about Rumble on X and CheckMyAds.org that were reasonably capable of sustaining an incorrect and defamatory implication.  Specifically, Defendants juxtaposed the following statements of fact to imply a defamatory connection between them or otherwise create a defamatory implication:

> a.     On August 16, 2023, Jammi wrote on X that "Rumble is all posturing, all the time.  They're not a Google Ads killer or even

close to it – they depend on Google for their business.  We're talking a house of cards."[19]

b.   On September 26, 2023, Jammi wrote on X that "@rumblevideo is largely monetized through Google Video Partners (GVP), a network of sites that Google forcibly opts YouTube advertisers into."[20]

c.   On September 26, 2023, Atkin wrote on X that "Rumble, the most toxic place on the internet, is 90% funded by @GoogleAds.  But the advertisers using Google didn't know!  Until now."[21]

d.   On October 3, 2023, Jammi wrote on X that "Without @GoogleAds, Rumble would not be viable. … It's criminal behavior by Google, which has promised brand safety to its clients."[22]

e.   On October 24, 2023, Defendants published on CheckMyAds.org an article falsely claiming that: "Rumble is heavily monetized by Google Ads.  Rumble loves to boast about being free from Big Tech.  In reality, the business appears to be heavily dependent on Google Ads, by far its largest advertising partner — and advertisers often have no idea their ads are appearing there. Rumble is part of Google Video Partners, which means Google dumps inventory there that many advertisers assume is going to YouTube.  And it seems to know brands wouldn't appreciate appearing next to some of Rumble's content: it has taken steps to minimize the risk of advertisers waking up to screenshots of their ads next to Alex Jones' face. Its two-tier system for ads monetizes the worst videos through Rumble Ads, its in-house ad platform, while featuring Google

---

[19] Nandini Jammi (@nandoodles), X (Aug. 16, 2023, 12:32 PM), https://twitter.com/nandoodles/status/1691850380315951463.

[20] Nandini Jammi (@nandoodles), X (Sept. 26, 2023, 7:36 PM), https://twitter.com/nandoodles/status/1706814986461311430.

[21] Claire Atkin (@catthekin), X (Sept. 26, 2023, 7:43 PM), https://twitter.com/catthekin/status/1706816841061179478.

[22] Nandini Jammi (@nandoodles), X (Oct. 3, 2023, 1:02 PM), https://twitter.com/nandoodles/status/1709252496466575691.

(Continued…)

Ads on mainstream channels, such as Reuters."[23]

96.     Defendants juxtaposed these series of statements to imply—and their statements were reasonably understood to imply—(1) that Rumble's heavy reliance on Google Ads exposes Rumble to a material financial risk and (2) that Rumble has misled investors and other stakeholders by reporting false information about its financial health and sources of ad revenue in public securities filings.

97.     Defendants' statements and their implications are false.  As set forth above in detail, more than a year ago, Google Ads and another external advertising network accounted for 19% of Rumble's revenue, and Rumble received less than 1% of its revenue from Google Ads in October 2023.  The fact that Rumble receives a small percentage of its revenue from Google Ads has been publicly reported in Rumble's SEC filings, and Rumble told Jammi directly in late 2022 that it receives less than 20% of its ad revenue from Google and a second external advertising network.  As such, Rumble is not vulnerable to a material financial risk were Google Ads to drop it.  And Rumble has never lied to or misled its investors.

98.     Defendants' statements and their implications are defamatory—and at least a substantial and respectable minority of the community understood them to be defamatory—because they expose Rumble to hatred, ridicule, or contempt; tend to

---

[23] Check My Ads, *8 Things To Know About Rumble, The Toxic Platform That Will Stream The GOP Debate* (Oct. 24, 2023), https://checkmyads.org/updates/rumble-gop-debate-explainer/.

injure Rumble in its business and reputation; and charge that Rumble committed a crime.

99.    Defendants' false implications that Rumble is susceptible to a material financial risk because of its heavy reliance on Google Ads are defamatory per se because they improperly call into question Rumble's financial soundness, which tends to injure Rumble in its business.

100.    Defendants' false implications accusing Rumble of lying to investors are defamatory per se because they impute to Rumble an infamous crime–specifically, securities fraud—and they impute to Rumble conduct incompatible with the proper execution of lawful business.

101.    As a direct and foreseeable result of Defendants' false and defamatory statements and their implications, Rumble has suffered significant reputational and economic harm as detailed above.  Defendants have bragged about causing this harm, noting that their disinformation campaign has spurred advertisers to drop Rumble.  In addition, Rumble has been forced to expend more than $37,122.50 in legal fees and $10,000 to hire a public relations firm to try to mitigate the harm caused by Defendants' libelous smear campaign.   And Rumble's market capitalization has decreased by nearly $185 million.  The overall monetary value of the harm caused by Defendants' defamation exceeds $75,000.

102.    Defendants had no applicable privilege or legal authorization to publish

their defamatory statements or implications or, if they did, abused that privilege.

103.   Defendants published their defamatory statements and implications with actual malice.  Defendants knew their statements and implications were false when they made them, or recklessly disregarded the truth or falsity of their statements.  Specifically, Defendants acted with actual malice because: (1) Rumble informed Jammi directly more than a year before Defendants published their false and defamatory statements that revenue from Google Ads and another external advertising network was less than 20% of Rumble's overall ad revenue; (2) Defendants ignored obvious sources of information—including Rumble's publicly available securities filings—that contradicted the narrative they concocted to take down Rumble; (3) Defendants were motivated by hostility and ill will toward Rumble because Rumble allows content creators to express views on the platform contrary to Defendants' partisan political agenda; (4) Defendants had a financial motive to publish defamatory falsehoods about Rumble; (5) Defendants refused to retract or correct their false and defamatory statements; and (6) Defendants failed to adhere to journalistic standards in researching, writing, and publishing their October 24, 2023 "news article."

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor, and against Defendants, as follows:

(1) awarding Rumble actual and presumed damages to be specifically determined at trial;

(2) awarding Rumble punitive damages;

(3) awarding Rumble all costs, disbursements, fees, and interest as authorized by Florida Law and Rules;

(4) awarding Rumble a narrowly-tailored injunction prohibiting Defendants from repeating any statement adjudicated to be false and defamatory; and

(5) such other and additional remedies as the Court may deem just and proper.

A JURY TRIAL IS DEMANDED.

Dated: April 26, 2024

Respectfully Submitted,

/s/ *Jered T. Ede*
Jered T. Ede (Florida Bar No. 1045898)
Elizabeth M. Locke (admitted *pro hac vice*)
Nicholas J. Brechbill (admitted *pro hac vice*)
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
Telephone: (202) 628-7400
Email: jered@clarelocke.com
Email: libby@clarelocke.com
Email: nick@clarelocke.com

*Attorneys for Plaintiff Rumble Inc.*